UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: <u>24-20201-CR-WILLIAMS</u>

UNITED STATES OF AMERICA

vs.

DAVID KNEZEVICH,
    a/k/a "DAVID KNEZEVIC,"
    a/k/a "DUSAN KNEZEVIC,"

    **Defendant.**
_____/

**RESPONSE IN OPPOSITION TO DEFENDANT'S
OBJECTION TO THE MAGISTRATE JUDGE'S ORDER OF DETENTION**

The United States of America, through undersigned counsel, hereby opposes David Knezevich's (the "Defendant") Objection to the Magistrate Judge's Order of Detention. As demonstrated at the Detention Hearing, the Defendant is both a serious risk of flight and danger and should not be released into the community. Accordingly, the Defendant's Objection[1] should be overruled.

**I. FACTUAL BACKGROUND**

    **a. Charges**

On May 4, 2024, the Defendant was arrested for kidnapping, in violation of 18 U.S.C. § 1201(a), pursuant to a criminal complaint. *See* Criminal Complaint, Case No. 24-MJ-02896-REID. A grand jury sitting in the Southern District of Florida subsequently returned an indictment against the Defendant on the same charge on May 15, 2024. As explained below, the charges stemmed from the Defendant's kidnapping of his wife (the "Victim) while she was in Madrid,

---

[1] Although titled an "objection," the government understands the Defendant's filing to be a motion to revoke the Magistrate Judge's Detention Order (DE 17). *See* 18 U.S.C. § 3145(b).

Spain, after their separation.

b. **Detention Hearing**

After the Defendant's arrest, the government moved to detain him pending trial on the grounds that he is both a serious risk of flight and a danger to the community. *See* DE 7; *see also* 18 U.S.C. § 3142(f)(1)(B) (permitting the government to move for pre-trial detention where the Defendant is charged with an offense for which the maximum sentence is life imprisonment); 18 U.S.C. § 3142(f)(2)(A) (permitting the government to move for pre-trial detention where there is a serious risk that the defendant will flee).

On May 10, 2024, the Magistrate Judge held a detention hearing. At the detention hearing, the government established the following facts via proffer, which were affirmed by FBI Special Agent M. Alexandra Montilla. On or about December 26, 2023, the Defendant's wife, a 40-year-old female and United States citizen (the "Victim) flew out of Miami International Airport to Madrid, Spain. Thereafter, on February 2, 2024, the Victim's friends and family, who had previously communicated with her while she was in Spain, lost contact with her. Spanish authorities were alerted to the Victim's disappearance by one of her friends after the Victim failed to show up for a previously planned trip to Barcelona. The last non-automatic activities on the Victim's Bank of America account were for a flower purchase on February 2, 2024, the day she was last seen entering her apartment, as well as a charge from a restaurant in Madrid on February 10, 2024, for failing to show up to a dinner reservation that she had previously made.

On February 4, 2024, Spanish firefighters entered the Victim's apartment for a welfare check and discovered that she was not in the apartment. Subsequently, Spanish law enforcement searched the Victim's apartment pursuant to a court order and discovered that her cell phone, laptop computer and respective chargers were missing. At the time of her disappearance, the

Victim was married to the Defendant, a Yugoslavian-born naturalized citizen of the United States. According to the Victim's friends and family, the Victim and the Defendant were separated and planned to divorce. The separation was contentious because the Defendant did not want to split the marital assets evenly with the Victim. The Victim was very fearful of the Defendant.

An investigation into the Victim's disappearance by Spanish authorities revealed that on February 2, 2024, the security camera at the Victim's apartment building in Madrid captured her entering the building around 1:42 p.m. This is the last time she has ever been seen. The same day, at approximately 9:27 p.m., the building surveillance camera captured a male, believed by law enforcement to be the Defendant, waiting outside the entrance to the Victim's apartment building. The male is wearing a motorcycle helmet, a reflective vest, dark pants and gloves and is holding a white plastic bag giving the impression that he is a food delivery service provider. As two women exit the building, the male uses the opportunity to enter the building. He remains downstairs briefly outside of the video surveillance cameras and then proceeds to go up the stairs.

A short time thereafter, the male is captured descending the stairs while holding a can of spray paint with a strip of duct tape now affixed to the chest of his vest. The male sprayed the lens of the surveillance camera with the spray paint to disable it. The male then returns to the front door that he entered the building through, pauses for a moment, seemingly to fasten a piece of duct tape to the lock to prevent the lock from engaging to allow subsequent entry to the building, and then exits the front door of the apartment. At approximately 9:52 p.m., the male reenters the apartment building and appears to enter the elevator with an object. Based on the movement of the object, its proximity to the male and its shape, it appears to be a rolling suitcase. The male then leaves the elevator with the suitcase at approximately 9:55 p.m.

Based on the surveillance footage, Spanish authorities were able to identify the brand of

spray paint used to disable the security camera. Law enforcement then determined that a retailer in Madrid had reported a sale of that particular brand of spray paint on February 2, 2024, the same day the Victim is last seen. Surveillance footage from the retailer clearly depicts the Defendant purchasing the spray paint along with two rolls of duct tape in cash on February 2, 2024, around noon.

Additionally, a Columbian woman, who the Defendant met on a dating app in October of 2023, advised law enforcement that on February 3, 2024, the day after the Victim is last seen, the Defendant contacted her via WhatsApp and asked her for help in translating a message into, quote, perfect Colombian for a friend in Serbia is writing a script about a Colombian character. Notably, the Victim in this case was born and raised in Colombia and is fluent in Spanish. She later became a United States citizen. The individual then translates two messages for the Defendant.

The first message stated, "I met someone wonderful, he has a summer house about two hours from Madrid. We are going there now and I will spend a few days there. There is barely a signal though, I'll call you when I come back. Kisses." The second message stated, "Yesterday after therapy I needed a walk and he approached me on the street. Amazing connection, like I never had before." Those messages are the last messages that family and friends received from the Victim. The messages were sent from the Victim's phone on February 3, 2024, the day after she is last seen entering her apartment building. Law enforcement has no reason to believe that the Victim or this Colombian woman ever knew one another. The only connection between the Victim and the Colombian woman is the Defendant.

Records from Customs and Border Protection revealed that on January 27, 2024, the Defendant traveled by airplane from Miami International Airport to Istanbul, Turkey. He subsequently traveled out of Serbia into Croatia by a vehicle via a border crossing on January 30,

2024, and returned to Belgrade, Serbia from Croatia by vehicle also through border crossing on February 5, 2024. The Defendant rented a Peugeot 308 (a vehicle) in Serbia from on or about January 29, 2024, through on or about March 15, 2024. When the Defendant returned the vehicle, the windows had been tinted, there was an indication that the license plates had been -- the license plate frames had been changed, and two stickers had been removed from the vehicle. The vehicle had traveled approximately 7,677 kilometers while in the Defendant's possession.

Spanish authorities also advised that around the relevant time, which is approximately February 1 to February 2, 2024, an individual filed a complaint that both of his license plates were stolen off of his vehicle in Spain. Spanish authorities ran a search in their plate reader database for that stolen plate and learned that the plate was present on the street where the Victim's apartment was located. The stolen plate passed through two tollbooths in the middle of the night on February 2, 2024, into February 3, 2024. Video from the tollbooths revealed that the plates were attached to Peugeot 308 with tinted windows, which is the type of vehicle that the Defendant rented in Serbia. Because of the tint, the driver is not visible. One of the tollbooths was in a town which is just outside of Madrid.

More license plate readers positioned the stolen plates within a four-minute walk of a motorcycle accessory shop in Madrid on February 2, 2024. Around the same time the vehicle was located there, an individual bought a motorcycle helmet and a reflective vest at the store in cash at approximately 5:10 p.m. The helmet purchased is the same brand of helmet, make and model, if you will, that the Defendant wore while spray painting the surveillance cameras in the Victim's apartment.

Additionally, the Defendant's Facebook account used an IP address in an area of Spain just north of Madrid on February 1, 2024, the day before the Victim's disappearance. The Defendant

was born in Yugoslavia, as noted in the Pretrial Services report. He's traveled to over 30 countries, most recently Serbia where he remained until he flew into Miami International Airport on Saturday May 4, 2024, and at that point he was arrested.

  c. The Pre-Trial Services Report

On May 6, 2024, a Pre-trial Services ("PTS") Officer interviewed the Defendant and authored a report ("PTS Report"). The PTS Report noted the Defendant was born in Serbia and has traveled to over 30 countries in the last decade. PTS Report at 1. It also noted that both of his parents reside in Serbia, that he has no children, and did not know the contact number for his brother, who resided in Miami. *Id.* at 1-2. The Defendant reported $30,000 a month in income and a net worth of over $2 million dollars.[2] *Id.* at 2-3. The PTS Officer found that the Defendant posed a risk of non-appearance for several reasons, including his strong family ties to Serbia and reported foreign travel. *Id.* at 4. The PTS Officer also found that the Defendant posed a risk of danger for multiple reasons, including the offense charged. *Id.* Despite these findings, the PTS Officer nevertheless recommended a bond. Notably, at the time the PTS Report was authored, the PTS Officer did not know the circumstances of the Defendant's alleged offense as the Criminal Complaint was under seal.

## II. LEGAL STANDARD

Upon being ordered detained pending trial, a defendant may move to revoke his order of detention. *See* 18 U.S.C. § 3145(b). The district court must conduct a *de novo* review of the detention determination. *See United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985); *United States v. Niles*, 874 F. Supp. 1372, 1374 (N.D. Ga. 1994) (citing *United States v. King*, 849

---

[2] As discussed herein, the government has also learned that the Defendant holds mortgage notes in the amount of $3.4 million dollars, as well as an escrow account with approximately $214,000. However, the Defendant did not report these assets to PTS.

F.2d 485, 490 (11th Cir. 1988)). Review by the district court contemplates an "independent consideration of all facts properly before it." *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) (citing *Hurtado*, 779 F.2d at 1480-81). If the district court concludes after a careful review of both the parties' papers and the evidence presented at the detention hearing that the evidence supports the Magistrate Judge's findings of fact, and if the district court concludes that the Magistrate Judge correctly applied the law, "[t]he court may then explicitly adopt the magistrate's pre-trial [release] order." *King*, 849 F.2d at 490. However, if necessary, to the resolution of an essential issue of fact, the district court may marshal further evidence by convening a hearing. *Id.* at 491.

In moving for pretrial detention, the government must establish that the Defendant is a danger to the community by clear and convincing evidence *or* a flight risk by a preponderance of the evidence. *King,* 849 F.2d at 489-491. The government need only demonstrate one or the other to justify detaining the Defendant pending trial. *Id.* at 488. In determining whether there are conditions of release that will reasonably assure the Defendant's appearance as required and safety of the community, the court must consider several factors, including the nature and circumstances of the offense charged; the weight of the evidence against the Defendant; the Defendant's history and characteristics; and the nature and seriousness of the danger to any person or the community that would be posed by the Defendant's release. 18 U.S.C. § 3142(g).

### III.   ARGUMENT

The evidence presented at the detention hearing firmly established that the Defendant is both a risk of flight and a danger to the community[3] and all of the § 3142(g) factors heavily weigh

---

[3] The Magistrate Judge found that the Defendant was a serious risk of flight, but not a danger to the community. Nevertheless, because this Court conducts a *de novo* review, the government is reiterating its argument that the Defendant is also a danger to the community.

in favor of detention.

First, the nature and circumstances of the offense demonstrate that the Defendant deliberately attempted to conceal his crimes, indicating that he poses a serious risk of nonappearance. Specifically, rather than flying directly into Spain, the Defendant sought to conceal his travel to Madrid by flying into Istanbul, Turkey, and then driving over 5,000 kilometers through multiple countries to Madrid. During his journey, the Defendant used at least two stolen license plates—one from Serbia[4] and one from Spain—in order to further obscure his travel to Madrid. The Defendant also purchased the spray paint and duct tape he used to commit the kidnapping in cash, making it more difficult to track his movements. Moreover, his taking of the Victim, and the fact that she has not been seen for three months, reveals that he is a danger to community.

The strength of the evidence in this case coupled with the penalties the Defendant is facing also provides the Defendant a strong incentive to flee. *See United States v. Burstyn*, No. 04-CR-60279-ALL, 2005 WL 2297605, at *4 (S.D. Fla. Mar. 18, 2005) ("The Court further notes that the potential penalty faced by a Defendant is an incentive to consider flight."). The Defendant is charged with kidnapping, in violation of 18 U.S.C. § 1201(a), which carries a maximum sentence of life imprisonment, and his guidelines are currently conservatively estimated to be 10 to 12 years imprisonment. If the Defendant is ultimately charged with the Victim's death, the Defendant faces a mandatory sentence of life imprisonment or death. While the Defendant is presumed innocent, the evidence in this case is strong. As summarized by the Magistrate Judge, "A great deal of circumstantial evidence supports the government's complaint, including Defendant's documented

---

[4] Since the Detention Hearing, the government has learned that the Defendant also used a stolen Serbian license plate during his travel to Madrid in addition to the stolen Spanish license plate that he used while in Spain.

travel through extraordinary means from the United States to Turkey and then to Spain." DE 17 (Detention Order) at 2.  As attested to by the agent during the Detention Hearing, the Defendant is clearly depicted purchasing spray paint and duct tape in Madrid, Spain, the day the Victim was last seen alive, and it is undeniable that the Defendant bears a strong resemblance to the individual who spray painted the surveillance cameras at his wife's apartment building:

**Knezevich in a Hardware Store in Madrid, Spain, on February 2, 2024**





**Knezevich Entering the Victim's Apartment on the Evening of February 2, 2024**



**Knezevich Spray painting the Surveillance Camera in the Victim's Apartment on the Evening of February 2, 2024**



11

**Knezevich on May 4, 2024, after his Arrest**



The Defendant's significant foreign ties, lack of ties to this District, and assets also make him a serious risk of flight. Contrary to the Defendant's assertions, the Defendant is in fact a Serbian citizen and has a current Serbian passport that does not expire until 2032. *See* Exhibit A (Letter from Embassy of the Republic of Serbia Confirming Knezevich's Serbian Citizenship and Passport). The PTS report also indicates that the Defendant advised that he has traveled to over

30 countries in the past decade and both of his parents reside in Serbia. *See* PTS Report at 2.[5]

While the Defendant advised PTS that he has a brother in Miami, Florida, this is not a basis to give the Defendant a bond as the Defendant's brother advised federal agents that he was estranged from the Defendant. *See* Exhibit B (FBI 302 dated March 8, 2024). Specifically, the Defendant's brother ("U.K.") advised that he reached out to the Defendant after being contacted by the Victim's brother about her disappearance, which U.K. was previously unaware of. *Id*. *U.K. did not have the Defendant's phone number*, so he contacted his mother who provided it to him. *Id.* U.K. called his brother and "described the initial call as awkward *because he has not spoken to his brother in many years." Id.* U.K. was uncertain if he would be able to identify the Victim in photos *since it had been so long since he had last seen the Defendant and the Victim*. *Id.* Thus, as the Defendant's wife remains missing and he has no children, the Defendant's only familial connection to this District appears to be his estranged brother whom he had no contact with for the last several years until very recently.

Lastly, the Defendant's financial means give him the ability to flee to avoid criminal prosecution, and as discussed above, he has shown that he will go to great lengths to operate without being detected by law enforcement. According to the PTS report, the Defendant reported an estimated net worth of $2,546,370. PTS Report at 3. While this net worth alone would provide the Defendant the ability to flee, the government has also learned that the Defendant sold seven residential properties between December 2023 and February 2024, just prior to the Victim's disappearance, for a total of $6,686,500.[6] *See* Exhibits C – I (Public Records from Broward County Property Appraisers Website). The Defendant then loaned the bulk of the proceeds of

---

[5] Prior to the Defendant's arrest, his prior counsel also advised Fox News that the Defendant "lives in Serbia" and "has an apartment" there. *See Husband of Florida woman missing in Spain denies involvement, attorney says*, Feb 21, 2024, https://www.foxnews.com/video/6347333182112.
[6] These sales also drastically reduced the Defendant's ties to this District.

13

these sales to the purchaser of the properties. *See* Exhibits J – Q. The mortgages for these properties are worth $3,486,489.38 and are payable upon a specified date in 2027 "or upon either the Sale or Refinance of the property, whichever event occurs first." *See, e.g.,* Exhibit N at 2. As such, these mortgages could be repaid at any time if the property is sold by the borrower. The mortgages held by the Defendant are an asset which the Defendant failed to report to PTS, as is the interest income he is earning from these mortgages, which also does not appear on the PTS report. *See, e.g.,* Exhibit N at 22. Moreover, on June 6, 2024, an FBI Special Agent spoke with a title agent involved in the sale of several properties sold by the Defendant, who advised that he is holding $214,000 in an escrow account for the Defendant. This money is also not reported in the PTS Report.

Accordingly, the Defendant's meager ties to this district (the presence of his estranged brother) are substantially outweighed by the significant prison sentence the Defendant is facing, as well as his foreign ties, substantial assets, and inclination to evade law enforcement. Thus, the record clearly supports the Magistrate Judge's finding that the Defendant is a serious risk of flight and would additionally support a finding by this Court that he is a danger to the community. Therefore, the Defendant's request for a bond should be denied, and he should remain detained pending trial.

                Respectfully submitted,

                MARKENZY LAPOINTE
                UNITED STATES ATTORNEY

By:   **Lacee Elizabeth Monk**
      Lacee Elizabeth Monk
      Assistant United States Attorney
      Florida Bar No. 100322
      U.S. Attorney's Office
      99 N.E. 4th Street, Miami, FL 33132-2111
      (305) 961-9427| Lacee.Monk@usdoj.gov