UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FORIDA
CASE NO. 24-cr-20201-KMW

UNITED STATES OF AMERICA,

v.

DAVID KNEZEVICH,

     Defendant.

_____/

## MOTION TO REOPEN DETENTION HEARING

     Defendant, DAVID KNEZEVICH, by and through undersigned counsel, respectfully files this Motion to Re-Open the Detention Hearing before Magistrate Judge Torres, pursuant to 18 U.S.C. § 3142(f). In support of this Motion, Defendant states:

## ORIGINAL HEARING BEFORE MAGISTRATE

     1.     On May 10, 2024, Defendant appeared at a detention hearing before Magistrate Judge Torres. [D.E. 9]. At the hearing, Magistrate Judge Torres ordered detention on the basis that Defendant was a "risk of flight." *Id.* A copy of the transcript from the hearing is attached as **Exhibit A**.

     2.     Notably, Magistrate Judge Torres rejected the government's separate argument that detention was warranted because Defendant is a danger to the community. [Ex. A at 46:5-12] ("Well, I can't detain based on danger because I think the evidence -- I can't make a finding sufficient to detain him on danger . . . even in the light most favorable to the government . . .); [*see also id.* at 53:9-13].

     3.     Magistrate Judge Torres candidly stated (more than once) that the decision whether to order detention based on risk of flight was "*a close call*" and could go either way. [Ex. A at T.

48:4-5; 51:3-6]. Magistrate Judge Torres also acknowledged that because *all the evidence* in the case against Defendant is circumstantial, this appears to be a defensible case. [*Id.* at 46:21-24].

4.      On June 3, 2024, Magistrate Judge Torres entered his written order of detention. [D.E. 17]. In the detention order, Magistrate Judge Torres determined that the factors enumerated in 18 U.S.C. § 3142(g) favored detention—in particular, the weight of the evidence and Defendant's history and characteristics. *Id.*

## BASIS TO REOPEN DETENTION HEARING

5.      The detention statute provides that a "hearing may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue. . ." 18 U.S.C. 3142(f).

6.      On June 17, 2024, the government began producing discovery to Defendant. This included approximately sixty-six FBI 302 reports written by Special Agent Montilla (the "302s"), who testified at the first detention hearing.

7.      The 302s were not available for consideration in cross-examining Special Agent Montilla at the first detention hearing.

8.      The 302s have a material bearing on detention, including on all the factors for consideration in 18 U.S.C. § 3142(g). First, they contain new information that contradicts the allegations in the complaint and indictment. Second, they contain additional information that makes clear the Court has no jurisdiction over this alleged kidnapping. Third, they contain information that makes clear, beyond any doubt, that the government is simply using this alleged

kidnapping charge as a means of detaining Defendant while it conducts a massive international murder investigation.[1]

9.     Moreover, the case law on jurisdiction cited by the government at the detention hearing—*U.S. v. Meyer*, 63 F.4th 1024 (5th Cir. 2023)—is totally inapposite. While the government represented *Meyer* was on all fours with this case, there are critical evidentiary differences, which was only further confirmed in the 302s. The government raised *Meyers* for the first time at the detention hearing. The defense was thus not able to respond to it in full but is now prepared to do so.

10.    In addition, undersigned counsel has learned more about Defendant's assets, which bear on his risk of flight. For example, the government argued at the first hearing that Defendant is a risk of flight because he has significant means. In fact, the government did not provide the Court with bank accounts or assets to support its position that Defendant is a "man of means." This is because there are no substantial "means" to show. Indeed, most of Defendant's "means" are tied up in second mortgages, and now that a conservatorship was opened by his wife's brother, Defendant does not have significant means at all. The property listed in the pretrial services report is not accurately portrayed. All the properties are heavily mortgaged. Many other assets are tied up in the conservatorship. Simply stated, Defendant does not have access to significant amounts of money. Defendant is far from "a man of means," as very few of his assets are liquid, and none of his assets are easily accessible.

11.    Defendant has never been charged with a crime. He was in Serbia when first notified by the Spanish police and others of the alleged disappearance of his wife. Knowing that

---

[1] For example, the defense notes that on every 302, including 302s written as recently as last week, it names the alleged crime as "Foreign Murder of a US National by a US National," referencing 18 U.S.C. 1119, rather than the kidnapping charge lodged against him.

there was an  ongoing investigation into his wife's alleged disappearance, he voluntarily returned to South Florida from Serbia .

12.     Finally, in the briefing on the defense's objection to the detention order, the government filed a response brief, [D.E. 20], that contained information contrary to the allegations in the complaint and indictment, particularly with respect to the timing of the alleged conduct and purported video recording time stamps. For example, in the government's complaint, it is alleged that the last time the victim is "seen alive" is at 2:20 p.m. on February 2, 2024, via camera footage at her apartment. [D.E. 2 at 2]. In its briefing, the government changes the time to 1:42 p.m., again via camera footage at her apartment. [D.E. 20 at 3]. There are similar disparities regarding Defendant's purported appearance on camera footage at the apartment. Obviously, these changes in the government's timeline were not known to the defense at the first detention hearing, as the response papers were not filed until after.

13.     For all these reasons, there is sufficient and just cause for Magistrate Judge Torres to reopen the detention hearing given new information that was not known to the defense during the first detention hearing, which bears on the weight of the evidence and the nature and circumstances of the alleged offense, upon which this Court issued its Order of Detention.

14.     Fairness requires reopening the hearing to complete the record, particularly given the longstanding principal that all accused are considered innocent until proven guilty, and pretrial release should only be denied in rare circumstances. *United States v. Sanchez-Martinez*, 2013 WL 3662871.

15.     The law favors pretrial release of defendants, *see, e.g., United States v. Bradshaw*, 2000 WL 1371517, at *3 (D. Kan. July 20, 2000), and "[t]he court must resolve all doubts regarding the propriety of release in the defendant's favor." *United States v. Morales*, 2012 WL

4

603520, at *1 (D. Kan. Feb.24, 2012), *citing United States v. Chavez–Rivas*, 536 F.Supp.2d 962, 965 (E.D.Wis.2008).

16.     Magistrate Judge Torres said more than once that whether to grant bond in this matter was a ***very close call***.  Defendant submits that "close calls" should be resolved in favor of releasing a defendant before trial, in accordance with *Morales. See Morales*, 2012 WL 603520, at *1 ("The court must resolve all doubts regarding the propriety of release in defendant's favor.").

17.     Prior to filing this Motion, undersigned counsel met and conferred with AUSA Lacee Monk pursuant to the Local Rules. AUSA Monk indicated that she opposes this Motion.

WHEREFORE, Defendant respectfully requests that the detention hearing be reopened given new evidence and new information not known to Defendant during the first hearing.

Dated: June  18, 2024

**SALE & WEINTRAUB, P.A.**
2 S. Biscayne Boulevard, 21st Floor
Miami, FL 33131
**By: /s/ Jayne C. Weintraub**
Jayne C. Weintraub
Florida Bar No. 320382

**NELSON MULLINS**
2 S. Biscayne Boulevard, 21st Floor
Miami, FL 33131
**By: /s/ Christopher Cavallo**
Christopher Cavallo
Florida Bar No. 0092305

**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd., Suite 1400
West Palm Beach, Florida 33401
**By: s/Bruce A. Zimet, Esq.**
Florida Bar No. 0225053

5

# EXHIBIT "A"

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA
 2    --------------------------------x
                                            24-MJ-02896(LMR)
 3    UNITED STATES OF AMERICA,

                                            United States Courthouse
 4                                          Miami, Florida

 5              -against-                   May 10, 2024

 6    DAVID KNEZEVICH,

 7              Defendant.
      --------------------------------x
 8
           TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
 9            BEFORE THE HONORABLE EDWIN G. TORRES
                      CHIEF MAGISTRATE JUDGE
10

11    APPEARANCES:

12    For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                 Southern District of Florida
13                               99 N.E. 4th Street
                                 Miami, Florida 33132
14                               BY:  LACEE E. MONK, AUSA

15

16    For the Defendant:        SALE & WEINTRAUB, P.A.
                                 One Biscayne Tower
17                               2 South Biscayne Boulevard, 21st Fl.
                                 Miami, Florida 33131
18                               BY:  JAYNE C. WEINTRAUB, ESQ.

19

20

21    Transcribed By:           Georgette K. Betts, RPR, FCRR, CCR
                                 Phone:   (201)314-3902
22                               Email:  Georgetteb25@gmail.com

23

24          (Proceedings recorded by electronic sound recording.)

25
```

PROCEEDINGS

1          THE COURTROOM DEPUTY:  Calling case United States

2    versus David Knezevich, case number 24-2896, Judge Reid.

3          MS. MONK:  Good afternoon, your Honor.  Lacee Monk

4    on behalf of the United States.

5          MS. WEINTRAUB:  Good afternoon, your Honor.  Jayne

6    Weintraub on behalf of the defendant.  I entered a temporary

7    appearance last night.

8          THE COURT:  Thank you, good afternoon.

9          MS. WEINTRAUB:  Good afternoon, Judge.

10          THE COURT:  We are set for a detention hearing for

11    Mr. Knezevich.

12          MS. WEINTRAUB:  Yes, Judge.

13          THE COURT:  Is the government ready to proceed?

14          MS. MONK:  Yes, we are, your Honor.  The government

15    is prepared to proceed by proffer.  I do have FBI Special

16    Agent Alexandra Montilla here available for cross-examination.

17          Before I get into the factual proffer, the

18    government is moving for detention based upon both a serious

19    risk of flight and danger to the community.  The statutory

20    basis for that is 3142(f)(1)(B), an offense for which the

21    maximum sentence is life imprisonment or death.  And

22    3142(f)(2)(A), a serious risk that such person will flee.

23          Kidnapping has a stat max of life and as of right

24    now we conservatively estimate the defendant's guidelines to

25    be 121 to 151 months, which is roughly 10 to 12 years.  So

PROCEEDINGS

1    with that I'll move forward with the proffer, your Honor.

2                On or about December 26th, 2023, the defendant's

3    wife, a 40-year old female and United States citizen, who I'll

4    refer to as the victim going forward, flew out of Miami

5    International Airport to Madrid, Spain.

6                Thereafter, on or about February 2nd, 2024 the

7    victim's friends and family, who had previously communicated

8    with her while she was in Spain, lost contact with her.

9    Spanish authorities were alerted to the victim's disappearance

10   by one of her friends after the victim failed to show up for a

11   previously planned trip to Barcelona.

12               The last non-automatic activities on the victim's

13   Bank of America account were for a flower purchase on or about

14   February 2nd, 2024, the day she was last seen entering her

15   apartment.  As well as a charge from a restaurant in Madrid on

16   or about February 10, 2024 for failing to show up to a dinner

17   reservation that she had previously made.

18               On or about February 4th, 2024 Spanish firefighters

19   entered the victim's apartment for a welfare check and

20   discovered that she was not in the apartment.  Subsequently,

21   Spanish law enforcement searched the victim's apartment

22   pursuant to an order and discovered that her cell phone,

23   laptop computer and respective chargers were missing.

24               At the time of her disappearance, the victim was

25   married to the defendant, Mr. Knezevich, a Yugoslavian born

4

PROCEEDINGS

1  naturalized citizen of the United States.  According to the

2  victim's friends and family, the victim and the defendant were

3  separated and planned to divorce.  The separation was

4  contentious because the defendant did not want to split the

5  marital assets evenly with the victim.  The victim was very

6  fearful of the defendant.

7          An investigation in to the victim's disappearance by

8  Spanish authorities revealed that on or about February 2nd,

9  2024, the security camera at the victim's apartment building

10  in Madrid captured her entering the building around 1:42 p.m.

11  This is the last time she has ever been seen.

12          The same day, at approximately 9:27 p.m., the

13  building surveillance camera captured a male, believed by law

14  enforcement to be the defendant, waiting outside the entrance

15  to the victim's apartment building.  The male is wearing a

16  motorcycle helmet, a reflective vest, dark pants and gloves

17  and is holding a white plastic bag giving the impression that

18  he is a food delivery service provider.  As two women exit the

19  building, the male uses the opportunity to enter the building.

20  He remains downstairs briefly outside of the video

21  surveillance cameras and then proceeds to go up the stairs.  A

22  short time thereafter the male is captured descending the

23  stairs while holding a can of spray paint with a strip of duct

24  tape now affixed to the chest of his vest.  The male sprayed

25  the lens of the surveillance camera with the spray paint to

PROCEEDINGS

1   disable it.  The male then returns to the front door that he

2   entered the building through, pauses for a moment, seemingly

3   to fasten a piece of duct tape to the lock to prevent the lock

4   from engaging to allow subsequent entry to the building, and

5   then exits the front door of the apartment.

6        At approximately 9:52 p.m. the male reenters the

7   apartment building and appears to enter the elevator with an

8   object.  Based on the movement of the object, its proximity to

9   the male and its shape, it appears to be a rolling suitcase.

10  The male then leaves the elevator with the suitcase at

11  approximately 9:55 p.m.

12       Based on the surveillance footage, Spanish

13  authorities were able to identify the brand of spray paint

14  used to disable the security camera.  Law enforcement then

15  determined that a retailer in Madrid had reported a sale of

16  that particular brand of spray paint on or about February 2nd,

17  2024, the same day the victim is last seen.  Surveillance

18  footage from the retailer clearly depicts the defendant

19  purchasing the spray paint along with two rolls of duct tape

20  in cash on or about February 2nd, 2024 around noon.

21       Additionally, a Columbian woman, who the defendant

22  met on a dating app in October of 2023, advised law

23  enforcement that on or about February 3rd, 2024, the day after

24  the victim is last seen, the defendant contacted her via

25  WhatsApp and asked her for help in translating a message into,

6

PROCEEDINGS

1   quote, perfect Colombian for a friend in Serbia is writing a

2   script about a Colombian character.  Notably, the victim in

3   this case was born and raised in Colombia and is fluent in

4   Spanish.  She later became a United States citizen.

5        The individual then translates two messages for the

6   defendant.  The first, I met someone wonderful, he has a

7   summer house about two hours from Madrid.  We are going there

8   now and I will spend a few days there.  There is barely a

9   signal though, I'll call you when I come back.  Kisses.

10       The second message:  Yesterday after therapy I

11  needed a walk and he approached me on the street.  Amazing

12  connection, like I never had before.

13       Those messages are the last messages that family and

14  friends received from the victim.  The messages were sent from

15  the victim's phone on February 3rd of 2024, the day after she

16  is last seen.  Law enforcement has no reason to believe that

17  the victim or this Colombian woman ever knew one another.  The

18  only connection is the defendant.

19       Records from Customs and Border Protection revealed

20  that on or about January 27, 2024 the defendant traveled by

21  airplane from Miami International Airport to Istanbul, Turkey.

22  He subsequently traveled out of Serbia into Croatia by a

23  vehicle via a border crossing on January 30th of 2024, and

24  returned to Belgrade, Serbia from Croatia by vehicle also

25  through border crossing on February 5th, 2024.

7

PROCEEDINGS

1          The defendant rented a Peugeot 308, which is a

2     vehicle in Serbia from approximately on or about January 29th,

3     2024 through approximately March 15th of 2024.

4          When the defendant returned the vehicle, the windows

5     had been tinted, there was an indication that the license

6     plates had been -- the license plate frames had been changed,

7     and two stickers had been removed from the vehicle.  The

8     vehicle had traveled approximately 7,677 kilometers while in

9     the defendant's possession.

10          Spanish authorities also advised that around the

11     relevant time, which is approximately February 1st to

12     February 2nd, an individual filed a complaint that both of his

13     license plates were stolen off of his vehicle in Spain.

14     Spanish authorities ran a search in their plate reader

15     database for that stolen plate and learned that the plate was

16     present on the street where the victim's apartment was

17     located.

18          The stolen plate passed through two tollbooths in

19     the middle of the night on February 2nd into February 3rd.

20     Video from the tollbooths revealed that the plates were

21     attached to Peugeot 308 with tinted windows, which is the type

22     of vehicle that the defendant rented in Serbia.  Because of

23     the tint, the driver is not visible.  One of the tollbooths

24     was in a town which is just outside of Madrid.

25          More license plate readers positioned the stolen

8

PROCEEDINGS

1    plates within a four-minute walk of a motorcycle accessory

2    shop in Madrid on February 2nd, 2024.

3           Around the same time the vehicle was located there,

4    an individual bought a motorcycle helmet and a reflective vest

5    at the store in cash at approximately 5:10 p.m.  The helmet

6    purchased is the same brand of helmet, make and model, if you

7    will, that the defendant wore while spray painting the

8    surveillance cameras in the victim's apartment.

9           Additionally, the defendant's Facebook account used

10   an IP address in an area of Spain just north of Madrid on

11   February 1st of 2024, the day before the victim's

12   disappearance.

13          The defendant was born in Yugoslavia, as noted in

14   the Pretrial Services report.  He's traveled to over 30

15   countries, most recently Serbia where he remained until he

16   flew into Miami International Airport on this Saturday May 4th

17   of 2024 and at that point he was arrested.  And that concludes

18   the government's proffer.

19          THE COURT:  Counsel.

20          MS. WEINTRAUB:  Yes, Judge, I would like to cross

21   examine the agent if I might.

22          THE COURT:  Go ahead and call the agent.

23          (The witness takes the stand.)

24          THE COURTROOM DEPUTY:  Please raise your right hand.

25          (Continued on next page.)

MONTILLA – CROSS – MS. WEINTRAUB

1    **ALEXANDRA MONTILLA**, called as a witness, having been first

2    duly sworn/affirmed, was examined and testified as follows:

3              THE WITNESS:  I do.

4              THE COURTROOM DEPUTY:  Please have a seat, ma'am,

5    and state and spell your name for the record.

6              THE WITNESS:  Alexandra Montilla.

7    A-L-E-X-A-N-D-R-A.  Last name, M-O-N-T-I-L-L-A.

8              THE COURTROOM DEPUTY:  And your agency, ma'am?

9              THE WITNESS:  Federal Bureau of Investigation.

10             THE COURTROOM DEPUTY:  Thank you.

11             MS. WEINTRAUB:  May I proceed?

12   CROSS-EXAMINATION

13   BY MS. WEINTRAUB:

14   Q    Agent Montilla, you are not the agent who authored the

15   complaint in this case, are you?

16   A    No.

17   Q    Are you -- what was your involvement in this case if you

18   did not author the complaint?

19   A    I am the case agent along with Agent Ules{ph}.

20   Q    Can you please tell the Court, since we didn't share,

21   what evidence specifically do you have that the defendant

22   seized, confined, abducted or carried away Ana Maria

23   Knezevich?  Do you have any?

24   A    So all the information that the prosecutor just read, all

25   the information from the Spanish National Police where he's

10

MONTILLA – CROSS – MS. WEINTRAUB

1  spotted in the hardware store buying the spray paint, the duct

2  tape, then a man similar to him is seen spraying the

3  surveillance camera where Ana Maria was staying at.  The car

4  that he rented --

5  Q    Agent, I don't mean to interrupt you, but I would like to

6  go one at a time because I don't want a narrative answer.

7          So, first, if you could just give me a yes or no and

8  answer my question --

9  A    Can you repeat the question.

10 Q    -- and if your answer is everything the prosecutor just

11 said that's fine, but I just want to get a clean record and I

12 don't want to be interrupting you, so I'm going to remind you

13 of the question.

14 A    Can you repeat the question?

15 Q    Yes, please.  Thank you.

16         So the question is, what specific evidence do you

17 have that David Knezevich seized, confined, abducted or

18 carried away Ana Maria?  Do you have any specific evidence of

19 those things that I just mentioned?

20 A    Again, I can go through all the evidence we have that

21 leads to suspect that he did kidnap her.

22 Q    Okay.  Fair to say you can -- as of today you have not

23 located her, correct?

24 A    Ana Maria is still missing.

25 Q    There was never any ransom notice --

MONTILLA - CROSS - MS. WEINTRAUB

1    THE COURT:  Have any efforts been made to locate

2    her?  Are there still ongoing efforts to locate her?

3    THE WITNESS:  Yes, there are efforts.  We're still

4    looking for her.

5    Q    Has there been any ransom demand by anybody?

6    A    No.

7    Q    Was there ever any single person questioned in exchange

8    for her return?

9    A    No.

10   Q    So your evidence basically is that on February 2nd, the

11   last time she was in contact with a family -- by the way

12   before that, do you know how often she was in contact with her

13   family?

14   A    Often.

15   Q    Daily, weekly, monthly, do you know?

16   A    Often, might be daily, every two days.  I mean often.

17   And with her friends very often.

18   THE COURT:  What was she doing in Madrid, do you

19   know?

20   THE WITNESS:  They were in the process of getting a

21   divorce and she feel her life was threatened by David so she

22   went to Spain to live far away from David.

23   BY MS. WEINTRAUB:

24   Q    Okay.  So let's --

25   THE COURT:  Does she have family in Spain or

MONTILLA - CROSS - MS. WEINTRAUB

1   something?

2          THE WITNESS:  No.  She had a lot of friends.

3   Q    Did she have a boyfriend there?

4   A    No, no that I know of.  I know she had friends,

5   girlfriends.

6   Q    Do you know if she was dating people and had boyfriends,

7   or you don't know that?

8   A    Yes, she dated.

9   Q    Did the Spanish authorities interview any other men that

10  she had been with?

11  A    Yes.  All of them.

12  Q    How many were there?

13  A    I don't know exactly, but I know they interviewed all of

14  them since she had gotten to Spain.

15  Q    Now you said that there was a divorce that was going on

16  that was very contentious?

17  A    They had agreed to get a divorce, yes.

18  Q    Okay.  Do you have any evidence other than a -- I'm

19  thinking for the right word -- an angry family member that

20  might have a reason to not be happy with the situation, other

21  than a family member telling you that it was a contentious

22  divorce proceeding that was about to happen, do you have any

23  other evidence?

24  A    Yes.  I have numerous texts and audios from Ana to her

25  friends stating that it was an ugly divorce.

13

MONTILLA - CROSS - MS. WEINTRAUB

1   Q    Do you also have texts from Ana with David including --

2   and lawyers on February -- on January 30th, February 1st,

3   February 2nd, in a very amicable manner?

4   A    No, that's -- that's information I'm not allowed to --

5   that's privileged information.

6   Q    You do not -- you do not have any --

7   A    With the attorneys?  That's privileged information I

8   wouldn't have that.

9   Q    Were you --

10            THE COURT:  Let me --

11   Q    You said you didn't --

12            THE COURT:  Let me rephrase the question.  Do you

13   have any text messages shortly before the victim disappeared

14   with this defendant?

15            THE WITNESS:  No.

16   Q    Did you see any text messages on her WhatsApp

17   application?

18   A    I do have messages from her.

19   Q    And are you telling this court under oath that there are

20   no messages that indicate that amicable discussion between

21   David and Ana as recently as January 30th, February 1st, and

22   2nd --

23   A    I do not have that --

24   Q    Let me finish the question.

25   A    -- in my possession.

14

MONTILLA - CROSS - MS. WEINTRAUB

1   Q    I'm sorry.

2          Are you telling this court that you did not see any

3   communications between Ana and David from January 30th,

4   February 1st and 2nd regarding a piece of property that was

5   going to be sold?

6   A    I don't have that in my possession.  It might exist, I

7   just don't have that in my possession, or I haven't come

8   across it.

9   Q    That isn't the question.

10          THE COURT:  What else do you know about -- when you

11   say it was contentious, what other facts do you know that

12   leads you to conclude that?

13          THE WITNESS:  So I have audios from Ana to her

14   friends describing that she's feels threatened, she feel

15   endangered, that David didn't want to give her half of the

16   alimony of the divorce.  That he didn't want her to go to a

17   different attorney, and so forth.

18          THE COURT:  And what was the status of the actual

19   litigation, the divorce litigation?

20          THE WITNESS:  So she had given him an ultimatum of

21   February 1st to file and he had not met that deadline, so she

22   was upset basically.

23          THE COURT:  How long had they been separated?

24          THE WITNESS:  She left for Spain December 26th.

25

MONTILLA - CROSS - MS. WEINTRAUB

1  BY MS. WEINTRAUB:

2  Q    Are you telling this court that there were divorce

3  proceedings?

4  A    They were in the process.

5  Q    What does that mean?

6  A    That they were in talks of going forward with the

7  divorce.

8         THE COURT:  But had a divorce petition --

9         THE WITNESS:  I don't -- I don't the papers had not

10  been filed.

11        THE COURT:  Okay.

12  BY MS. WEINTRAUB:

13  Q    So there was not a divorce proceeding, right?

14  A    No.

15  Q    And the only evidence that anything was contentious is

16  from a family member that told you that she heard it from Ana?

17        MS. MONK:  Objection.  Misstatement of the evidence

18  and the testimony.

19        THE COURT:  She can answer it.  Overruled.

20        THE WITNESS:  Can you repeat the question?

21        MS. WEINTRAUB:  I don't think I ever got a very

22  specific answer to a specific question.  I'm going to try and

23  ask it again and I don't mean to be repetitive I'm trying to

24  get you to answer the question.

25  Q    You've reviewed text messages between Ana and other

16

MONTILLA - CROSS - MS. WEINTRAUB

1   people, yes?

2   A     Yes.

3   Q     You reviewed her WhatsApp application text messages

4   between Ana and other people, yes?

5   A     Yes.

6   Q     You reviewed text messages between Ana and David on

7   WhatsApp during the period the end of January beginning of

8   February, yes?

9   A     No, I haven't reviewed them.  I -- those -- the messages

10  I got from Ana were provided to me.

11  Q     By whom?

12  A     By friends and family members.

13  Q     So then -- okay, so let's -- I need to understand and I

14  want the judge to understand.  Did you review -- you only

15  reviewed a limited amount or a small amount that the family

16  gave you, is that what you're saying?

17  A     And friends.

18  Q     Okay, you didn't have access to it?

19        THE COURT:  In other words, have you already pulled

20  all her text messages for that period of time or her WhatsApp

21  messages through this service provider?

22        MS. MONK:  Judge, I'm sorry I think there's a

23  misunderstanding of how WhatsApp works and that is muddying

24  the waters in the questioning.

25        THE COURT:  All right, she can answer it.  Go ahead.

MONTILLA – CROSS – MS. WEINTRAUB

1     THE WITNESS:  No.  And the what's up[sic] we still

2  are in the works for that, we haven't received their return,

3  but what I reviewed was, yes, messages that were provided to

4  me by families and friends.

5     THE COURT:  Okay.

6  BY MS. WEINTRAUB:

7  Q   So let me ask you this:  If there was a message between

8  say Ana and somebody else about the sale of the property and

9  she was saying things like, whatever David thinks is fine,

10  would your testimony be different today?

11  A   No.

12  Q   It wouldn't?

13  A   No.

14  Q   Wouldn't that show that it wasn't so contentious and she

15  wasn't afraid and she's saying it depends on whatever David

16  wanted?

17  A   I have numerous messages where she's saying that she's

18  suicidal, that she's seeing therapy, that she's not doing

19  well.

20  Q   Do you -- okay, let's go back to the question and see if

21  we can get an answer.

22     First of all, do you know -- you talked about her

23  mental health.  Did you know that she was suicidal before?

24  A   Before what?

25  Q   Well, whenever you're reviewing messages, did you know

MONTILLA - CROSS - MS. WEINTRAUB

1   she suffered mental illness for years?

2   A    I knew -- no.  No.

3   Q    Do you know that she's been treated by several mental

4   health people, professionals, and on medication for years?

5   A    I was aware of that.  I just don't know specifically what

6   she was diagnosed with.

7   Q    Okay.  So when you say she was suicidal, that really was

8   part of her being for several years, it was not a new ideation

9   that came on February 2nd, was it?

10  A    She referred to being suicidal because of the issues she

11  was having with David.

12  Q    Let's talk about evidence.  The complaint says that on

13  February 2nd, the last that she was in contact with her

14  family, a male wearing a helmet, who has the same physical

15  characteristics as David, was entering her apartment building.

16       Do you remember that?

17  A    Correct.

18  Q    When you say -- when the agent wrote "physical

19  characteristics," what does that mean, same height?

20  A    Eyebrows, build, but most significantly the eyebrows, the

21  eyes and eyebrows.

22  Q    Okay.  There is no facial recognition, right?

23  A    No.

24  Q    You couldn't tell whether he had facial hair, a mustache

25  or a beard from this, could you?

MONTILLA - CROSS - MS. WEINTRAUB

1    A    No.

2    Q    Couldn't tell if he had hair or was bald, could you?

3    A    No.

4    Q    So he basically --

5         THE COURT:  In other words, you can see only the

6    front, the front part of --

7         THE WITNESS:  Yes, he had his mouth covered.

8         THE COURT:  Okay.

9         THE WITNESS:  The mouth covered and the helmet so

10   you can see his eyes and eyebrows.

11   Q    Okay.  So you really couldn't see very much aside from

12   his build and his eyebrows, correct?

13   A    Correct.

14   Q    And all of this took place outside the United States,

15   didn't it?

16   A    Yes.

17   Q    Now Spanish authorities entered Ana's apartment

18   eventually and noted that all of her electronics were gone,

19   right?

20   A    Yes.

21   Q    And isn't that indicative of the fact that she took them

22   with her?  You're talking about a cell phone and a laptop,

23   right?

24   A    But all of her belongings were there, like toothpaste,

25   the toothbrush.  Her clothing, her personal items were there.

20

MONTILLA - CROSS - MS. WEINTRAUB

1   Q    Okay, and you're --

2   A    Her electronics were gone.

3   Q    Okay.  Sorry?

4   A    Her electronics were gone.

5   Q    Okay.  If she's going for a day trip or going somewhere

6   she might take her electronic laptop and cell phone and a

7   couple of -- or a change of clothes, right, nothing unusual --

8   A    Maybe.

9   Q    Is there anything unusual about that?

10  A    I -- well, no.

11  Q    Now there's no evidence -- there was no evidence of a

12  struggle at that apartment either, was there?

13  A    No.

14  Q    And there was no sign that there was any violence in that

15  apartment at all, correct?

16  A    There was blood found by the Spanish National Police and

17  they're in the process of doing the forensic examination.

18  Q    Where is this blood found?

19  A    In various places of the apartment.

20  Q    So you would think that that's a very important fact,

21  right?

22  A    Yes.

23  Q    And it's so important that it's not even mentioned in the

24  complaint, is it?

25  A    It is an important factor but it's not mentioned because

21

MONTILLA - CROSS - MS. WEINTRAUB

1   we don't have the results yet.

2   Q    So then you're not considering that to be a factor

3   against David who stands here under the presumption of

4   innocence, is that fair?

5   A    If DNA matches.

6   Q    If.  If -- no offense but as you sit here right now and

7   he has the presumption -- I'm sorry, Judge, excuse the

8   snarkiness.

9        As David stands here right now he is presumed

10  innocent, you do understand that, right?

11  A    But we have a lot of other evidence that is pretty

12  strong.

13  Q    Well, let's talk about a lot of that other evidence.

14       THE COURT:  Let me ask you this question, how

15  certain are you that there was blood found in the apartment?

16       THE WITNESS:  This is according to the Spanish

17  National Police.

18       THE COURT:  They've informed you of that?

19       THE WITNESS:  Yes.  The forensic examiners have

20  found blood in the apartment.

21  BY MS. WEINTRAUB:

22  Q    And that would have been from February when they went

23  there?

24  A    February 4th when they went in there.

25  Q    Okay.  And it's now May what, tenth, yes?

22

MONTILLA - CROSS - MS. WEINTRAUB

1   A     Yes.

2   Q     And you haven't heard anything about that blood?

3   A     We're waiting for getting comparison.

4   Q     We're also waiting for Ana to come back with whoever

5   she's with, right?  Because you're actively looking for her.

6   A     We are.

7   Q     Now, there was no evidence that Ana was taken against her

8   will, was there?

9   A     No.

10          THE COURT:  Now was there no video outside the -- I

11  mean, a video camera outside the apartment that would have

12  captured somebody --

13          THE WITNESS:  So there is --

14          THE COURT:  -- coming out?

15          THE WITNESS:  -- a camera but it's apparently it's

16  not a video, it works when you press the apartment button, but

17  it was sprayed also.

18          THE COURT:  Oh.

19  BY MS. WEINTRAUB:

20  Q     And Ana, by the way, was a woman -- she had money in her

21  own name, right?

22  A     Yes, she has some assets.

23  Q     She had assets, she had property, yes?

24  A     Yes.  But David controlled all of it.

25          THE COURT:  Where was the property located?

23

                    MONTILLA - CROSS - MS. WEINTRAUB

1            THE WITNESS:  Excuse me?

2            THE COURT:  Where was the property?

3            THE WITNESS:  They had properties in Broward County.

4    Q    And Ana had property in her own name, not --

5    A    Yes.

6    Q    -- with David, didn't she?

7    A    Yes.

8    Q    So when you say, well, David controlled it, I mean, you

9    really don't know that for a fact, it's in her name?

10   A    Yes.

11   Q    Okay.  So isn't it fair to say she meets -- she goes off

12   to Madrid, we don't know to meet who or with whom, correct?

13   We don't know if she went alone, right?

14   A    She went alone.

15   Q    Do you know she wasn't meeting somebody?

16   A    We know she -- she met people there, yes, and they were

17   interviewed.

18   Q    Okay.  Well, you didn't interview all of the men that she

19   dated, did you?

20   A    All the ones we found, yes.  They were interviewed by the

21   Spanish National Police.

22   Q    Okay.  All the ones you had found, had you gone through

23   her dating app to see how many there were?

24   A    Yes.

25   Q    And did you interview the men from that?

24

MONTILLA – CROSS – MS. WEINTRAUB

1  A    The Spanish National Police did.

2  Q    And --

3         THE COURT:  Have you examined -- has there been any

4  further activity on either her social media or telephone or --

5         THE WITNESS:  Nothing since February 2nd.

6  Q    Do you agree that Ana was a person of means, 40 years

7  old, she was pretty, right?

8  A    Yes.

9  Q    And she was in Madrid by herself or with new friends,

10 right?

11 A    Yes.

12 Q    And she could have easily been a target for many

13 opportunists there; isn't that right?

14 A    Maybe, but not -- again, not in this case as we --

15 Q    David is a U.S. citizen, right?

16 A    He's a U.S. and Serbian.  David or Ana?  Wait a second,

17 what did you say?

18         THE COURT:  David.

19 A    He's a dual citizen.

20 Q    You're sure of that?

21 A    David, yes.

22 Q    Are you sure that when he became a U.S. citizen that the

23 Serbian citizenship had not been renounced to get the U.S.

24 citizenship?

25 A    As far as I know he is a dual citizen.

25

MONTILLA - CROSS - MS. WEINTRAUB

1    Q    And what are you basing that on?

2    A    On information regarding --

3    Q    That --

4    A    Throughout our investigation.

5    Q    Can you be more specific?

6    A    Information received from immigration.

7              THE COURT:  Do you know what --

8              THE WITNESS:  We know that his passport had expired,

9    his Serbian passport had expired.

10   Q    Okay, so that's what I was getting at --

11   A    Oh.

12   Q    -- is that you knew he had a Serbian passport and assumed

13   that he had dual citizenship, right?

14   A    Yes.

15   Q    Okay.  But now you know that the Serbian passport

16   expired, right?

17   A    Yes.

18   Q    The only valid passport he has is the U.S. passport,

19   right?

20   A    Yes.

21   Q    Okay.  He's lived in this country for -- well, first,

22   he's had two different legitimate businesses in Fort

23   Lauderdale for more than 10 years, right?  That he's owned and

24   operated, they were mentioned in the Pretrial Services report.

25   A    Yes.

26

MONTILLA - CROSS - MS. WEINTRAUB

1    Q    So he had a legitimate IT computer data-based business,

2    yes?

3    A    Yes.

4    Q    And he also owned businesses and owned properties, some

5    with Ana and some without.  Some she owned on her own, right?

6    A    Correct.

7    Q    David has no prior record, correct?

8    A    Yes.

9    Q    Are you aware, Agent -- one second.  Are you aware,

10   Agent, that according to the statute, the kidnapping statute,

11   that involuntariness or coercion related to taking and keeping

12   of the victim is an essential part of the crime?

13   A    Yes.

14   Q    And can you tell us again what specific evidence you have

15   that Ana was coerced to be taken?

16   A    Again, David was placed in Madrid, he was seen identified

17   by the owner of the hardware store buying the same spray paint

18   and duct tape --

19   Q    Buying the same spray paint or the same brand?

20   A    The same brand.

21   Q    Okay.  Do you know how many brands of spray paint there

22   are?

23   A    Apparently in Madrid they were able to find the store

24   because it's not that common there and that's how they were

25   able to --

27

MONTILLA – CROSS – MS. WEINTRAUB

1    Q    Madrid is a city, Madrid is not a small, little town,

2    right?

3    A    So.  They were able to --

4    Q    But did he have(inaudible.)

5    A    -- go to the store and review the surveillance camera

6    where they spotted David, full face, he was uncovered.

7             THE COURT:  I'm going to ask, how well can you see

8    him on that video?

9             THE WITNESS:  A hundred percent.  You can see him

10   completely.  He's not covered.  The owner identified him fully

11   as David.

12   Q    And --

13            THE COURT:  You actually see him buying paint?

14            THE WITNESS:  Yes.  You can see him buying paint and

15   two rolls of the American duct tape.

16   Q    And now can you answer my question about what evidence is

17   there that Ana was taken against her will by anyone.

18            MS. MONK:  Judge, asked and answered.

19            MS. WEINTRAUB:  It's not been answered.

20            THE COURT:  Sustained.

21            I take it that you don't actually know how she was

22   taken?

23            THE WITNESS:  Yes, correct.

24            MS. WEINTRAUB:  May I have a minute, your Honor?

25            THE COURT:  Sure.

28

MONTILLA - CROSS - MS. WEINTRAUB

1          (Pause in proceedings.)

2   BY MS. WEINTRAUB:

3   Q    When Ana's apartment was searched, there were no

4   personal -- like her makeup kit wasn't there, there were

5   things that a woman of Ana's stature, so to say, a 40-year,

6   old pretty woman going out would have, like makeup kits and

7   personal toiletries, right?

8   A    Yes, she did, she had like approximately seven boxes,

9   Home Depot boxes with her belongings.

10  Q    Okay.  So in those boxes was there makeup there?

11  A    There was everything, there were purses, clothing,

12  motorcycle gear, personal items.

13          THE COURT:  How long had she lived there or stayed

14  there I guess?

15          THE WITNESS:  Um, I don't know.

16  Q    Are you talking about the Fort Lauderdale apartment?

17  A    I'm talking about the one 643 Eighth Avenue residence.

18  Q    Okay.  So that's in Fort Lauderdale.

19  A    Yes.

20  Q    No, no, I'm talking about in Madrid.

21  A    Oh.  In Madrid.  Yes, she -- her belongings were still

22  there.

23          THE COURT:  Can you tell me what was in them, what

24  was there?

25          THE WITNESS:  Her clothing, toiletries.

MONTILLA - CROSS - MS. WEINTRAUB

1  BY MS. WEINTRAUB:

2  Q    Do you know that toiletries were there or are you just

3  assuming?

4  A    This is from the Spanish National Police.

5  Q    Do you have a property receipt saying that?

6  A    No, we have reports, the forensic reports.

7  Q    And they mention specifically that the toiletries were

8  there?

9  A    They just said personal belongings.

10 Q    Okay.  So personal belongings could be --

11 A    It's a wide range.  I mean, I cannot tell you

12 specifically toothpaste, what kind of brand of toothpaste --

13 Q    Okay.  So you can't --

14 A    -- or how many toothbrush.

15 Q    So you can't say that there were toiletries that were

16 there or makeup, you don't know.  You just know that some of

17 her personal belongings were there and some weren't?

18 A    I know there were four boxes of her belongings.

19       THE COURT:  Last question?

20 Q    From the investigation that you did do, can you tell us

21 when she started dating all these other people?

22 A    So I know they had agreed to an open relationship

23 before -- to fix their marriage before she went to Spain.

24 When she traveled to Spain the 26th I know she had been --

25 she -- I don't know specific, but I know like two or three

MONTILLA - CROSS - MS. WEINTRAUB

1   dates.

2   Q    So you do know that she had been cheating on David and

3   then she left the country, right?  I mean, that's the bottom

4   line.

5   A    They had an agreement of an open relationship, but I know

6   that David was -- had a girlfriend in Colombia.

7   Q    And do you know what the timing of that was?

8   A    No.

9   Q    And do you know that she was a girlfriend as opposed to

10  somebody he just met on a dating app in March?

11  A    I don't know this person.

12  Q    The last question is, to sum up, there's absolutely no

13  evidence that anything took place to facilitate, coerce, to

14  take, to do anything to Ana in the United States, true?

15  A    Can you repeat that question.

16  Q    Yes.  Is there anything -- it's your opinion, based on a

17  lot of assumptions, most respectfully, that she was kidnapped

18  as opposed to she's just gone off on one of her mental health

19  fits, my question to you is, is there anything to facilitate

20  the taking of Ana occur inside the United States?

21       Yes or no.

22  A    No.

23       MS. WEINTRAUB:  I hate this when I have to say no

24  further questions.

25       THE COURT:  Any questions?

MONTILLA - REDIRECT - MS. MONK

1    MS. MONK:  Just two, your Honor.

2   REDIRECT EXAMINATION

3   BY MS. MONK:

4   Q    What is the last communication that was sent from the

5   victim's phone?

6   A    February 2nd.

7   Q    But what was the gist of the communications?

8   A    She was going to stay home because she was not feeling

9   well.

10  Q    Were there communications that were the same as those

11  that the defendant communicated to his associate in Colombia?

12  A    Yes.

13  Q    And were those the exact same communications that were

14  sent from the victim's phone?

15  A    Yes.

16  Q    Would that conclude you to believe that the defendant was

17  in the possession of the victim's phone?

18  A    Yes, but that was -- sorry, I apologize.

19        MS. WEINTRAUB:  I object because I don't understand

20  what's being asked or answered.

21        THE COURT:  Overruled.

22  A    No, it was on February 3rd when there was a text message

23  from What's up[sic] sent to her friends from Ana's phone.

24  Q    And what information do you have that that text message

25  was actually sent by the defendant?

PROCEEDINGS

1    A    So, the defendant's girlfriend at the time went to the

2    police and said he -- she had the text where David is asking

3    her to translate a message into perfect Spanish.

4              MS. MONK:  No further questions.

5              THE COURT:  You may step down.  Thank you very much.

6              THE WITNESS:  Thank you.

7              (The witness was excused.)

8              THE COURT:  Just turning it back to the government,

9    what are the jurisdictional basis for charging him here?

10             MS. MONK:  Sure.  So in 2006 the kidnapping statute

11   was amended to allow an offender's travel to provide the

12   jurisdictional basis.  So if someone travels from the United

13   States and orders a kidnapping, that then provides

14   jurisdiction in the United States.

15             And there's a Fifth Circuit case in 2023 that is on

16   point on that.  It's *United States versus Meyer*.

17             THE COURT:  And that holds what?

18             MS. MONK:  That being based on the 2006 amendment to

19   the kidnapping statute which specifically added in language if

20   it -- I'm paraphrasing here but, if an offender travels in

21   interstate or foreign commerce in furtherance or in the

22   commission of a kidnapping, then it is a violation of the

23   statute.  And so in the *Meyer* case someone traveled from Texas

24   to Mexico in order to commit a kidnapping that occurred in

25   Mexico and the Fifth Circuit upheld that conviction based on

PROCEEDINGS

1    that 2006 amendment to the kidnapping statute.

2            THE COURT:  And here specifically the travel you're

3    referring to was what?

4            MS. MONK:  The travel out of Miami International

5    Airport was on January 27th of 2024.  He even flies directly

6    to Istanbul, Turkey rather than flying to Madrid, then goes

7    into Serbia, rents the car and travels to Spain and we know

8    that he was in Spain both by digital evidence and the

9    eyewitness identification of him in the hardware store as well

10   as the video of him in the hardware store.

11           THE COURT:  And did the defendant make any

12   incriminating statements or any statements at all?

13           MS. MONK:  We knew he was represented so we did not

14   inquire of him.

15           THE COURT:  Okay.  Ms. Weintraub?

16           MS. WEINTRAUB:  Judge, I'm glad that the prosecutor

17   brought that up because I forgot to ask and have the agent

18   confirm.  I'm sure the prosecutor will confirm because I spoke

19   with her about it.

20           The defendant's mother lives in Serbia, she is an

21   amputee, she's elderly and sick and disabled.  She's in a

22   wheelchair and he tries to see her as often as he can and take

23   care of her properly.  He goes there frequently through the

24   years to see his mom and that's why he flew into Serbia.  He

25   did not go to Serbia to go to Spain.  I mean, there is no

PROCEEDINGS

1    evidence that he went to Serbia or went to Spain to facilitate

2    the furtherance of anything.  There is no evidence of that.

3    He was in the United States and he went to see his mom and

4    dad.  That's what the evidence is.  The rest is really

5    speculation of how and when or where he got to Madrid or for

6    how long at all.

7              So I would submit to the Court there is a

8    significant jurisdictional issue, because unlike what was

9    passed in the Adam Walsh statute, the 2006 statute, this is

10   not the same as in *Meyer*.  In *Meyer* there was -- you know, the

11   person went there to commit the crime.  Well, he doesn't go

12   directly to -- I mean, he couldn't have just gone from Miami

13   to Madrid.  It's a five and a half hour flight, I'm sure there

14   are people in this world who have done it.

15             THE COURT:  Unless he was trying to hide his

16   appearance in Madrid.

17             MS. WEINTRAUB:  Or unless he was going to visit his

18   elderly mom --

19             THE COURT:  Right.

20             MS. WEINTRAUB:  -- who was sick, and we're not

21   speculating because that we do know that he did do that.

22             We do know that --

23             THE COURT:  Are you disputing that there were -- how

24   many miles, 7900 kilometers.

25             MS. MONK:  It's 7,677 kilometers was the distance

PROCEEDINGS

1    that was traveled, that the distance the rental vehicle

2    traveled while it was in the defendant's possession.  And I

3    believe a trip to Spain is around 2500 kilometers one way, so

4    total there and back it would have been about 5,000

5    kilometers.

6        MS. WEINTRAUB:  And where else in Europe could he

7    have gone?  I mean, should, you know, we play Where is Waldo?

8    I mean, there is no evidence.

9        THE COURT:  Well, it's a circumstantial.

10       MS. WEINTRAUB:  That is leap, it's not even the same

11   mileage.  It's a huge leap.  Is it possible, sure it's

12   possible that I could drive to Palm Beach, it's also possible

13   I could take the Brightline and go there.  I mean, it's a just

14   a fact if I wind up in Palm Beach, how I got there, who knows?

15   There's many different ways I could have gotten there.  My

16   partner, Chris Cavallo, could have taken me there.  I mean,

17   there are many ways to get there.  So because they're picking

18   out the one that, you know, matches nicely to go into the

19   round hole, that's not evidence.

20       THE COURT:  Let's assume for the sake of argument

21   that -- and obviously we could -- you could develop this if we

22   wanted to, but I haven't seen it but let's assume that the

23   officer, the agent's testimony is accurate that the

24   surveillance video that the Spanish police were able to secure

25   evidences him buying duct tape and paint, let's assume for the

PROCEEDINGS

1    sake of argument.  So you take that as a fact, why wouldn't

2    that then connect the dots to the theory that the government

3    is presenting?

4              MS. WEINTRAUB:  Because he didn't go to Spain to

5    commit a crime.  He went -- first of all, when he left the

6    United States he didn't go there.

7              THE COURT:  But you wouldn't drive 7,000 kilometers

8    to buy paint and duct tape.

9              MS. WEINTRAUB:  Judge, maybe he was going to --

10             THE COURT:  They have that evidence.

11             MS. WEINTRAUB:  -- paint the apartment --

12             THE COURT:  They have it in Serbia, right?

13             MS. WEINTRAUB:  Sorry?

14             THE COURT:  They have paint and duct tape in Serbia

15   if you needed it, right?

16             MS. WEINTRAUB:  That's true, but maybe he was

17   going -- Judge, I mean, I don't want to -- I don't want to

18   engage on this maybe, because there are too many maybes.

19   Maybe he was going to visit somebody.  Maybe they were getting

20   back together again.  Maybe Ana said come see me.  Maybe he

21   never went to see Ana and he saw somebody else.  We don't

22   know.

23             What we do know that he didn't go from the United

24   States to Madrid to commit a crime.  And when the statute says

25   in furtherance of, it usually means something started here and

PROCEEDINGS

1    you go to do -- to stretch the elastic rubber band in

2    furtherance of, right just like with a conspiracy.  So there's

3    no beginning here though.  That's the problem.  The beginning,

4    if at all is in Serbia.  And I think we have enough crime in

5    the United States to focus on crimes that are committed here

6    and not in Serbia.

7              My point is that the statute is vague as to in

8    furtherance of.  I think it makes just as much sense of what

9    I'm saying that in furtherance of means in furtherance of,

10   that it means it began here and goes to the next point which

11   would be Madrid which he didn't, and that it doesn't allow for

12   intervening paths.  Well, if he went to, you know, Serbia

13   first for a month and then he plotted doing it, well then he

14   didn't go to Madrid in furtherance -- from the United States

15   in furtherance of committing or facilitating a kidnapping.

16   That's my point.  My point is that this is a bond hearing and

17   that for purposes of bond, bond isn't to be punitive.

18             Even Pretrial Services recommends a bond can be

19   fashioned with a GPS monitor, turning in his passport.  We

20   offered the prosecutor a bond asking if there were any

21   circumstances that you would consider to make an agreement, of

22   course it's within their rights to decline and they did.

23   But --

24             THE COURT:  Let me ask you about that issue because

25   your point is well taken if, at the very best, in the light

PROCEEDINGS

1    most favorable to the government, it is entirely

2    circumstantial at this point, right?  But on the question of

3    the risk of flight, given his ties to foreign countries, his

4    extensive foreign travel, the means that he has, how do you

5    deal with their argument that even on the basis of serious

6    risk of flight is too much.

7              MS. WEINTRAUB:  Easy because he doesn't have his

8    passport anymore, they took his passport.  The other one is

9    expired.  If he's on a GPS monitor and he puts up his property

10   and a relative will co-sign the bond here, then what's -- and

11   then where is he going?  He might have, you know, 50 people

12   that he's best friends with and his family in Serbia.  He

13   can't get there.  How is he getting there?  I mean, if he

14   doesn't have a passport, he doesn't have travel documents and

15   he's on a GPS and monitor, how is he leaving the country?  I

16   mean, we can't -- we can't say that it's a factor against him

17   that he has elderly parents there.

18             He has extensive ties here to the United States to

19   Fort Lauderdale where he's lived for 14 years.  His businesses

20   are here --

21             THE COURT:  You want to respond --

22             MS. WEINTRAUB:  -- he has employees.

23             THE COURT:  You want to respond to that?

24             MS. MONK:  Yes, I would like to offer argument

25   generally.  Earlier when I was answering your Honor's

PROCEEDINGS

1   questions, but I didn't have an opportunity to provide my

2   argument, so can I go ahead and do that?

3          THE COURT:  Yes.

4          MS. MONK:  So, yes, we are recommending that the

5   defendant be detained based upon the risk of flight and

6   danger.  One of the factors that your Honor can consider when

7   making a bond determination is the strength of the evidence,

8   and with all due respect to the defense I really think their

9   argument just ignores all of the evidence that we've

10  presented.

11         We have the defendant renting a car in Serbia,

12  tinting the windows of a rental car, which is extremely

13  abnormal, removing identifying stickers, a report that it

14  appeared as if the license plate has been changed.

15         To your Honor's point, if he had legitimate business

16  in Spain, why not just fly directly to Spain.  It's a

17  five-hour flight, as the defense attorney noted.  Instead, he

18  goes out of his way, flies into Turkey, gets to Serbia, but he

19  does so immediately.  So as to this point of, you know,

20  there's no evidence that that was his intent, again I think

21  that ignores the evidence.  He flies out on the 27th and

22  within days he's already -- he's renting the car two days

23  later and then is traveling across the Serbian-Croatian border

24  on the 30th.  So, you know, I think that ignores the evidence.

25         Then he's in the hardware store buying the exact

PROCEEDINGS

 1    kind of items that are used by this phantom man who has the

 2    same build that the defendant has, has facial characteristics

 3    that are similar to him.  There's a stolen plate that is

 4    affixed to the exact type of rental car that he rented in

 5    Serbia that's placed in Spain.  We have GPS information

 6    placing him in Spain.  We have that stolen plate outside of a

 7    motorcycle store where there's a report that the individual

 8    who bought that helmet and the vest.  When you do the

 9    comparison of the receipt and what items are purchased, it's

10    the exact type of helmet that's used by this phantom man who

11    resembles the defendant spray painting the camera.

12            So the evidence in this case is extremely strong and

13    that doesn't even take into consideration this bombshell text

14    message exchanged where he's communicating with his

15    girlfriend, asks her to translate messages, and then lo and

16    behold those are the exact messages that are sent from the

17    victim's phone.  So the evidence in this case is extremely

18    strong.

19            In terms of danger, I think the danger in this case

20    should be obvious at this point.  I mean, we have a woman who

21    has been missing for three months and we don't know where she

22    is.  And there's evidence that she was last with the

23    defendant.  So obviously the government has a very strong

24    concern that she's been killed, that she's deceased at this

25    point.

PROCEEDINGS

1          THE COURT:  Let me ask this question, have you done

2    forensic analysis of the rental car?

3          MS. MONK:  That investigation is ongoing, but I will

4    say he kept it for a significant amount of time before turning

5    it in and the car has since been rented.  But he -- we, you

6    know, obviously, believe her disappearance and potential

7    homicide happened on the second or the third.  He then did not

8    turn the car in until March 15th, which I think is also

9    indicative of guilt.  And so I'm certain that he would have

10   cleaned that car in the month's time that he had.

11          In terms --

12          THE COURT:  Well, you would still though have to

13   concede even with everything you're saying in its entirety,

14   it's still a circumstantial case because we don't even know

15   what actually happened to her.

16          MS. MONK:  It's a circumstantial case, but as your

17   Honor knows, I mean, the evidence is the same whether it's

18   eyewitness testimony, it's given the same weight.  Direct

19   evidence and circumstantial evidence are given the same

20   weight.  And here we have --

21          THE COURT:  But if it's an entirely circumstantial

22   case, why isn't that a case that a defendant may want to

23   defend, why would he flee?

24          MS. MONK:  Because he's facing a stat max of life

25   and 10 to 12 years in prison.

PROCEEDINGS

1          THE COURT:  Only if he gets convicted.  If it's

2  entirely circumstantial, why wouldn't he fight the charge?

3          MS. MONK:  Because the circumstantial evidence is

4  extremely strong.  What are the odds that he's in Spain buying

5  paint that is used to then spray paint the surveillance -- I

6  mean, that's innocent conduct.  There is no reason someone

7  goes on a multi-country journey with stolen license plates and

8  tinted windows to spray paint someone -- I mean, that's just

9  defies common sense.

10         He's a person who has significant foreign ties.  He

11  has a lot on the line here.  It's a stat max of life.  It

12  is -- if we do find a body that becomes a stat max of death.

13  Really his ties here are not as strong as the defense is

14  making it.  I mean, he's essentially a single man at this

15  point, he has no wife.  He has no children, and as the

16  Pretrial Services report notes, I mean he didn't even know the

17  contact information for his brother.  So he can up and go

18  whenever he feels like it.

19         THE COURT:  How do you respond to Ms. Weintraub's

20  point about --

21         MS. WEINTRAUB:  First of all, his brother --

22         THE COURT:  -- if you take away his means of travel,

23  how would he do that?

24         MS. MONK:  He --

25         MS. WEINTRAUB:  The definition in the pattern jury

43
PROCEEDINGS

1    instruction is to kidnap a person means to forcibly and

2    unlawfully hold, keep, detain and confine that person against

3    that person's will.

4            There's never going to be any evidence of that.  The

5    involuntariness --

6            THE COURT:  Go ahead -- hold on.  Go ahead and

7    answer my question.

8            MS. MONK:  I'm sorry, what is your question, Judge?

9            THE COURT:  Her question was that if we take away

10   his means of travel, the risk of flight is sufficiently

11   ameliorated.

12           MS. MONK:  I would say this is a defendant who has

13   significant means, much more than the average defendant and

14   given those means it is much more feasible for him to flee

15   than the average.  I think cutting off the GPS monitor does us

16   no good, that does nothing to reduce the risk of flight it

17   just let's us know when he's fled and at that point it's too

18   late.

19           MS. WEINTRAUB:  I don't know how often that happens

20   but in over 25 years, I've never had a client who did that

21   honestly.  I never --

22           THE COURT:  I've had a defendant who did that.

23           MS. WEINTRAUB:  I'm sorry.  But I will also --

24           THE COURT:  When you're here 20 years you'll have at

25   least a couple.

PROCEEDINGS

1        MS. WEINTRAUB:  Judge, furthermore at the end of the

2   statute and at the end of the instructions, it says,

3   involuntariness or coercion related to taking and keeping is

4   an essential part of the crime.  Again, they don't even know

5   where she is.  They don't even know when she got -- for all we

6   know, she's just doing this because she's psychotic.  When she

7   has suffered mental health issues for years and, you know,

8   she's going to walk in the door.  I mean, we don't know.

9   There are so many questions.

10       He's got a legitimate business.  The fact that, you

11  know, they were splitting up is certainly not to be used

12  against him that she's single.  He's only 36 years old.  I

13  don't want to say it, but I have children older.  I mean, he's

14  36 years old, he's got everything -- all of his assets are

15  here in the United States.  His life has been in Fort

16  Lauderdale.

17       There is, it's -- it's -- it's -- it's almost not

18  fair to say, because it's a circumstantial case it still could

19  be and possibly and therefore and deprive him of his freedom

20  while we're waiting on Spanish police reports from more than

21  three months old already.  I mean, what is the end game here?

22       Most respectfully, I think that a bond could be

23  fashioned with reasonable conditions of confinement that it

24  could be two of his properties, his brother can sign the bond.

25       I'm looking at the Pretrial Services record.  Of

45

PROCEEDINGS

1    course he not have any firearms, I don't think there were any,

2    GPS monitoring.  I don't know if they could even -- I don't

3    know what is involved, I'm not going to even offer it.

4         And actually I disagree with Ms. Monk that by the

5    time they find out that the monitor is off, you know, he's

6    gone.  That's just not true.  Especially not on an

7    international flight.  I mean, they get noticed immediately if

8    something is, you know, awry.

9         I had a case in Fort Lauderdale a month ago where my

10   client took the garbage out and wound up in the middle of the

11   street and it went off because he went in the middle of the

12   street, and they were police there within five minutes.

13        I mean, I don't know where she thinks he's going

14   without a passport or travel documents.  And everything he has

15   is here, where is he going?  If his brother signs it and his

16   property and it's extensive and do a million dollar bond,

17   Judge.

18        THE COURT:  Last word, Ms. Monk.

19        MS. MONK:  Just, Judge, you know, the cat is out of

20   the bag at this point.  I think he's going to be all the wiser

21   now he knows the information that the government has that's

22   only going to make him more deliberate in his flight.

23        He obviously took steps to conceal his crime when he

24   committed it.  It's the government belief he will do the same

25   when taking the opportunity to be given a bond to flee.

PROCEEDINGS

1      The evidence in this case is strong.  There's no

2  amount of property that would assure his attendance in court

3  given the penalties that are on the line.  And we believe he's

4  both a serious risk of flight and a danger.

5      THE COURT:  Okay.  Well, I can't detain based on

6  danger because I think the evidence -- I can't make a finding

7  sufficient to detain him on danger.  There is probable cause

8  to believe of course that he committed this offense, but

9  that's not sufficient for me to find that he's a danger,

10  because I have to do that on a clear and convincing basis and

11  I don't think, even in the light most favorable to the

12  government, I could do that.

13      The issue though is on the risk of flight that the

14  government has charged him, assuming the grand jury agrees and

15  indicts, the factors that the government relies upon are

16  significant.  He's traveled to 30 countries throughout the

17  world, he has significant ties to Serbia, he has significant

18  means and the only way one can flee is through means.  So this

19  actually is a case where you have sufficient serious risk of

20  flight in the record given the property that he has available

21  and his frequent travel and the nature of the case, because

22  even though I think it's a defensible case because the

23  evidence is circumstantial, that doesn't mean it's not

24  significant.  So --

25      MS. WEINTRAUB:  Well, actually I think it kind of

47

PROCEEDINGS

1    is.  And I think it does mean that.  If it's a strictly

2    circumstantial case, and even the Court questions, you know,

3    and I'm sure the Court doesn't often say that it's a

4    defensible case, I'm sure of that in this building because I'm

5    here too and I know that most cases are not defensible.  This

6    case is defensible.  And it sure would help to have my client

7    in my office working with me, with investigators to defend

8    this case.

9         And there has to be a monitor system where without

10   travel documents -- I mean, he and Ana traveled extensively

11   together, I mean, that's what that was.  So that's not to be

12   used against him.  The fact that he was a successful shouldn't

13   be a factor against hum.  Whoever signs the bond they won't be

14   able to put up the money for anything else, there will be a

15   *Nebbia* requirement.  So there was no ill gotten gain, he has

16   been successful so he shouldn't we punished for that.

17        And I think that there are conditions together that

18   do make a valid presentation for bond especially.  I mean,

19   it's not -- it's not as if he went from A to B in furtherance

20   of.  There are significant legal issues to be attacked in

21   this.  They haven't gone to the grand jury yet --

22        THE COURT:  Well, you may want -- you may actually

23   want to ask for a speedy trial.

24        MS. WEINTRAUB:  And I also know that when they go to

25   the grand jury they're not going to be able to ask the

PROCEEDINGS

1    questions that the agent couldn't answer.  Because the bottom

2    line is, they are going to be asking a jury to speculate on

3    the coercion and the detention.

4                 I just think, Judge, I know it's a close call --

5                 THE COURT:  It's a close call.

6                 MS. WEINTRAUB:  -- and I would ask the Court to err

7    on the side of fairness and not deprive him of his liberty.

8    He has no prior record, nothing, zero.

9                 THE COURT:  Ordinarily that counts but of course in

10   a potential kidnapping and murder case that's a different --

11                MS. WEINTRAUB:  Not murder, not murder --

12                THE COURT:  -- case.

13                MS. WEINTRAUB:  -- seriously.  And they are not

14   seeking an indictment on her.

15                THE COURT:  They don't have enough information, they

16   only have at this point a potential kidnapping.

17                MS. WEINTRAUB:  Well, Judge, and I submit they don't

18   even have that --

19                THE COURT:  Right.

20                MS. WEINTRAUB:  -- but it's not going to be a murder

21   case and I don't think that the kidnapping case is going to

22   last.  And I think there are real significant -- and I think

23   the Court recognizes the jurisdictional issues that are

24   attached to this and that they are real.  They're not -- these

25   are not speculative.  These are real, substantial legal issues

PROCEEDINGS

1    that have to be ironed out.

2            I looked, you know, in a cursory way in preparing

3    for this hearing and I couldn't find any case since 2006 when

4    the Adam Walsh statute was re-- was formed -- formulated to --

5            THE COURT:  By the way, on that question why

6    wouldn't -- could the use of instrumentality of commerce in

7    furtherance of a kidnapping also be sufficient not just

8    travel?

9            MS. WEINTRAUB:  Like what?

10           THE COURT:  The WhatsApp messages from Madrid?

11           MS. WEINTRAUB:  The WhatsApp messages from when he's

12   in Serbia?

13           THE COURT:  And Madrid, right?  According to the

14   government, right, according to the government their evidence

15   is that, if you believe their theory, that he commits the

16   kidnapping, he then gets her phone and sends those

17   communications while he's there, and he sends those

18   communications to people here.

19           Why would that not be a basis for jurisdiction, or

20   is that not.  Ms. Monk, do you know?

21           MS. MONK:  Judge, I will -- I mean, I haven't

22   explored that specifically, but the statute does include the

23   use of mail or any means of facility or instrumentality of

24   interstate commerce --

25           THE COURT:  Right.

PROCEEDINGS

1          MS. MONK:  -- which I understand to be telephone,

2     the internet, things of that nature which I think we also

3     would have here, but also just say there has been a probable

4     cause finding.  I think this is way outside the bounds of a

5     detention hearing.

6          MS. WEINTRAUB:  Judge, the WhatsApp -- the WhatsApp

7     was not even alleged to have been in Madrid.

8          THE COURT:  Well, what was the date of the WhatsApp

9     messages?

10         MS. MONK:  It was February 3rd, the day after she's

11    last seen, so that would be during the commission of the

12    offense.

13         THE COURT:  He's clearly --

14         MS. WEINTRAUB:  Might have been, might not have

15    been.  Might have left the country by then, maybe.

16         THE COURT:  But even if he had been -- even if he

17    was on the road to Serbia it would still be a potential

18    violation if you're using a means of commerce, foreign

19    commerce for fraud purposes to further the crime, right?  I

20    could be right, right?  Okay.

21         Well, I'm going to let you defend the case as ably

22    you will be I know, and again, I can't make a finding of

23    danger because it's just not -- that's too circumstantial a

24    case; however, on the risk of flight analysis, even for

25    somebody who doesn't have a record, given the means that he

PROCEEDINGS

1   has to flee and given the seriousness of the charge, I think

2   that that is a basis for detention.

3           Now I weigh, it's a close call, and I don't know who

4   the duty judge is this week.  Ms. Monk, let me find out from

5   you if you want to appeal it, right, you have to the right to

6   appeal.

7           MS. WEINTRAUB:  And, Judge, half the property is

8   already in conservatorship and the victim's family has

9   already, you know, initiated litigation to get money and

10  property, whatever --

11          THE COURT:  Right.

12          MS. WEINTRAUB:  -- and I don't do any of that, so I

13  don't really know because I'm a criminal defense lawyer so

14  what do I know --

15          THE COURT:  Sure.

16          MS. WEINTRAUB:  -- but if there was a way to set

17  that up, I mean if the Court's concerned that he has access to

18  money, we could address that.

19          THE COURT:  Let's find out who is the duty judge,

20  is.

21          (Discussion off the record.)

22          MS. WEINTRAUB:  And, Judge, I don't believe that --

23  you know, when the government says he has all these means, he

24  doesn't have access to liquid funds right now, by the way.  I

25  don't know what the government is alluding to.

PROCEEDINGS

1          MS. MONK:  Judge, I don't think that's accurate

2   based on the information that I have.  It's my understanding

3   that in the last couple of months he's sold several

4   properties.  I think a decent amount of them are listed on the

5   Pretrial Services report.  I don't think that's all of them,

6   but there are at least three homes that are listed that

7   were -- that -- maybe those are the remaining residences, but

8   I know he sold recently several --

9          MS. WEINTRAUB:  Actually they --

10          MS. MONK:  -- pieces of real estate.

11          MS. WEINTRAUB:  I'm sorry, I interrupted, sorry.

12   They did not close and they are in conservatorship.  That's

13   right, he did have deals going and they were stopped by the

14   victim's family and they have been stopped.

15          MS. MONK:  This is outside the proffer and I don't

16   know that that's accurate, so I don't think your Honor should

17   rely on that representation.

18          THE COURT:  All right.  Do you know who --

19          THE COURTROOM DEPUTY:  Judge, I'm looking --

20          (Cross talk inaudible.)

21          MS. WEINTRAUB:  Would you take a representation from

22   the real estate lawyer in person?

23          THE COURTROOM DEPUTY:  -- I can't find it here.

24          THE COURT:  Shouldn't it be on the...

25          (Pause in proceedings.)

PROCEEDINGS

1          UNIDENTIFIED SPEAKER:  Judge Gayles.

2          THE COURT:  Judge Gayles.

3          THE COURTROOM DEPUTY:  Gayles, okay.

4          THE COURT:  Judge Gayles is the duty judge this

5     morning.

6          MS. WEINTRAUB:  I'm sorry?

7          THE COURT:  Judge Gayles, he's the duty judge this

8     morning.

9          So, all right, I'm going to go ahead and grant the

10    government's motion on risk of flight because I need only a

11    preponderance of the evidence and the preponderance of the

12    evidence here establishes a serious risk of flight.  I'm not

13    granting it on the basis of danger.

14         While you're in our custody you'll continue to have

15    opportunities to prepare for your defense and meet with your

16    family and you have a right to appeal my order to Judge

17    Gayles.  Okay?

18         MS. WEINTRAUB:  Thank you, your Honor.

19         THE COURT:  Good presentation as always.  Thank you.

20         MS. MONK:  Thank you.

21         (Matter concluded.)

22                    *    *    *    *    *

23

24

25

1          I certify that the foregoing is an accurate

2  transcript from the official electronic sound recording of the

3  proceedings in the above-entitled matter.

4  s/ Georgette K. Betts                May 17, 2024

5  GEORGETTE K. BETTS                   DATE

6                        I N D E X

7  WITNESS                                  PAGE

8  **ALEXANDRA MONTILLA**

9  CROSS-EXAMINATION    BY MS. WEINTRAUB      9

10  REDIRECT EXAMINATION BY MS. MONK          31