UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FORIDA

CASE NO. 24-cr-20201-KMW

UNITED STATES OF AMERICA,

v.

DAVID KNEZEVICH,

    Defendant.

_____/

**<u>RENEWED MOTION TO REOPEN DETENTION HEARING</u>**

DAVID KNEZEVICH ("Knezevich"), through undersigned counsel, pursuant to 18 U.S.C. § 3142(f), files this Renewed Motion to Reopen the Detention Hearing before Magistrate Judge Torres. In support of this Renewed Motion to Reopen Detention Hearing, Knezevich states the following:

Knezevich remains detained pursuant to a May 10, 2024 Order issued following a detention hearing conducted before Magistrate Judge Torres. (D.E. 9). Magistrate Judge Torres entered the written Order of Detention on June 3, 2024. (D.E. 17). Magistrate Judge Torres based detention on Knezevich being a risk of flight, while determining that Knezevich was not a danger to the community. (D.E. 17 at 2). Unfortunately, Magistrate Judge Torres was not aware that Knezevich, who was arrested on May 6, 2024, upon arrival at Miami International Airport, had previously been notified by an FBI Special Agent that the United States was conducting an investigation into the alleged disappearance of Knezevich's wife, Ana. Rejecting the option of remaining in Serbia and avoiding federal law enforcement, Knezevich retained counsel in the United States and voluntarily returned to the United States. Knezevich's voluntary return to the United States is inconsistent with an individual who is a risk of flight.

Knezevich submits this Renewed Motion to Reopen the Detention Hearing pursuant to 18 U.S.C. § 3142(f) with the recognition that Magistrate Judge Torres concluded that the determination to order detention based on risk of flight was "a close call" that could go either way. *See* **Exhibit A**, transcript from Detention Hearing, at 48:4-5; 51:3-6.

Knezevich, in seeking to reopen the detention hearing before Magistrate Judge Torres, follows the direction given by the District Court at a June 18, 2024 hearing:

> THE COURT: ". . . **Ms. Weintraub, I think you should go see Judge Torres and have a <u>new hearing based on new evidence</u>**."

**Exhibit B**, transcript from June 18 hearing, at 8:6-9 (emphasis added).

### NEW INFORMATION SUPPORTING REOPENING OF DETENTION HEARING

1. **THE FBI CASE AGENT'S DETENTION HEARING TESTIMONY THAT BLOOD HAD BEEN FOUND AT THE ALLEGED CRIME SCENE HAS BEEN TOTALLY DISPROVEN BY SCIENTIFIC TESTING**

The Government's kidnapping theory of prosecution is that Knezevich entered Knezevich's wife's Madrid Spain apartment and proceeded to engage in actions that constitute a violation of the federal kidnapping statute. The Government did not present any evidence of Knezevich's wife leaving the Madrid apartment or apartment building with Knezevich. Instead, the Government claimed that a camera on the first floor of the Madrid apartment building captured Knezevich leaving the Madrid apartment building with a rolling suitcase. Naturally, the viability of the Government's theory of prosecution would be dependent upon evidence of any type of physical confrontation in the wife's Madrid apartment. At the detention hearing, FBI Agent Montilla testified that Spanish National Police ("SNP") had found blood in several locations of the wife's Madrid apartment. Recognizing the significance of the testimony concerning the finding of blood, Magistrate Judge Torres questioned Agent Montilla:

> THE COURT: Let me ask you this question, **how certain are you that there was blood found in the apartment**?
>
> THE WITNESS: This is according to the Spanish National Police.
>
> THE COURT: They've informed you of that?
>
> THE WITNESS: **Yes**. **The forensic examiners have found blood in the apartment**.

(Detention Hearing, Ex. A at 20:14-20) (emphasis added).

Agent Montilla's testimony was *unequivocal* that forensic examiners found blood in the apartment. Numerous reports produced after the detention hearing included similar information, including that the SNP conducted forensic examinations using Luminol and found the presence of blood. *See, e.g.*, Serial 65, Bates 8627; Serial 74, Bates 9520-9552.[1]

Later, on July 11, 2024, months after the detention hearing, and only in response to defense counsel repeatedly requesting the blood analysis, the Government notified counsel that the substance found in the apartment was *not* blood and therefore Agent Montilla's testimony was inaccurate. Scientific testing, which was finally provided in July, after the detention hearing, established that what Agent Montilla represented was blood found at the alleged crime scene was *not* blood at all.

The fact that *no* blood was found at the alleged crime scene represents a material new fact not known to Magistrate Judge Torres at the detention hearing and contradicts a significant fact presented to him, which obviously goes to the weight of the evidence. Moreover, reports provided in discovery clearly state there were no signs of violence in the apartment. These facts are inconsistent with the Government's theory of prosecution.

---

[1] Knezevich is not filing this report given the pendency of a motion for protective order with the Court but will make the reports available for review upon the Court's request.

## 2. CONTRARY TO THE PROFFER PRESENTED AT THE DETENTION HEARING THE ACTUAL VIDEO RETREIVED FROM THE MADRID APARTMENT BUILDING DOES NOT DEPICT A MALE WITH SIMILAR FEATURES TO KNEZEVICH LEAVING THE MADRID APARTMENT BUILDING WITH A ROLLING SUITCASE

The Government proffered testimony at the detention hearing, including references to video footage of a "male," believed by law enforcement to be Knezevich, entering the Madrid apartment building elevator with an object at 9:52 p.m. and then leaving the elevator with a suitcase three minutes later, at approximately 9:55 p.m. (Detention Hearing, Ex. A at 5:6-11). The complaint contains similar allegations that a male was captured on camera leaving the apartment elevator with what appeared to be a suitcase. (D.E. 3 at ¶7).

Since the detention hearing, the Government has produced in discovery the purported video supposedly supporting the representations made at the detention hearing concerning the male believed to be Knezevich entering and leaving the Madrid apartment building wheeling a suitcase.[2] The Government has also produced in discovery several reports that specifically refer to the suitcase video footage.[3] The reports describe a "grainy video footage from a surveillance camera depicting a man with <u>similar features</u> as [Knezevich] entering the apartment building with a suitcase" at approximately 10 p.m. *See, e.g.*, Serial 10, Bates 8159.

Review of the video reveals that it is impossible to determine the size or even the sex of the individual depicted. Likewise, it is impossible to make any honest determination of any of the features of the person seen on the video. The inability to discern any of the features of the individual in the video renders the conclusion that the individual's features were "similar" to

---

[2] *See* XVR_ch3_main_20240202223026_20240202223054 (not bates stamped); XVR_ch3_main_20240202223310_20240202223338 (not bates stamped).

[3] *See, e.g.*, Serial 1, Bates 7951; Serial 10, Bates 8159; Serial 17, Bates 8180; Serial 50, Bates 8561; Bates 8602 ("Affidavit in Support of an Application for a Search Warrant").

Knezevich's features farcical. This is not a situation in which reasonable minds could reach different conclusions concerning the image on a video. No reasonable mind could conclude that the person in the video had similar features to Knezevich.

Given the Government's theory of prosecution concerning the kidnapping allegation, it is impossible to overstate the failure of the video to depict that an individual with "similar features" to Knezevich was observed leaving the Madrid apartment building with a rolling suitcase. Without the video evidence, the Government's kidnapping theory is at best on life support and clearly not the basis to sustain detention.

3. **SINCE THE DETENTION HEARING KNEZEVICH HAS LEARNED OF PREVIOUSLY UNDISCLOSED BRADY EVIDENCE RELATING TO A MYSTERY INDIVIDUAL ENTERING THE MADRID APARTMENT BUILDING**

Following the detention hearing, the Government commenced discovery. FBI reports revealed a joint investigation conducted with the FBI, the SNP, and Serbian law enforcement. Multiple FBI reports describe the existence of CCTV footage of "an unknown male on a scooter spray painting several CCTV cameras outside Ana's apartment building" on the day Knezevich's wife allegedly disappeared.[4] Since the description of the unknown male on a scooter did not include any representation that the individual depicted had similar features to Knezevich, counsel immediately requested production of the video which would be classic <u>Brady</u> evidence. Knezevich has made repeated requests to produce the video that Spanish authorities had supposedly viewed in support of this assertion. The Government failed to produce the video.

---

[4] *See, e.g.*, Serial 1, Bates 7951; Serial 50, Bates 8561; Serial 150, Bates 10523.

### 4. THE GOVERNMENT NOW CLAIMS THAT THE PREVIOUSLY UNDISCLOSED POTENTIAL EXCULPATORY VIDEO INVOLVING A MYSTERY INDIVIDUAL DOES NOT EXIST

The Government now claims that the CCTV video referenced in multiple FBI reports does not exist. The Government has cited a smorgasbord of excuses for the potentially exculpatory video, which it claims does not exist. Included in the explanations is that the SNP got facts wrong, there was confusion over the footage, and it did not matter anyway because the Government was not alleging that Knezevich was the unknown male on a scooter spray painting cameras at the Madrid apartment building <u>the same day</u> she allegedly disappeared. The Government even claimed that this information came from a lay witness, who is friends with Knezevich's wife. Regardless, the FBI reports authored by Agent Montilla, among others, reference the source of this information as footage from CCTV cameras, not from a lay witness. *See, e.g.,* Serial 1, Bates 7951.

Not only is this new information material because it shows reliance on evidence that supposedly does not exist (*i.e.*, camera footage), but it is also new information suggesting that there may be a mystery individual who was spray painting cameras outside the apartment and who may be responsible for conduct inside of the Madrid apartment building. The supposed nonexistence of CCTV video footage that FBI reports described as having been viewed by Spanish authorities raises multiple questions concerning the integrity of the investigation that has led to charges against Knezevich. Detaining an individual when there is evidence of a "mystery individual" caught on CCTV and the video of the "mystery individual" now supposedly never existing casts doubt on the strength of the Government's case.

5. **NEWLY DISCLOSED EVIDENCE REVEALS THAT ACCUSATIONS INVOLVING KNEZEVICH STEALING SERBIAN LICENSCE PLATES ARE AT BEST SPECULTIVE**

In its response to Knezevich's Objection to Detention Order, the Government alleged Knezevich stole Serbian license plates to avoid detection in Madrid. (D.E. 20 at n.4). During the subsequent hearing before the District Court, Agent Montilla admitted there was no direct evidence to demonstrate that Knezevich was in possession of the car driving with stolen Serbian plates. Agent Montilla claimed that circumstantial evidence supported the Government's stolen Serbian license plate allegation. (June 18 Hearing, Ex. B at 16:3-9). According to Agent Montilla, the circumstantial evidence was based on an analysis of license plate readers and cell tower information, placing Knezevich within a 2-mile or more radius of the stolen plates. (*Id.* at 11:6-12:12). While circumstantial evidence is admissible, the supposed evidence cannot be speculative. In this instance, the two mile or more radius fails to pass the test of speculation.

6. **INVESTIGATIVE REPORTS REVEAL THAT THE KIDNAPPING CHARGES ARE MERELY BEING EMPLOYED TO DETAIN KNEZEVICH WHILE THE GOVERNMENT SEEKS TIME TO PURSUE MURDER CHARGES**

Nearly all the reports the defense has received in discovery after the detention hearing identify the crime being investigated is "Foreign Murder of a US National by a US National," referencing 18 U.S.C. §1119, as opposed to kidnapping.[5] Production of the law enforcement reports in discovery reveals that the Government is simply using an unsupported and speculative kidnapping charge as a means of detaining Knezevich while it conducts a murder investigation. Obviously, the Government is free to conduct any investigation it chooses. However, detaining an individual based on allegations that lack evidentiary support, for the purpose of investigating a separate charge, is not a legitimate basis for detention.

---

[5] *See, e.g.*, Serial 1, Bates 7950; Serial 157, Bates 10593.

## 7. THE GOVERNEMNT'S LEGAL BASIS FOR JUSRISDICTION IS NOT SUPPORTED BY CASE LAW CITED AT THE DETENTION HEARING

Agent Montilla testified, and the Government does not dispute, that *all* relevant conduct in the alleged kidnapping occurred outside the United States, without exception. (Detention Hearing, Ex. A at 30:12-22). The ten thousand plus pages of reports and exhibits produced thus far in discovery, contain references to reports of foreign investigations conducted by the Spanish police, Serbian police, and even Colombian authorities. Across all the new discovery received to date, there is absolutely no conduct that is alleged to have occurred in the United States.

The issue of jurisdiction came up at the discovery hearing when Magistrate Judge Torres asked the Government to proffer its evidence supporting jurisdictional elements. (Detention Hearing, Ex. A at 32:8-33:10). The Government replied it had a case "on point," citing United States v. Meyer, 63 F.4th 1024 (5th Cir. 2023). The Government represented to the Court that Meyer supported the Court's jurisdiction over Knezevich's kidnapping charge. The Government did not share Meyer with the defense, or cite Meyer, before the detention hearing. After the hearing, the defense had the opportunity to review Meyer and can unequivocally state that it is inapposite. There are critical evidentiary differences between Meyer and this case. In Meyer, unlike the present case, there was clear and reliable evidence that the defendant's travel was connected to the kidnapping, where defendant planned and communicated with coconspirators in Mexico, before travelling to Mexico (from Texas) to effectuate the kidnapping plan. The Fifth Circuit found:

> At trial, the Government argued (and produced evidence supporting the conclusion) that Meyer traveled to Mexico to make Oyervides feel comfortable attending the meeting with Arismendez. And while Meyer disputes that the jury could have found that she had the requisite intent in traveling to Mexico, she does not contest that the Government's theory of the case, **and its trial proof, always connected her travel to the kidnapping.**

Meyer 63 F.4th at 1035 (emphases added).

Here, there is no evidence in the tens of thousands of pages of discovery received to date linking Knezevich's travel to the alleged kidnapping. Indeed, several days passed between Knezevich's arrival in Turkey and Serbia, and when the Government alleges Knezevich traveled to Madrid.

Moreover, the Court noted in its detention order that Knezevich traveled to Madrid through extraordinary means, implying, as the Government suggested, that his travel to Turkey was to circumvent his true destination of Madrid. However, what the Court did not know, and the defense is now prepared to proffer, is that it is not unusual at all for Knezevich to travel to Serbia through Turkey. In fact, that is one of the most common routes, and there is a connecting flight from Turkey to Serbia. Knezevich's family lives in Serbia. He has previously traveled this very route when going to see his parents. Knezevich was also in Serbia in December 2023, and Ana flew there and met him at his parents' home. He returned to Ft. Lauderdale in January 2024 to attend a civil court hearing, but always intended to return to Serbia later that month after the hearing.

8. **THE GOVERNMENT'S DETENTION HEARING CLAIM THAT KNEZEVICH IS A MAN OF MEANS IS UNSUPPORTED BY ACTUAL EVIDENCE**

At the detention hearing, the Government proffered without any support or proof, that Knezevich is a "man of means" and has access to money to flee. Since the hearing, Knezevich and his counsel have learned more about the status of his assets, which bears on his risk of flight. Indeed, most of Knezevich "means" are tied up in second mortgages, and a conservatorship was opened by his wife's family. Knezevich does not have significant means at all. The property listed in the pretrial services report, which the defense obtained for the first time the day of the detention hearing (and which Knezevich had no chance to review) is not accurately portrayed. All the

9

properties listed are heavily mortgaged. Many other assets are tied up in the conservatorship, including Knezevich's bank accounts, which have been frozen, despite the fact they were opened with his business and solely in his name. Simply stated, Knezevich does not have liquid assets, and none of his assets are easily accessible.

## MEMORANDUM OF LAW

**1. Detention is Reserved for Rare Circumstances**

As now-Chief Judge Altonaga recognized, "only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in favor of defendants." United States v. Kaplowitz, 14–20323–CR, 2014 WL 2155231, *4 (S.D. Fla. May 22, 2014) (citing United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir.1985) (alterations added; citations omitted); See also United States v. Ali, No. 05-cr-936, 2005 WL 3115876, at *2 (N.D. Ill. Nov. 18, 2005) ("Consistent with the most fundamental principles on which this Nation is based, the Bail Reform Act's overriding preference for liberty ensures that pretrial detention will occur only in the rarest of circumstances."); United States v. Rangel, 318 F.Supp.3d 1212, 1217 (E.D. Wash. 2018) ("The [Bail Reform Act] makes clear that only in rare cases should release be denied, and doubts regarding the propriety of pretrial release are to be resolved in favor of the defendant.") (internal quotations omitted).

In Kaplowitz, the Court also found that "mere theoretical opportunity for flight" was an insufficient ground for pretrial detention. Kaplowitz, at *5. That is precisely the position we are in. The Government has not shown any more than a theoretical opportunity. The Government speculates that Knezevich will flee because he has ties to Serbia, he has travelled in the past, and he has means. But Knezevich's actions have all been to the contrary, as discussed above. Knezevich willingly and intentionally returned to Miami from Serbia after his wife disappeared,

despite the FBI having advised Knezevich and his counsel that a criminal investigation was opened in Miami, Florida. It is the Government's burden at a detention hearing and, in cases of potential flight, to show "more than evidence of the commission of a serious crime and the fact of a potentially long sentence" to support detention. Id. at *5 (citing United States v. Friedman, 837 F.2d 48, 50 (2d Cir.1988)).

2. **Close Call Should Go in Favor of Knezevich**

Consistent with Kaplowitz (which calls for any doubts over detention to be decided in favor of defendants), courts routinely give the benefit of the doubt to criminal defendants over "close calls." See, e.g., Burbank v. Cain, No. 06-2121, 2007 U.S. Dist. LEXIS 63829, at *23 (E.D. La. Aug. 29, 2007) ("The Court notes that a petitioner is given the benefit of the doubt by the Fifth Circuit if there is a close call on whether the error was harmless."); United States v. Jones, 983 F.2d 1425, 1431 (7th Cir. 1993) ("This is not a situation for giving Jones the benefit of the doubt, **as we would if this were a close call**") (emphasis added).

Magistrate Judge Torres stated several times that detention in this case is a "close call." (Detention Hearing, Ex. A at 48:4-5; 51:3-6). Knezevich submits that this "close call," especially considering the new evidence presented in this Renewed Motion, should be resolved in favor of releasing him before trial, in accordance with Kaplowitz, et al.

3. **Pretrial Services Recommended Release**

Pretrial Services recommended that Knezevich *not* be detained, and that he be released on bond. As a trusted and valued arm of the Court, and especially given the BRA's "overriding preference for liberty" (see above), Pretrial Services' recommendation should be given substantial deference. See, e.g., United States v. Snead, No. 12-132M, 2014 WL 4473773, at *3 (D.R.I. Feb. 4, 2014) ("The recommendation of Pretrial Services is key to the court's finding whether 'some

11

risk' exists."); United States v. Mendez, No. 1:21-cr-00095-ADA, 2023 WL 3931720, at *7 (E.D. Cal. June 9, 2023) ("When Pretrial Services speaks, it is the Court speaking, as after all, Pretrial Services is acting on behalf of the Court to enforce the orders of this Court.").

Because Probation is the entity responsible for monitoring defendants who are given pretrial release, "the Court values the opinions of the probation professionals and gives their evaluations significant weight." United States v. Makaria, 576 F. App'x 252, 261 (4th Cir. 2014) (noting that Pretrial Services is "an arm of the court").

Here, particularly where Pretrial Services had the opportunity to review Knezevich's finances and travel history, its opinion on release is significant and should be given considerable weight by the Court. Coupled with the Court's determination that detention is a "close call," the Pretrial Services' recommendation for pretrial release is highly significant.

Lastly, it has now become apparent that this case will not be tried in the coming months. The defense has not yet been provided with many requested forensic reports, relevant crime scene evidence, or any expert reports, all of which will be addressed in a separate motion. Moreover, the defense has been provided thousands of pages of documents in Spanish and Serbian that need to be translated. The Government is waiting on reports and analyses performed abroad that involve a painstaking process to arrive in the United States. However, it bears mentioning that this detention, if continued, through no fault of Knezevich, will likely be for an extensive period.

## CONCLUSION

Based on all the issues raised herein, fairness requires reopening the hearing given new information that was not known to the defense during the first detention hearing, which bears on the weight of the evidence and the nature and circumstances of the alleged offense, upon which this Court issued its Order of Detention. The Court should have the opportunity to consider newly

discovered evidence that is contrary to previous Government representations that obviously impacted the Court's initial detention decision, especially in a case that is a close call.

WHEREFORE, based on new information materially relevant to the factors considered in ordering detention, Defendant, David Knezevich, respectfully requests that the detention hearing be reopened before Magistrate Judge Torres pursuant to pursuant to 18 U.S.C. § 3142(f).

## MEET AND CONFER CERTIFICATION

Prior to filing this Motion, undersigned counsel met and conferred with AUSA Lacee Monk pursuant to the Local Rules. AUSA Monk indicated that the United States opposes this Motion.

Dated: July 30, 2024

Respectfully Submitted,

**By: s/ Jayne S. Weintraub, Esq.**
Florida Bar No. 320382
**SALE & WEINTRAUB, P.A.**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 374-1818
Email: JWeintraub@SaleWeintraub.com

**By: s/ Bruce A. Zimet, Esq.**
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd.
Suite 1400
West Palm Beach, FL 33401
Tel:   (561) 508-7741
Tel:   (954) 764-7081
Email: BAZ@BruceAZimetLaw.com

**By: s/ Christopher Cavallo, Esq.**
Florida Bar No. 0092305
**NELSON MULLINS**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 373-9465
Email: ChrisCavallo@NelsonMullins.com