UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: <u>24-20201-CR-WILLIAMS</u>

UNITED STATES OF AMERICA

vs.

DAVID KNEZEVICH,
    a/k/a "DAVID KNEZEVIC,"
    a/k/a "DUSAN KNEZEVIC,"

    **Defendant.**
_____/

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO REOPEN DETENTION HEARING

The United States of America, through undersigned counsel, hereby opposes David Knezevich's Renewed Motion to Reopen Detention Hearing ("Motion"). *See* (DE 43). The Defendant's Motion should be denied because he has failed to present "new and material evidence bearing on the issue [of] whether there are conditions of release that will reasonably assure his appearance at trial." *United States v. Simpson*, 408 F. App'x 830, 831 (5th Cir. 2011); *see also* 18 U.S.C. § 3142(f). Under the Defendant's theory, every time a defendant receives discovery, they would be entitled to successive detention hearings. This position is not supported by any legal authority and would lead to an absurd result. Moreover, the Defendant's Motion misapplies the law and misconstrues the evidence. Accordingly, the Defendant's Motion should be denied.

**I. FACTUAL BACKGROUND**

    **a. Charges**

On May 4, 2024, the Defendant was arrested for kidnapping, in violation of 18 U.S.C. § 1201(a), pursuant to a criminal complaint. *See* Criminal Complaint, Case No. 24-MJ-02896-REID (DE 3). A grand jury sitting in the Southern District of Florida subsequently returned an

indictment against the Defendant on the same charge on May 15, 2024. (DE 11). As explained below, the charges stemmed from the Defendant's kidnapping of his wife (the "Victim") while she was in Madrid, Spain, after their separation. The Victim has never been seen or heard from again.

    **b. Detention Hearing**

On May 6, 2024, at the Defendant's initial appearance, the government moved to detain him pending trial on the grounds that he is both a serious risk of flight and a danger to the community. *See* DE 7; *see also* 18 U.S.C. § 3142(f)(1)(B) (permitting the government to move for pre-trial detention where the Defendant is charged with an offense for which the maximum sentence is life imprisonment); 18 U.S.C. § 3142(f)(2)(A) (permitting the government to move for pre-trial detention where there is a serious risk that the defendant will flee). The Defendant's counsel at the time, Ken Padowitz, requested the hearing occur on Friday, May 10, 2024. (DE 7). The night prior to the hearing, the undersigned was advised by Mr. Padowitz that the hearing was not going forward and that the Defendant had retained new counsel. Nevertheless, the following morning at approximately 10:00 am, the government was contacted by current Defense Counsel, who reversed course and advised that the hearing was going forward. During the conversation, Defense Counsel did not request any *Jencks* material or discovery.

As such, that afternoon, this Court held a detention hearing where the case agent (the "Agent") was subjected to a extensive cross-examination. (DE 43-1). During the hearing, the government proffered the following information in support of its motion that the Defendant be detained pending trial:

> On or about December 26, 2023, the Defendant's wife, a 40-year-old female and United States citizen (the "Victim) flew out of Miami International Airport to Madrid, Spain. Thereafter, on February 2, 2024, the Victim's friends and family, who had previously communicated with her while she was in Spain, lost contact with her. Spanish authorities were alerted to the Victim's disappearance by one of her friends after the Victim failed to show up for a previously planned trip to

Barcelona. The last non-automatic activities on the Victim's Bank of America account were for a flower purchase on February 2, 2024, the day she was last seen entering her apartment, as well as a charge from a restaurant in Madrid on February 10, 2024, for failing to show up to a dinner reservation that she had previously made.

On February 4, 2024, Spanish firefighters entered the Victim's apartment for a welfare check and discovered that she was not in the apartment. Subsequently, Spanish law enforcement searched the Victim's apartment pursuant to a court order and discovered that her cell phone, laptop computer and respective chargers were missing. At the time of her disappearance, the Victim was married to the Defendant, a Yugoslavian-born naturalized citizen of the United States. According to the Victim's friends and family, the Victim and the Defendant were separated and planned to divorce. The separation was contentious because the Defendant did not want to split the marital assets evenly with the Victim. The Victim was very fearful of the Defendant.

An investigation into the Victim's disappearance by Spanish authorities revealed that on February 2, 2024, the security camera at the Victim's apartment building in Madrid captured her entering the building around 1:42 p.m. This is the last time she has ever been seen. The same day, at approximately 9:27 p.m., the building surveillance camera captured a male, believed by law enforcement to be the Defendant, waiting outside the entrance to the Victim's apartment building. The male is wearing a motorcycle helmet, a reflective vest, dark pants and gloves and is holding a white plastic bag giving the impression that he is a food delivery service provider. As two women exit the building, the male uses the opportunity to enter the building. He remains downstairs briefly outside of the video surveillance cameras and then proceeds to go up the stairs.

A short time thereafter, the male is captured descending the stairs while holding a can of spray paint with a strip of duct tape now affixed to the chest of his vest. The male sprayed the lens of the surveillance camera with the spray paint to disable it. The male then returns to the front door that he entered the building through, pauses for a moment, seemingly to fasten a piece of duct tape to the lock to prevent the lock from engaging to allow subsequent entry to the building, and then exits the front door of the apartment. At approximately 9:52 p.m., the male reenters the apartment building and appears to enter the elevator with an object. Based on the movement of the object, its proximity to the male and its shape, it appears to be a rolling suitcase. The male then leaves the elevator with the suitcase at approximately 9:55 p.m.

Based on the surveillance footage, Spanish authorities were able to identify the brand of spray paint used to disable the security camera. Law enforcement then determined that a retailer in Madrid had reported a sale of that particular brand of spray paint on February 2, 2024, the same day the Victim is last seen. Surveillance footage from the retailer clearly depicts the Defendant purchasing the spray paint

along with two rolls of duct tape in cash on February 2, 2024, around noon.

Additionally, a Columbian woman, who the Defendant met on a dating app in October of 2023, advised law enforcement that on February 3, 2024, the day after the Victim is last seen, the Defendant contacted her via WhatsApp and asked her for help in translating a message into, quote, perfect Colombian for a friend in Serbia is writing a script about a Colombian character. Notably, the Victim in this case was born and raised in Colombia and is fluent in Spanish. She later became a United States citizen. The individual then translates two messages for the Defendant.

The first message stated, "I met someone wonderful, he has a summer house about two hours from Madrid. We are going there now and I will spend a few days there. There is barely a signal though, I'll call you when I come back. Kisses." The second message stated, "Yesterday after therapy I needed a walk and he approached me on the street. Amazing connection, like I never had before." Those messages are the last messages that family and friends received from the Victim. The messages were sent from the Victim's phone on February 3, 2024, the day after she is last seen entering her apartment building. Law enforcement has no reason to believe that the Victim or this Colombian woman ever knew one another. The only connection between the Victim and the Colombian woman is the Defendant.

Records from Customs and Border Protection revealed that on January 27, 2024, the Defendant traveled by airplane from Miami International Airport to Istanbul, Turkey. He subsequently traveled out of Serbia into Croatia by a vehicle via a border crossing on January 30, 2024, and returned to Belgrade, Serbia from Croatia by vehicle also through border crossing on February 5, 2024. The Defendant rented a Peugeot 308 (a vehicle) in Serbia from on or about January 29, 2024, through on or about March 15, 2024. When the Defendant returned the vehicle, the windows had been tinted, there was an indication that the license plates had been -- the license plate frames had been changed, and two stickers had been removed from the vehicle. The vehicle had traveled approximately 7,677 kilometers while in the Defendant's possession.

Spanish authorities also advised that around the relevant time, which is approximately February 1 to February 2, 2024, an individual filed a complaint that both of his license plates were stolen off of his vehicle in Spain. Spanish authorities ran a search in their plate reader database for that stolen plate and learned that the plate was present on the street where the Victim's apartment was located. The stolen plate passed through two tollbooths in the middle of the night on February 2, 2024, into February 3, 2024. Video from the tollbooths revealed that the plates were attached to Peugeot 308 with tinted windows, which is the type of vehicle that the Defendant rented in Serbia. Because of the tint, the driver is not visible. One of the tollbooths was in a town which is just outside of Madrid.

More license plate readers positioned the stolen plates within a four-minute

4

walk of a motorcycle accessory shop in Madrid on February 2, 2024. Around the same time the vehicle was located there, an individual bought a motorcycle helmet and a reflective vest at the store in cash at approximately 5:10 p.m. The helmet purchased is the same brand of helmet, make and model, if you will, that the Defendant wore while spray painting the surveillance cameras in the Victim's apartment.

Additionally, the Defendant's Facebook account used an IP address in an area of Spain just north of Madrid on February 1, 2024, the day before the Victim's disappearance. The Defendant was born in Yugoslavia, as noted in the Pretrial Services report. He's traveled to over 30 countries, most recently Serbia where he remained until he flew into Miami International Airport on Saturday May 4, 2024, and at that point he was arrested.

(DE 43-1 at 3:1-8:18).

## II.   LEGAL STANDARD

The law provides two distinct methods to revisit detention. The first is an appeal of a detention order to the district court. *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988) ("Pursuant to 18 U.S.C. § 3145, following a magistrate's order that a detainee be held without bond pending trial, the detainee may move the district court to revoke or amend the magistrate's pretrial Detention Order."); *see also* 18 U.S.C. § 3145.  The Defendant previously filed an "Objection to Order of Detention" to the District Court, which was treated as motion to revoke the Detention Order under § 3145.  (DE 15); *see also* (DE 20 (Government's Response to Defendant's Objection)).  During a hearing in front of the District Court, Defense Counsel decided mid-hearing to move to re-open the detention hearing in front of the Magistrate Court.  As such, the Defendant now seeks to revisit detention under the second method, a motion to reopen a detention hearing under § 3142(f).

Under § 3142(f), a Court *may* reopen a detention hearing, but only if it finds "that 'information exists that was not known to the movant at the time of the hearing and that has a material bearing' on the issue of detention." *United States v. Gallo*, Case No. 12-20630-CR, 2014

WL 1230717, at *3 (S.D. Fla. Mar. 25, 2014) (quoting 18 U.S.C. § 3142(f)(2)).  As previously explained by this Court:

> "'[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly.'" *Burger King Corp. v. Ashland Equities, Inc.,* 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002) (citing *Mannings v. Sch. Bd. of Hillsborough Cnty.,* 149 F.R.D. 235, 235 (M.D. Fla. 1993)). "There are three major grounds which justify reconsideration: (1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Id.* at 1369 (citing *Offices Togolais Pes Phosphates v. Mulberry Phosphates, Inc.,* 62 F. Supp. 2d 1316, 1331 (M.D. Fla. 1999): *see also United States v. Edler,* No. 13–60168–CR, 2013 WL 4543695, at *1 (S.D. Fla. 2013) (applying reconsideration factors set forth in *Burger King,* 181 F. Supp. at 1370 to motion for reconsideration/rehearing of a pretrial detention order).

*Gallo*, 2014 WL 1230717, at *3; *see also United States v. Haynes*, No. 9:19-CR-80045, 2019 WL 5538300, at *2-3 (S.D. Fla. Oct. 28, 2019) (employing the same standard and denying motion to reopen detention hearing).

"Courts have interpreted that [reopening] provision strictly, holding that reopening is unwarranted **if the newly offered evidence was available at the time of the hearing**." *United States v. Pon*, No. 3:14-CR-75-J-39PDB, 2014 WL 3340584, at *3 (M.D. Fla. May 29, 2014) (emphasis added) (citing *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991) and *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989)). As the court explained in *Pon*:

> As written, the reopening provision is, in effect, a codification of a court's inherent reconsideration authority tempered by the understanding that, to promote finality, preserve judicial resources, and discourage piecemeal presentations, a court should not reconsider a decision based on information that could have been presented the first time around. *See Lederman v. United States,* 539 F. Supp. 2d 1, 2 (D.D.C.2008) ("Due to considerations of finality, predictability and preserving judicial resources, . . . a court should be [loath] to revisit its own prior decision in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice."); *cf. Mays v. USPS,* 122 F.3d 43, 46 (11th Cir. 1997) (holding, in Fed. R. Civ. P. 59(e) context, that "where a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion"). Under the provision, reopening is unwarranted if the newly offered evidence was available at the time of the

hearing. *See United States v. Dillon,* 938 F.2d 1412, 1415 (1st Cir. 1991); *United States v. Hare,* 873 F.2d 796, 799 (5th Cir. 1989). And even then, reopening is discretionary. *United States v. Watson,* 475 F. App'x 598, 599–600 (6th Cir. 2012).

*Pon*, 2014 WL 3340584 at *9. New and material information "consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." *United States v. Jerdine*, No. 1:08 CR 00481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009), *aff'd*, 511 F. App'x 391 (6th Cir. 2013).

**III.   ARGUMENT**

    **a. The Defendant has not satisfied the standard of § 3142(f) to reopen a detention hearing.**

As a threshold matter, the Defendant has not proffered evidence that has a material bearing on the issue of detention that was not available at the time of his Detention Hearing. *Simpson*, 408 F. App'x at 831; *Pon*, 2014 WL 3340584, at *3; 18 U.S.C. § 3142(f). As explained herein, the Defendant's motion is premised on evidence that does not exist or is inculpatory and reiterates arguments that were previously made to this Court at the Detention Hearing.

Moreover, Defense Counsel's assertion that the Defendant's Motion is made at the direction of the District Court is misleading and takes the District Court's quote on this point out of context. *See* (DE 43 at 2) (asserting that the Defendant "follows the direction given by the District Court at a June 18, 2024 hearing" in filing the instant Motion). To the contrary, Defense Counsel decided to move to reopen the detention hearing after the District Court appropriately prohibited Defense Counsel from engaging in an entirely new cross-examination of the Agent:

> THE COURT: Oh, we're not going to get into last evening's discovery production because if you want to do that, Ms. Weintraub, I think you should go see Judge Torres and have a new hearing based on new evidence. But we are not going to do this piecemeal, and we are not going to do it in any way that strays from what Ms. Monk correctly recited as the parameters for the hearing. And we are not going to

7

> do this for more than thirty minutes.

(DE 43-2 at 8:6-13).[1]

> THE COURT: Is there anything further in terms of new matters the Government raised in its response that you were not able to address in the hearing before Judge Torres?
>
> MS. WEINTRAUB: I would like to address the timing, Your Honor, if I might.
>
> THE COURT: The timing?
>
> MS. WEINTRAUB: Yes, Your Honor; the timing of -- that the Government's theory has laid out in the complaint that Judge Torres had before him, as opposed to the Government's response, which contains a very different timeline.
>
> THE COURT: Well, no. Either you are going to ask Judge Torres to reopen the case with, I guess, the additional 600 pages, which alters his interpretation of the timeline, or you will file something other than the two page motion, which I granted, requesting thirty minutes to address the footnote in the Government's response; which I think we've exhausted at this point. Although Ms. Monk did say there were a few other matters that were brought up; but that's not happening today. I was under the impression that we would have some brief argument about how the altered or stolen tags affected the Government's position and your appeal. But I don't know what else really we can do today.
>
> **MS. WEINTRAUB: Your Honor, we would -- based on the Court's ruling we will then seek to reopen the hearing with Judge Torres as opposed to appealing.** We also did not have -- when I filed my motion with the Court I also did not have the detention order yet.
>
> THE COURT: Right.
>
> MS. WEINTRAUB: That came after. **I don't know whether I should file an appeal from the detention order at this point just seeking a de nouveau [sic] review, start fresh, all over -- or if the Court is directing I should go back to Judge Torres first with all the new evidence.**
>
> **THE COURT: Well, I mean, you and Mr. Zimet and Mr. Cavallo combined have probably more experience in this area than I ever did; and so I will leave it to your good offices how you wish to proceed.** But it seems to me that the things you wished to address this morning included discovery production and other matters which Ms. Monk has not had an opportunity to address in terms of your

---

[1] Citations to page numbers in transcripts refer to the page number of the transcript, not the page number assigned by PACER.

argument. And I don't think it can just be brought up now.

MS. WEINTRAUB: I understand, Your Honor -- and I am at the Court's pleasure. If the Court would guide me I would appreciate it -- if it is not inappropriate -- to know if I should go back to Judge Torres to reopen it, even though now he has already given his written order. I don't know if that's going to work or if I should just take that written order as is and then file my appeal with this Court for de nouveau [sic] review.

(DE 43-2 at 22:17-24:17). Defense Counsel's representation that she is "follow[ing] the direction given by the District Court" (DE 43 at 2), in filing the instant Motion is misleading and should not be viewed by this Court as a basis to reopen the Detention Hearing under § 3142(f).

### b. The purportedly new information asserted by the Defendant does not alter this Court's finding that he is a serious risk of flight.

#### i. *Blood Evidence*

Even if this Court chooses to consider the purportedly new information advanced by the Defendant, that information does alter this Court's finding that he is a serious risk of flight. First, the Defendant argues that the Agent's testimony regarding blood at the crime scene was totally disproven. (DE 43 at 2-3). This is a red herring because the Government did not advance blood evidence as a basis to detain the Defendant. Consistent with the Agent's testimony, at the time of the Detention Hearing, the United States was not in possession of the results of the forensic examination of the Victim's home. **As such, the government did not include any reference to blood evidence in its proffer to the Court or in its argument.** *See* **(DE 43-1). Likewise, the government did not allege there was any blood found in the Victim's apartment in the Complaint. (DE 3).** Most significantly, this Court's Order of Detention makes *no* reference to any blood being found in the Victim's apartment. (DE 17).

Tellingly, in his Motion, the Defendant did not include the full portion of the Agent's testimony, which makes clear that the government did not advance this fact (precisely because law

9

enforcement was awaiting the results of a forensic examination) and that it was the Defendant, rather than the government, who elicited information about the presence of blood in the apartment:

> MS. WEINTRAUB: And there was no sign that there was any violence in that apartment at all, correct?
>
> AGENT: There was blood found by the Spanish National Police and **they're in the process of doing the forensic examination.**
>
> MS. WEINTRAUB: Where is this blood found?
>
> AGENT: In various places of the apartment.
>
> **MS. WEINTRAUB: So you would think that that's a very important fact, right?**
>
> **AGENT: Yes.**
>
> **MS. WEINTRAUB: And it's so important that it's not even mentioned in the complaint, is it?**
>
> **AGENT: It is an important factor but it's not mentioned because we don't have the results yet.**
>
> MS. WEINTRAUB: So then you're not considering that to be a factor against David who stands here under the presumption of innocence, is that fair?
>
> AGENT: If DNA matches.
>
> MS. WEINTRAUB: If. If -- no offense but as you sit here right now and he has the presumption – I'm sorry, Judge, excuse the snarkiness. As David stands here right now he is presumed innocent, you do understand that, right?
>
> AGENT: But we have a lot of other evidence that is pretty strong.
>
> MS. WEINTRAUB: Well, let's talk about a lot of that other evidence.
>
> THE COURT: Let me ask you this question, how certain are you that there was blood found in the apartment?
>
> **THE WITNESS: This is according to the Spanish National Police.**
>
> THE COURT: They've informed you of that?
>
> THE WITNESS: Yes. The forensic examiners have found blood in the apartment.

10

>MS. WEINTRAUB:  And that would have been from February when they went there?
>
>AGENT: February 4th when they went in there.
>
>MS. WEINTRAUB:  Okay. And it's now May what, tenth, yes?
>
>AGENT: Yes.
>
>**MS. WEINTRAUB:  And you haven't heard anything about that blood?**
>
>**AGENT: We're waiting for getting comparison.**

(DE 43-1 at 20:14-22:3).

The Agent's testimony at the hearing was accurate. SNP had relayed to the FBI that blood was found in the apartment. When Defense counsel asked the Agent about forensic evidence in the Victim's apartment, the Agent truthfully provided the information she had been provided by SNP at the time. If the Agent would have answered otherwise, her testimony would have been inaccurate. Nevertheless, the government **did not** include this fact in its proffer, argument, or Complaint specifically because the results were not finalized. When the FBI subsequently learned that forensic analysis revealed that blood was not present in the Victim's apartment, the government relayed that information to the Defendant. Simply put, the government did not rely on blood evidence, the absence of which the Defendant now relies on in support of his Motion. Nothing has changed, and the lack of blood evidence that the government did not rely on does not change the Defendant's status as a flight risk.

    **ii.** *FBI Reports Describing Video Evidence*

Next, the Defendant argues that "reports describ[ing] 'grainy video footage from a surveillance camera depicting a man with <u>similar features</u> as [Knezevich] entering the apartment with a suitcase' at approximately 10 p.m." are a basis to overturn the Court's Order of Detention.

11

(DE 43 at 4). The government's proffer and the Agent's testimony, not FBI reports, were what this Court based its decision on at the Detention Hearing. During the proffer, the government did not refer to a grainy video depicting a man with similar features to the Defendant. Rather, it referred to a "male, believed by law enforcement to be the defendant" depicted on the surveillance footage and explained the basis for that belief. *Id.* at 3:1-8:18. The government has filed the relevant videos under seal for this Court's consideration. *See* Sealed Exhibit 1 (Hardware Store Surveillance; Sealed Exhibit 2 (Surveillance Footage from Apartment).[2]

Given that the Defendant has entered a plea of not guilty, it is no surprise that he is contesting that he is the individual in the video surveillance. Nevertheless, the Defendant's assessment of the strength of the evidence in his case in not a basis to reopen the Detention Hearing. *See Jerdine*, 2009 WL 4906564, at *3. Moreover, many of the FBI reports in this case, along with all of the videos at issue, were in existence at the time of the Detention Hearing. Defendant's strategic decision to have the Detention Hearing at the first possible opportunity, rather than holding it at a later date with the benefit of discovery does not make the evidence in this case "new" evidence such that it allows the Defendant to reopen the Detention Hearing under § 3142(f), especially given that Defense Counsel did not ask for any of this information. If this were the case, every Defendant in this District would be entitled to a second detention hearing upon receiving discovery. Such an outcome is practically impossible and is not rooted in § 3142(f).

### iii.  *Video of a Man on a Scooter*

Next, Defense counsel falsely represents that the government has withheld video evidence of a man on a scooter spray painting cameras outside of the Victim's apartment building. (DE 43

---

[2] The government has filed several of the exhibits referenced herein under seal because the discovery in this case is subject to a protective order. *See* (DE 44).

at 5-6). To the contrary, government counsel has produced all video in its possession to the Defendant, pinpointed the exact video clip that Spanish law enforcement believes depicts a scooter, produced all reports referencing a man on a scooter, and engaged in extensive dialogue with Defense Counsel about the genesis of this information. Defendant's representations about government counsel are demonstrably false. *See* Exhibit 3[3] (advising Defense Counsel that the government had produced 600 video clips, providing the specific file name of the video clip depicting what SNP believes to be a scooter, and explaining how the FBI was first advised of a man on a scooter spray painting cameras).

As is the case with every criminal investigation, law enforcement documents information that it receives and then investigates to determine if that information is accurate and is indicative of criminal activity. That is what occurred here. The FBI received information through its threat hotline from a civilian[4] regarding the disappearance of the Victim, which included a report of a man on a scooter spray painting cameras outside of the Victim's apartment building. This information was documented by the FBI. During its investigation, the FBI obtained video surveillance from the Victim's apartment from SNP, which shows a single headlight on the area adjacent to the front door to the apartment building. Scooters are common in Salamanca, Spain, so SNP deduced that the headlight belonged to a scooter. A review of the remainder of the surveillance footage from the evening of February 2, 2024, did not reveal a man on a scooter spray painting cameras outside the apartment building. However, it did reveal the Defendant spray painting a surveillance camera inside the apartment building. While there is a camera outside of

---

[3] On pages 1-9 of Exhibit 3, government counsel's responses appear in red.
[4] This individual was a friend of the Victim and received one of the last messages sent from the Victim's phone, which law enforcement knows was translated by a woman the Defendant met on a dating application.

13

the building, it part of a device used for visitors to gain entry into the building and only provides a live video feed when in use. It does not record. As such, it appears that details about the video surveillance recorded at the Victim's apartment have been conflated. The government is not in possession of surveillance footage depicting a man on a scooter spray painting cameras outside of the Victim's apartment building and cannot produce something that does not exist.[5] Defense Counsel's assertion that the government has withheld *Brady* evidence is meritless.

Moreover, if a man on a scooter was spray painting a camera outside the Victim's apartment on the night of her disappearance, it would not be a stretch for a reasonable fact finder to conclude that it was the **Defendant**, given that he is on camera in Madrid, Spain, on the day his wife (who has requested a divorce) is last seen alive, purchasing the same brand of spray paint that, just hours later, a man who strongly resembles the Defendant used to spray paint the surveillance camera inside her apartment building, along with duct tape, which was also found on the front door of the her apartment building. Such a recording would likely be compelling evidence for the government. This argument has no merit.

### iv. *"Speculative" Evidence*

The Defendant next argues that the evidence pertaining to a Serbian license plate is "speculative" evidence. After the Detention Hearing, FBI personnel learned that a license plate was stolen in Belgrade, Serbia ("Stolen Plate"), on January 28, 2024, the day the Defendant arrived in Belgrade from Miami, Florida. Thereafter, license plate readers recorded the Stolen Plate traveling from France towards Madrid, Spain, on February 1, 2024 (the day prior to the Victim's

---

[5] Unlike the United States, Spain has privacy laws that restrict the use surveillance cameras recording public areas, such as the street of the Victim's apartment building. *See, e.g.*, Spanish Data Protection Agency, https://www.aepd.es/preguntas-frecuentes/8-videovigilancia (last visited August 3, 2024).

14

disappearance). Spanish law enforcement also determined that the Stolen Plate was moving parallel to the Serbian telephone the Defendant used during his kidnapping. This information is documented in a report authored by the SNP that was produced to the Defendant via email on June 17, 2024.

While this is new evidence,[6] it is not a basis to reopen the Detention Hearing because it is **inculpatory**. Moreover, even assuming this Court finds the new evidence to be "speculative," the government did not rely on it in the Detention Hearing, so it has no significance now as it does not refute any of the government's claims at the Detention Hearing. Defense Counsel's personal belief that inculpatory evidence that was not considered by this Court at the Detention Hearing is "speculative" is not a sufficient basis to reopen the Detention Hearing. Furthermore, contrary to Defense Counsel's assertions, this evidence further demonstrates that the Defendant went to great lengths to obscure his whereabouts and attempt to remain undetected during the commission of his crimes. Given that this Court has already found the Defendant to be a serious risk of flight, this evidence should cause great concern for the Court about what the Defendant will do if released on bond.

### v. *Investigation Into Other Charges*

The Defendant argues that the kidnapping charge is a "means of detaining Knezevich while [the government] conducts a murder investigation." (DE 43 at 7). The government has sought to detain the Defendant because he is a risk of flight and a danger to the community. Three months have passed since the Detention Hearing, and the Victim has still not been located, despite Defense Counsel's argument that "she's just doing this because she's psychotic" and is "going to walk in

---

[6] The government did not learn about the stolen Serbian license plate until after the Detention Hearing.

15

the door." *See* (DE 43-1 at 45). The fact that the Victim has still not been located is further evidence that she is likely deceased and that the Defendant is a danger to the community.

Likewise, the government's argument that the Defendant is a serious risk of flight has strengthened. Despite the Defendant advising Pre-Trial Services that he "relinquished his Serbian citizenship" (PTS Report at 1), and suggesting that he was not a dual citizen and representing that his Serbian passport was expired at the Detention Hearing (DE 43-1 at 24:15-25:20), the Republic of Serbia has unequivocally advised that the Defendant "is a citizen of the Republic of Serbia and has a passport . . . issued by the police department of the city of Belgrade, with an expiration date of 09/17/2032." *See* Exhibit 4. Moreover, the owner of an apartment the Defendant was renting in Serbia prior to his arrest took a photo of the Defendant's *active* Serbian passport that he found in the apartment after the Defendant was arrested and provided the photo to law enforcement in June 2024. *See* Sealed Exhibit 5. The owner subsequently provided the Defendant's passport to his parents pursuant to their request. However, the passport was noticeably absent when Serbian law enforcement searched the Defendant's parents' home in June 2024. The Defendant's representations at the Detention Hearing regarding his Serbian citizenship and passport have been disproven.

Additionally, the Defendant understated his assets to Pre-Trial Services, failing to report that he holds mortgage notes in the amount of $3.4 million dollars. The notes are the result of the Defendant's sale of seven residential properties between December 2023 and February 2024, just prior to the Victim's disappearance, for a total of $6,686,500.[7] *See* Exhibits 6-12. Curiously, the Defendant loaned the bulk of the proceeds of these sales to the purchaser of the properties. *See* Exhibits 13-20. The mortgages for these properties are worth $3,486,489.38 and are payable upon

---

[7] These sales also drastically reduced the Defendant's ties to this District.

16

a specified date in 2027 "or upon either the Sale or Refinance of the property, whichever event occurs first." See, e.g., Exhibit 17 at 2. As such, these mortgages could be repaid at any time if the property is sold by the borrower. The mortgages held by the Defendant are an asset which the Defendant failed to report to PTS, as is the interest income he is earning from these mortgages, which also does not appear on the PTS report. *See, e.g.,* Exhibit 17 at 22. Moreover, on June 6, 2024, an FBI Special Agent spoke with a title agent involved in the sale of several properties sold by the Defendant, who advised that he is holding $214,000 in an escrow account for the Defendant. This money is also not reported in the PTS Report. These facts are at odds with the Defendant's representations that he is "not a man of means." (DE 43 at 9). The Defendant argues in his Motion that this Court should defer to the recommendation of Pre-Trial Services, but he was not forthcoming with Pre-Trial Services about his Serbian citizenship or his assets. As such, the Defendant's arguments should be rejected by this Court.

Furthermore, law enforcement is not precluded from continuing to investigate the Defendant's criminal activity, and Defense Counsel was aware at the Detention Hearing that the Defendant was being investigated for other offenses. The government executed a search warrant on the Defendant's residence on May 8, 2024 (2 days before the Detention Hearing), and the warrant left at the residence indicated that the home was being searched for evidence of Foreign Murder, Kidnapping, and Stalking, in violation of 18 U.S.C. §§ 1119, 1201(a), and 2261A, respectively. Defense Counsel asked the undersigned if the Defendant was being charged with other offenses before the Detention Hearing. This information is not new. Accordingly, it is not a basis to reopen the Detention Hearing under § 3142(f).

### vi. *Jurisdiction*

The Defendant next argues that the United States does not have jurisdiction over the instant

17

offense. This argument fails for a multitude of reasons. First and foremost, this issue is not before the Court, which is currently tasked with assessing whether the Defendant is a risk of flight or a danger to the community. A motion to dismiss under Federal Rule of Criminal Procedure 12(b), not a motion to reopen a detention hearing under § 3142(f), is the proper vehicle to challenge jurisdiction. Second, the Indictment tracks the language of the statute, and is, therefore, valid. *See* 18 U.S.C. § 1201(a) (providing that "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when . . . *the offender travels in interstate or foreign commerce*" commits the offense of kidnapping); *see also United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. Moreover, this court is constitutionally barred from ruling on a hypothetical question. The sufficiency of a criminal indictment is determined from its face. The indictment is sufficient if it charges in the language of the statute."). To this point, another Magistrate Judge of this Court also issued the Complaint based on this theory. (DE 3).

Lastly, this argument was raised by Defense Counsel at the Detention Hearing and is not "new." *See* (DE 43-1 at 32:8-37:23). The Defendant is not entitled to reopen a detention hearing to rehash arguments that have previously been made before the Court. This Court should once again reject the Defendant's jurisdictional argument.

### vii. *Defendant's Assets*

The Defendant next argues that he is not a "man of means." (DE 43 at 9). As described above, the Defendant was not forthcoming with Pre-Trial Services and has significantly more assets than he disclosed. *See supra* at pp. 15-16. Defense Counsel also represents that "Knezevich's bank accounts . . . have been frozen, despite the fact they were opened **with his**

**business and solely in his name**." (DE 43 at 10) (emphasis added). However, the undersigned has conferred with the attorney representing the Victim's mother in the conservatorship action who advised that only a single joint Chase bank account has been frozen. The PTS Report indicates that the Defendant has multiple bank accounts, several of which are not business accounts, and therefore, would be accounts other than those referenced by Defense Counsel as accounts that have been frozen:

| | |
|---|---|
| Personal Checking Acct. – Chase: | $160,000[8] |
| Personal Savings Acct. – Chase: | $50 |
| **Personal Checking Acct. – BOA:** | **$40,000** |
| Business Acct. – Chase: | $50,000 |
| Business Acct. – BOA: | $3,000 |
| **Personal Checking Acct. - Pentagon FCU:** | **$80,000** |
| **Savings Acct. – FCU:** | **$10,000** |

PTS Report at 2-3. Any other bank accounts the Defendant has access to, such as those he reported to Pre-Trial Services, do not appear to have been frozen by the conservatorship. Moreover, the Defendant reported owning $20,000 in jewelry, $100,000 in stocks, and $133,000 in motor vehicles. *Id.* The assets the Defendant reported to PTS alone—without even considering the $3.4 million in mortgage notes the Defendant holds and any of the interest he is earning on those notes—demonstrate that he does have significant assets. *See* (PTS Report at 3) (estimating the Defendant's net worth to be $2,546,370). The Defendant's argument on this point is refuted by the record.

      **viii.**   *Reliance of U.S. v. Kaplowitz*

Lastly, the Defendant's reliance on *United States v. Kaplowitz*, No. 14-20323-CR, 2014 WL 2155231 (S.D. Fla. May 22, 2014) is misplaced. In *Kaplowitz*, the district court revoked an

---

[8] It is unclear from the PTS Report if this is the frozen Chase account at issue in the conservatorship.

order of detention for two defendants facing fraud charges. *Id.* One of the defendant's "net worth [was] approximately $300,000, he own[ed] two South Florida homes with his partner, and he ha[d] no ties to foreign countries." *Id.* at *3. The other defendant owned a $1.4 million dollar home in South Florida, had significant assets, and had a strong bond to his extended family. *Id.* at *4. The same is not true here. The Defendant's net worth is in the millions; he has sold seven properties that he owned in this District just before the Victim disappeared and is **currently attempting to sell their marital home**;[9] the Defendant's only blood relative in this District is his brother who had not spoken to the Defendant for years prior to his arrest;[10] and he has significant ties to Serbia, is a dual citizen of that country, and has an active passport (despite his prior representations to this Court to the contrary). Moreover, Defense Counsel makes too much of his return to this District. Given that a large portion of the Defendant's conduct occurred in Spain, the Defendant, who is not a lawyer, likely did not anticipate that he could be arrested in the United States. As such, *Kaplowitz* is not persuasive here and does not provide this Court with a basis to release the Defendant.

Accordingly, the Defendant has not provided grounds to reopen his Detention Hearing under § 3142(f). His Motion should be denied, and he should remain detained pending trial.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: **Lacee Elizabeth Monk**
Lacee Elizabeth Monk
Assistant United States Attorney
Florida Bar No. 100322
U.S. Attorney's Office
99 N.E. 4th Street, Miami, FL 33132-2111
(305) 961-9427| Lacee.Monk@usdoj.gov

---

[9] *See David Knezevich v. John P. Seiler, Esq., as Conservator for "A.K.,"* Case No. CACE-24-010353 (Fla. 17th Cir. July 23, 2024) at Complaint.
[10] *See* (DE 20-2).