UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cr-20201-KMW

UNITED STATES OF AMERICA,

v.

DAVID KNEZEVICH,

Defendant.

_____/

## MOTION FOR LIMITED DISCLOSURE OF GRAND JURY MINUTES

David Knezevich ("Knezevich") through undersigned counsel, respectfully submits this Motion for Limited Disclosure of Grand Jury Minutes relating to the accuracy of both legal instructions concerning the elements of the charged offense, as well as testimony essential to establish that offense. Knezevich's Motion for Limited Disclosure relates to the grand jury indictment dated May 15, 2024, charging Knezevich with the February 2, 2024, kidnapping of Knezevich's wife in Madrid Spain in violation of 18 U.S.C. section 1201 (a). (D.E. 11).

## I.    INTRODUCTION

Knezevich's prosecution commenced on Saturday May 4, 2024, with what the Government has described as Knezevich's "reactive arrest" at Miami International Airport when Knezevich returned to the United States from Serbia.  While the Government charged Knezevich with the alleged kidnapping of Knezevich's wife Ana in Madrid, Spain on February 2, 2024, the Government's real purpose in arresting Knezevich was to detain Knezevich until the Government could acquire what the Government believes is sufficient evidence to charge Knezevich with the murder of his wife. Since detaining an individual for purposes of an investigation contradicts basic constitutional protections, the Government has attempted to legitimize its kidnapping prosecution.

1

Six months into the kidnapping prosecution the veneer of legitimacy that the Government has sought to portray has crumbled.

The first indicia of the Government's gameplan surfaced at Knezevich's detention hearing when the Government authored the novel claim that Knezevich, who returned to the United States after being notified by the FBI that he was under investigation for the disappearance of Knezevich's wife, was a risk of flight. Claiming that an individual, who voluntarily returned to the United States after being informed that he was under FBI investigation, is a risk of flight, epitomized the Government's determination to detain Knezevich at all costs.

The Government's discovery production confirmed that the kidnapping prosecution is in fact a "placeholder" for the Government's desired murder prosecution. Report after report from the FBI and their investigative partners from the Spanish National Police ("SNP") reference the investigation as "Murder of a U.S. National by a U.S. National."  The operative criminal statute cited in reports is 18 U.S.C. section 1119 (murder) and not 18 U.S.C. section 1201(a) (kidnapping).

Government pleadings, hearing testimony, and discovery displayed a distinct indifference to the essential elements of kidnapping as set forth in 18 U.S.C. 1201(a). As a result, the question has arisen whether the Government's treatment of the kidnapping charge as a "placeholder" infected the Government's fundamental due process responsibilities. The Government's haste in charging Knezevich, and its recent representations to the Court and to the defense, raise serious questions whether the grand jury was given accurate legal instruction concerning the essential kidnapping elements of taking and holding, "for an appreciable period," with the defendant traveling in "foreign commerce" in "committing or in furtherance of" the kidnapping.

In detention hearing testimony, FBI Special Agent Montilla acknowledged the absence of evidence that the alleged victim was taken or held for an appreciable time period—the basic

elements of kidnaping.  In fact, the Government's theory appears to be *incompatible* with those basic elements.  Specifically, the Government's theory appears to be that Knezevich murdered his wife in her apartment and removed her body from the building in a rolling suitcase. This theory negates the offense of kidnapping.  Kidnapping requires a live victim taken and held against her will.   In addition, it is plain from the detention hearings that the Government has no evidence that Knezevich traveled in "foreign commerce" in "furtherance of" the alleged kidnapping.

The evidence and the Government's representations also raise serious questions whether the grand jury was misled concerning essential Government evidence.  Specifically, the Government's pleadings and factual proffer in favor of detention claim that a video establishes that Knezevich entered and left his wife's apartment building with a suitcase.  Chief Magistrate Judge Torres viewed the video in question and concluded that the video does not show that claimed by the Government (Ex. A, 8/8/24 Tr. at 57:5-12).[1] Presentation of testimony in the grand jury that the video established Knezevich entering and leaving his wife's apartment building with a suitcase would be misleading and inaccurate. Knezevich requests disclosure of the grand jury minutes describing the video to determine whether the grand jury was misled.

These circumstances, the lack of evidence supporting the essential elements of the kidnapping charge, and the fact that the Government's own apparent theory is at odds with the charge—raise serious questions about whether the grand jury was misled about the elements of the charged kidnapping offense.  Accordingly, Knezevich has demonstrated the "particularized need" required to warrant disclosure to the defense of the grand jury instructions and related colloquy about the law, as well as any testimony about the video allegedly reflecting Knezevich entering and leaving the victim's apartment building with a rolling suitcase.

---

[1] The transcript from the renewed detention hearing on August 8, 2024, is attached as **Exhibit A**.

## II.    "HEIGHTENED RELIABILITY" REQUIREMENT

The Government's recent injection of the possibility of "capital-eligible charges" implicates an additional level of analysis of the issues presented, because "[t]here is no doubt that [d]eath is different." *Ring v. Arizona*, 536 U.S. 584, 605 (2002). Expressly because of that difference, the Supreme Court has "imposed protections that the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991). *See also, e.g., United States v. Anderson*, 229 F. Supp. 2d 17, 25 (D. Mass. 2002) (explaining that because "death is different," the Supreme Court has "repeatedly . . . require[ed] that courts take special care to assure the fairness and integrity of death penalty proceedings. . .").

One such requirement is that of "heightened reliability" in such cases. *See, e.g., Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("the Eighth Amendment **requires a greater degree of accuracy and factfinding than would be true in a noncapital case**.") (emphasis added).  And, whether a part of "heightened reliability" or a more general "special care to assure the fairness and integrity of death penalty proceedings," it is undeniably true that "**an already significant legal question is even more so in the context of a capital case, because death is different**." *Sampson v. United States*, 832 F.3d 37, 43 (1st Cir. 2016) (emphasis added) (internal quotations omitted).[2]

## III.    FACTUAL BACKGROUND

Knezevich and his wife, Ana, were married for approximately 13 years before separating in 2023.  In December 2023, Knezevich spent most of his time in Belgrade, Serbia, where his disabled mother lives, and where he had leased an apartment for a year to make easier long visits

---

[2] The ABA Guidelines for capital cases "apply in any circumstances in which a detainee of the government **may face** a possible death sentence, regardless of whether formal legal proceedings have been commenced or the prosecution has affirmatively indicated that the death penalty will be sought." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 Ed.), Guideline 1.1. (emphasis added).

to help his mother, as needed.  In December 2023, Ana Knezevich visited Knezevich in Belgrade.  Ana subsequently returned to Fort Lauderdale and then, on December 26, flew to Madrid, where she had relocated and rented an apartment.  Knezevich remained in Belgrade in December 2023 and early January 2024.  (Ex. A at 78, 72-73; D.E. 86 at 2).

In mid-January 2024, Knezevich briefly left Belgrade to attend a state court civil proceeding in South Florida.  On January 27, 2024, Knezevich left Miami to return to Serbia, flying on Turkish Airways with a layover in Istanbul.  He arrived in Belgrade on January 28. *Id*. at 72-73.  The Government alleges that **two and a half days later**, on the evening of January 30, Knezevich left Serbia in a rental car and arrived in Madrid on February 1, kidnapped his wife on February 2, 2024, and returned to Serbia on February 5, 2024.  (Ex. B, 5/10/24 Tr. at 6:19-6:25)[3]; (D.E. 86, at 2).  Knezevich remained in Serbia until May 4, when he voluntarily returned to Miami with full knowledge that he was under federal investigation.  Upon arriving in Miami, he was arrested and charged with kidnapping.[4]

The Government's theory is that on February 2, Knezevich "strangled" or "otherwise incapacitated" his wife and subsequently took her out of the apartment building in a suitcase. (Ex. A at 95).  At the detention hearings, Agent Montilla acknowledged that the Government does not know how the victim was "taken"—and in fact, concedes **there is no evidence she was taken against her will.**  (Ex. B at 22, 27). The Court questioned Agent Montilla on this specific issue. *See* Ex. A at 38 (COURT: . . . Other than the fact no one has seen her, **what other evidence is**

---

[3] The transcript from the detention hearing on May 10, 2024, is attached as **Exhibit B**.

[4] During the second detention hearing, it was confirmed that the FBI contacted Knezevich in Belgrade to question him.  He referred all inquiries to his criminal lawyer in Miami.  It is undisputed his lawyer was told that the FBI opened an investigation in Miami and that Knezevich was the prime target of the FBI investigation.  (Ex. A at 71).

**there that she was taken from the apartment**?  Agent Montilla: **No, no other evidence**.) (emphasis added). Thus, the Government's only evidence that the victim was "taken" is that she has not been seen since February 2. (Ex. A at 38).  Agent Montilla further testified:

- There was no evidence of a struggle in the victim's apartment. (Ex. B at 20; Ex. A at 11-12);
- No blood was found in the apartment (Ex. A at 10); and
- Contrary to the Agent's prior testimony suggesting a scene of violence, nothing in the apartment looked suspicious, according to the Spanish National Police (Ex. A at 11-12).

With respect to the "rolling suitcase," the Government's Complaint alleged that the apartment building's surveillance camera captured a "male" who looked directly at the camera and had "physical characteristics that resemble those of Knezevich," "leaving the elevator with what appears to be a suitcase."  (D.E. 3, at ¶ 7).[5]  Similarly, at the May 10 detention hearing, the Government proffered that the "building surveillance camera captured a male, believed by law enforcement to be the defendant, waiting outside the entrance to the victim's apartment building," and later "the male reenters the apartment building and appears to enter the elevator with an object" that "appears to be a rolling suitcase" and then leaves with suitcase.  (Ex. B at 4-5).  In the subsequent August 8 detention hearing, however, when the defense played the relevant videos, Chief Magistrate Judge Torres questioned whether Agent Montilla saw a suitcase in the videos, and she acknowledged that there was **no video *showing* a suitcase**.  (Ex. A at 34-37).  Judge Torres, after reviewing all relevant video, said he did **not** see a suitcase.  (Ex. A at 57:5-12).  Agent Montilla further admitted that she did not have the video when her reports and the Complaint were drafted, and she was relying on information from the SNP.  (Ex. A at 19:21-24).  This further raises

---

[5] FBI reports obtained in discovery are similarly speculative. The FBI Reports claim the footage *shows a man with the same features at Knezevich* entering the apartment building with a suitcase. *See, e.g.*, Serial 10, Bates 8159.

the question: Was the grand jury told there was video evidence of a male with the same physical characteristics as Knezevich entering the apartment and leaving the apartment with a suitcase? That could be critical evidence for a kidnapping charge, which requires taking and holding—but does not exist, as described.

Knezevich has been detained since May 4 on kidnapping charges.  The Government described his arrest as "reactive" and said it is "evaluating whether to pursue capital-eligible offenses."  (D.E. 86 at 3-4).  In short, the Government intends to hold Knezevich indefinitely on kidnapping charges it cannot prove, *while it considers whether to charge him with murder.*

## IV.   LEGAL STANDARD

The grand jury is "essential to basic liberties." *United States v. Calandra*, 414 U.S. 338, 342-43 (1974).  Its responsibilities include "determin[ing] whether there is probable cause to believe a crime has been committed" and "protection of citizens against unfounded criminal prosecutions." *Id*.  The grand jury's "mission is to clear the innocent, no less than to bring to trial those who may be guilty." *United States v. Dionisio*, 410 U.S. 1, 16-17 & n.15 (1973).  To guard against unfounded prosecutions, "**the Fifth Amendment require[s] that the grand jury find probable cause for each of the elements**" of the charged offense.  *United States v. Martinez*, 800 F.3d 1293, 1295 (11th Cir. 2015) (per curiam) (emphasis added).

Although grand jury material generally is secret, there are exceptions.  Rule 6(e), specifically provides that the Court may "authorize disclosure … at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  This exception applies upon a showing of "particularized need" for the material.  *See Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).  Specifically, a party seeking disclosure must show that: (1) "the material they

seek is needed to avoid a possible injustice in another judicial proceeding"; (2) "the need for disclosure is greater than the need for continued secrecy"; and (3) the "request is structured to cover only material so needed." *Id*. "To show a compelling and particularized need, the private party must show circumstances had created certain difficulties peculiar to this case, which could be alleviated by access to *specific* grand jury materials, without doing disproportionate harm to the salutary purpose of secrecy embodied in the grand jury process." *United States v. Aisenberg*, 358 F.3d 1327, 1348–49 (11th Cir. 2004) (punctuation and citation omitted).

"While the government need not provide the grand jury with legal instructions, if the Government does provide legal instruction, it is error to do so incompletely or erroneously." *United States v. Patel*, No. 3:21-CR-220 (VAB), 2022 WL 12358443, at *8 (D. Conn. Oct. 21, 2022) (punctuation and citations omitted). *See also United States v. Brito*, 907 F.2d 392, 395 (2d Cir. 1990) ("[C]areless instructions, such as those given here, tend to hamper the grand jury's understanding of the importance of evaluating the reliability of the evidence and to discourage it from demanding eye witness testimony."). Courts will dismiss the indictment if "the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (punctuation and citation omitted).[6]

---

[6] *See also United States v. Stevens*, 771 F. Supp. 2d 556, 567 (D. Md. 2011) (dismissing indictment where prosecutor erroneously instructed grand jurors that the advice of counsel was irrelevant to a determination of whether there was probable cause to indict defendant); *United States v. Cerullo*, No. CRIM. 05CR1190BEN, 2007 WL 2683799, at *3-4 (S.D. Cal. Sept. 7, 2007) (dismissing indictment in tax case where grand jury repeatedly asked how to distinguish between gift and earnings, and the prosecutor and agent witnesses failed to tell the grand jury that the donor's intent is the most critical factor; as a result, "the grand jury was misled on the law, was unable to correctly adjudge the evidence, and no longer operated as an independent body and buffer between the Government and the Defendant"); *United States v. Peralta*, 763 F. Supp. 14, 20 (S.D.N.Y. 1991) (dismissing indictment where "there was a high probability, if not a certainty, that the grand jury . . . was misled into thinking that constructive possession was equivalent to the mere *physical*

Accordingly, many courts have concluded that "particularized need" is established and have granted motions for disclosure, or *in camera* review before disclosure, where the defendant shows a basis to believe that the grand jury was improperly instructed.  *See Patel*, 2022 WL 12358443, at *9 (granting request for *in camera* review of grand jury instructions, and noting lack of harm in doing so); *United States v. Islam*, No. 20-cr-00045, 2021 WL 312681, at *3 (E.D. Pa. Jan. 29, 2021) (granting request for *in camera* review of certain instructions "given the complexity of the law and the subtlety of the facts, reasonable minds might differ, warranting Defendants' request for early review"); *United States v. FedEx Corp.*, No. C14-00380, Dkt. No. 165 (N.D. Cal. Jan. 19, 2016) (**ordering the government to produce grand jury instructions to defense**); *United States v. Hoey*, No. S3 11-cr-337 (PKC), 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (emphasis added) (ordering government to produce relevant portions of grand jury instructions for *in camera* review); *United States v. Mix*, No. CRIM.A. 12-171, 2013 WL 4786027, at *4 (E.D. La. Sept. 6, 2013) (**quoting and analyzing relevant grand jury instructions, which the court previously had reviewed *in camera*, where defendant argued it was difficult to see how a grand jury that was appropriately advised of the evidence and correctly instructed on the elements could have found probable cause**); *United States v. Stevens*, 771 F. Supp. 2d 556, 564 (D. Md. 2011) (emphasis added) (noting that court disclosed relevant excerpt from the grand jury transcripts to defendant to allow further briefing on whether grand jury was properly instructed on advice of counsel defense); *United States v. Ho*, No. 08-cr-00337 (JMS), 2009 WL 2591345, at *4-5 (D. Haw. Aug. 20, 2009) (granting request for *in camera* review of government's instruction on element of the offense where prosecutor's "on-the-record statements" reflected a

---

*possibility* of exercising dominion and control over the gun and the drugs" and the case agent gave inaccurate testimony).

misunderstanding of the element and the court could not "rule out that the government did not properly instruct the grand jury"); *United States v. Twersky*, No. S2 92-cr-1082 (SWK), 1994 WL 319367, at \*4-5 (S.D.N.Y. June 29, 1994) (granting *in camera* inspection of grand jury charge to assess if government misled the grand jury given intervening Supreme Court case).

## ARGUMENT

### 1.      Knezevich is Entitled to Disclosure of the Requested Grand Jury Minutes

The circumstances of this case raise serious questions about whether the grand jury was misled as to the essential elements of the charged offense.  In addition, there is a serious question of whether the Government misled the grand jury about the video evidence allegedly depicting Knezevich in the victim's apartment building with a "rolling suitcase," which the Government calls "grainy video."  The reality is that it is not grainy video; it is totally indecipherable video, and the viewer cannot tell what, if anything, appears on the video.  It is clear the Government does not have, and therefore could not present to the grand jury, evidence supporting the essential elements, including taking, holding, and travel in foreign commerce in furtherance of the offense. Any error in instructing the grand jury as to the essential elements, **and** any inaccurate description of the Government's evidence, raises grave concern that the grand jury's decision to indict is tainted.

Further, Knezevich's need for disclosure of the limited, specific requested grand jury minutes is greater than the minimal need for continued secrecy of that material, and the request is narrowly tailored to cover only necessary material.  This is especially true now, after the Government has advised that this is a potential death penalty case. The circumstances thus demonstrate a compelling, particularized need for the requested grand jury materials.

a. **The Circumstances Suggest the Grand Jury Was Improperly Instructed as to Both the "Taking" and the "Holding" Elements of the Charged Kidnapping Offense and Potentially Misled about the Government's Evidence**

The crime of kidnapping under section 1201(a) requires: "(1) unlawfully seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away the victim; and (2) holding the victim for ransom or reward or otherwise." *United States v. Gillis*, 938 F.3d 1181, 1203 (11th Cir. 2019) (citing *Chatwin v. United States*, 326 U.S. 455, 459 (1946)). The Supreme Court has explained that "[t]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." *Chatwin*, 326 U.S. at 460.

The Government essentially acknowledges that it has no evidence that Knezevich took the alleged victim, let alone that he held her for an appreciable time against her will. Indeed, Agent Montilla testified that there was no evidence of a struggle in victim's apartment (Ex. B at 20; Ex. A at 11-12); no blood was found in the apartment (Ex. A at 10); nothing in the apartment looked suspicious, according to the Spanish National Police (Ex. A at 11-12); and there is no evidence that the victim was taken against her will (Ex. B at 22). The Government's assertion that the victim was taken and "held" is pure speculation.

Moreover, the Government's own apparent theory belies the "taking" and "holding" elements of a kidnaping charge. As noted above, the Government's *theory* is that on February 2,

11

Knezevich "strangled" or "otherwise incapacitated"[7] his wife and subsequently left the apartment building with her in a suitcase.  (Ex. A at 95).[8]

The absence of any evidence to support the "taking" and "holding" elements—and the Government's own apparent disbelief of facts that would support those elements—raise serious questions about whether the grand jury was misled about the essential elements of the charged offense.  That concern is exacerbated by the possibility that the grand jury was misled about the absence of evidence demonstrating a "taking" or "holding."  Specifically, as explained above, the Government's criminal complaint and proffer in support of detention suggested that surveillance tapes from the alleged victim's apartment building showed a male with physical characteristics resembling Knezevich entering and leaving the building with an object that appeared to be a suitcase.  (D.E. 3, at ¶ 7; Ex. B at 4-5).  In reality, however, as Judge Torres noted, the videos show no such thing.  The relevant tapes, shown during the August 8 hearing, do not show the physical characteristics of a person, nor do they show a suitcase.  Indeed, when the defense played the relevant videos, Judge Torres questioned whether Agent Montilla saw a suitcase in the videos, and she had to acknowledge that there was no video showing a suitcase.  (Ex. A at 34-36).  If the Government provided testimony about the videos rather than playing the videos themselves for the grand jury, disclosure of the relevant portions of the grand jury transcript is warranted to determine whether they support a motion to dismiss.  *See, e.g., United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (granting motion to dismiss indictment based on errors in the grand

---

[7] The Government essentially concedes that, as to the statutory elements of "taking" and "holding," it has no evidence—all it has at this juncture, is a theory. (Ex. A at 95).

[8] It is well-established that the kidnapping statute requires the taking and holding of a live victim. *See, e.g., United States v. Davis*, 19 F.3d 166, 169 (5th Cir. 1994) ("It is true that under § 1201(a) the defendants must abduct a live person who then moves in interstate commerce. Federal kidnapping does not cover transportation of a corpse across state lines.").

jury proceeding that "went both to the quality of the evidence before the grand jury and to the requirements of the legal theory at the core of the government's case").

**b.  The Circumstances Suggest the Grand Jury Was Improperly Instructed as to the "Foreign Commerce" Element of the Offense**

The charged statute, 18 U.S.C. section 1201(a), forbids kidnapping when "the offender travels in . . . foreign commerce . . . in committing or in furtherance of the commission of the offense."  The Government alleges that this element is satisfied by Knezevich's travel from Miami International Airport **to Madrid** in foreign commerce.[9]  It is clear, however, that a properly instructed grand jury could not have indicted on that basis.

**i.  Travel in "foreign commerce" is limited to travel between the U.S. and a foreign country.**

The term "foreign commerce" means "commerce with a foreign country."  18 U.S.C. § 10. It is limited to travel "between some place within the United States and some place outside the United States."  *Eleventh Circuit Pattern Jury Instructions (Criminal Cases)* § O71 (addressing element of 18 U.S.C. § 1952(a)(3)).  Travel from one foreign country to another does not qualify as travel in "foreign commerce."  *See United States v. Weingarten*, 632 F.3d 60, 70 (2d Cir. 2011) ("[W]e conclude that it would be anomalous to construe the general definition of 'foreign commerce' in § 10, upon which many of Title 18's provisions rely in setting out the scope of criminal prohibitions, as including all forms of commerce occurring outside the United States and without nexus whatsoever to this country."); *United States v. McRary*, 665 F.2d 674, 678 (5th Cir. 1982) (addressing § 1201 prior to 2006 amendments and holding that "the foreign commerce

---

[9] As discussed further below, this is a deliberate misrepresentation in the Indictment. It is undisputed Knezevich flew from Miami to Serbia, where the Government admits **he stayed for several days** before it is alleged that he drove to Madrid. The Government continues to misrepresent this fact, as recently as its response to Knezevich's request for a discovery cut off, in which it said: "After landing in Serbia on January 28, 2024 the Knezevich **immediately** initiated his covert journey to Madrid." (D.E. 86 at 2) (emphasis added).

jurisdictional basis mandates that the kidnapping take place in the United States and that the victim be subsequently transported to a foreign State").[10]

### ii. The offender's travel in "foreign commerce" must be in furtherance of the offense.

The offender's travel to or from the United States must be "in committing or in furtherance of the offense." 18 U.S.C. § 1201(a). **It is not sufficient that a defendant travels from the U.S. and then commits a kidnapping abroad.** *See United States v. Meyer*, 63 F.4th 1024, 1032 (5th Cir.), *cert. denied,* 144 S. Ct. 312 (2023) (concluding that district court erred in failing to instruct the jury that defendant's travel in foreign commerce must be in committing or furthering the offense).

Where the kidnapping allegedly occurred abroad, settled canons of construction mandate that the statute be read narrowly to require a direct and substantial relationship between the travel in "foreign commerce" and the kidnapping:

- First, courts are to "construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *see also RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2107 n.9 (2016) (same).

- Second, the Supreme Court has repeatedly and emphatically confirmed that where "a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010). "**Any doubt**" about whether conduct falls within the statute must be resolved by the presumption against extraterritoriality. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 442, 454-56 (2007) (emphasis added) (rejecting "expansive interpretation" of extraterritorial application of patent law). The presumption against extraterritoriality is grounded in the **basic premise of our legal system that . . . 'United**

---

[10] In *McRary*, the court addressed a prior version of the statute that required that the victim be "'willfully transported in interstate or foreign commerce.'" *McRary*, 665 F.2d at 676 (quoting § 1201(a)(1)). In 2006, the statute was amended to permit prosecution, *inter alia*, where the *offender* travels in interstate or foreign commerce. The amendment, however, does not affect the *McRary* court's conclusion that travel in "foreign commerce" (whether by the victim or by the offender) means travel between the U.S. and another country.

**States law governs domestically but does not rule the world.'"** *RJR Nabisco*, 136 S. Ct. at 2100 (quoting *Microsoft Corp.*, 550 U.S. at 454) (emphasis added).

In the few cases addressing the foreign-commerce element, courts have upheld prosecutions where the evidence demonstrated that the travel was for the purpose of committing the alleged kidnaping. For example, in *Meyer*, defendant allegedly participated in a drug conspiracy in the U.S. The Government argued (and the evidence supported) that the defendant traveled from the U.S. to Mexico for the purpose of luring the victim to a meeting where the victim was kidnaped at gunpoint, and then returned to the U.S. 63 F.4th at 1031-32, 1035-36.

> **iii. A properly instructed grand jury could not have found probable cause to believe that Knezevich traveled in foreign commerce in committing or in furtherance of the alleged offense.**

The Indictment alleges that Knezevich "did travel in foreign commerce from the United States, that is, Miami International Airport in Miami, Florida, to Madrid, Spain, in committing and in furtherance of the commission of the offense." This allegation is belied by applicable law and indisputable facts.

First, contrary to the Indictment, Knezevich did not travel "in foreign commerce" from "Miami to Madrid." That the Indictment states this, in and of itself, raises significant questions about what the grand jury was instructed by the Government and shows the Government was aware of the jurisdictional issue it would face.[11] It is undisputed that Knezevich flew from Miami through Istanbul (on Turkish Air) to Belgrade, Serbia, arriving on January 28, 2024. (Ex. A at 81:14-

---

[11] That the Government felt the need to misstate the evidence as to Knezevich's travel highlights its problems with making what they have called a "reactive arrest" and charging Knezevich with kidnapping while continuing to investigate a murder charge. The Government indicted on kidnapping, a charge it could not prove, because it did not have sufficient evidence to charge murder and a murder charge would further require a lengthy review and approval process involving the Attorney General due to the extraterritorial component.

81:23).  The Government alleges that two days later, on the evening of January 30, he left Serbia in a rental car, arrived in Madrid on February 1, kidnapped his wife on February 2, 2024, and returned to Serbia on February 5, 2024.  (Ex. B at 6:19-6:25; (D.E. 86, at 2). As explained above, travel between two foreign countries—i.e., Serbia and Madrid—does not constitute travel in "foreign commerce."  Knezevich's travel in "foreign commerce" was complete when he arrived in Serbia on January 28.

Second, there is no evidence to support an inference that Knezevich traveled from Miami to Serbia "in committing or in furtherance of the commission of" the alleged offense.  At the detention hearings, Agent Montilla acknowledged that there is **no evidence of any action in the United States to facilitate the alleged kidnaping.**  (Ex. B at 30:16-30:23).  Rather, the Government's assertion that Knezevich traveled to Serbia "in furtherance of" the alleged kidnaping is based entirely on the fact that he allegedly began driving to Madrid within a few days after arriving in Serbia, where he had rented an apartment for a year.  *See id.* at 39.

The temporal proximity between Knezevich's flight to Serbia and the alleged kidnaping, however, is insufficient to support an inference that Knezevich traveled to Serbia for the purpose of kidnaping his wife.  Such an inference is particularly problematic given the undisputed facts that Knezevich had rented a home in Serbia (Ex. A at 78) (referencing Knezevich's landlord in Serbia), that he was in Serbia in December 2023 and early January 2024 seeing his mother (*id.* at 72-73), and that he returned to Florida only briefly in mid- to late-January for a court appearance, and left Miami on January 27 to return to Serbia (*id.* at 72-73).  There is no basis to conclude that his travel from Miami to Serbia was for any purpose other than to return to his temporary home.

The Government's theory, if accepted, would stretch the territorial reach of the statute well beyond Congress's intent.  Under the Government's approach, for example, a foreign person who

travels to the U.S. for vacation, returns home, and then commits a kidnaping in his home country (or a third country) in the following days would be subject to prosecution in the United States.[12] Such an expansive interpretation of U.S. jurisdiction is untenable.  *See, e.g.*, *Microsoft Corp.*, 550 U.S. at 442, 454-56.

Further, there is no factual (or logical) support for the suggestion that Knezevich's travel from Miami to Serbia facilitated or furthered in any material way the alleged kidnapping of his wife in Madrid.  As the Government acknowledges, Belgrade is approximately 2,592 kilometers from Madrid -- approximately a 26-hours trip by car.  (D.E. 3, at ¶ 13).  If Knezevich intent in leaving Miami was to kidnap his wife, he easily could have flown directly to Madrid, or to another place within easy driving distance.

To avoid this defect, the Government has speculated that "rather than flying directly into Spain, the Knezevich sought to conceal his travel to Madrid by flying into Istanbul, Turkey, and then driving over 5,000 kilometers through multiple countries to Madrid."  (D.E. 20 at 8).  The suggestion that Knezevich's traveling through Istanbul was somehow deceptive, however, is completely disingenuous.  Indeed, in the second detention hearing on August 8, 2024, Agent Montilla conceded that there are no direct flights from South Florida to Serbia, that getting to Serbia requires flying through Paris, Zurich, or Istanbul, **and that there was nothing extraordinary about Knezevich travelling through Istanbul to get to Serbia on January 27**. (Ex A. at 73).  The Government fails to identify any way in which Knezevich's travel from Miami to Belgrade, in his own name, on a commercial flight, was in any way covert.  Rather, the Government's argument rests on the unsupported, circular (and counterfactual) *assumption* that

---

[12] With the limited exception set forth in section 1201(e), which applies only if the victim is an "internationally protected person outside the United States," section 1201(a)(1) does not distinguish between offenders who are U.S. nationals and those who are not.

Knezevich's intent in leaving Miami was to go to Madrid and kidnap his wife, so he must have flown to Serbia first to conceal his movements.[13]  Notably, Knezevich and his wife flew this route many times when they visited Serbia previously.

Given the lack of any evidence that Knezevich traveled from the U.S. to Serbia "in furtherance of" the alleged kidnaping, a rational grand jury properly instructed on the law could not have returned the Indictment.

### 2.      The Need for Disclosure Outweighs Any Need for Continued Secrecy

Knezevich's need for the requested grand jury materials is substantial.  As explained above, there is good reason to believe that the grand jury was improperly instructed as to two essential elements of the charged offense and may have been misled about the Government's video evidence.  If so, such errors would provide a ground for dismissal of the indictment.  *See, e.g.*, *United States v. Stevens*, 771 F. Supp. 2d 556, 564-68 (D. Md. 2011); *United States v. Cerullo*, No. 05-cr-1190, 2007 WL 2462111, at *2-4 (S.D. Cal. Aug. 28, 2007); *United States v. Peralta*, 763 F. Supp. 14, 17-21 (S.D.N.Y. 1991).  Accordingly, disclosure is necessary to avoid injustice.

On the other hand, the need for continued secrecy is minimal, if extant.  The Supreme Court has summarized the reasons for grand jury secrecy as follows:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is

---

[13] The Government alleges that in driving from Serbia to Madrid, Knezevich took steps to obscure that travel.  (D.E. 20 at 8).  Those alleged actions, however, **relate to the trip from Serbia to Madrid.**  They do not change the fact that Knezevich's return from Miami to his home in Serbia was overt and unconcealed, nor do they suggest that he returned to Serbia from United States for the purpose of covertly driving to Madrid to kidnap his wife.  To the contrary, he was returning to Belgrade, after he had briefly returned to the United States for a court hearing.

> exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 n.6 (1958) (quoting *In United States v. Rose*, 215 F.2d 617, 628-629 (3d Cir. 1954)).

None of these reasons applies to a request for disclosure of **legal instructions**, as opposed to witness testimony, nor to the very limited portions of agent testimony describing the "suitcase" video. *See Islam*, 2021 WL 312681, at *2 (recognizing that "disclosure of grand jury instructions does not carry the same concerns as, for example, compelled disclosure of witness testimony"); *United States v. Facteau*, No. 1:15-CR-10076-ADB, 2016 WL 4445741, at *4 (D. Mass. Aug. 22, 2016) (noting that "[l]egal instructions provided by prosecutors **do not implicate any of the concerns typically cited in support of grand jury secrecy**" and that "allowing the instructions to be disclosed through the discovery process would help **ensure the integrity of the grand jury process, incentivize prosecutors to be careful in instructing a grand jury, and give some teeth to the grand jury's 'shield' function**") (emphasis added). In fact, some courts have authorized disclosure of the legal instructions without requiring a showing of particularized need. *See, e.g.*, *United States v. Belton*, No. 14-CR-00030-JST, 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015) ("The instructions do not reveal the substance of the grand jury's deliberative process or other information that would compromise the secrecy that Rule 6 seeks to protect. Therefore, Defendant is entitled to disclosure of these instructions even without a showing of particularized need.").

### 3.    The Request Is Limited to Necessary Material

Finally, the request is narrowly tailored to seek only the necessary material: The legal instructions and related colloquy about applicable law, and a very limited portion of agent testimony. For these reasons, Knezevich is entitled to disclosure.

### 4.  Erroneous Grand Jury Instructions Are Prejudicial

If the Government gave misleading testimony or erroneous instructions to the grand jury, that is a substantial violation of Knezevich's Fifth Amendment rights.  The foreign commerce and taking and holding elements all are essential elements of the crime of kidnapping.  The Government's representations to the Court and defense counsel make clear that the evidence does not support them.  Errors in the instructions and in describing the Government's evidence necessarily create "grave doubt that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia*, 487 U.S. at 256 (quotation marks omitted).  If indeed that occurred, additional and separate pleadings will be filed accordingly.

## CONCLUSION

Knezevich has established that review of grand jury materials is appropriate: The material sought is needed to avoid possible injustice; the need for disclosure is greater than the need for continued secrecy; and the request is designed to cover only necessary material. That, coupled with the fact that "death is different" and "heightened reliability" and scrutiny applies to all cases in which the death penalty is even contemplated, mandate disclosure to the defense of all legal instructions to the grand jury as well as any questions and answers relating thereto, and any testimony describing the "suitcase" video.

**WHEREFORE**, the defense respectfully requests entry of an order requiring the Government to provide the defense with the requested grand jury minutes.

## MEET AND CONFER

Per Local Rule 88.1, undersigned counsel contacted the Government regarding the relief sought in this Motion. The Government objects to the relief sought.

Respectfully submitted,

**By: s/ Jayne C. Weintraub, Esq.**
Florida Bar No. 320382
**SALE & WEINTRAUB, P.A.**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 374-1818
Email: JWeintraub@SaleWeintraub.com

**By: s/ Bruce A. Zimet, Esq.**
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd.
Suite 1400
West Palm Beach, FL 33401
Tel:    (561) 508-7741
Tel:    (954) 764-7081
Email: BAZ@BruceAZimetLaw.com

**By: s/ Christopher Cavallo, Esq.**
Florida Bar No. 0092305
**NELSON MULLINS**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 373-9465
Email: ChrisCavallo@NelsonMullins.com