# EXHIBIT "A"



THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  24-cr-20201-KMW

```
UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )         August 8, 2024
v.                             )
                               )
DAVID KNEZEVICH,               )
                               )         Pages 1 - 101
              Defendant.       )
_____/
```

DETENTION HEARING

BEFORE THE HONORABLE EDWIN G. TORRES
UNITED STATES CHIEF MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Plaintiff:

                    UNITED STATES ATTORNEY'S OFFICE
                    99 NE 4th Street,
                    Miami, FL  33132
                    BY:  LACEE E. MONK, AUSA
                    BY:  JESSICA K. OBENAUF, AUSA

```
 1   APPEARANCES CONTINUED:

 2   On behalf of the Defendant:

 3                       SALE & WEINTRAUB, P.A.
                         2 South Biscayne Boulevard
 4                       Suite 21,
                         Miami, FL 33131
 5                       BY:  JAYNE C. WEINTRAUB, ESQ.

 6

 7

 8                       BRUCE A. ZIMET, P.A.
                         633 South Federal Highway, Fl 6,
 9                       Fort Lauderdale, FL 33301
                         BY:  BRUCE A. ZIMET, ESQ.
10

11

12
                         NELSON MULLINS
13                       2 South Biscayne Boulevard
                         Suite 2100,
14                       Miami, FL 33131
                         BY:  CHRISTOPHER C. CAVALLO, ESQ.
15

16

17

18   Transcribed By:

19
                         BONNIE JOY LEWIS, R.P.R.
20                       7001 SW 13 Street
                         Pembroke Pines, FL  33023
21                       954-985-8875
                         caselawreporting@gmail.com
22

23

24

25
```

1

2                            I N D E X

3

4   THE WITNESS:                                    PAGE:

5
    FBI SPECIAL AGENT ALEXANDRA MONTILLA
6

7   Cross Examination by Ms. Weintraub:                 9

8   Redirect Examination by Ms. Monk:                  50

9   Recross Examination by Ms. Weintraub:              62

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Thereupon, the following proceeding was held:)

2          THE COURTROOM DEPUTY:  Calling Case United States

3  versus David Knezevich; Case Number 24-cr-20201-Judge Williams.

4          Counsel, your appearances for the record starting with

5  the Government.

6          MS. MONK:  Good afternoon, Your Honor.

7          Lacee Monk with Jessica Obenauf on behalf of the

8  United States.  And we are also joined at counsel table by FBI

9  Special Agent Alexandra Montilla.

10          THE COURT:  Good afternoon.

11          MS. WEINTRAUB:  Good afternoon, Your Honor.  Jayne

12  Weintraub on behalf of David Knezevich.

13          MR. ZIMET:  Good afternoon, Judge.

14          May it please the Court.  Bruce Zimet also on behalf

15  of the Defendant.

16          MR. CAVALLO:  Good afternoon, Your Honor.  Christopher

17  Cavallo on behalf of the Defendant.

18          THE COURT:  Good afternoon.  Everybody can have a

19  seat.

20          MS. WEINTRAUB:  Your Honor, before we begin, can the

21  Marshals take the handcuffs off of my client so he can help me

22  write notes while I am preparing?

23          THE COURT:  Sure.

24          MS. WEINTRAUB:  Is that okay?

25          THE COURT:  Fine by me.

1    MS. WEINTRAUB:  Thank you, Your Honor.

2    THE COURT:  Okay.  I have been referred I think over

3 objections to my initial detention order and a motion to reopen

4 was raised.

5         And I believe that was the motion that then caused

6 Judge Williams to refer it back to me.  So she would like me to

7 entertain any evidentiary hearing related to that, which is why

8 we set this matter for hearing.

9         So let me first turn to the Government.  I have

10 reviewed the parties' materials.  Not all the materials.  I

11 wasn't able to view -- you had sent me a disk of materials.  We

12 were having a hard time opening it, but I figured you would

13 fill in the gaps for me, but I did review your response to the

14 motion.  Is there any evidence that you wish to affirmatively

15 put on?

16    MS. MONK:  No, Judge.

17         There is no evidence that the Government would wish to

18 introduce at this time.  And I am not sure that Your Honor is

19 going to turn to it, but as I have outlined in my motion, I

20 don't believe there are any grounds to reopen the detention

21 hearing from the Defense side.

22    THE COURT:  Right.  Okay.

23         Turning to the Defense what evidence, if any did you

24 wish to put on, or did you wish to argue the point?

25    MS. WEINTRAUB:  Judge, I am not sure that I am clear

1    on where we are at.  I thought that the Court did grant the

2    motion, the hearing, and that is why we are here.

3         I understand that they filed their response, which of

4    course we filed a reply to as well.  We are here because we

5    moved the Court to reopen based on the evidence that was

6    presented in discovery that contradicts the evidence that was

7    previously before the Court through the proffers, complaint,

8    and the agent.

9         Once we noted the new discovery that was inconsistent

10   with what the Government had proffered to the Court and as a

11   result, unfortunately was in the detention order, we moved the

12   Court to reopen.  Based on that, I do believe the Court did

13   reopen the hearing.

14        And at this time we would ask the Court for us to be

15   able to call Agent Montilla to the stand to continue her

16   cross-examination so I can demonstrate what the evidence is

17   that is different.

18        THE COURT:  And just so I understand, I recognize

19   there were various points that you raised in your papers.

20        MS. WEINTRAUB:  Yes, sir.

21        THE COURT:  For purposes of detention, though, what do

22   you believe is the most consequential?

23        MS. WEINTRAUB:  Well, Judge, honestly I believe they

24   are all consequential because they are starting to have a

25   pattern and a threat that isn't -- they are starting to have a

1   pattern and a threat of conduct that needs to be looked at as a

2   whole.

3          For example, we now know that the blood evidence that

4   was testified to, as we referred to in our papers, is not

5   blood.  The Court was concerned with that.  The Court

6   questioned her yourself.  We want to explain to the Court

7   exactly what happened with that.

8          There are videos that have come to light that we were

9   not privy to that were in the complaint that are in the proffer

10  that the Government made to this Court.  As an officer of the

11  Court that is completely inconsistent with the video that we

12  were provided.

13         So when the Court asked me which is more

14  consequential, I think both are pretty important.  They are

15  very, very significant and they are both mentioned in the

16  Court's detention order.

17         So I think to that end, I think they are all

18  consequential.

19         THE COURT:  Okay.  Well, reserving the right to change

20  my mind, I will go ahead and reopen the hearing and let you

21  introduce the evidence that you wish to introduce and see if it

22  makes any difference.

23         MS. WEINTRAUB:  At this time I would call Agent

24  Montilla to the stand.

25         MS. MONK:  Judge, just before Agent Montilla begins to

1  be cross examined, it is the Government's request that Miss

2  Weintraub only be able to cross-examine Agent Montilla on the

3  matters that she raised in her renewed motion as the new

4  evidence and that this isn't just a complete re-examination of

5  Agent Montilla.

6         MS. WEINTRAUB:  Correct.

7         MS. MONK:  And in the event that there is new evidence

8  that's what 3142 seems to provide for.  And that is why the

9  previous hearing in front of Judge Williams ended abruptly

10  because Defense counsel tried to cross-examine the agent anew

11  and that is not provided for in the rule.

12         And so before she gets up there, I would like everyone

13  to understand the parameters of the cross-examination.

14         THE COURT:  I agree with that.  Let's stick to what is

15  new.  Go ahead.

16         MS. WEINTRAUB:  Agent Montilla.

17         THE COURTROOM DEPUTY:  Raise your right hand.

18         THE WITNESS:  (Complied.)

19         THE COURTROOM DEPUTY:  Please have a seat and state

20  and spell your name for the record.

21         THE WITNESS:  Alexandra Montilla; A-L-E-X-A-N-D-R-A

22  and last name M-O-N-T-I-L-L-A.

23  (Witness sworn.)

24         MS. WEINTRAUB:  Your Honor, may it please the Court.

25         Would the Court permit me to stay here because I have

1  exhibits --

2          THE COURT:  Sure.

3          MS. WEINTRAUB:  -- rather than the podium?

4          THE COURT:  Sure.  Just move the microphone a little

5  closer to you.

6          MS. WEINTRAUB:  I'm usually not hard to hear, Judge.

7          THE COURT:  That's fine.  I want to make sure the

8  system picks you up.

9          MS. WEINTRAUB:  Thank you, Judge.

10         FBI S/A ALEXANDRA MONTILLA, GOVERNMENT WITNESS SWORN

11                       CROSS EXAMINATION

12 BY MS. WEINTRAUB:

13 Q.  Good afternoon, Agent Montilla.

14 A.  **Good afternoon.**

15 Q.  You know why we are here today, right?

16 A.  **Yes.**

17 Q.  Okay.  Agent Montilla, at the detention hearing before

18 Judge Torres when we were last together, you were asked whether

19 or not there was any violence at the scene of Ana's** apartment

20 and you answered:

21     While there was blood found in various places by the

22 Spanish National Police and they are in the process of doing

23 forensic examinations, basically to do the comparisons, right?

24 A.  **Correct.**

25 Q.  And you went on about those forensic examinations and you

1  remember that the Judge questioned you, himself, about the

2  blood presence?

3  A.   **Correct.**

4  Q.   Do you remember?

5       And the Judge asked you:  Let me ask you a question.  How

6  certain are you that there is blood found in the apartment to

7  which you answered:  According to the Spanish National Police.

8       The Judge:  They've informed you of that?

9       Your answer:  The forensic examiners have found blood in

10  the apartment.

11       Do you remember those questions and those answers from the

12  last detention hearing?

13  A.   **Yes.**

14  Q.   And the truth there was no blood found in that apartment at

15  all, correct?

16  A.   **Correct.**

17  Q.   And your testimony about the blood being found in various

18  places in the apartment was in response to my question about

19  violence being there, right?

20  A.   **Correct.**

21  Q.   Now, you were aware when you testified last time as of

22  February 4th when the police, the first responders, went to

23  that apartment there was a wellness check done, right?  Do you

24  remember that?

25  A.   **Yes.**

1  Q.   And during that wellness check, the agents wrote in their

2  report that nothing looked suspicious, right?

3  A.   **Correct.   There was no forced entry.**

4  Q.   No, no, no.   Not that there was no forced entry.   The

5  agent's words were inside the the apartment nothing looked

6  suspicious?

7  A.   **Correct.**

8  Q.   Okay.   So there was no mention of any forced entry.   You

9  just added that, right?   It's not in the report?

10  A.   **Okay.**

11  Q.   No, not okay.   You have to say yes or no.

12  A.   **Yes.**

13  Q.   Okay.   So to be clear, you knew when you testified last

14  time that nothing looked suspicious in the apartment and there

15  was no sign of a struggle, correct?

16  A.   **Correct.**

17  Q.   And there was no sign of any violence at all, correct?

18  A.   **We don't know that.**

19  Q.   I'm sorry?

20  A.   **That there was --**

21  Q.   We don't know that?   Is that what you said?

22  A.   **Right.**

23  Q.   Okay.   So when you say you don't know that does that mean

24  that you are not aware of the report that was written from

25  February 4th that you have that says when they responded to the

1  apartment they noticed all the locks were locked and no foul

2  play was found?

3  A.  **That's correct.  That's what the report says.**

4  Q.  Okay.  And the report goes on to say inside the apartment

5  nothing looked suspicious, correct?

6  A.  **Correct.**

7  Q.  What do you base -- and you seen pictures that he attested

8  to, right, from the apartment?

9  A.  **So my testimony is according to the Spanish Police Report.**

10 **I am relaying what they reported.**

11 Q.  Oh, so then everything that you said was just relaying what

12 the Spanish National Police did?

13 A.  **Correct.**

14 Q.  Or another department did?

15 A.  **The Spanish -- it's under the Spanish National Police.**

16          MS. WEINTRAUB:  Let me have the new report.  Where is

17 the new report?

18          UNIDENTIFIED MALE SPEAKER:  The new report.

19 BY MS. WEINTRAUB:

20 Q.  So the only other police or law enforcement that worked on

21 this was the Spanish National Police or the FBI, right?

22          MS. MONK:  Objection; relevance.

23 By MS. WEINTRAUB:

24 Q.  Is that what you just said?

25          THE COURT:  Overruled.

1  A.   **What you are telling me that I testified to was according**

2  **to a Spanish National Police Report.**

3  BY MS. WEINTRAUB:

4  Q.   Okay.  So as it turned out, you knew there was no blood in

5  that apartment as of June 13th; is that correct?

6  A.   **No, that's not correct.**

7  Q.   When did you first find out that this was no blood in the

8  apartment?

9  A.   **When we received the report from the Spanish National**

10 **Police in July.**

11 Q.   Okay.  You received it in July when it is dated June 13th?

12 A.   **Correct.**

13 Q.   Okay.  And July what, do you know?

14 A.   **Second week of July.  Like mid-July.**

15 Q.   Okay.  And as soon as you saw that were you upset to see

16 that your testimony to know that your testimony was inaccurate

17 that you testified to before the Court?

18 A.   **It is not inaccurate.**

19 Q.   Oh.

20 A.   **I am articulating what the Spanish National Police**

21 **reported.**

22 Q.   Okay.  Well, you testified that there was the presence of

23 blood.  We know now there is no blood.

24      Therefore, you were wrong when you testified there was

25 blood, correct?

| | |
|---|---|
| 1 | MS. MONK:  Objection.  Counsel is testifying. |
| 2 | THE COURT:  Sustained. |
| 3 | A. **Again, I am articulating --** |
| 4 | THE COURT:  Let her ask you another question. |
| 5 | THE WITNESS:  Okay. |
| 6 | BY MS. WEINTRAUB: |
| 7 | Q. You assumed when you testified or during the course of your |
| 8 | investigation that everything that was done by the Spanish |
| 9 | National Police was done properly, right? |
| 10 | A. **Correct.** |
| 11 | Q. And you assume that everything that was done by the Spanish |
| 12 | National Police was reported accurately, correct? |
| 13 | A. **Correct.** |
| 14 | Q. Now, because like everything else in this case, the |
| 15 | investigation that is done, particularly early on, is all done |
| 16 | in Spain and not here, correct? |
| 17 | A. **Correct.** |
| 18 | Q. So I am going to ask you -- |
| 19 | THE COURT:  Just so I understand, have there been any |
| 20 | charges levied in Spain yet? |
| 21 | THE WITNESS:  Any charges?  No. |
| 22 | THE COURT:  It is still under investigation? |
| 23 | THE WITNESS:  We have the case here. |
| 24 | THE COURT:  I'm sorry? |
| 25 | THE WITNESS:  They are not -- |

```
 1              THE COURT:  They are not investigating any further?
 2              THE WITNESS:  Well, they are looking for her, but they
 3   don't have an investigation open for charges.
 4              THE COURT:  Okay.
 5              THE WITNESS:  Unless they find her.
 6              THE COURT:  Okay.
 7   BY MS. WEINTRAUB:
 8   Q.  So, Agent, the question that started all this, I want to
 9   ask you again, is there any evidence at all in Ana's apartment
10   of violence?
11   A.  No.
12   Q.  When you testified the first time, you were aware and you
13   have the luminol reports that were done early, correct?
14   A.  Yes.
15   Q.  And you were aware that those luminol reports show that
16   there might have been traces or specks of blood in a few
17   places, correct?
18   A.  The report said it tested positive for blood presence.
19   That's why I said that it was being sent to the lab for further
20   testing.
21   Q.  Is it your testimony that you were not aware that it was
22   traces of blood?
23   A.  Again, I am articulating what was relayed in the report
24   from the Spanish National Police.
25   Q.  Okay.
```

```
 1              THE COURT:  Now she is looking for that.  And since
 2    that report, have there been new reports dealing with the blood
 3    evidence?
 4              THE DEFENDANT:  Yes.  So it came back negative.
 5              THE COURT:  So there was a later report indicating
 6    that there were no traces of blood in the apartment; is that
 7    correct?
 8              THE WITNESS:  Correct.
 9              THE COURT:  Go ahead.
10    BY MS. WEINTRAUB:
11    Q.   Agent Montilla, on April 24th before you testified, there
12    is a report from the Spanish National Police to the FBI that
13    talks about traces of blood detected in the victim's apartment
14    and that is at Bates stamp 9559.
15         Do you disagree that you knew that it was only traces of
16    blood?
17    A.   No, I don't disagree.
18    Q.   Okay.  So you knew that at best it was only a tiny amount
19    to begin with.  It certainly wasn't a bloody scene and signs of
20    great violence, right?
21    A.   Right.  And that's why I said we are waiting for results.
22    Q.   Well, actually, I don't need to quibble with you, but I am
23    going to go back and say you were very clear that there was
24    presence of blood, the forensic examination revealed that, and
25    you told the Judge you were only waiting for a comparison --
```

```
 1            MS. MONK:  Objection, counsel is testifying.
 2   BY MS. WEINTRAUB:
 3   Q.   -- isn't that right?
 4            THE COURT:  Overruled.  You can answer.
 5   A.   Repeat that again.
 6   BY MS. WEINTRAUB:
 7   Q.   You were very clear.  You told the Judge that there was a
 8   presence of blood determined by the forensic examinations in
 9   Spain and you were waiting on the comparison to see whose blood
10   it was?  You were waiting on the DNA to see whose blood was
11   there?
12   A.   Again, correct.  I am articulating what was relayed to me
13   by the Spanish Police.
14   Q.   Okay.  So I just want to make sure that we are clear and
15   the record is clear.
16        You told the Judge that in response to me asking if it was
17   a scene of violence you said, yes, there was blood in many
18   places?
19   A.   With the --
20   Q.   Is that right?
21            MS. MONK:  That's a misstatement of the transcript.
22            MS. WEINTRAUB:  In multiple places.  I apologize.
23   BY MS. WEINTRAUB:
24   Q.   Right?
25   A.   Yes.
```

1  Q.   So then the Judge asked you, are you sure that there's

2  blood?  Has that been confirmed?  And you told the Judge, yes,

3  the forensic examination was done; it is blood?

4  A.   **I said according to the Spanish National Police Report.**

5  Q.   You didn't say report.  You said according to the Spanish

6  National Police, right?

7  A.   **Yes.**

8  Q.   And what you told the Judge was, yes, it is blood, you were

9  just waiting on the comparison to see whose it is; yes or no?

10  A.   **Yes.**

11  Q.   Agent Montilla, you would agree that a trace of blood is

12  inconsistent with a scene of violence, right?

13  A.   **Yes.**

14  Q.   I am going to change topics and I am going to direct your

15  attention to the last time we were before Judge Torres.

16       The Government, Miss Monk, made a proffer to the Court

17  about what the evidence was going to show before you testified.

18  Do you recall Miss Monk telling the Judge, quote:

19       At approximately 9:52 the male re-enters the apartment

20  building and appears to enter the elevator with an object.

21  Based on the movement of the object, the proximity to the male

22  and its shape it appears to be a rolling suitcase.  The male

23  then leaves the elevator with the suitcase at approximately

24  9:55.

25       Do you remember that proffer?

1  A.  **Yes.**

2  Q.  After the detention hearing, Agent, we were provided with a

3  video that you referred to in your report as a grainy video.

4  Do you recall that?

5  A.  **Which report did I refer as grainy?**

6  Q.  It is serial one, Bates stamped 7950 and it was written on

7  February 22nd by you.

8  A.  **That's the opening communication?**

9  Q.  I'm sorry?

10 A.  **Is that an opening communication?**

11 Q.  I believe so.  Open and full investigation is your

12 synopsis?

13 A.  **Yes.**

14 Q.  And what you wrote is, quote:  There is a grainy video with

15 similar features to David -- meaning, I assume David Knezevich

16 -- entering Ana's apartment with a suitcase.

17     Did you write that?

18 A.  **Yes.**

19 Q.  What features in particular were similar to that of David

20 Knezevich on the grainy video that you could see?

21 A.  **So when I wrote that I did not have the video.  That was**

22 **information received through the tip line and that was**

23 **information at the time that Ana was missing is information we**

24 **put to open the communication.**

25 Q.  Oh.

```
 1  A.   After we received further -- the video and further evidence
 2  it was disproved.
 3  Q.   It was what?
 4  A.   It was disproved.
 5  Q.   Disproved?
 6  A.   Yes.
 7            THE COURT:  What was disproved?
 8            THE WITNESS:  Oh, I'm sorry.  I thought you were
 9  talking about the scooter.  The scooter --
10            THE COURT:  No, no, no, the video --
11            THE WITNESS:  No, no, no.  The grainy video.
12            THE COURT:  Of an elevator.
13            THE WITNESS:  Yeah.  That was information first.  That
14  was information we received through a tip line and through the
15  Spanish Police.
16            MS. WEINTRAUB:  May I, Your Honor?
17  BY MS. WEINTRAUB:
18  Q.   Let's back up again because this is a very serious charge
19  and our client is in custody because of this.  So I want you to
20  be very clear in your testimony.
21  A.   I am.
22  Q.   You wrote a report --
23  A.   Yes.
24  Q.   -- on February 22nd that says on February 2nd, 2024, a man
25  was captured in CCTV cameras spray painting cameras outside the
```

1  building where Ana was staying in Avenida Salmonta in Madrid.

2      According to Spanish authorities the man had similar

3  features, eyebrows, as David.  That same day at approximately

4  10:00 p.m. there was a grainy video of a man with similar

5  features as David entering the apartment with a suitcase.

6      Did you write that?

7  A.  **Yes.**

8  Q.  Now, you didn't write in this report based on a tip line of

9  third persons of anonymous that we don't know who it is, right?

10  You didn't write that?

11  A.  **It is an open communication.  I did write that.**

12  Q.  Oh, you did.  You --

13  A.  **We take all the information we have received.  We take all**

14  **the information received from the Spanish Police to open the**

15  **case.**

16  Q.  Agent, I am going to stop you because I am going to ask you

17  right now, would you like to look at this report before you

18  answer?

19  A.  **I know what the report is.**

20  Q.  Okay.  So are you telling this Court now that this report

21  says anything like what you are saying?  That it talks about a

22  tip line, or that it wasn't clear, or that it wasn't viewed?

23  A.  **Again, it is the open communication that at the time that's**

24  **the information we had received from the Spanish Police.**

25  Q.  On any place in this report, other places you say things

1  like --

2          THE COURT:  Yeah, but I don't really care about her

3  report.  The only question is what information I have.  Do you

4  see my point?  In other words, you are impeaching her with the

5  report --

6          MS. WEINTRAUB:  I do.

7          THE COURT:  -- but it doesn't do me any good.

8          MS. WEINTRAUB:  I will make it clear.

9  BY MS. WEINTRAUB:

10  Q.  The reports that you got from the Spanish Police and you

11  articulate that according to authorities in Spain, for example,

12  so that we understand it is not you seeing it, right?

13  A.  **Correct.**

14  Q.  Okay.  But then, there are times that you don't do that and

15  you write it as though you saw it?

16          THE COURT:  But the Court noted that she didn't go to

17  Spain.  In other words, there is no question that she didn't

18  conduct an independent investigation.  So I am not exactly

19  clear on what your point is -- or how do you conduct an

20  independent investigation.

21          THE WITNESS:  That's an open communication that we use

22  to --

23          THE COURT:  My question is did you go to Spain and

24  conduct your own investigation?

25          THE WITNESS: No, not at that point.

1  BY MS. WEINTRAUB:

2  Q.   The information that's in the complaint -- I think it is

3  Paragraph 7.

4         THE COURT:  What paragraph did you say, 7?

5         UNIDENTIFIED MALE SPEAKER:  7.

6  BY MS. WEINTRAUB:

7  Q.   In Paragraph 7 it goes on Pages 2 and 3 of the complaint.

8  You've read that, right?

9  A.   **Yes.**

10  Q.   And on Paragraph 7 of the complaint it states:

11        An investigation into the victim's disappearance by Spanish

12  authorities revealed that on or about February 2nd, security

13  cameras at the victim's apartment building in Madrid captured

14  her entering the building at 2:20.  That's the last time that

15  she is seen.

16        That same day at approximately 9:27, the building

17  surveillance camera captured a male wearing a helmet entering

18  the building at the same time others exit.

19        I am going down a couple of lines and it says:

20        Notably the male looks directly at the camera and his

21  characteristics resemble those of Knezevich.  At 10:30 p.m.,

22  the male -- I assume you mean the Defendant -- is captured

23  leaving the elevator with what appears to be a suitcase.

24  A.   **Correct.**

25  Q.   Okay.  So, again, that is information that you never

24

```
 1  verified?
 2         THE COURT:  She has established that she didn't go to
 3  Spain herself.
 4  BY MS. WEINTRAUB:
 5  Q.  Did you ask for the video?
 6         THE COURT:  Oh, did you have the video?
 7         THE WITNESS:   Yes.
 8  BY MS. WEINTRAUB:
 9  Q.  So you saw the video?
10  A.  Yes.
11  Q.  Oh, so you confirmed what was on the video?
12  A.  Yes.
13  Q.  Oh, okay.  So then let's play the video and let's see if it
14  confirms exactly what you are saying that you see the man,
15  David Knezevich, leaving the building, the elevator with what
16  appears to be a suitcase.
17      Let's see what you saw and what the special features were
18  that you noted.
19         UNIDENTIFIED MALE SPEAKER:  Sorry.  It went back to
20  the ELMO.
21         THE COURT:  Yeah, you've got to press that button.
22         MS. MONK:  Judge, I am not sure which videos you were
23  not able to play, but we filed all these videos under seal in
24  addition to the video from the hardware store.
25         MS. WEINTRAUB:  Well, it is not Bates stamped.  I
```

```
 1  don't know how to identify it except --
 2          THE COURT:  It says February 2nd, 2230.
 3          MS. WEINTRAUB:  Correct.
 4  BY MS. WEINTRAUB:
 5  Q.  I'm playing that video right on the screen right in front
 6  of you?
 7  A.  Can you start it again so I can --
 8  Q.  Sure.  This is (inaudible).  This is what you described as
 9  the grainy video that you could see his characteristics were
10  similar to that of David; okay?
11          THE COURT:  Is that right?
12          THE WITNESS:  No.  Wait.
13          This characteristic are when he is spraying the CCTV
14  camera, the eyebrows, and he has a motorcycle vest that is
15  reflective and a motorcycle helmet.
16  BY MS. WEINTRAUB:
17  Q.  And then you say the man, meaning it is the same man.
18          The next sentence says the man, then, enters the elevator
19  and then he exists the elevator with a suitcase?
20  A.  Right.  Correct.
21  Q.  Okay.  Right, correct.  So that means it is the same
22  person?
23  A.  Yes.  I thought you --
24  Q.  Okay.  So now let's look at this video and see on this
25  grainy video --
```

1  A.  **So there you see the reflective vest hauling something --**

2  Q.  Well, hold on.

3  A.  **He took the elevator and before he had taken the stairs and**

4  **this time he took the elevator.**

5  Q.  Okay.  So let's hold on a second.

6      You said you see the reflective vest?

7  A.  **Yes.**

8  Q.  Go back.  Let's play it again and see -- let the record

9  reflect we are playing the video.

10 A.  **There you see the vest.**

11 BY MS. WEINTRAUB:

12 Q.  You see a vest or you see a --

13 A.  **Yeah, the reflective --**

14 Q.  Hold on.  I'm asking you a question.

15     Do you see a vest where it starts and where it stops?

16 Could you show us on the screen?

17 A.  **No.  I see that it is a reflective vest.  So you see the**

18 **reflection.**

19 Q.  Hold on.  Hold on.  So now you are saying --

20         MS. MONK:  Objection, asked and answered.

21 BY MS. WEINTRAUB:

22 Q.  -- you didn't see the reflective vest.  You saw the --

23         THE COURT:  Overruled.

24 BY MS. WEINTRAUB:

25 Q.  -- reflection?  Yes?

1  A.   **Yes, I saw the reflection.**

2  Q.   Okay.  So to be clear --

3          THE COURT:  Just so I understand --

4  BY MS. WEINTRAUB:

5  Q.   -- you don't see a reflective --

6          MS. WEINTRAUB:  I'm sorry, Judge.

7          THE COURT:  Just so I understand refection of?

8          THE WITNESS:  The vest; the vest has reflectors.  So

9  you see the back part.  The reflectors of the vest.

10          THE COURT:  Okay.

11          THE WITNESS:  You see them.  That's how we were able

12  to --

13          THE COURT:  And it's because it's like a motorcycle

14  vest kind of thing?

15          THE WITNESS:  Yes, it is.

16          THE COURT:  I see.

17          MS. WEINTRAUB:  So --

18          THE COURT:  But you would agree now that you look at

19  the video that there are no features of anybody displayed.

20          THE WITNESS:  Well, if you look at the video when he

21  is spraying the cameras you see it.

22          THE COURT:  Right.  I am asking, though, in this video

23  -- and this is just so I understand, the video comes from an

24  elevator?  Is that where the video camera is?

25          THE WITNESS:  From the CCTV from the building.

1          THE COURT:  From the CCTV in the building?

2          THE WITNESS:  Uh-huh.

3          THE COURT:  And do you know where the camera is

4    located, do you know?

5          THE WITNESS:  In the lobby.

6          THE COURT:  In the lobby area.

7          Okay.  And then, I guess depicting the entrance?  Is

8    that what it is depicting?

9          THE WITNESS:  The entrance, yes.

10         THE COURT:  You would agree, though, that there is no

11   features of any individual that you could see?

12         THE WITNESS:  Well, that's what I wanted to -- that's

13   what I was telling her the features you see when he is before

14   this when he is spraying the camera, you visibly see his

15   eyebrows and his eyes.

16         THE COURT:  And that is a different video.

17         THE WITNESS:  It is in this video.  She is not playing

18   it.

19         THE COURT:  Oh, this is before he disabled the camera.

20         THE WITNESS:  This is -- so he spray pains before

21   this.

22         THE COURT:  Got you.  Okay.

23         THE WITNESS:  So I don't know if you want to play it.

24         THE COURT:  So this video shows the camera after it

25   has been adulterated?

1      THE WITNESS:  After it has been sprayed.

2      THE COURT:  Okay.

3      THE WITNESS:  Before it completely dries out and you

4  could still see the reflector.

5      THE COURT:  Okay.  So do you want to play the video

6  before it gets adulterated?

7      THE WITNESS:  No.

8      THE COURT:  Okay.  Well, let Miss Monk play it.

9  BY MS. WEINTRAUB:

10  Q.   Agent Montilla, what you said was, what you wrote and what

11  you testified to was according to the authorities, the man had

12  similar features as David.

13      Then you wrote, same paragraph next sentence:  That same

14  day at approximately 10:00 p.m. there is a grainy video of a

15  man with similar features as David entering the apartment with

16  a suitcase.

17      Did you write that?  I will bring it to you if you want to

18  look at it?

19  A.   **That's the open communication.  That's --**

20  Q.   Did you write that; yes or no?

21  A.   **Yes.  That's according to the information received from the**

22  **National Police; from the Spanish National Police.**

23  Q.   Okay.  So when you wrote that same day there was a grainy

24  video, which is what you are saying this is, right?

25  A.   **Yes.**

1   Q.   This is a grainy video?

2   A.   **Yes.**

3   Q.   And this is supposed to be a grainy video of a man with

4   similar features as David entering the apartment with a

5   suitcase; yes or no?

6   A.   **Yes.**

7   Q.   And you agree that that grainy video does not show any

8   features of anybody, correct?

9   A.   **That particular part, no.**

10  Q.   And that's the only one that you were looking at when you

11  said grainy video with a suitcase?

12  A.   **Again, that's the opening communication that information**

13  **was provided to me.**

14  Q.   Okay.  Do you have any other evidence -- well, no, strike

15  that.

16       When you heard that or when you saw that didn't you say, as

17  an experienced investigator, hey, send me that video clip, I

18  want to see it?

19  A.   **Of course and that's what we did.  That's why the**

20  **information changed a bit.  I mean, we didn't say that we saw**

21  **his eyebrows in the grainy video.  That's the opening**

22  **communication.  That's the first serial.**

23           THE COURT:  When did you review -- when did you first

24  have access to the video?

25           THE WITNESS:  So --

1    THE COURT:  Of any video.

2    THE WITNESS:  I don't remember when this -- this was

3 as soon as we got information that there was a missing woman in

4 Spain and we got this information from Spain.  So we must have

5 got it as weeks later.

6 BY MS. WEINTRAUB:

7 Q.   Okay.  That makes sense, but it doesn't make sense, though,

8 that in June months later, not in serial one in the Bates

9 stamp, but in serial 150 on June 7th, just two weeks before you

10 testified before -- or no.

11    I'm sorry.  You wrote another report on June 7th that says

12 and I quote:

13    On February 2nd, 2024, a man was captured on CCTV cameras

14 spray painting cameras outside the building where Ana was

15 staying.  According to Spanish authorities the man had similar

16 features as David.

17    That same day, approximately 10:00 p.m., there was a grainy

18 video with a man with similar features.  You wrote this and

19 in June --

20 A.   **And --**

21 Q.   Hold on.  In June you wrote this similar features as David

22 entering the apartment with a suitcase.

23    Did you write that; yes or no?

24 A.   **Can you tell me what the --**

25 Q.   Yes.

1  A.   -- report is?

2  Q.   Yes.   June 7th, 2024.

3  A.   **No, no, no.   What the report is.   (Inaudible) too was the**

4  **report.**

5        MR. WEINTRAUB:   May I approach?

6  BY MS. WEINTRAUB:

7  Q.   I don't understand your question.   I am happy to answer it,

8  but I really don't know what date you want.   Here is the date

9  on the report.

10 A.   **No, no, no.   But what is it?   Is this -- what is the**

11 **report?**

12        THE COURT:   Why don't you just show her the report

13 since you are making an issue of it.

14        MS. WEINTRAUB:   May I approach?

15        THE COURT:   Yes.

16        MS. WEINTRAUB:   For the record I am showing her serial

17 150 Bates stamp 10520** .

18        THE COURT:   Don't trip.

19 A.   **Okay.   That is a request for the lab for an internal**

20 **request.**

21 BY MS. WEINTRAUB:

22 Q.   So you did write that?

23 A.   **Let me see.**

24 Q.   The date of the report is June 7th?

25 A.   **Let me see.   Let me see something.   I did not write that.**

1  Q.  Did you read this?

2  A.  **Yes.  It's a lab request**.

3  Q.  And it is written by Gillis and he's your case agent?

4  A.  **Yes.**

5  Q.  He wrote the complaint?  Yes?

6  A.  **Yes.  That's an internal document for the lab to request**

7  **lab information**.

8  Q.  Well, as of June the FBI is still under the impression that

9  that grainy video shows someone with similar features to David

10 Knezevich entering that apartment building with a suitcase,

11 right?

12 A.  **No.**

13 Q.  It doesn't say that?

14 A.  **Again, that's in the opening communication.  It might**

15 **have --**

16 Q.  It's not in the opening communication.  It's --

17 A.  **Let me --**

18 Q.  No, no, no.  There's a court reporter who's going to take

19 this.

20         THE COURT:  Just ask the question.

21 BY MS. WEINTRAUB:

22 Q.  Do you agree, Agent Montilla, that looking at this video

23 this is what the Government relied on when it wrote in the

24 complaint that a male with the same physical characteristics of

25 David leaves with a suitcase?

34

1  A.  **No, because he didn't show the part where we can see his**

2  **eyes.**

3  Q.  Okay.

4  A.  **His physical features.**

5  Q.  Okay.

6          THE COURT:  Now let me ask you this question.  Is

7  there any video that shows a suitcase?

8          THE WITNESS:  No.

9          THE COURT:  Okay.

10          THE WITNESS:  It's -- we believe it's a suitcase.  It

11  looks like a suitcase, but you cannot clearly see it in this

12  video.

13          THE COURT:  Other than this video --

14          THE WITNESS:  No.

15          THE COURT:  -- is there any video depicting a

16  suitcase?

17          THE WITNESS:  No.

18          THE COURT:  So you would agree that that is

19  inconsistent with what was written in the complaint in the

20  proffer?  Because the complaint says the male is captured

21  leaving the elevator with what appears to be a suitcase.

22          THE WITNESS:  Appears, but she didn't show him leaving

23  the elevator.

24          MS. WEINTRAUB:  Well, let's take a look at it right

25  any.

1        THE COURT:  In other words, there is no video

2   depicting any suitcases is what you are telling me, right?

3        THE WITNESS:  Right.  It appears to be a suitcase in

4   that video when he leaves the elevator.

5        THE COURT:  This video here?

6        THE WITNESS:  Yes, but there is another part where he

7   is seen getting out of the elevator hauling something and it

8   appears to be a suitcase.

9        THE COURT:  A different video than the one I just saw?

10       THE WITNESS:  Yes, it continues --

11       THE COURT:  Okay.

12       THE WITNESS:  -- if you want to play it.

13       THE COURT:  Okay.

14       MR. WALSH:  With the Court's permission I am going to

15   show you only other video with this.

16       THE COURT:  Okay.

17       MS. WEINTRAUB:  Let the record reflect we are showing

18   -- it's marked February 2nd, 2024.  It says 2233 at the top cam

19   3.  It's a three-minute video.  This is three minutes in,

20   right?  Watch the time.

21   A.  **That's the elevator opening and you see the vest and the**

22   **reflector and then it looks like his.**

23   BY MS. WEINTRAUB:

24   Q.  Okay.  Tell us when you see the suitcase.

25   A.  **Well, you've got to go back.**

1          THE COURT:  Is it before that?

2    BY MS. WEINTRAUB:

3    Q.  Do you want to go back and see the suitcase?  Okay.  Tell

4    us when.

5    A.  **It appears like a suitcase.**

6    Q.  Okay.  So let us know when you see what appears to be a

7    suitcase.  What color is the suitcase?

8    A.  **It looks white, but you don't know because it's --**

9    Q.  You can't tell, can you?

10   A.  **You can't tell.  That's when the elevator opens that's him**

11   **and you can see what appears he is hauling something.  It**

12   **appears to be a suitcase.**

13   Q.  Do you see a suitcase -- I am not being sarcastic.  Do you

14   see a suitcase --

15          THE COURT:  You see a suitcase?

16          THE WITNESS:  Again, it looks likes he is hauling

17   something.

18   BY MS. WEINTRAUB:

19   Q.  And is that suitcase, is that like regular carry-on size or

20   what size is that?

21   A.  **Oh, I don't know.**

22   Q.  You don't know and you don't know what color it is?

23   A.  **No.**

24   Q.  And you don't know anything else.  That is the only -- the

25   two video clips that His Honor is now seeing is the only

1 evidence of anything resembling a suitcase in this entire case?

2 A.  **Yes.**

3 Q.  Is that right?

4 A.  **Yes.**

5 Q.  Would you agree with me Agent Montoya (phonetic)?

6        THE COURT:  Montilla.

7        MS. WEINTRAUB:  I'm sorry.

8 BY MS. WEINTRAUB:

9 Q.  Would you agree with me, Agent, that there is no evidence,

10 there is no clear specific evidence that can be discerned of a

11 suitcase in that video; yes or no?

12 A.  **Yes.**

13 Q.  Okay.  By the way, Agent, that video is also the only

14 evidence that the Government has and relies on to prove or try

15 to prove that Ana was taken out of the apartment, right?

16        MS. MONK:  Objection; misstatement of the evidence.

17        THE COURT:  You can answer it.

18 A.  **No.**

19 BY MS. WEINTRAUB:

20 Q.  No, you have other evidence that shows her being taken out

21 of that apartment?

22 A.  **No.  There are various strong overwhelming circumstantial**

23 **evidence.**

24 Q.  Okay.  Let's be very clear.

25        What I asked you is this is the evidence that you are

1  relying on.  It is part of the Government's theory of

2  prosecution that Ana was taken out of that apartment in a

3  suitcase that you claim is on this video?

4  A.  **So there is --**

5  Q.  Wait.  Is that correct or not?

6  A.  **Yes, but there is other evidence inside the building.**

7  Q.  Is there any other evidence --

8       MS. MONK:  Objection.

9       This argument was already raised at the original

10 detention hearing about all the various types of evidence the

11 Government has.

12      MS. WEINTRAUB:  Judge, we don't want you to know the

13 real truth here.

14      THE COURT:  I will overrule the objection for now.

15      Other than the fact no one has seen her, what other

16 evidence is there that she was taken from the apartment?

17      THE WITNESS:  No, no other evidence.

18      THE COURT:  Okay.  In other words, you are relying

19 upon the fact that when the police went in to search the

20 apartment she wasn't found?

21      THE WITNESS:  She wasn't found.  She is still not

22 found.

23      THE COURT:  Okay.

24 BY MS. WEINTRAUB:

25 Q.  Now, I am going to talk about the scooter just to put you

1  in context.  So you have reviewed several reports by the FBI as

2  well as the Spanish National Police that there was CCTV video

3  footage of, quote:

4      An unknown male on a scooter spray painting several CCTV

5  cameras outside Ana's apartment building on the day that Ana

6  allegedly disappeared, right?

7  A.  **Yes**.

8          THE COURT:  What paragraph are you looking at?

9          MS. WEINTRAUB:  I'm sorry, Judge?

10         THE COURT:  What paragraph are you reading from or

11 what were you reading from?  Is it the complaint or the

12 proffer?

13         MS. WEINTRAUB:  Actually it's the report.

14         THE COURT:  Oh, okay.  I didn't understand.  Okay.

15         MS. WEINTRAUB:  And for the Court it's 8561 of the

16 Bates stamp.

17         THE COURT:  Okay.  But you are reading the report and

18 not the proffer or the complaint?

19         MS. WEINTRAUB:  That's correct.

20         THE COURT:  Okay.

21 BY MS. WEINTRAUB:

22 Q.  Now, on March 27th you, yourself, wrote a report that says:

23     On February 2nd a man was captured on CCTV -- just what I

24 read -- CCTV cameras spray painting cameras outside the

25 building where Ana was staying in Madrid.  According to Spanish

1  authorities the man had similar features, eyebrows as David.

2      Do you remember that?

3  A.  **What kind of --**

4  Q.  I apologize.  I'm reading the wrong paragraph.  This is

5  what you said about the scooter.

6      According to authorities in Spain, CCTV cameras captured an

7  unknown male on a scooter spray painting several CCTV cameras

8  outside Ana's apartment building at 9:30 p.m. and making entry

9  after following a resident.

10  A.  **Again, this is preliminary information we got at the**

11  **beginning from the Spanish Police.**

12  Q.  This is serial number 50 and it is written March 27th.  It

13  is not at the beginning, is it?

14  A.  **It's a couple of weeks after that.  I mean, we are dealing**

15  **with --**

16  Q.  Actually it's not at the beginning.  The beginning was a

17  serial one and it goes to 125 in July.  We are at serial 50 at

18  the end of March.  So this has been going on for two full

19  months of an investigation and, yet, that still is what is

20  being written and not corrected, right?

21  A.  **It's the information that we received from Spain.**

22  Q.  Okay.  And you just cut and paste it and keep putting it in

23  reports?

24          THE COURT:  Why do you keep asking about what's in her

25  reports as opposed to what I know?  I didn't read her reports.

1           MS. WEINTRAUB:   Okay.

2    BY MS. WEINTRAUB:

3    Q.   Did you ask to see the CCTV footage with the man on the

4    scooter?

5    A.   **Yes.**

6    Q.   When did you ask to see it?

7    A.   **Ma'am, as we open the case immediately we ask Spain for**

8    **everything, but we don't get it overnight.  We are dealing with**

9    **another country.  So we've got to wait for them to give us**

10   **legally the information.  We've got to go through the Embassy**

11   **through legal channels.**

12   Q.   When was the -- sorry.

13   A.   **So as soon as Ana disappeared we requested every**

14   **information they had.**

15   Q.   Okay.  So you did not just take their word for it.  You

16   wanted to verify the information?

17   A.   **At the beginning of the case it was open with that**

18   **information because it was received by the Spanish Police.**

19   Q.   Okay.  And so in February, in March, in April --

20   A.   **As soon as we --**

21   Q.   Let me finish.

22        June, July and now we are in August.  Is there ever a time

23   when you say -- strike that.

24        Agent, did you go to Madrid?

25   A.   **Yes.**

1  Q.  When?

2         MS. MONK:  Objection; outside the scope of today's

3  hearing and irrelevant.

4         THE COURT:  It's potentially impeaching.  Overruled.

5  BY MS. WEINTRAUB:

6  Q.  When was the first time when you went?

7  A.  **I think it was in May.**

8  Q.  Okay.  So when you went there in May and you went to work

9  with the Spanish National Police, correct?

10         THE COURT:  Go ahead.

11  BY MS. WEINTRAUB:

12  Q.  Did you go to work with the Spanish National Police?

13  A.  **Yes.**

14  Q.  And so when you went to go to work with them in May, did

15  you say, hey, let me see that footage of the guy that you have

16  on a scooter outside her building; that's really important

17  evidence, let me see.  Did you say that?

18  A.  **Of course.  We reviewed everything.  We went to the**

19  **building, yes.**

20  Q.  So you saw the video of the man on the scooter?

21  A.  **There was no man on the scooter.**

22  Q.  Okay.  So did you --

23  A.  **That was discarded.**

24  Q.  That was what?

25  A.  **Disapproved -- disproved.**

1  Q.   Disproved?  What does that mean disproved?

2  A.   **Like it was not accurate.**

3  Q.   So in all these reports that is being written, even through

4  July by the FBI, you're reporting that that exists, that

5  footage exists, do you ever correct it?

6  A.   **Yes.**

7  Q.   When?

8  A.   **As soon as we got the video and when we got further**

9  **evidence, again, that was discarded and I spoke to the**

10  **investigator in Spain.**

11  Q.   And when was that?

12  A.   **Recently, but at the beginning also.  The case was open as**

13  **a missing person by the police in Salmonta when she went**

14  **missing.**

15        THE COURT:  The Court just specifically -- when did

16  you prepare a report that negated the relevance of any scooter.

17        THE WITNESS:  I don't remember.  It's there.

18        THE COURT:  At the time when you went to Madrid in

19  May, were you still under the impression that there was some

20  relevance to a scooter?

21        THE WITNESS:  No, no.  As we saw the video we know

22  there was no scooter and I did speak to the investigator.

23        MS. WEINTRAUB:  What video?

24        THE COURT:  And what video are you referring to that

25  negated the --

```
 1            THE WITNESS:  The CCTV video of the building.
 2            THE COURT:  Okay.  And what does it show?
 3            THE WITNESS:  So it shows him in the door -- outside
 4  the door and then he slid in by two residents, two individuals
 5  who were coming out of the building.
 6            THE COURT:  And there is no video of any scooter?
 7            THE WITNESS:  No.
 8            THE COURT:  Okay.  So is that information that was
 9  wrong from the Spanish Police?
10            THE WITNESS:  Yes.  So when I spoke to them they said
11  that because Ana was missing everything was possible.  And they
12  had seen some lights when they saw him leaving the building and
13  they associated the motorcycle gear with the scooter.  Plus
14  there's a **Kentucky Fried Chicken next to it and it is very
15  common to have scooters, but they said that everything was
16  possible.
17            So that's the information we got at the beginning of
18  the case and it is in the opening communication, but then as
19  soon as we got the evidence we know it was not true.
20            THE COURT:  Okay.
21            THE WITNESS:  It was, you know, we shut down the
22  theory.
23            THE COURT:  Okay.
24  BY MS. WEINTRAUB:
25  Q.  So you just mentioned the camera outside again.  So first
```

1  we get reports --

2  A.  **No, I didn't say -- in the lobby in the building.**

3  Q.  Okay.  But you read all the reports about the video, the

4  video that captured, saw, the video existed.  And then, all of

5  a sudden, it was disproved.

6      Is that what you are saying?

7  A.  **Uh-huh -- yes.**

8  Q.  And you said anything was possible and they just kind of

9  made it up or set it up and there was nothing to base it on?

10 A.  **The Spanish Police that --**

11 Q.  Yeah.

12 A.  **-- were looking for Ana?**

13 Q.  Yeah.

14 A.  **They said everything was a possibility and they associated**

15 **lights with a scooter and his gear.  Again, I am relaying what**

16 **was provided to us.**

17 Q.  Okay.  We are going to show the lights in a minute, but we

18 are talking about cameras outside.

19     So for months you thought that there was a video that

20 captured a man on a scooter that looked similar to David,

21 correct?  That was spray painting.  That's what all these

22 reports for months said that we got in discovery; yes?

23 A.  **Yes.**

24 Q.  So my next question to you is very simple.

25     Did you go with Agent Gillis in May over to Spain and

1  Belgrade?

2  A.  **I went to Spain in May.  Not with Agent Gillis.**

3  Q.  Gillis.

4      But you've read, as the special case agent in charge,

5  you've read all the FBI 302s, right?

6  A.  **Correct.**

7  Q.  And you are aware of the fact that in May, a week before

8  the pretrial detention hearing before Judge Torres that your

9  co-agent wrote three reasons that he wanted approval to go to

10  Spain:

11      One, David was seen in a hardware store buying paint and

12  duct tape;

13      Two, the CCTV cameras outside the apartment building were

14  sprayed by a man with similar features as David;

15      And three, he was arrested at Miami International Airport

16  and you are aware of that, right?

17  A.  **Yes.**

18  Q.  So as of May 10th, the FBI was relying on that video

19  footage being in existence.  They are using it to get approval

20  to go to Spain; yes?

21  A.  **Yes.**

22  Q.  When you were told recently that no such video was

23  available did you question it?

24  A.  **Do you mean the video --**

25  Q.  The CCTV video of a man on a scooter spray painting outside

1  the building the night that Ana disappeared, did you question

2  what happened?

3  A.  **Of course.  I mean, when we got the CCTV footage we**

4  **reviewed it.**

5  Q.  And you didn't see anything that they had been talking

6  about, right?

7  A.  **I did not see a scooter and the Spanish Police realized**

8  **that.**

9  Q.  Okay.  And so when was that?

10  A.  **I cannot tell you a specific time.**

11  Q.  Give me a month.

12  A.  **I don't know.  Within since we began the investigation.**

13  Q.  Okay.

14  A.  **I mean --**

15  Q.  At the beginning, though, obviously you wanted to see the

16  video?

17  A.  **The video was reviewed and that was discarded.  That theory**

18  **was discarded.**

19  Q.  Okay.  So then why would Agent Gillis in May be using that

20  as a reason in existence, that footage in existence, as a

21  reason to go from Miami to Spain?

22  A.  **Well, he didn't say anything about a scooter.  You're**

23  **talking about -- I think that was probably a mistake.  He meant**

24  **to say inside the building; the CCTV inside the building.**

25  Q.  Okay.  Well, let's not make excuses and let's be really

1  clear.

2          THE COURT:  You see, I don't really care why the FBI

3  decided to send her to Spain.

4          The only question that matters to me is the evidence

5  that I received at the detention hearing being wrong.  So I

6  never heard anything about a scooter.

7          So is there anything else that you have as to

8  something that I heard?

9          MS. WEINTRAUB:  Yes, Judge.

10          What they did say at the detention hearing, Judge, was

11  that there was potential footage of him there outside.  Not the

12  video of the spray painting of the lens.  Not the video at the

13  hardware store.

14          The video that they claim where the suitcase doesn't

15  exist and it is repeatedly throughout all these reports up

16  until about two weeks ago and that they rely on the suitcase

17  that doesn't exist and they rely on the CCTV camera footage

18  outside the building.

19          Now they claim there is no video from outside the

20  building and there never was.  Then they say, as a matter of

21  fact, one of the layman might have conflated it.  A million

22  different excuses were rendered.

23          Again, just like the blood.  I must have e-mailed Miss

24  Monk seven times asking her for the analysis of the blood.

25  Miss Monk did not share the blood results with us and was not

1   forthcoming as she said in her papers, most respectfully.  This

2   is the same situation.

3           Again, I kept hounding them and e-mailing many times.

4   May I please see the video footage that's referenced in -- and

5   I gave them all the Bates stamp numbers to show whether or not

6   he's there or under *Brady* maybe it is somebody else that is

7   spray painting outside.  We don't know.  Don't you have an

8   obligation to investigate to which I was told they did not

9   believe so and that is where we were at.

10          So, yes, I think it was relevant.  It also goes to the

11  weight of the evidence.  And because of the way it is written,

12  it is written as the next sentence to something that has no

13  business being there to make it seem like it is the same person

14  and that is what they did with the suitcase tale.

15          THE COURT:  Okay.

16          MS. WEINTRAUB:  You know, there is such a thing as

17  playing fair and --

18          THE COURT:  Miss Monk, do you have questions of the

19  witness?

20          MS. MONK:  Sure.  May I stay here as well, Your Honor?

21          THE COURT:  Sure.

22          MS. WEINTRAUB:  Judge, may I?  There is one other

23  thing.

24          THE COURT:  Let me go to Miss Monk now.

25                      REDIRECT EXAMINATION

```
 1  BY MS. MONK:
 2  Q.  Agent Montilla, how did the FBI originally learn about the
 3  disappearance of Ana Knezevich?
 4  A.  Through our threat line.  There was a friend of Ana who
 5  reported her missing.
 6  Q.  Okay.  And during the course of your investigation, did you
 7  obtain video surveillance from the Spanish National Police that
 8  they had obtained in their investigation?
 9  A.  Yes.
10  Q.  And did that include video surveillance from the hardware
11  store?
12  A.  Correct.  Yes.
13  Q.  And did that also include video surveillance from the
14  victim's apartment?
15  A.  Yes.
16  Q.  Okay.  And have you personally reviewed that footage?
17  A.  Yes.
18       MS. MONK:  This side is not working.  Is there a way
19  for me to plug this into the video?
20       THE COURT:  Yes, you plug it in.  There is a cord
21  right there.  It is actually on your table.
22       MS. WEINTRAUB:  Judge, while she is doing that --
23       MS. MONK:  It's not working.
24       MS. WEINTRAUB:  Judge, there is one other area that is
25  really --
```

1          THE COURT:   Hold on.

2          MS. WEINTRAUB:  -- important that she testified to

3    during the detention hearing that I would like to bring to the

4    Court's attention.

5          THE COURT:  I have given the floor to Miss Monk, but I

6    will let you do it after if you want.

7          MS. WEINTRAUB:  Yes, please.  Thank you.

8          THE COURT:  And then you have to press the button.

9    Can you press the button?  Okay.  Now it is working.  So there

10   is something wrong with that cable.

11         THE COURTROOM DEPUTY:  I will let them know, Judge.

12         THE COURT:  Okay.  Let Christian know.

13   BY MS. MONK:

14   Q.  All right.  Now, for the record, I am playing what has been

15   filed as video clip one in the Government's sealed Composite

16   Exhibit 2.

17         THE COURT:  Maybe you have to minimize the folder.

18         MS. MONK:  Oh, yes.

19         THE COURT:  There you go.

20         MS. MONK:  Yes.  Let me go back to --

21         THE COURT:  I should have been a tech person.

22         MS. MONK:  You should have.

23         THE COURT:  I would have made a lot more money.

24         MS. MONK:  So we will actually shift to Composite

25   Exhibit 1.

```
 1              THE COURT:  Okay.
 2              MS. MONK:  And just for time sake, I am in the video
 3   clip ending in 59.  We've got February 2nd, 2024, at
 4   approximately noon up at the top.
 5              THE COURT:  Okay.
 6              MS. MONK:  And I am moving to -- let's see here; 256
 7   in the clip.
 8              THE COURT:  Okay.
 9   BY MS. MONK:
10   Q.   Agent Montilla, do you recognize anyone in that video clip?
11   A.   Yes, the man dressed in black.  It's David Knezevich.
12   Q.   And I imagine you've met David Knezevich in person before?
13   A.   Yes, I arrested him.
14   Q.   And do you see him in the courtroom here today?
15   A.   Yes.
16   Q.   Can you please point him out and describe what he is
17   wearing?
18   A.   So he is behind you in a cream-colored shirt and pants.
19   Q.   And what does this video depict?
20   A.   So he is buying the spray paint and two duct tapes and the
21   spray paint is the same brand that is seen when he walks in the
22   building and spray paints the CCTV inside the building where
23   Ana was staying.
24              THE COURT:  How do you know that?  How do you know
25   that it's the same brand --
```

1         THE WITNESS:  Similar characteristics as David.  When

2    he is spray painting, his eyebrows.

3         THE COURT:  No, no, no.  You said he was using the

4    similar brand of paint.

5         THE WITNESS:  Oh, because when he is spray painting

6    you can see the brand of paint and that's how the Spanish were

7    able to get to the surveillance footage.  They queried all the

8    hardware stores that would sell that brand.

9         THE COURT:  Oh, I see.

10        THE WITNESS:  And that's how they got to this hardware

11   store and were provided with this CCTV video.

12        THE COURT:  I see.

13   BY MS. MONK:

14   Q.   And how did he pay for the spray paint?

15   A.   **Cash.**

16   Q.   And do we have the receipt associated with this

17   transaction?

18   A.   **Yes.**

19   Q.   All right.  Now I am ending this at 440, but there is some

20   additional footage.

21        Now turning to the Government's Composite Exhibit 2, which

22   was also sealed, I will start with what I have labeled as clip

23   one.

24        MS. WEINTRAUB:  Judge, I am going to object.

25         I mean, these videos have nothing to do with what is

 1  at issue here.

 2          THE COURT:  Overruled.

 3          MS. WEINTRAUB:  And what was different from the

 4  detention hearing.  It is also beyond the scope of my

 5  examination.

 6          THE COURT:  Overruled.

 7          Now what am I seeing?  What are we depicting here?

 8  BY MS. MONK:

 9  Q.  So, Agent Montilla, can you describe what that is right

10  there?

11  A.  **So there is an individual that looks like David walking in**

12  **with the vest; with the reflective motorcycle vest.  He is**

13  **looking at the camera.  He is going down the stairs.  You can**

14  **see his -- right there scoping the area.**

15  Q.  Now moving to clip two.

16  A.  **He goes back.  He takes the stairs (inaudible).**

17  Q.  Now going to video clip three.

18  A.  **So you can see he has a piece of tape on his right side and**

19  **you can see the spray paint, the brand, and his eyes; his**

20  **eyebrows.**

21  Q.  And now is that the reflector that you were previously

22  referencing?

23  A.  **Yes.**

24  Q.  And we see him by the door there.  Did law enforcement ever

25  find anything on that door?

1  A.  **They found a piece of tape in the lock.**

2  Q.  Okay.  Now just going back to the beginning of video clip

3  three, do you notice anything on the left side of this

4  individual's vest?

5  A.  **He has the tape, the piece of tape taped to his vest.**

6  Q.  And do you see that tape on his vest when he first enters

7  into the apartment building?

8  A.  **No.**

9       THE COURT:  What is the significance of that?

10      THE WITNESS:  That's probably what he used to lock --

11  to put it in the lock so he could come in without ringing when

12  he left.

13      THE COURT:  Got it.

14  BY MS. MONK:

15  Q.  Is it law enforcement's theory that the duct tape prevented

16  the lock from engaging?

17  A.  **Correct.**

18      MS. WEINTRAUB:  Objection to theory unless there's

19  evidence of it.

20      THE COURT:  Overruled.

21  BY MS. MONK:

22  Q.  Now, going back to clip four, which I believe the Defense

23  played.  That illumination, what is that?

24  A.  **So that's the camera.  The paint is drying.**

25  Q.  No, the --

1  A.  **The light.**

2  Q.  What is that?

3  A.  **From the entrance.**

4  Q.  Have you seen the elevator in this building?

5  A.  **Yes.**

6  Q.  And when it opens is there a light inside the elevator?

7  A.  **Yes.**

8  Q.  Now that little mark that we saw -- oh, right there.  You

9  can see it again?

10  A.  **Yes.**

11  Q.  It is hard to pause.  What is law enforcement's theory

12  about that reflection?

13  A.  **That's the same reflection that was in the man's vest.**

14  Q.  Okay.

15  A.  **Yeah.**

16  Q.  So I am showing you a selection of clips, but on this night

17  are there at least 600 video clips or this day -- excuse me --

18  on February 2nd?

19  A.  **Yes.**

20  Q.  And has law enforcement reviewed other clips after the

21  camera was spray painted that depict individuals other than Mr.

22  Knezevich?

23  A.  **Yes.**

24  Q.  And do they have a reflector on their person?

25  A.  **No.**

1  Q.  Okay.

2          THE WITNESS:  You see.

3          THE COURT:  Uh-huh.

4  BY MS. MONK:

5  Q.  What about the movement of that object that led law

6  enforcement to conclude that it was likely a suitcase?

7  A.  **Because it looks like it is heavy and he is hauling it**

8  **inside the elevator.  It is a small elevator and he has to be**

9  **quick to --**

10  Q.  Now going to clip five --

11          THE COURT:  I don't see a suitcase.  Do you see one?

12          THE WITNESS:  I'm feeling like (inaudible).

13          THE COURT:  Okay.

14          THE WITNESS:  Maybe now when you see him getting out

15  of the elevator.

16  BY MS. MONK:

17  Q.  How tall is the victim?

18  A.  **Very short.**

19  Q.  Does 4'11 --

20  A.  **Less than five foot.**

21  Q.  Okay.  And do you know approximately how much she weighed?

22  A.  **Like very petite.**

23  Q.  Okay.  Do you think she could fit in a suitcase?

24  A.  **Absolutely.  That's the elevator opening.  There's the**

25  **reflective vest.**

```
 1          THE COURT:  And do you see a suitcase?  (Inaudible).
 2   BY MS. MONK:
 3   Q.   Now do you have video of the day after this incident?
 4   A.   Yes.
 5   Q.   And is Ana ever viewed leaving the apartment?
 6   A.   No.  The last time she was seen was the day of her
 7   disappearance; buying flowers, coming in with flowers around
 8   1:40 p.m.
 9          THE COURT:  In fairness, though, how long did the
10   spray paint take to get clear?
11          THE WITNESS:  So after you see the reflective vest
12   exiting the building, it takes a couple of minutes before it
13   completely blacks out.
14          THE COURT:  It completely --
15          THE WITNESS:  Blacks out the camera.
16          THE COURT:  No, no, no.  That's my question.
17          THE WITNESS:  Oh.
18          THE COURT:  This occurred roughly around 10:00,
19   9:00 at night?
20          THE WITNESS:  Yes.
21          THE COURT:  The spray painting?
22          THE WITNESS:  Yes.
23          THE COURT:  How long did the camera paint take to get
24   rid of it?  In other words, at what point in time were you able
25   to see something on the camera?
```

```
 1          THE WITNESS:  Oh, afternoon.  The next day after the
 2    building noticed it and they had to clean it.
 3          THE COURT:  Right.  So there was multiple hours.
 4          THE WITNESS:  Where it was completely dark.
 5          THE COURT:  Right.  So theoretically, since we are
 6    playing on that, theoretically if, in fact, she was fine at
 7    midnight and left on her own from the apartment you wouldn't
 8    have seen that on the video?
 9          THE WITNESS:  Not that night.
10    BY MS. MONK:
11    Q.   Now what prompted the victims' friends to report her
12    missing?
13    A.   So Ana was very social in constant daily with her friends
14    and she had plans to go to a conference that Monday in
15    Barcelona.
16    Q.   Were there any communications received from Ana's What's
17    App account that were concerning to her friends and family?
18    A.   Yes.  Two of her friends received messages from Ana -- from
19    Ana's phone saying that she had met someone and she was going
20    two hours from Madrid.
21    Q.   Now has law enforcement contacted a woman in Colombia?
22    A.   Yes.
23    Q.   And did she represent to law enforcement that she had a
24    romantic relationship with Mr. Knezevich?
25    A.   Yes.
```

```
 1   Q.   And did she also advise law enforcement that she translated
 2   those very messages that were last sent from the victim's
 3   phone?
 4   A.   Yes.
 5   Q.   And does law enforcement have a copy of her What's App
 6   communications with the Defendant where he requests that
 7   translation?
 8   A.   Yes.
 9            THE COURT:  At what point in time is that, by the way,
10   just so I understand?
11            THE WITNESS:  So he contacted her the 3rd;
12   February 3rd.
13            THE COURT:  The next day.
14            THE WITNESS:  The next day and the messages were sent
15   on February 3rd.
16            THE COURT:  And do you have evidence as to where he
17   was where the communication was originated?
18            THE WITNESS:  When the communication of the --
19            THE COURT:  Right.
20            THE WITNESS:  -- What's App?
21            THE COURT:  Of the What's App.  Do you have any
22   information as to where he was at the time of his
23   communication?
24            THE WITNESS:  So we have -- no, not the 3rd.  We have
25   the cell phone towers --
```

61

```
 1              THE COURT:  Uh-huh.
 2              THE WITNESS:  -- pinging at the same time as the
 3    rental car, the blue Peugeot departing on the 3rd; from Spain
 4    on the 3rd.
 5              THE COURT:  Got you.  But, in other words, there is no
 6    technology that you have that --
 7              THE WITNESS:  So that was Ana's What's App and we
 8    don't have her device.
 9              THE COURT:  Got it.
10    BY MS. MONK:
11    Q.   Does the What's App return for Ana's phone number indicate
12    that it last pinged in France?
13    A.   **Yes.**
14    Q.   And does France border Spain?
15    A.   **Yes.**
16    Q.   And to drive back from Serbia do you have to go through
17    France?
18    A.   **Yes.**
19              MS. MONK:  No further questions.
20              THE COURT:  Do you have any followup questions?
21              MS. WEINTRAUB:  Yes, I do.  There are two very
22    important things I would like to bring to the Court's
23    attention.
24              THE COURT:  Microphone.
25              MS. WEINTRAUB:  One is --
```

1        THE COURT:  Microphone.

2        THE COURTROOM DEPUTY:  Microphone.

3        THE COURT:  Pick your poison; lectern or the

4   microphone.

5        MS. WEINTRAUB:  Sorry, Judge.  Sorry.

6                    RECROSS EXAMINATION

7   BY MS. WEINTRAUB:

8   Q.   It's the Government's theory that David did not want to

9   split 50/50 assets with Ana in the divorce, right?

10  A.   **That was my information given through interviews; obtained**

11  **through interviews.**

12  Q.   Now, you do agree at the beginning any divorce could be

13  pretty contentious, right?

14  A.   **Yes.**

15  Q.   And you also agree that people say things they don't mean

16  and then things calm down and that's just every day life?

17  A.   **Sure.  Okay.**

18  Q.   So kind of like with the blood when the Judge asked you I'm

19  going to -- do you remember when the Judge asked you when you

20  say that it was contentious -- meaning between David and Ana?

21       MS. MONK:  Objection.  This is outside the scope of

22  the pleadings.

23       THE COURT:  Overruled.  Let her finish.

24  BY MS. WEINTRAUB:

25  Q.   What other factors do you know that lead you to conclude

 1  that?  Do you remember when the Judge asked you himself?

 2  A.  **Can you keep reading?**

 3  Q.  Yes.  You answered:  I have audios where David doesn't want

 4  to give her half and she feels threatened.

 5      Do you remember that?

 6  A.  **Yes.**

 7  Q.  What you didn't tell the Judge, that we were recently

 8  provided in discovery, is that you were also in possession of

 9  messages from mid-January and January 31st from Ana to her best

10  friends that David did agree to split everything 50/50; isn't

11  that true?  Yes or no and then you can explain.

12  A.  **I don't recall.**

13  Q.  You don't recall.

14      On March 21st, isn't it true that you received an audio

15  message that goes from January 13th with Ana and her best

16  friend Sauna (phonetic) that David agreed to split everything;

17  yes or no?

18  A.  **Can you -- I -- can you read it?  What does it say?  What**

19  **was the context of the message?**

20  Q.  I'll play it for you with the Court's permission?

21          THE COURT:  Sure.  We've gone this far.

22          MS. WEINTRAUB:  While you are doing that I will start

23  with the other one.

24  BY MS. WEINTRAUB:

25  Q.  Do you remember on January 31st you interviewed Daisy

1  Mendosa.  She was the person that's very good friends with Ana,

2  right?

3  A.  **Yes.**

4  Q.  And she is such a good friend, she's the one that called

5  the police that she thought Ana was missing?

6  A.  **Yes.**

7  Q.  And she told the police that she thought Ana overdosed,

8  right?

9  A.  **Yes.**

10  Q.  Now, when the Judge asked you the last time we were here

11  about those audio messages showing contention, you didn't tell

12  the Judge that you interviewed Daisy Mendosa and she told you

13  that Ana finally told David she was going to split everything

14  50/50 and that took place on January 31st; isn't that right?

15  A.  **So there's a little information received regarding that he**

16  **did not want to split.**

17      THE COURT:  Just answer her question.  Does it sound

18  like somebody may have thought that they actually would have

19  agreed on a 50/50 split?

20      THE WITNESS:  I don't remember.  I know that she gave

21  him an ultimatum and he had agreed.

22  BY MS. WEINTRAUB:

23  Q.  Agent, you wrote a report on June 6th that says:

24      On or about January 31st or February 1st, David contacted

25  Ana and seemed to agree to everything Ana was asking regarding

1  the divorce settlement.  Ana would justify David's actions and

2  stated he wasn't a bad person and that it was just hard after

3  13 years of marriage sometimes.

4  A.  **I do recall that.  Thanks for reading that.**

5  Q.  Okay.  So when the Judge, himself, asked you what factors

6  do you have to say that it was so contentious and such a bitter

7  divorce proceeding, you only told him a very early message.

8      You did not tell the Judge -- the Judge did not have the

9  benefit of this information when he made his decision, did he?

10 A.  **The majority of the information says the opposite.**

11      THE COURT:  Just answer the question.  The Court

12 didn't have that information at the time?

13      THE WITNESS:  Yes, the Court did not have that

14 information.

15 BY MS. WEINTRAUB:

16 Q.  Nor did the Court have the information on January 13th two

17 weeks before the supposed disappearance when Ana sounded very

18 happy and was telling Sauna that David agreed to a 50/50 split.

19 You didn't tell the Judge about that either, did you?

20 A.  **No.**

21 Q.  And you had it in your possession.  Let's play it.

22      For the record, we are going to play that tape.

23      UNIDENTIFIED MALE SPEAKER:  It's not playing audio.

24      MS. WEINTRAUB:  Oh, go ahead.

25      UNIDENTIFIED MALE SPEAKER:  I don't know how to play

1  the audio.

2        THE COURT:  Yes, it doesn't play audio.  If it doesn't

3  come out of your laptop it doesn't come out.

4        UNIDENTIFIED MALE SPEAKER:  We have to play it here.

5  I will play it for the Court.

6        MS. WEINTRAUB:  Can I get the microphone?

7        THE COURT:  Oh, yes, or just play it at the lectern

8  and it will work.

9        THE COURTROOM DEPUTY:  Just push it until the green

10  comes on.

11        THE COURT:  Yes, just play it at the lectern.

12  (Thereupon, the audiotape was published:)

13        "ANA:  Yeah, I wanted to tell you that I was talking

14  to -- I talked to my therapist today.

15        WOMAN:  Really.

16        ANA:  And then, of course he told me he can promise

17  you the sky and, you know, the moon and the sun, but until he

18  does what he says.

19        And you know, you just don't believe anything, but

20  also you cannot just tell him, no, there is nothing else there,

21  you know.  I'm not coming back with you like how you're feeling

22  or whatever.  You just need to be very straight about like

23  (inaudible).  Like that is what I need right now and so I did

24  that.  So I called and we will see.  So that was like the

25  method that I had to like tell him, you know.

```
 1          So I called him.  I told him that.  I told him that if
 2   he was serious with what he is saying, I needed us to be
 3   completely separate and I needed this to be filed in court
 4   before the end of the month and that's what I want.
 5          And that's where I am and that was it that I didn't
 6   want to work with him in the future neither and that we were
 7   not going to share finances neither or anything like that and
 8   those were the things that were talked about, you know.
 9          And so we will see and he accepted that and he said
10   that he was going to do it.  Like everything like
11   fifty percent.  Everything from the house if I wanted to go
12   thing by thing or he will do it.  And if he miss anything, I
13   just tell him, you know, he will include it.  But everything
14   will be everything in the house of the things that we have and
15   the business, everything.  So I'm happy about that and I hope
16   it's true and I leave this like the 13th now of the month.
17          So I have fifteen more days with all of this to see if
18   actually like this is going to be (inaudible), if this is
19   really happening and it's going to be like this.  That's all I
20   want and that's it.
21          I just wanted to let you know that everything is cool
22   and fine and I hope you have a beautiful day over there and I
23   am so excited to come over there.  You have no idea.
24          So I am happy that I will see you and tonight I am
25   going out with a couple of girls and I guess I will see you
```

 1  soon.  Bye."

 2  BY MS. WEINTRAUB:

 3  Q.  You had that audio, didn't you?

 4  A.  **Yes.  We brought it to you, yes.**

 5  Q.  And you did not tell, when the Judge asked you about other

 6  messages and the contentious bitterness, you didn't tell the

 7  Judge about this message either, did you, the last time?

 8  A.  **No.**

 9       MS. WEINTRAUB:  Judge, I have two more areas that are

10  very similar, unfortunately, if I might.

11       THE COURT:  Go ahead and wrap it up.

12  BY MS. WEINTRAUB:

13  Q.  Now there was also representation the last time we were in

14  Court by the Government in its proffer, quote:

15       Additionally, the Defendant's Facebook account used to

16  (inaudible) Pedras** in an area of Spain just north of Madrid

17  on February 1st --

18       MS. MONK:  Objection.  This is not in the briefing.

19       MS. WEINTRAUB:  What's the objection?

20       UNIDENTIFIED MALE SPEAKER:  It's not in the briefing.

21       MS. MONK:  It's not.  It's outside the parameters of

22  today's hearing.  It is not briefed.

23       THE COURT:  Did you not raise this issue?

24       MS. MONK:  No.

25       THE COURT:  Proffer it for me just without -- just

1  proffer it.

2      MS. WEINTRAUB:  The Government's evidence is that an

3  IP address was used and I am going to read it for you and show

4  it to you; 668117419 and that was an IP address that was used

5  by Ana all through the month of January.

6      May I approach the witness, Your Honor?

7      THE COURT:  Just proffer for me the point you are

8  making.

9      MS. WEINTRAUB:  Judge, the Government has given us in

10 discovery an IP address of 66811749.  That's Ana's IP address

11 from her apartment from her location.  We all know how IP

12 addresses work.  They work according to the location.

13     David's Facebook account -- well, that's how you use

14 somebody's Internet.  It comes back on with IP address.

15 David's Facebook account apparently was logged in on

16 February 1st, 2024 at 8:00 p.m. from Ana's IP address.

17     The Government maintains or submits that that was

18 David logging into his account.  We submit that it was Ana

19 logging into David's account and checking up on him.

20     THE COURT:  From her apartment?

21     MS. WEINTRAUB:  Correct, because it is her IP address.

22     THE COURT:  Isn't that more likely?  If it is her IP

23 address on the day before, isn't it more likely that she was

24 logging on rather than him?

25     THE WITNESS:  I don't know.  Yes.

1      THE COURT:  Okay.

2      MS. WEINTRAUB:  There's only one more thing, Judge,

3  that I would like to -- two more things.  One is --

4  BY MS. WEINTRAUB:

5  Q.   Agent, you are aware that somebody contacted David to

6  question him and advised him that there was an open

7  investigation by the FBI into the disappearance of his wife,

8  right?

9  A.   **I don't know that.**

10  Q.   You don't know that.

11      Didn't you call David at one point and ask him questions?

12  A.   **I've never talked to him.  I did try.  I called him and**

13  **texted him on February 15th, but he didn't answer.**

14  Q.   Did you leave him a voicemail?

15  A.   **Probably.  I don't remember.**

16  Q.   Do you remember that you contacted his attorney at the

17  time?

18  A.   **Yes.**

19  Q.   And you told his attorney that there was an open

20  investigation that he was the focus of the investigation as a

21  suspect in the disappearance of Ana; yes?

22  A.   **May I explain?**

23  Q.   First say yes or no and then you can explain.  You did tell

24  him that, didn't you?

25  A.   **I asked him if his client would help us find Ana.**

1  Q.   Okay.  Let me try this a different way.

2       Did you tell his lawyer that David was a target of an

3  investigation into the disappearance of his wife; yes or no?

4  Yes?

5  A.   **Yes.**

6  Q.   And he knew that that first conversation was February 28th;

7  yes?

8  A.   **I don't know the exact date.  I know there were two**

9  **conversations.**

10  Q.   And then you tried to speak to David yourself and you were

11  referred to speak to his lawyer, right?

12  A.   **That's not how it happened.  Can I explain?**

13  Q.   So first you tried to speak with him and then you spoke

14  with his lawyer?

15  A.   **So I contacted David and then Ken reached out to me.  His**

16  **former --**

17  Q.   His lawyer?

18  A.   **How do you say his former attorney contacted me.**

19  Q.   Okay.

20  A.   **And he said he is not going to talk to the FBI and he is**

21  **not going to submit himself to a polygraph.**

22  Q.   Okay.  Let me ask you something else.  It's the

23  Government's theory -- well, strike that.

24       You subpoenaed Turkish Air, did you not?

25  A.   **Yes.**

1  Q.   For records that if David traveled through Turkey on

2  Turkish Air, correct?

3  A.   **Yes.**

4  Q.   Now David traveled in January of 2024.  He departed on

5  January 20th and came back on January 21st.  Do you know that?

6          MS. MONK:  Objection, outside the scope of the

7  pleadings.

8          THE COURT:  Overruled.

9  BY MS. WEINTRAUB:

10 Q.   Do you know that?

11 A.   **No.  I mean, I probably know, but I --**

12 Q.   Aren't you aware of the fact that David returned in January

13 to go to a court hearing?

14 A.   **I know it was January, but I don't know exactly what date,**

15 **yes.**

16 Q.   Okay.  So you know that David came back to the United

17 States in January?

18 A.   **Yes.**

19 Q.   Through Turkish Air which stops in Istanbul both ways and

20 went back to Serbia to his mom's, right?

21 A.   **He went back to Serbia.**

22 Q.   Okay.  And you did interview his mother there?

23 A.   **Yes.**

24 Q.   And you do know that he was there; yes?  In the interview

25 she tells you that he was there and Ana came to visit even in

1  December, right?

2  A.  **Oh, back in January, yes.**

3  Q.  Yes?

4  A.  **Yes.**

5  Q.  And didn't you also verify that Ana flew through Istanbul

6  to go to Serbia?

7  A.  **I don't know how she got there, but I know she was in**

8  **Serbia with David.**

9  Q.  Okay.  Do you know that there are no direct flights from

10 Miami or Fort Lauderdale South Florida to Serbia?

11 A.  **Yes, I know.**

12 Q.  And do you know that you have to fly through either

13 Istanbul, Paris, or Zurich to get there?

14 A.  **Yes.**

15 Q.  So it is not an extraordinary means to go through Istanbul

16 to get there to Serbia, right?

17 A.  **Right.**

18      MS. WEINTRAUB:  One last point is the matter of means

19 that came up.  If I could just have one second, Judge.  I am

20 actually just trying to go through your detention order.

21      THE COURT:  Sure.

22 BY MS. WEINTRAUB:

23 Q.  I forget to ask you this, Agent.  So just to be clear and

24 to close this situation up, David returned to the U.S. after

25 you spoke with his prior lawyer and told him that he was a

1  suspect in the case in January?

2  A.  **Correct.**

3  Q.  And that he also knew about it obviously because it was all

4  over the news and everything by the time he was arrested and

5  there were many news articles, in Spain, here, everywhere?

6  A.  **I don't know what he knows.**

7  Q.  Sorry?

8  A.  **I don't know what he knows.**

9  Q.  Were you aware that there was press before he got arrested

10  about him being a suspect?

11  A.  **Yes.**

12  Q.  Okay.  Now there has been a lot of talk about how much

13  money David has access to, right?  Do you remember talking

14  about it at the last hearing?

15  A.  **Yes.**

16  Q.  Now, because that is such an important factor for you at

17  this point, did you pull the real estate files, the closings,

18  everything that is public record?

19  A.  **Yes.**

20  Q.  Okay.  And did it come to your attention that there are

21  seven properties that were sold that David has a second

22  mortgage on?

23  A.  **Yes.**

24  Q.  And the balloon of that mortgage, the second mortgages, are

25  due 2027; is that correct?

1  A.  **Yes.**

2  Q.  Okay.  Now, by the way, those properties weren't listed in

3  January and February.  They were listed for over a year; isn't

4  that right?

5  A.  **I don't know that part.**

6  Q.  Well, actually you do because didn't you speak with

7  Victoria Fischer, the realtor, the agent?

8  A.  **Yes.**

9  Q.  And didn't she tell you that they were listed a year before

10  they were brought on?

11  A.  **I don't remember.**

12  Q.  You spoke with Victoria Fischer on May 9th, right?

13  A.  **Uh-huh.**

14  Q.  Does that sound about right?

15  A.  **If that's what the report says.**

16  Q.  Yes, ma'am.

17  A.  **Yes.**

18  Q.  It says the real estate agent, to sell those properties,

19  one year ago and that was written May 9th.  Does that sound

20  accurate?

21  A.  **Yes.**

22  Q.  Okay.  So it was not like those properties were just put on

23  the market in January or February right before she disappeared,

24  allegedly, right?

25  A.  **Yes.**

1  Q.   Okay.  So let's talk about the bulk of David's cash that

2  you believe he has access to.  That was with Chase Bank; is

3  that right?

4  A.   **He has other bank accounts.**

5  Q.   Let's talk about Chase Bank first.  That's the largest bank

6  account I saw in the Government's pleadings.  It was $160,000

7  plus $50000, right?

8  A.   **Yes.**

9  Q.   You are aware that the fact that Chase Bank is frozen, are

10 you not, that account?

11 A.   **Yes.**

12 Q.   So that David does not have access to those monies, does

13 he?

14 A.   **Not to the Chase.**

15 Q.   Right.  And there were a couple of other accounts that he

16 might have had access to when he was arrested that he

17 legitimately does not have access to anymore, correct?

18 A.   **He has other account that he has access to.**

19 Q.   And do you know the total amount of money of those cash

20 accounts that you believe he has access to?

21 A.   **No.**

22 Q.   Isn't it true, Agent, that it was under $300,000?

23 A.   **I don't know.**

24 Q.   You are not saying it was more, are you?

25 A.   **I don't know.**

1      MS. WEINTRAUB:  May I have a moment?

2      Judge, I have no further questions of the witness.

3      THE COURT:  Okay.  Thank you very much.

4      Do you have any further questions?  No?

5      MS. MONK:  No, Your Honor.

6      THE COURT:  Okay.  Thank you very much, Miss Montillo.

7      Any evidence, additional evidence that the Defendant

8  wishes to introduce?

9      MS. WEINTRAUB:  Hold on.

10      THE COURT:  Do you wish to call anybody?

11      MS. WEINTRAUB:  No, Judge.  We are not going to call

12  other witnesses.  I would like to make a brief argument and I

13  know that it is late and we are pressing the Court's time, but

14  I think it is important.

15      THE COURT:  Let me turn to Miss Monk.

16      Any evidence that you would like to introduce other

17  than than what you have already introduced through the witness?

18      MS. MONK:  No, Your Honor.

19      THE COURT:  Okay.

20      MS. MONK:  Just what we have filed all the exhibits

21  attached to the filing, including the sealed Exhibits 1, 2, and

22  5.

23      THE COURT:  Yes.  I was going to ask you, actually,

24  about that.  Number one, the videos are -- I couldn't really

25  see them.  So did you file them under seal?  Do I have the

1  original?

2       MS. MONK:  You do.  So we filed sealed Exhibit 1 are

3  the various clips from the hardware store.  Sealed Exhibit 2

4  are the clips that I played today.

5       THE COURT:  Okay.

6       MS. MONK:  And then sealed Exhibit 5 is the active

7  Serbian passport.

8       THE COURT:  Yes, I was going to ask you about that

9  which I will authorize to be sealed, of course.  What was the

10 significance of the passport for me?

11      MS. MONK:  Well, they represented at the detention

12 hearing and he represented to Pretrial Services that he wasn't

13 a Serbian citizen and contacted the Serbian Embassy in

14 Washington, D.C. who said he was, in fact, a Serbian citizen.

15 He crossed in and out of the Serbian Croatian border during the

16 commission of the offense with his active Serbian passport,

17 which they also represented was expired.

18      And his landlord actually found that active Serbian

19 passport in his home after his arrest, which then when agents

20 searched the home with the Serbian Police pursuant to an MLAT

21 it was notably missing.

22      So really just to express to the Court that he was

23 misleading when he said that he was not a Serbian citizen.  He

24 is.  He also implied that he doesn't have a Serbian passport

25 and he does and now that Serbian passport is essentially

 1  missing.

 2          THE COURT:  But this picture of it, if it is missing

 3  how do you have it?

 4          MS. MONK:  Because after he was arrested --

 5          THE COURT:  Uh-huh.

 6          MS. MONK:  -- his parents contacted his landlord to

 7  say, hey, we would like to get all of our son's belongings.

 8          THE COURT:  Okay.

 9          MS. MONK:  The landlord found this suspicious.

10          THE COURT:  Okay.

11          MS. MONK:  And contacted Serbian law enforcement and

12  also got an attorney to get inventory of the things that were

13  in the home, which included the Serbian passport.  He took a

14  picture of it and then provided it to Serbian law enforcement

15  in June of 2024 when the MLAT was under way.

16          THE COURT:  Oh, so the parents secured the passport?

17          MS. MONK:  Yes.

18          THE COURT:  In other words, this was part of the

19  materials that was given back to the parents?

20          MS. MONK:  Correct.  So at least in May of 2024 when

21  he was arrested he had rented an apartment in Serbia and then

22  after the arrest the parents contacted the landlord.  They want

23  all his things.  The landlord finds this in the unit and takes

24  a picture of it.

25          THE COURT:  Okay.

1     MS. MONK:  And then when agents searched the parents'

2   home the passport is not found.

3     THE COURT:  Now, in fairness to him, I don't remember

4   him testifying at the first hearing.

5     MS. WEINTRAUB:  He didn't.

6     MS. MONK:  So it is in the Pretrial Services Report.

7   I quoted it, but I believe it said he relinquished his Serbian

8   citizenship.  And then there was a significant amount of

9   questioning by Defense counsel, which I also pinpoint in my

10  briefing about, you know, you are just assuming he is a Serbian

11  citizen.  His passport is expired.  I outline all of that in

12  detail with the specific citations in my briefing.

13    THE COURT:  I see.  Let me pull up the Pretrial

14  Services Report just so I have it.

15    MS. MONK:  I do think it has been amended at least as

16  to that point.  Now it just reads that he is a naturalized

17  citizen, but in the prior version it says that he had

18  relinquished his citizenship and I could probably find that in

19  my e-mail if Your Honor needs it.

20    THE COURT:  No, I have it.

21    Okay.  So now in terms of the Government's evidence

22  with respect to the travel, which is of course what the case is

23  about, is what passport was used for the travel; the Serbian

24  passport or the American passport?

25    MS. MONK:  When he was in Serbia he crossed the

81

1  Serbian land border into Croatia with a Serbian passport.  And

2  then when he returned from Spain, he again went through Croatia

3  into Serbia with a Serbian passport.

4        THE COURT:  To fly from Miami, the flight from Miami?

5        MS. WEINTRAUB:  American.

6        THE COURT:  American passport?

7        MS. MONK:  That sounds correct, yes.

8        THE COURT:  Because it is my understanding that

9  technically is the offense here any foreign travel or the

10 travel from the United States to commit a kidnapping?

11       MS. MONK:  I believe the way the statute reads is the

12 offender travels in interstate or foreign commerce in

13 furtherance or in the commission of the offense.

14        So here we are saying that it exists in the Southern

15 District of Florida because he traveled from Miami

16 International Airport ultimately to Serbia for the purposes of

17 committing the kidnapping.

18       THE COURT:  Right.  The departure record of that was

19 on what date?

20       MS. MONK:  He flew out of Miami International on

21 January 27th and you don't make it within the same day.  So he

22 lands in Belgrade.  He flies Miami to Istanbul and Istanbul to

23 Belgrade and that is January 28th.

24       THE COURT:  And as far as you know what passport was

25 used to do that trip?

1          MS. MONK:  I think we are saying U.S. passport.

2          THE COURT:  U.S. passport.

3          All right.  Now I understand the significance of it.

4          Did you want to make an argument?

5          MS. WEINTRAUB:  Yes, Your Honor, I do.  Thank you.

6          Judge, today what you've heard, contradicting what you

7    heard the last time, is there was no blood.  They knew there

8    were no traces.  At the most there were traces of blood.  They

9    knew there was no violence.  No struggle.  No signs of foul

10   play and nothing suspicious at Ana's apartment.

11         The FBI knew that when she testified and told you

12   about the violence.  Today that was corrected for the very

13   first time.  When she testified about this contentious bitter

14   divorce, which the Court was also concerned about and mentions

15   in the detention order, she had in her possession messages from

16   January 13th and January 31st or February 1st, she writes, from

17   two of Ana's very best friends.

18         From Ana herself saying that David has agreed to

19   everything.  I basically thank God.  She sounded fine.  She

20   sounded happy.  She was saying she was happy.  She was saying

21   things are good.  Deliberately the FBI did not tell you that.

22         When you asked -- you took over the questioning for me

23   last time and you said what factors do you have to say it was

24   so bitter and contentious and she tells you that she has

25   messages that she is basically suicidal and he is threatening

1    her and he doesn't want to give her anything.

2           She had the evidence contradicting that to the hundred

3    percent to the opposite and she didn't tell the Court and

4    that's really troubling.

5           Now the other thing that is really troubling is that,

6    of course, everything is relying on the Spanish National Police

7    in this courtroom, but we are in the United States.

8           So my problem is when I get 10,000 pages of reports

9    from the Spanish National Police, but it is written by the FBI

10   as he is captured on the CCTV video outside her apartment

11   building, well, that's a concern.

12          As the Court said last time, well, maybe you want to

13   ask for a speedy trial so he is not detained so long.  And that

14   would be great, but how could I possibly do that?  Look what we

15   found out in a month.

16          So we wouldn't be doing our jobs if I relinquished

17   that obligation that we have as lawyers in this country because

18   we are only concerned with due process in this country.  And it

19   seems like everything that is relied upon should call into

20   question the integrity of the investigation that was done in

21   Madrid.

22          And I say that because even when the Court asked the

23   agent about the blood there were forensic examinations that

24   there was the presence of blood.  The only question was did it

25   match David or not.  That's not true at all.  That was

1  completely made up.  She knew there were traces only.  She knew

2  there was no violence and she didn't have it confirmed that it

3  was blood if that's the way the testimony came to this Court.

4        And I have been doing this a long time, Judge.  You

5  know, I am not sitting here saying she's a liar.  She is

6  relying on what they told her and that's my problem.  So I want

7  it to be clear.

8        My problem is two-fold, but it is also what is being

9  relied on is not reliable and that stuff is in search warrants.

10  That stuff is throughout this case.  The threat of this case is

11  the lack of integrity by the SNP, which is repeated and cut and

12  pasted into 302s by the FBI.

13       That's a problem, but more of a problem is this

14  Court's concern right now, as is ours, is with our client's

15  custody status.  He is being detained in a U.S. Court for

16  something that happened in Spain, if it happened at all.

17       Now the Court relies on the Government saying that

18  they believe that there is jurisdiction.  They believe that

19  there is jurisdiction and the case that they cited to you was

20  the Meyer** case, but the Meyer case does not at all say what

21  the Government told you that it says.

22       I am looking for the cite, of course.  The Meyer case

23  is at 63 F.4 1024, Fifth Circuit, 2023.  There was jurisdiction

24  in Meyer.  Do you want to know why?  There was jurisdiction in

25  Meyer because it was a drug conspiracy that started in Texas.

1    The co-Defendant was in Texas.  The co-Defendant was in Mexico.

2    In Texas they talk about having to go to Mexico to intimidate

3    the other guy that is holding the drugs.

4            So he is traveling, in Meyer, from Texas.  He goes to

5    Mexico with a job to intimidate the guy and therein lies

6    jurisdiction.  It's a continuation about conspiracy.  You don't

7    have that here.  You don't have that at all.  All you have --

8            THE COURT:  You don't think the presence of the fact

9    that their prior residence here and their divorce here, coupled

10   with the international travel from here to commit the murder or

11   kidnapping --

12           MS. WEINTRAUB:  First of all, there is no divorce

13   proceeding that ever started.  They were contemplating a

14   divorce and making an agreement.  That's what the evidence is.

15   To be clear, you even asked -- and finally she said on the

16   stand last time -- no, they didn't actually go to court yet.

17           So even though she kept talking about this divorce, no

18   divorce yet.  And t the end the Court heard that he was willing

19   to split 50/50.  They relied on that as a motive.  They rely on

20   the taking of her with a suitcase that does not exist.  With a

21   suitcase that we didn't know didn't exist.

22           Again, now they are using words like, well, it appears

23   to be.  Well, it looks like to me.  Judge, this is a courtroom

24   in the United States of America where he is being detained for

25   months.

1          THE COURT:  But I agree with you that some of their

2     evidence is challengeable.  I don't see a suitcase on the

3     video, but how do you deal with the -- so you have to discredit

4     some of what they rely upon, but now that we've actually gotten

5     to see the video of him in the hardware store and in the

6     building, does not that strengthen their case?

7          MS. WEINTRAUB:  But today, Judge, we are only talking

8     about -- I mean, today they acknowledge there is no -- she said

9     there was no evidence of a taking of Ana.  That's kidnapping.

10         What happened before or why that surveillance tape

11    exists, that is in the weeds and the nitty-gritty of what we

12    are here for.  We are not trying the case today.  We are

13    talking about evidence that does not exist now and never will

14    exist of an essential element of kidnapping.

15         The agent testified under oath today when you asked

16    her, do you have any evidence of him taking her.  She said no.

17    Is there any evidence -- and that's not even enough under the

18    law because under the law he has to hold her for a significant

19    period of time and that's the law.

20         THE COURT:  You don't think taking her to France would

21    qualify?

22         MS. WEINTRAUB:  I'm sorry?

23         THE COURT:  You don't think taking her to France would

24    qualify?

25         MS. WEINTRAUB:  There is no evidence that he took her

1    to France.

2         THE COURT:  But wasn't there evidence that her phone

3    pinged in France?

4         MS. WEINTRAUB:  There was no evidence that David took

5    her anywhere unless you see a suitcase that I don't see but, by

6    the way, it wouldn't be moving that fast.

7         But the Court has to look at the weight of the

8    evidence for the risk of flight which seems to be the Court's

9    biggest concern.  And when the Court is looking at the weight

10   of the evidence as a whole this is what you have.  You have

11   maybe suspicious thoughts about the hardware store.  I

12   understand that.  That's just suspicion.  That's speculation.

13   What we don't know is everything else.

14        As you correctly pointed out and took the best part of

15   my cross, we don't know what happened after 10:00 p.m.  That's

16   a big what if.  There is no taking of Ana Knezevich.  There's

17   no evidence.  There is only guesswork and appearances of

18   speculation.  If that's a suitcase I am not standing here.

19        There is just no evidence of it.  I mean, it sounds

20   good, but there is no evidence of a suitcase and that's even in

21   the search warrant and that's the problem with this case.

22        This case is never going to be about a kidnapping.

23   This case is about a murder they cannot prove and if they can

24   prove it, let them indict him.  This is the United States of

25   America.  You have evidence?  Bring it.  We will defend it.

1  They don't have it.

2          So what do they do instead to hold him?  They go for

3  the lesser of kidnapping.  Okay.  But you don't get to detain

4  him when you can't prove it and your agent is saying there is

5  no evidence of a struggle.  No sign of foul play.

6          And Judge, the worst thing, three minutes and three

7  minutes that's when this all happened.  He goes upstairs.

8  Kills her.  Not a sign of disarray.  No foul play.  Nothing

9  arousing suspicion was in the report of the first responder.

10  He puts her in a suitcase and goes back downstairs?  Come on.

11  You know, it is beyond a reasonable person's standard, but

12  that's not evidence to detain somebody of his freedom.

13          And I also want to tell the Court, as an officer of

14  this Court, there are over 10,000 pages of Spanish reports.  I

15  asked the Government for translations.  I don't speak Spanish

16  and neither do my co-counsel.

17          I asked the Government for translations because it is

18  prohibitive.  And I gave them a quote that we got which was

19  astronomically insane .  I asked the Government for

20  translations.  The Government says you are not entitled to it.

21  We are not obligated.  Okay.  Fine.  Like after two months they

22  agreed to give us translations and that was two months ago.

23          THE COURT:  They have to translate to introduce it.

24          MS. WEINTRAUB:  Well, they are going to get the

25  translations, but we still don't have it.  My point is it is

1   going to be months before we are in trial, Judge.  We don't

2   have access yet to this crime scene in Madrid when we asked for

3   that.

4           We will file the appropriate motions as we go.  We

5   will file an appropriate motion to dismiss on the jurisdiction

6   properly briefing it, but as the Court can see from the only

7   case that they bring you it is not applicable.

8           There is no evidence.  None that anything occurred in

9   the United States whatsoever.  Even if *arguendo* the Court wants

10  to say, well, he knew.  There is no evidence.  When he left

11  here and he got to Serbia to go to his mom's, which he had just

12  been to a month before and said I'll be back, as they know,

13  there is no evidence that in those three days --

14          THE COURT:  Isn't that an incriminatory fact that he

15  had just been in Serbia and then he leaves again?

16          MS. WEINTRAUB:  I'm sorry?  I didn't hear that.

17          THE COURT:  Isn't that an incriminatory fact that he

18  had just been in Serbia the week before?

19          MS. WEINTRAUB:  He had to come back in January --

20          THE COURT:  Right.

21          MS. WEINTRAUB:  -- for the Court hearing.

22          THE COURT:  But he was in Serbia and that's where he

23  came back from.

24          MS. WEINTRAUB:  Correct.  And he told his mother

25  because he was thinking of living there and helping his mother

1    for the next few months.  That's what he was going to do and

2    they know that.  She's an amputee.  She is disabled.  She is

3    elderly and she is really sick.  And so he was going to stay

4    there, which he did for long periods of time with Ana and

5    without Ana.

6            THE COURT:  Well, I guess the strongest part of the

7    Government's case is that with all that need to be in Serbia

8    with his mother, he ends up in a hardware store in Madrid.

9            MS. WEINTRAUB:  But, Judge, if he goes there and if he

10   decides three days after he is there, or if they get in a

11   fight, or if anything else happens, it didn't happen in the

12   United States.  When he left the United States to go to Serbia,

13   there is no evidence of any intent to do anything in Madrid.

14           And he doesn't go right to Madrid.  He could have

15   rented a car the day he got there.  He didn't do that.  He

16   didn't travel for three days in Serbia.  So that calls into

17   question like an intervening period of time.

18           And again, trying to put the square in the round hole

19   that they wanted to fit.  They are saying, well, he must have

20   thought about it in Miami before he boarded the plain.  We are

21   in the United States.  We don't do that.  We don't guess about

22   what somebody is thinking when there is no evidence whatsoever

23   to presuppose what occurred in the U.S. three days earlier.

24           As opposed to once he got there there was a problem or

25   an issue between the two of them.  That's much more likely

1  anyway, but we don't have evidence.  And we have to go by

2  evidence because that is what our Constitution says.  We are

3  not in Spain and we are not in Serbia and his freedom means

4  something.

5       THE COURT:  How do I deal with the representation

6  about no Serbian citizenship with the passport.

7       MS. WEINTRAUB:  I mean, there is just no other word

8  for it.  I misunderstood.  You know, I met with him and I am

9  going to tell the Court candidly there is a record of it, I'm

10  sure.  I met with David for two hours.  I was hired and we had

11  a detention hearing.

12       That was another thing that she put in her papers, the

13  Government, that she didn't know and that's not true because I

14  filed a temporary appearance.

15       THE COURT:  Even if you made a mistake because you

16  didn't have a lot of time to talk with him --

17       MS. WEINTRAUB:  And I cross-examined the agent.

18       THE COURT:  -- he could have corrected you.  He was at

19  the hearing.

20       MS. WEINTRAUB:  Judge, the agent could have corrected

21  herself or she could have corrected the agent.  Things happen

22  and it happens quickly and I don't think he knew at that point

23  that he should have said something to me.

24       THE COURT:  I mean, I wouldn't have that information

25  but for a very, very --

```
 1        MS. WEINTRAUB:  But for me bringing it up you wouldn't
 2   have had it.
 3        THE COURT:  No.  But for a very industrious landlord
 4   who took a picture of something in Serbia.  That's a bad fact,
 5   don't you think?
 6        MS. WEINTRAUB:  But, Judge, what does that prove?
 7        THE COURT:  And by the way, the other problem is that
 8   I take you at face value that it was your misunderstanding that
 9   he had a Pretrial Service discussion where he affirmatively
10   told Pretrial Services that he had relinquished Serbian
11   citizenship and that's documented because we have the Pretrial
12   Services Report of the day.
13        MS. WEINTRAUB:  Judge, I can't address every concern
14   that the Court has, but I can address the big concern.  And the
15   big concern is, is that enough to detain somebody?  Is it?
16        Because there are, you know, I know I don't have to
17   tell the Chief Magistrate Judge what the law is.  I know that
18   you know the law a hundred times better than me and I know that
19   you know that detention is reserved for the rarest of occasion.
20   For only the most dangerous, unrestricted defendant.
21        That is what detentions are served for, but there are
22   conditions of bond that can satisfy this Court that he won't be
23   a risk of flight because that is what the Court is addressing
24   and the Court already addressed that you don't think he is a
25   danger and the Court already said that even in the light most
```

 1  favorable to the Government, there was no evidence that he was

 2  a danger.

 3        And so we are only dealing with the risk of flight and

 4  there are ways to condition that in a bond to ameliorate the

 5  Court's concerns.

 6        THE COURT:  Miss Monk?

 7        MS. MONK:  Yes, Judge.

 8        THE COURT:  There are two issues that are particularly

 9  persuasive.  One is the fact that the case is so defensible.

10  There are many inferences that we are drawing from the

11  Government's point of view.

12        MS. MONK:  Uh-huh.

13        THE COURT:  And so, therefore, it is just as equally

14  defensible to stay here as it would be to flee, number one.

15        Number two, going to the facts, what about the issue

16  of the time that the Government relied upon in the terms of the

17  time that you see him in the lobby.  And I conclude that it is

18  him and a reasonable jury could conclude that it is him, but

19  the time that you see him in the lobby and the time that you

20  see the departing -- not the suitcase -- but the departing

21  white thing, it is about three minutes; is that right?

22        MS. MONK:  No, that's incorrect.

23        So what happens is he enters at about 9:27.  We will

24  have to refer to the time stamps to be one hundred percent

25  accurate and there is a 38-minute, I think, lag in the video.

1  So, basically, he enters into the apartment.  He goes upstairs

2  and he is in there for, I guess up to down, he is in there for

3  six minutes.  He spray paints the camera and then leaves and

4  puts the duct tape on the front door and is outside for

5  18 minutes.

6          He then comes back inside and this is the three-minute

7  time period where we believe he is taking her in some type of

8  luggage and from entry into the elevator to back out that is

9  the three-minute time period.  So it is initially six minutes

10  inside and an 18-minute gap where he goes out and then the

11  three minutes back in.

12          THE COURT:  So he spends a total of nine minutes in

13  the building?

14          MS. MONK:  Correct.

15          THE COURT:  And you believe that that is a sufficient

16  time for him to conduct a seizure of the person and a kidnap?

17          MS. MONK:  Correct, Judge.

18          THE COURT:  Isn't that very defensible, though?

19          MS. MONK:  No.  I mean, I don't think here given the

20  victim's size and the size of the Defendant.  I mean, we see

21  him sitting here today and a ballpark he is at least six feet.

22  He looks fairly strong.  We are dealing with a 4'11, 90-pound

23  woman probably about the size of Miss Weintraub.

24          I mean, it is not unbelievable to think that a

25  six-foot man with a decent amount of strength could quickly

1    overpower a 4'11, 90-pound woman.  I don't think that is hard

2    to accept.

3           He obviously did it quickly.  The Government's theory

4    has never been that there was some type of brutal stabbing or

5    shooting inside that apartment.  We think he may have strangled

6    her in there or he otherwise incapacitated her.  We don't know

7    at this juncture and we put forth what we know.

8           In terms of the video, it wasn't misrepresented.  We

9    have always said you can check the proffer, but based on the

10   proximity of the object to the male, the way that it is moving

11   and shaped, we believed it to be a suitcase.  That's what was

12   proffered to this Court.

13          The Defense has accused us of trying to I think it was

14   hide the evidence from the Court.  We have filed all the videos

15   with the Court.  It was the Defense who didn't want Your Honor

16   to see that they used **(inaudible) in the hardware store with

17   his face fully exposed, you know, showing his build that

18   appears the same as the individual on the apartment

19   surveillance spray painted camera wearing the same style pants,

20   same style shoes, and same eyebrows.

21          The Government has been very forthcoming and very

22   conservative in its description of the evidence to the Court.

23   So, I mean, no, I don't think this is a very defensible case

24   because, to Your Honor's point, you don't drive -- I don't know

25   -- 26 meters or kilometers I believe is what we talked about

1    earlier to go buy spray paint and duct tape.  Especially when

2    spray paint and duct tape is used at the victim's apartment.

3         The last night she is seen alive and the last messages

4    sent from her phone are traced back to the Defendant through a

5    woman who he met in Colombia.  It is a very strong case.

6         MS. WEINTRAUB:  Except that the agent testified and

7    the evidence is there is no taking.

8         THE COURT:  With respect to talking about addressing

9    the other issue that Miss Weintraub makes a point about is the

10   jurisdictional component that there is a real challenge here to

11   whether or not the Court has and the Government has

12   jurisdiction to make the charges it is making.

13        MS. MONK:  Sure.  So if we take a look at the case

14   that she is harping on it says:

15        Rather Meyer claims the Government must show that the

16   victim was transported in interstate or foreign commerce.  Yet,

17   in so arguing Meyer ignores that in 2006 the statute was

18   amended to allow of the Government to establish jurisdiction by

19   the offender's travel.

20        Now the federal kidnapping statute reads the precise

21   kidnapping statute and brings special attention to the part

22   that says or the offender travels in interstate or foreign

23   commerce.  And then the Court goes on to say it was therefore

24   not error for the District Court to instruct the jury that the

25   offender's own interstate or foreign travel could apply the

1  jurisdictional hook.

2       And here he very clearly did travel in foreign

3  commerce.  He flies out on the 27th.  He landed in Belgrade on

4  the 28th.  On the 29th he rents this Peugeot 308.  The very

5  next day with his American driver's license.  And then the

6  Serbian license plate that is referenced in the pleadings is

7  stolen that same day.

8       Then on January 30th he tints the windows.  The car

9  that is tinted has the same VIN as the Peugeot that he rents

10  and then he crosses the border into Croatia.  So it is very

11  clear from that timeframe that this is (inaudible).**

12       It was not to go and visit his mother who is an

13  amputee in Serbia.  Yes, he can have a mother in Serbia and he

14  can also fly there to go and kill his wife or kidnap his wife

15  and that is what the evidence supports.

16       If he wanted to fly into Madrid Spain there is much to

17  do about the fact that you can't get a direct flight into

18  Serbia.  That's true.  That is not the point of us bringing out

19  the fact that he flew through Istanbul Turkey.  We were just

20  illustrating to the Court how he got there.

21       What is significant is that you can get a direct

22  flight into Madrid Spain and he didn't do that.  I mean, it

23  defies common sense to think when he could fly directly to

24  Spain.  Instead, he is going to fly into Istanbul, into Serbia

25  and then drive 2600 miles to go buy spray paint and duct tape?

1   I mean, that defies common sense.

2            So absolutely we have jurisdiction on this case.  He

3   flew out of the Southern District of Florida.  The statute

4   provides for it.  Judge Reid signed the complaint and that it

5   is also not before the Court today.  This is not a proper way

6   to challenge it.

7            And the jury can conclude that that is why he left,

8   but she said we are not here to try the case, but then she

9   brings up arguments like this that are strictly for the jury.

10           So, I mean, the jurisdiction she was not before the

11  Court.  And even so if Your Honor is going to consider it, we

12  provided the statute and we provided relevant case law and the

13  timeline strongly supports the Government's case.

14           THE COURT:  Okay.

15           MS. WEINTRAUB:  Judge, may I just say one thing in

16  response?

17           THE COURT:  Last word.

18           MS. WEINTRAUB:  The statute that she brings up, the

19  18 USC 1201 does apply extraterritorially in limited

20  circumstances only and that is what the statute says.

21           And the statute specifically at (e) says if the victim

22  of the offense under Subsection A, which is what he is charged

23  under, is an internationally protected person outside the U.S.,

24  then the U.S. may exercise jurisdiction.

25           What is a protected person?  If she was a diplomate.

1    If she was a Chief of State.  If she was a government employee.

2    That term is defined in the statute.

3         When a statute expressly gives grounds for the

4    extraterritorial application, the Court has to interpret it and

5    read it narrowly.  It is a longstanding principle that unless a

6    contrary intent appears in the statute it is meant only to

7    apply within the territorial jurisdiction of the United States.

8         And that is a case of *Fully v. Velardo*** and it is my

9    papers, 336, U.S. 281, but it also goes as far as *Morrison v.*

10   *National Australian Bank*, 651 U.S. 247 in 2010 after that

11   statute was --

12        THE COURT:  Amended.

13        MS. WEINTRAUB:  Amended.  Thank you.

14        And so my point is we are still at a point where

15   extraterritorially you can't indict -- and they know this.  You

16   can't indict a U.S. citizen in the United States for doing

17   something abroad because their laws are different than our

18   laws.

19        So our Congress decided the only time that you could

20   do that is in a murder and only a murder in which the hosting

21   country can't extradite the citizen.  That is not true here.

22   Those are not the circumstances.

23        This is a case that happened in Spain if at all and if

24   ever.  This is a crime that did not occur in the United States.

25   This is a crime that was investigated by Spain.  The witnesses

1   are in Spain.  He didn't go to Spain.  He went from -- I mean,

2   he went from here to Belgrade.  If something happened three

3   days later that caused him to go to Spain, then we are all just

4   guessing and speculating.

5           But Miss Monk can't take the position that there is

6   evidence because he left from here to Belgrade and then he

7   drove there three days later.  Well, obviously he intended to

8   go and kill her.  That is absurd.

9           We don't transfer intent like that when there is no

10  evidence of it because it is not as the Court was concerned --

11  as Miss Monk says I didn't want to try the case.  This goes to

12  the strength of the Government's case.  This is the weight of

13  the evidence.  Of course the Court considers this on whether or

14  not to detain him.

15          This is somebody that was not in the middle of a

16  contentious divorce.  Maybe there was some argument and some

17  bitter words back and forth at the beginning, but within two

18  months things are fine.  He says you can have it.  I don't

19  care.  Take half of it.  That's what he said.  No contentious

20  divorce.

21          There is no motive.  There is no evidence of any

22  taking, of any struggle, or of anything suspicious in that

23  apartment.  And anything that the Court or that the Government

24  is asking the Court to rely on is imagination like that

25  suitcase and that's not right and intellectually we all know

1    that's not right.  And intellectually and legally, I ask the

2    Court not to detain him and to impose a bond that can be

3    fashioned that I am ready to suggest to this Court.

4         THE COURT:  I am going to take another look at this

5    jurisdictional argument as well.

6         MS. WEINTRAUB:  May I submit a brief on it, Judge,

7    within three days?

8         THE COURT:  You already did.  You briefed it.

9         And then, I am going to formally go ahead and grant

10   the pending motion.  There is a pending motion to reopen that

11   was referred to me.  Obviously I reopened it given the fact we

12   had a full hearing for three hours.

13        So I am going to just grant that and then either enter

14   an amended order of detention in light of the new evidence that

15   I have, or vacate that order and enter an order of release.  In

16   which case, then, I will set a hearing for the terms of release

17   and give the Government a chance to appeal.

18        So whichever way I go, I will do one or the other, but

19   the immediate pending motion will be granted, but I have

20   explained to you why.  So just by granting it I am not doing

21   anything vis-a-vis the Defendant yet.

22        Okay.  Thank you very much.

23        MS. WEINTRAUB:  Judge, thank you for taking the time.

24        THE COURT:  Thank you.  We are adjourned.

25        (Thereupon, the following proceeding concluded.)

1

2

3                                    CERTIFICATE

4

5          I hereby certify that the foregoing transcript is an

6    accurate transcript of the audiotape recorded proceedings in

7    the above-entitled matter.

8

9

10

11
     08/12/24                      Bonnie Joy Lewis,
12                        Registered Professional Reporter
                             CASE LAW REPORTING, INC.
13                          7001 Southwest 13 Street,
                           Pembroke Pines, Florida 33023
14                              954-985-8875

15

16

17

18

19

20

21

22

23

24

25