# EXHIBIT "B"

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA
 2    --------------------------------x
                                          24-MJ-02896(LMR)
 3    UNITED STATES OF AMERICA,

                                          United States Courthouse
 4                                        Miami, Florida

 5             -against-                  May 10, 2024

 6    DAVID KNEZEVICH,

 7             Defendant.
      --------------------------------x

 8
          TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
 9            BEFORE THE HONORABLE EDWIN G. TORRES
                    CHIEF MAGISTRATE JUDGE
10

11    APPEARANCES:

12    For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                 Southern District of Florida
13                               99 N.E. 4th Street
                                 Miami, Florida 33132
14                               BY:  LACEE E. MONK, AUSA

15

16    For the Defendant:        SALE & WEINTRAUB, P.A.
                                 One Biscayne Tower
17                               2 South Biscayne Boulevard, 21st Fl.
                                 Miami, Florida 33131
18                               BY:  JAYNE C. WEINTRAUB, ESQ.

19

20

21    Transcribed By:           Georgette K. Betts, RPR, FCRR, CCR
                                 Phone:  (201)314-3902
22                               Email:  Georgetteb25@gmail.com

23

24             (Proceedings recorded by electronic sound recording.)

25
```

2

PROCEEDINGS

1          THE COURTROOM DEPUTY:  Calling case United States

2   versus David Knezevich, case number 24-2896, Judge Reid.

3          MS. MONK:  Good afternoon, your Honor.  Lacee Monk

4   on behalf of the United States.

5          MS. WEINTRAUB:  Good afternoon, your Honor.  Jayne

6   Weintraub on behalf of the defendant.  I entered a temporary

7   appearance last night.

8          THE COURT:  Thank you, good afternoon.

9          MS. WEINTRAUB:  Good afternoon, Judge.

10          THE COURT:  We are set for a detention hearing for

11   Mr. Knezevich.

12          MS. WEINTRAUB:  Yes, Judge.

13          THE COURT:  Is the government ready to proceed?

14          MS. MONK:  Yes, we are, your Honor.  The government

15   is prepared to proceed by proffer.  I do have FBI Special

16   Agent Alexandra Montilla here available for cross-examination.

17          Before I get into the factual proffer, the

18   government is moving for detention based upon both a serious

19   risk of flight and danger to the community.  The statutory

20   basis for that is 3142(f)(1)(B), an offense for which the

21   maximum sentence is life imprisonment or death.  And

22   3142(f)(2)(A), a serious risk that such person will flee.

23          Kidnapping has a stat max of life and as of right

24   now we conservatively estimate the defendant's guidelines to

25   be 121 to 151 months, which is roughly 10 to 12 years.  So

PROCEEDINGS

1   with that I'll move forward with the proffer, your Honor.

2           On or about December 26th, 2023, the defendant's

3   wife, a 40-year old female and United States citizen, who I'll

4   refer to as the victim going forward, flew out of Miami

5   International Airport to Madrid, Spain.

6           Thereafter, on or about February 2nd, 2024 the

7   victim's friends and family, who had previously communicated

8   with her while she was in Spain, lost contact with her.

9   Spanish authorities were alerted to the victim's disappearance

10  by one of her friends after the victim failed to show up for a

11  previously planned trip to Barcelona.

12          The last non-automatic activities on the victim's

13  Bank of America account were for a flower purchase on or about

14  February 2nd, 2024, the day she was last seen entering her

15  apartment.  As well as a charge from a restaurant in Madrid on

16  or about February 10, 2024 for failing to show up to a dinner

17  reservation that she had previously made.

18          On or about February 4th, 2024 Spanish firefighters

19  entered the victim's apartment for a welfare check and

20  discovered that she was not in the apartment.  Subsequently,

21  Spanish law enforcement searched the victim's apartment

22  pursuant to an order and discovered that her cell phone,

23  laptop computer and respective chargers were missing.

24          At the time of her disappearance, the victim was

25  married to the defendant, Mr. Knezevich, a Yugoslavian born

PROCEEDINGS

1    naturalized citizen of the United States.  According to the

2    victim's friends and family, the victim and the defendant were

3    separated and planned to divorce.  The separation was

4    contentious because the defendant did not want to split the

5    marital assets evenly with the victim.  The victim was very

6    fearful of the defendant.

7            An investigation in to the victim's disappearance by

8    Spanish authorities revealed that on or about February 2nd,

9    2024, the security camera at the victim's apartment building

10   in Madrid captured her entering the building around 1:42 p.m.

11   This is the last time she has ever been seen.

12           The same day, at approximately 9:27 p.m., the

13   building surveillance camera captured a male, believed by law

14   enforcement to be the defendant, waiting outside the entrance

15   to the victim's apartment building.  The male is wearing a

16   motorcycle helmet, a reflective vest, dark pants and gloves

17   and is holding a white plastic bag giving the impression that

18   he is a food delivery service provider.  As two women exit the

19   building, the male uses the opportunity to enter the building.

20   He remains downstairs briefly outside of the video

21   surveillance cameras and then proceeds to go up the stairs.  A

22   short time thereafter the male is captured descending the

23   stairs while holding a can of spray paint with a strip of duct

24   tape now affixed to the chest of his vest.  The male sprayed

25   the lens of the surveillance camera with the spray paint to

5

PROCEEDINGS

1    disable it.  The male then returns to the front door that he

2    entered the building through, pauses for a moment, seemingly

3    to fasten a piece of duct tape to the lock to prevent the lock

4    from engaging to allow subsequent entry to the building, and

5    then exits the front door of the apartment.

6           At approximately 9:52 p.m. the male reenters the

7    apartment building and appears to enter the elevator with an

8    object.  Based on the movement of the object, its proximity to

9    the male and its shape, it appears to be a rolling suitcase.

10   The male then leaves the elevator with the suitcase at

11   approximately 9:55 p.m.

12          Based on the surveillance footage, Spanish

13   authorities were able to identify the brand of spray paint

14   used to disable the security camera.  Law enforcement then

15   determined that a retailer in Madrid had reported a sale of

16   that particular brand of spray paint on or about February 2nd,

17   2024, the same day the victim is last seen.  Surveillance

18   footage from the retailer clearly depicts the defendant

19   purchasing the spray paint along with two rolls of duct tape

20   in cash on or about February 2nd, 2024 around noon.

21          Additionally, a Columbian woman, who the defendant

22   met on a dating app in October of 2023, advised law

23   enforcement that on or about February 3rd, 2024, the day after

24   the victim is last seen, the defendant contacted her via

25   WhatsApp and asked her for help in translating a message into,

6

PROCEEDINGS

1   quote, perfect Colombian for a friend in Serbia is writing a

2   script about a Colombian character.  Notably, the victim in

3   this case was born and raised in Colombia and is fluent in

4   Spanish.  She later became a United States citizen.

5          The individual then translates two messages for the

6   defendant.  The first, I met someone wonderful, he has a

7   summer house about two hours from Madrid.  We are going there

8   now and I will spend a few days there.  There is barely a

9   signal though, I'll call you when I come back.  Kisses.

10          The second message:  Yesterday after therapy I

11   needed a walk and he approached me on the street.  Amazing

12   connection, like I never had before.

13          Those messages are the last messages that family and

14   friends received from the victim.  The messages were sent from

15   the victim's phone on February 3rd of 2024, the day after she

16   is last seen.  Law enforcement has no reason to believe that

17   the victim or this Colombian woman ever knew one another.  The

18   only connection is the defendant.

19          Records from Customs and Border Protection revealed

20   that on or about January 27, 2024 the defendant traveled by

21   airplane from Miami International Airport to Istanbul, Turkey.

22   He subsequently traveled out of Serbia into Croatia by a

23   vehicle via a border crossing on January 30th of 2024, and

24   returned to Belgrade, Serbia from Croatia by vehicle also

25   through border crossing on February 5th, 2024.

PROCEEDINGS

1        The defendant rented a Peugeot 308, which is a

2   vehicle in Serbia from approximately on or about January 29th,

3   2024 through approximately March 15th of 2024.

4        When the defendant returned the vehicle, the windows

5   had been tinted, there was an indication that the license

6   plates had been -- the license plate frames had been changed,

7   and two stickers had been removed from the vehicle.  The

8   vehicle had traveled approximately 7,677 kilometers while in

9   the defendant's possession.

10        Spanish authorities also advised that around the

11   relevant time, which is approximately February 1st to

12   February 2nd, an individual filed a complaint that both of his

13   license plates were stolen off of his vehicle in Spain.

14   Spanish authorities ran a search in their plate reader

15   database for that stolen plate and learned that the plate was

16   present on the street where the victim's apartment was

17   located.

18        The stolen plate passed through two tollbooths in

19   the middle of the night on February 2nd into February 3rd.

20   Video from the tollbooths revealed that the plates were

21   attached to Peugeot 308 with tinted windows, which is the type

22   of vehicle that the defendant rented in Serbia.  Because of

23   the tint, the driver is not visible.  One of the tollbooths

24   was in a town which is just outside of Madrid.

25        More license plate readers positioned the stolen

8

PROCEEDINGS

1    plates within a four-minute walk of a motorcycle accessory

2    shop in Madrid on February 2nd, 2024.

3           Around the same time the vehicle was located there,

4    an individual bought a motorcycle helmet and a reflective vest

5    at the store in cash at approximately 5:10 p.m.  The helmet

6    purchased is the same brand of helmet, make and model, if you

7    will, that the defendant wore while spray painting the

8    surveillance cameras in the victim's apartment.

9           Additionally, the defendant's Facebook account used

10   an IP address in an area of Spain just north of Madrid on

11   February 1st of 2024, the day before the victim's

12   disappearance.

13          The defendant was born in Yugoslavia, as noted in

14   the Pretrial Services report.  He's traveled to over 30

15   countries, most recently Serbia where he remained until he

16   flew into Miami International Airport on this Saturday May 4th

17   of 2024 and at that point he was arrested.  And that concludes

18   the government's proffer.

19          THE COURT:  Counsel.

20          MS. WEINTRAUB:  Yes, Judge, I would like to cross

21   examine the agent if I might.

22          THE COURT:  Go ahead and call the agent.

23          (The witness takes the stand.)

24          THE COURTROOM DEPUTY:  Please raise your right hand.

25          (Continued on next page.)

MONTILLA – CROSS – MS. WEINTRAUB

1  **ALEXANDRA MONTILLA,** called as a witness, having been first

2  duly sworn/affirmed, was examined and testified as follows:

3            THE WITNESS:  I do.

4            THE COURTROOM DEPUTY:  Please have a seat, ma'am,

5  and state and spell your name for the record.

6            THE WITNESS:  Alexandra Montilla.

7  A-L-E-X-A-N-D-R-A.  Last name, M-O-N-T-I-L-L-A.

8            THE COURTROOM DEPUTY:  And your agency, ma'am?

9            THE WITNESS:  Federal Bureau of Investigation.

10            THE COURTROOM DEPUTY:  Thank you.

11            MS. WEINTRAUB:  May I proceed?

12  CROSS-EXAMINATION

13  BY MS. WEINTRAUB:

14  Q    Agent Montilla, you are not the agent who authored the

15  complaint in this case, are you?

16  A    No.

17  Q    Are you -- what was your involvement in this case if you

18  did not author the complaint?

19  A    I am the case agent along with Agent Ules{ph}.

20  Q    Can you please tell the Court, since we didn't share,

21  what evidence specifically do you have that the defendant

22  seized, confined, abducted or carried away Ana Maria

23  Knezevich?  Do you have any?

24  A    So all the information that the prosecutor just read, all

25  the information from the Spanish National Police where he's

10

MONTILLA - CROSS - MS. WEINTRAUB

1   spotted in the hardware store buying the spray paint, the duct

2   tape, then a man similar to him is seen spraying the

3   surveillance camera where Ana Maria was staying at.  The car

4   that he rented --

5   Q   Agent, I don't mean to interrupt you, but I would like to

6   go one at a time because I don't want a narrative answer.

7           So, first, if you could just give me a yes or no and

8   answer my question --

9   A   Can you repeat the question.

10  Q   -- and if your answer is everything the prosecutor just

11  said that's fine, but I just want to get a clean record and I

12  don't want to be interrupting you, so I'm going to remind you

13  of the question.

14  A   Can you repeat the question?

15  Q   Yes, please.  Thank you.

16          So the question is, what specific evidence do you

17  have that David Knezevich seized, confined, abducted or

18  carried away Ana Maria?  Do you have any specific evidence of

19  those things that I just mentioned?

20  A   Again, I can go through all the evidence we have that

21  leads to suspect that he did kidnap her.

22  Q   Okay.  Fair to say you can -- as of today you have not

23  located her, correct?

24  A   Ana Maria is still missing.

25  Q   There was never any ransom notice --

MONTILLA - CROSS - MS. WEINTRAUB

1        THE COURT:  Have any efforts been made to locate

2   her?  Are there still ongoing efforts to locate her?

3        THE WITNESS:  Yes, there are efforts.  We're still

4   looking for her.

5   Q    Has there been any ransom demand by anybody?

6   A    No.

7   Q    Was there ever any single person questioned in exchange

8   for her return?

9   A    No.

10  Q    So your evidence basically is that on February 2nd, the

11  last time she was in contact with a family -- by the way

12  before that, do you know how often she was in contact with her

13  family?

14  A    Often.

15  Q    Daily, weekly, monthly, do you know?

16  A    Often, might be daily, every two days.  I mean often.

17  And with her friends very often.

18        THE COURT:  What was she doing in Madrid, do you

19  know?

20        THE WITNESS:  They were in the process of getting a

21  divorce and she feel her life was threatened by David so she

22  went to Spain to live far away from David.

23  BY MS. WEINTRAUB:

24  Q    Okay.  So let's --

25        THE COURT:  Does she have family in Spain or

MONTILLA - CROSS - MS. WEINTRAUB

1   something?

2           THE WITNESS:  No.  She had a lot of friends.

3   Q    Did she have a boyfriend there?

4   A    No, no that I know of.  I know she had friends,

5   girlfriends.

6   Q    Do you know if she was dating people and had boyfriends,

7   or you don't know that?

8   A    Yes, she dated.

9   Q    Did the Spanish authorities interview any other men that

10  she had been with?

11  A    Yes.  All of them.

12  Q    How many were there?

13  A    I don't know exactly, but I know they interviewed all of

14  them since she had gotten to Spain.

15  Q    Now you said that there was a divorce that was going on

16  that was very contentious?

17  A    They had agreed to get a divorce, yes.

18  Q    Okay.  Do you have any evidence other than a -- I'm

19  thinking for the right word -- an angry family member that

20  might have a reason to not be happy with the situation, other

21  than a family member telling you that it was a contentious

22  divorce proceeding that was about to happen, do you have any

23  other evidence?

24  A    Yes.  I have numerous texts and audios from Ana to her

25  friends stating that it was an ugly divorce.

MONTILLA - CROSS - MS. WEINTRAUB

1    Q    Do you also have texts from Ana with David including --

2    and lawyers on February -- on January 30th, February 1st,

3    February 2nd, in a very amicable manner?

4    A    No, that's -- that's information I'm not allowed to --

5    that's privileged information.

6    Q    You do not -- you do not have any --

7    A    With the attorneys?  That's privileged information I

8    wouldn't have that.

9    Q    Were you --

10            THE COURT:  Let me --

11   Q    You said you didn't --

12            THE COURT:  Let me rephrase the question.  Do you

13   have any text messages shortly before the victim disappeared

14   with this defendant?

15            THE WITNESS:  No.

16   Q    Did you see any text messages on her WhatsApp

17   application?

18   A    I do have messages from her.

19   Q    And are you telling this court under oath that there are

20   no messages that indicate that amicable discussion between

21   David and Ana as recently as January 30th, February 1st, and

22   2nd --

23   A    I do not have that --

24   Q    Let me finish the question.

25   A    -- in my possession.

MONTILLA - CROSS - MS. WEINTRAUB

1   Q    I'm sorry.

2        Are you telling this court that you did not see any

3   communications between Ana and David from January 30th,

4   February 1st and 2nd regarding a piece of property that was

5   going to be sold?

6   A    I don't have that in my possession.  It might exist, I

7   just don't have that in my possession, or I haven't come

8   across it.

9   Q    That isn't the question.

10       THE COURT:  What else do you know about -- when you

11  say it was contentious, what other facts do you know that

12  leads you to conclude that?

13       THE WITNESS:  So I have audios from Ana to her

14  friends describing that she's feels threatened, she feel

15  endangered, that David didn't want to give her half of the

16  alimony of the divorce.  That he didn't want her to go to a

17  different attorney, and so forth.

18       THE COURT:  And what was the status of the actual

19  litigation, the divorce litigation?

20       THE WITNESS:  So she had given him an ultimatum of

21  February 1st to file and he had not met that deadline, so she

22  was upset basically.

23       THE COURT:  How long had they been separated?

24       THE WITNESS:  She left for Spain December 26th.

25

MONTILLA - CROSS - MS. WEINTRAUB

1    BY MS. WEINTRAUB:

2    Q    Are you telling this court that there were divorce

3    proceedings?

4    A    They were in the process.

5    Q    What does that mean?

6    A    That they were in talks of going forward with the

7    divorce.

8            THE COURT:  But had a divorce petition --

9            THE WITNESS:  I don't -- I don't the papers had not

10   been filed.

11           THE COURT:  Okay.

12   BY MS. WEINTRAUB:

13   Q    So there was not a divorce proceeding, right?

14   A    No.

15   Q    And the only evidence that anything was contentious is

16   from a family member that told you that she heard it from Ana?

17           MS. MONK:  Objection.  Misstatement of the evidence

18   and the testimony.

19           THE COURT:  She can answer it.  Overruled.

20           THE WITNESS:  Can you repeat the question?

21           MS. WEINTRAUB:  I don't think I ever got a very

22   specific answer to a specific question.  I'm going to try and

23   ask it again and I don't mean to be repetitive I'm trying to

24   get you to answer the question.

25   Q    You've reviewed text messages between Ana and other

MONTILLA - CROSS - MS. WEINTRAUB

1    people, yes?

2    A    Yes.

3    Q    You reviewed her WhatsApp application text messages

4    between Ana and other people, yes?

5    A    Yes.

6    Q    You reviewed text messages between Ana and David on

7    WhatsApp during the period the end of January beginning of

8    February, yes?

9    A    No, I haven't reviewed them.  I -- those -- the messages

10   I got from Ana were provided to me.

11   Q    By whom?

12   A    By friends and family members.

13   Q    So then -- okay, so let's -- I need to understand and I

14   want the judge to understand.  Did you review -- you only

15   reviewed a limited amount or a small amount that the family

16   gave you, is that what you're saying?

17   A    And friends.

18   Q    Okay, you didn't have access to it?

19        THE COURT:  In other words, have you already pulled

20   all her text messages for that period of time or her WhatsApp

21   messages through this service provider?

22        MS. MONK:  Judge, I'm sorry I think there's a

23   misunderstanding of how WhatsApp works and that is muddying

24   the waters in the questioning.

25        THE COURT:  All right, she can answer it.  Go ahead.

MONTILLA - CROSS - MS. WEINTRAUB

1      THE WITNESS:  No.  And the what's up[sic] we still

2   are in the works for that, we haven't received their return,

3   but what I reviewed was, yes, messages that were provided to

4   me by families and friends.

5      THE COURT:  Okay.

6   BY MS. WEINTRAUB:

7   Q    So let me ask you this:  If there was a message between

8   say Ana and somebody else about the sale of the property and

9   she was saying things like, whatever David thinks is fine,

10  would your testimony be different today?

11  A    No.

12  Q    It wouldn't?

13  A    No.

14  Q    Wouldn't that show that it wasn't so contentious and she

15  wasn't afraid and she's saying it depends on whatever David

16  wanted?

17  A    I have numerous messages where she's saying that she's

18  suicidal, that she's seeing therapy, that she's not doing

19  well.

20  Q    Do you -- okay, let's go back to the question and see if

21  we can get an answer.

22      First of all, do you know -- you talked about her

23  mental health.  Did you know that she was suicidal before?

24  A    Before what?

25  Q    Well, whenever you're reviewing messages, did you know

18

MONTILLA - CROSS - MS. WEINTRAUB

1    she suffered mental illness for years?

2    A    I knew -- no.  No.

3    Q    Do you know that she's been treated by several mental

4    health people, professionals, and on medication for years?

5    A    I was aware of that.  I just don't know specifically what

6    she was diagnosed with.

7    Q    Okay.  So when you say she was suicidal, that really was

8    part of her being for several years, it was not a new ideation

9    that came on February 2nd, was it?

10    A    She referred to being suicidal because of the issues she

11    was having with David.

12    Q    Let's talk about evidence.  The complaint says that on

13    February 2nd, the last that she was in contact with her

14    family, a male wearing a helmet, who has the same physical

15    characteristics as David, was entering her apartment building.

16         Do you remember that?

17    A    Correct.

18    Q    When you say -- when the agent wrote "physical

19    characteristics," what does that mean, same height?

20    A    Eyebrows, build, but most significantly the eyebrows, the

21    eyes and eyebrows.

22    Q    Okay.  There is no facial recognition, right?

23    A    No.

24    Q    You couldn't tell whether he had facial hair, a mustache

25    or a beard from this, could you?

MONTILLA - CROSS - MS. WEINTRAUB

1  A    No.

2  Q    Couldn't tell if he had hair or was bald, could you?

3  A    No.

4  Q    So he basically --

5        THE COURT:  In other words, you can see only the

6  front, the front part of --

7        THE WITNESS:  Yes, he had his mouth covered.

8        THE COURT:  Okay.

9        THE WITNESS:  The mouth covered and the helmet so

10  you can see his eyes and eyebrows.

11  Q    Okay.  So you really couldn't see very much aside from

12  his build and his eyebrows, correct?

13  A    Correct.

14  Q    And all of this took place outside the United States,

15  didn't it?

16  A    Yes.

17  Q    Now Spanish authorities entered Ana's apartment

18  eventually and noted that all of her electronics were gone,

19  right?

20  A    Yes.

21  Q    And isn't that indicative of the fact that she took them

22  with her?  You're talking about a cell phone and a laptop,

23  right?

24  A    But all of her belongings were there, like toothpaste,

25  the toothbrush.  Her clothing, her personal items were there.

MONTILLA - CROSS - MS. WEINTRAUB

1    Q    Okay, and you're --

2    A    Her electronics were gone.

3    Q    Okay.  Sorry?

4    A    Her electronics were gone.

5    Q    Okay.  If she's going for a day trip or going somewhere

6    she might take her electronic laptop and cell phone and a

7    couple of -- or a change of clothes, right, nothing unusual --

8    A    Maybe.

9    Q    Is there anything unusual about that?

10   A    I -- well, no.

11   Q    Now there's no evidence -- there was no evidence of a

12   struggle at that apartment either, was there?

13   A    No.

14   Q    And there was no sign that there was any violence in that

15   apartment at all, correct?

16   A    There was blood found by the Spanish National Police and

17   they're in the process of doing the forensic examination.

18   Q    Where is this blood found?

19   A    In various places of the apartment.

20   Q    So you would think that that's a very important fact,

21   right?

22   A    Yes.

23   Q    And it's so important that it's not even mentioned in the

24   complaint, is it?

25   A    It is an important factor but it's not mentioned because

MONTILLA - CROSS - MS. WEINTRAUB

1   we don't have the results yet.

2   Q    So then you're not considering that to be a factor

3   against David who stands here under the presumption of

4   innocence, is that fair?

5   A    If DNA matches.

6   Q    If.  If -- no offense but as you sit here right now and

7   he has the presumption -- I'm sorry, Judge, excuse the

8   snarkiness.

9          As David stands here right now he is presumed

10  innocent, you do understand that, right?

11  A    But we have a lot of other evidence that is pretty

12  strong.

13  Q    Well, let's talk about a lot of that other evidence.

14         THE COURT:  Let me ask you this question, how

15  certain are you that there was blood found in the apartment?

16         THE WITNESS:  This is according to the Spanish

17  National Police.

18         THE COURT:  They've informed you of that?

19         THE WITNESS:  Yes.  The forensic examiners have

20  found blood in the apartment.

21  BY MS. WEINTRAUB:

22  Q    And that would have been from February when they went

23  there?

24  A    February 4th when they went in there.

25  Q    Okay.  And it's now May what, tenth, yes?

MONTILLA – CROSS – MS. WEINTRAUB

1    A    Yes.

2    Q    And you haven't heard anything about that blood?

3    A    We're waiting for getting comparison.

4    Q    We're also waiting for Ana to come back with whoever

5    she's with, right?  Because you're actively looking for her.

6    A    We are.

7    Q    Now, there was no evidence that Ana was taken against her

8    will, was there?

9    A    No.

10         THE COURT:  Now was there no video outside the –– I

11   mean, a video camera outside the apartment that would have

12   captured somebody ––

13         THE WITNESS:  So there is ––

14         THE COURT:  –– coming out?

15         THE WITNESS:  –– a camera but it's apparently it's

16   not a video, it works when you press the apartment button, but

17   it was sprayed also.

18         THE COURT:  Oh.

19   BY MS. WEINTRAUB:

20   Q    And Ana, by the way, was a woman –– she had money in her

21   own name, right?

22   A    Yes, she has some assets.

23   Q    She had assets, she had property, yes?

24   A    Yes.  But David controlled all of it.

25         THE COURT:  Where was the property located?

23

MONTILLA - CROSS - MS. WEINTRAUB

1    THE WITNESS:  Excuse me?

2    THE COURT:  Where was the property?

3    THE WITNESS:  They had properties in Broward County.

4  Q    And Ana had property in her own name, not --

5  A    Yes.

6  Q    -- with David, didn't she?

7  A    Yes.

8  Q    So when you say, well, David controlled it, I mean, you

9  really don't know that for a fact, it's in her name?

10 A    Yes.

11 Q    Okay.  So isn't it fair to say she meets -- she goes off

12 to Madrid, we don't know to meet who or with whom, correct?

13 We don't know if she went alone, right?

14 A    She went alone.

15 Q    Do you know she wasn't meeting somebody?

16 A    We know she -- she met people there, yes, and they were

17 interviewed.

18 Q    Okay.  Well, you didn't interview all of the men that she

19 dated, did you?

20 A    All the ones we found, yes.  They were interviewed by the

21 Spanish National Police.

22 Q    Okay.  All the ones you had found, had you gone through

23 her dating app to see how many there were?

24 A    Yes.

25 Q    And did you interview the men from that?

24

MONTILLA - CROSS - MS. WEINTRAUB

1  A    The Spanish National Police did.

2  Q    And --

3        THE COURT:  Have you examined -- has there been any

4  further activity on either her social media or telephone or --

5        THE WITNESS:  Nothing since February 2nd.

6  Q    Do you agree that Ana was a person of means, 40 years

7  old, she was pretty, right?

8  A    Yes.

9  Q    And she was in Madrid by herself or with new friends,

10  right?

11  A    Yes.

12  Q    And she could have easily been a target for many

13  opportunists there; isn't that right?

14  A    Maybe, but not -- again, not in this case as we --

15  Q    David is a U.S. citizen, right?

16  A    He's a U.S. and Serbian.  David or Ana?  Wait a second,

17  what did you say?

18        THE COURT:  David.

19  A    He's a dual citizen.

20  Q    You're sure of that?

21  A    David, yes.

22  Q    Are you sure that when he became a U.S. citizen that the

23  Serbian citizenship had not been renounced to get the U.S.

24  citizenship?

25  A    As far as I know he is a dual citizen.

MONTILLA - CROSS - MS. WEINTRAUB

1   Q   And what are you basing that on?

2   A   On information regarding --

3   Q   That --

4   A   Throughout our investigation.

5   Q   Can you be more specific?

6   A   Information received from immigration.

7           THE COURT:  Do you know what --

8           THE WITNESS:  We know that his passport had expired,

9   his Serbian passport had expired.

10  Q   Okay, so that's what I was getting at --

11  A   Oh.

12  Q   -- is that you knew he had a Serbian passport and assumed

13  that he had dual citizenship, right?

14  A   Yes.

15  Q   Okay.  But now you know that the Serbian passport

16  expired, right?

17  A   Yes.

18  Q   The only valid passport he has is the U.S. passport,

19  right?

20  A   Yes.

21  Q   Okay.  He's lived in this country for -- well, first,

22  he's had two different legitimate businesses in Fort

23  Lauderdale for more than 10 years, right?  That he's owned and

24  operated, they were mentioned in the Pretrial Services report.

25  A   Yes.

MONTILLA - CROSS - MS. WEINTRAUB

1    Q    So he had a legitimate IT computer data-based business,

2    yes?

3    A    Yes.

4    Q    And he also owned businesses and owned properties, some

5    with Ana and some without.  Some she owned on her own, right?

6    A    Correct.

7    Q    David has no prior record, correct?

8    A    Yes.

9    Q    Are you aware, Agent -- one second.  Are you aware,

10   Agent, that according to the statute, the kidnapping statute,

11   that involuntariness or coercion related to taking and keeping

12   of the victim is an essential part of the crime?

13   A    Yes.

14   Q    And can you tell us again what specific evidence you have

15   that Ana was coerced to be taken?

16   A    Again, David was placed in Madrid, he was seen identified

17   by the owner of the hardware store buying the same spray paint

18   and duct tape --

19   Q    Buying the same spray paint or the same brand?

20   A    The same brand.

21   Q    Okay.  Do you know how many brands of spray paint there

22   are?

23   A    Apparently in Madrid they were able to find the store

24   because it's not that common there and that's how they were

25   able to --

MONTILLA – CROSS – MS. WEINTRAUB

1   Q   Madrid is a city, Madrid is not a small, little town,

2   right?

3   A   So.  They were able to --

4   Q   But did he have(inaudible.)

5   A   -- go to the store and review the surveillance camera

6   where they spotted David, full face, he was uncovered.

7          THE COURT:  I'm going to ask, how well can you see

8   him on that video?

9          THE WITNESS:  A hundred percent.  You can see him

10   completely.  He's not covered.  The owner identified him fully

11   as David.

12   Q   And --

13          THE COURT:  You actually see him buying paint?

14          THE WITNESS:  Yes.  You can see him buying paint and

15   two rolls of the American duct tape.

16   Q   And now can you answer my question about what evidence is

17   there that Ana was taken against her will by anyone.

18          MS. MONK:  Judge, asked and answered.

19          MS. WEINTRAUB:  It's not been answered.

20          THE COURT:  Sustained.

21          I take it that you don't actually know how she was

22   taken?

23          THE WITNESS:  Yes, correct.

24          MS. WEINTRAUB:  May I have a minute, your Honor?

25          THE COURT:  Sure.

MONTILLA - CROSS - MS. WEINTRAUB

1          (Pause in proceedings.)

2    BY MS. WEINTRAUB:

3    Q    When Ana's apartment was searched, there were no

4    personal -- like her makeup kit wasn't there, there were

5    things that a woman of Ana's stature, so to say, a 40-year,

6    old pretty woman going out would have, like makeup kits and

7    personal toiletries, right?

8    A    Yes, she did, she had like approximately seven boxes,

9    Home Depot boxes with her belongings.

10   Q    Okay.  So in those boxes was there makeup there?

11   A    There was everything, there were purses, clothing,

12   motorcycle gear, personal items.

13          THE COURT:  How long had she lived there or stayed

14   there I guess?

15          THE WITNESS:  Um, I don't know.

16   Q    Are you talking about the Fort Lauderdale apartment?

17   A    I'm talking about the one 643 Eighth Avenue residence.

18   Q    Okay.  So that's in Fort Lauderdale.

19   A    Yes.

20   Q    No, no, I'm talking about in Madrid.

21   A    Oh.  In Madrid.  Yes, she -- her belongings were still

22   there.

23          THE COURT:  Can you tell me what was in them, what

24   was there?

25          THE WITNESS:  Her clothing, toiletries.

MONTILLA - CROSS - MS. WEINTRAUB

1    BY MS. WEINTRAUB:

2    Q    Do you know that toiletries were there or are you just

3    assuming?

4    A    This is from the Spanish National Police.

5    Q    Do you have a property receipt saying that?

6    A    No, we have reports, the forensic reports.

7    Q    And they mention specifically that the toiletries were

8    there?

9    A    They just said personal belongings.

10   Q    Okay.  So personal belongings could be --

11   A    It's a wide range.  I mean, I cannot tell you

12   specifically toothpaste, what kind of brand of toothpaste --

13   Q    Okay.  So you can't --

14   A    -- or how many toothbrush.

15   Q    So you can't say that there were toiletries that were

16   there or makeup, you don't know.  You just know that some of

17   her personal belongings were there and some weren't?

18   A    I know there were four boxes of her belongings.

19          THE COURT:  Last question?

20   Q    From the investigation that you did do, can you tell us

21   when she started dating all these other people?

22   A    So I know they had agreed to an open relationship

23   before -- to fix their marriage before she went to Spain.

24   When she traveled to Spain the 26th I know she had been --

25   she -- I don't know specific, but I know like two or three

1    dates.

2    Q    So you do know that she had been cheating on David and

3    then she left the country, right?  I mean, that's the bottom

4    line.

5    A    They had an agreement of an open relationship, but I know

6    that David was -- had a girlfriend in Colombia.

7    Q    And do you know what the timing of that was?

8    A    No.

9    Q    And do you know that she was a girlfriend as opposed to

10   somebody he just met on a dating app in March?

11   A    I don't know this person.

12   Q    The last question is, to sum up, there's absolutely no

13   evidence that anything took place to facilitate, coerce, to

14   take, to do anything to Ana in the United States, true?

15   A    Can you repeat that question.

16   Q    Yes.  Is there anything -- it's your opinion, based on a

17   lot of assumptions, most respectfully, that she was kidnapped

18   as opposed to she's just gone off on one of her mental health

19   fits, my question to you is, is there anything to facilitate

20   the taking of Ana occur inside the United States?

21        Yes or no.

22   A    No.

23        MS. WEINTRAUB:  I hate this when I have to say no

24   further questions.

25        THE COURT:  Any questions?

MONTILLA - REDIRECT - MS. MONK

1      MS. MONK:  Just two, your Honor.

2    REDIRECT EXAMINATION

3    BY MS. MONK:

4    Q    What is the last communication that was sent from the

5    victim's phone?

6    A    February 2nd.

7    Q    But what was the gist of the communications?

8    A    She was going to stay home because she was not feeling

9    well.

10   Q    Were there communications that were the same as those

11   that the defendant communicated to his associate in Colombia?

12   A    Yes.

13   Q    And were those the exact same communications that were

14   sent from the victim's phone?

15   A    Yes.

16   Q    Would that conclude you to believe that the defendant was

17   in the possession of the victim's phone?

18   A    Yes, but that was -- sorry, I apologize.

19        MS. WEINTRAUB:  I object because I don't understand

20   what's being asked or answered.

21        THE COURT:  Overruled.

22   A    No, it was on February 3rd when there was a text message

23   from What's up[sic] sent to her friends from Ana's phone.

24   Q    And what information do you have that that text message

25   was actually sent by the defendant?

PROCEEDINGS

1   A    So, the defendant's girlfriend at the time went to the

2   police and said he -- she had the text where David is asking

3   her to translate a message into perfect Spanish.

4            MS. MONK:  No further questions.

5            THE COURT:  You may step down.  Thank you very much.

6            THE WITNESS:  Thank you.

7            (The witness was excused.)

8            THE COURT:  Just turning it back to the government,

9   what are the jurisdictional basis for charging him here?

10           MS. MONK:  Sure.  So in 2006 the kidnapping statute

11   was amended to allow an offender's travel to provide the

12   jurisdictional basis.  So if someone travels from the United

13   States and orders a kidnapping, that then provides

14   jurisdiction in the United States.

15           And there's a Fifth Circuit case in 2023 that is on

16   point on that.  It's *United States versus Meyer*.

17           THE COURT:  And that holds what?

18           MS. MONK:  That being based on the 2006 amendment to

19   the kidnapping statute which specifically added in language if

20   it -- I'm paraphrasing here but, if an offender travels in

21   interstate or foreign commerce in furtherance or in the

22   commission of a kidnapping, then it is a violation of the

23   statute.  And so in the *Meyer* case someone traveled from Texas

24   to Mexico in order to commit a kidnapping that occurred in

25   Mexico and the Fifth Circuit upheld that conviction based on

PROCEEDINGS

1   that 2006 amendment to the kidnapping statute.

2            THE COURT:  And here specifically the travel you're

3   referring to was what?

4            MS. MONK:  The travel out of Miami International

5   Airport was on January 27th of 2024.  He even flies directly

6   to Istanbul, Turkey rather than flying to Madrid, then goes

7   into Serbia, rents the car and travels to Spain and we know

8   that he was in Spain both by digital evidence and the

9   eyewitness identification of him in the hardware store as well

10  as the video of him in the hardware store.

11           THE COURT:  And did the defendant make any

12  incriminating statements or any statements at all?

13           MS. MONK:  We knew he was represented so we did not

14  inquire of him.

15           THE COURT:  Okay.  Ms. Weintraub?

16           MS. WEINTRAUB:  Judge, I'm glad that the prosecutor

17  brought that up because I forgot to ask and have the agent

18  confirm.  I'm sure the prosecutor will confirm because I spoke

19  with her about it.

20           The defendant's mother lives in Serbia, she is an

21  amputee, she's elderly and sick and disabled.  She's in a

22  wheelchair and he tries to see her as often as he can and take

23  care of her properly.  He goes there frequently through the

24  years to see his mom and that's why he flew into Serbia.  He

25  did not go to Serbia to go to Spain.  I mean, there is no

34
PROCEEDINGS

1  evidence that he went to Serbia or went to Spain to facilitate

2  the furtherance of anything.  There is no evidence of that.

3  He was in the United States and he went to see his mom and

4  dad.  That's what the evidence is.  The rest is really

5  speculation of how and when or where he got to Madrid or for

6  how long at all.

7           So I would submit to the Court there is a

8  significant jurisdictional issue, because unlike what was

9  passed in the Adam Walsh statute, the 2006 statute, this is

10 not the same as in *Meyer*.  In *Meyer* there was -- you know, the

11 person went there to commit the crime.  Well, he doesn't go

12 directly to -- I mean, he couldn't have just gone from Miami

13 to Madrid.  It's a five and a half hour flight, I'm sure there

14 are people in this world who have done it.

15          THE COURT:  Unless he was trying to hide his

16 appearance in Madrid.

17          MS. WEINTRAUB:  Or unless he was going to visit his

18 elderly mom --

19          THE COURT:  Right.

20          MS. WEINTRAUB:  -- who was sick, and we're not

21 speculating because that we do know that he did do that.

22          We do know that --

23          THE COURT:  Are you disputing that there were -- how

24 many miles, 7900 kilometers.

25          MS. MONK:  It's 7,677 kilometers was the distance

PROCEEDINGS

1   that was traveled, that the distance the rental vehicle

2   traveled while it was in the defendant's possession.  And I

3   believe a trip to Spain is around 2500 kilometers one way, so

4   total there and back it would have been about 5,000

5   kilometers.

6          MS. WEINTRAUB:  And where else in Europe could he

7   have gone?  I mean, should, you know, we play Where is Waldo?

8   I mean, there is no evidence.

9          THE COURT:  Well, it's a circumstantial.

10          MS. WEINTRAUB:  That is leap, it's not even the same

11   mileage.  It's a huge leap.  Is it possible, sure it's

12   possible that I could drive to Palm Beach, it's also possible

13   I could take the Brightline and go there.  I mean, it's a just

14   a fact if I wind up in Palm Beach, how I got there, who knows?

15   There's many different ways I could have gotten there.  My

16   partner, Chris Cavallo, could have taken me there.  I mean,

17   there are many ways to get there.  So because they're picking

18   out the one that, you know, matches nicely to go into the

19   round hole, that's not evidence.

20          THE COURT:  Let's assume for the sake of argument

21   that -- and obviously we could -- you could develop this if we

22   wanted to, but I haven't seen it but let's assume that the

23   officer, the agent's testimony is accurate that the

24   surveillance video that the Spanish police were able to secure

25   evidences him buying duct tape and paint, let's assume for the

PROCEEDINGS

1    sake of argument.  So you take that as a fact, why wouldn't

2    that then connect the dots to the theory that the government

3    is presenting?

4           MS. WEINTRAUB:  Because he didn't go to Spain to

5    commit a crime.  He went -- first of all, when he left the

6    United States he didn't go there.

7           THE COURT:  But you wouldn't drive 7,000 kilometers

8    to buy paint and duct tape.

9           MS. WEINTRAUB:  Judge, maybe he was going to --

10          THE COURT:  They have that evidence.

11          MS. WEINTRAUB:  -- paint the apartment --

12          THE COURT:  They have it in Serbia, right?

13          MS. WEINTRAUB:  Sorry?

14          THE COURT:  They have paint and duct tape in Serbia

15   if you needed it, right?

16          MS. WEINTRAUB:  That's true, but maybe he was

17   going -- Judge, I mean, I don't want to -- I don't want to

18   engage on this maybe, because there are too many maybes.

19   Maybe he was going to visit somebody.  Maybe they were getting

20   back together again.  Maybe Ana said come see me.  Maybe he

21   never went to see Ana and he saw somebody else.  We don't

22   know.

23          What we do know that he didn't go from the United

24   States to Madrid to commit a crime.  And when the statute says

25   in furtherance of, it usually means something started here and

PROCEEDINGS

1    you go to do -- to stretch the elastic rubber band in

2    furtherance of, right just like with a conspiracy.  So there's

3    no beginning here though.  That's the problem.  The beginning,

4    if at all is in Serbia.  And I think we have enough crime in

5    the United States to focus on crimes that are committed here

6    and not in Serbia.

7            My point is that the statute is vague as to in

8    furtherance of.  I think it makes just as much sense of what

9    I'm saying that in furtherance of means in furtherance of,

10   that it means it began here and goes to the next point which

11   would be Madrid which he didn't, and that it doesn't allow for

12   intervening paths.  Well, if he went to, you know, Serbia

13   first for a month and then he plotted doing it, well then he

14   didn't go to Madrid in furtherance -- from the United States

15   in furtherance of committing or facilitating a kidnapping.

16   That's my point.  My point is that this is a bond hearing and

17   that for purposes of bond, bond isn't to be punitive.

18           Even Pretrial Services recommends a bond can be

19   fashioned with a GPS monitor, turning in his passport.  We

20   offered the prosecutor a bond asking if there were any

21   circumstances that you would consider to make an agreement, of

22   course it's within their rights to decline and they did.

23   But --

24           THE COURT:  Let me ask you about that issue because

25   your point is well taken if, at the very best, in the light

PROCEEDINGS

1  most favorable to the government, it is entirely

2  circumstantial at this point, right?  But on the question of

3  the risk of flight, given his ties to foreign countries, his

4  extensive foreign travel, the means that he has, how do you

5  deal with their argument that even on the basis of serious

6  risk of flight is too much.

7       MS. WEINTRAUB:  Easy because he doesn't have his

8  passport anymore, they took his passport.  The other one is

9  expired.  If he's on a GPS monitor and he puts up his property

10  and a relative will co-sign the bond here, then what's -- and

11  then where is he going?  He might have, you know, 50 people

12  that he's best friends with and his family in Serbia.  He

13  can't get there.  How is he getting there?  I mean, if he

14  doesn't have a passport, he doesn't have travel documents and

15  he's on a GPS and monitor, how is he leaving the country?  I

16  mean, we can't -- we can't say that it's a factor against him

17  that he has elderly parents there.

18       He has extensive ties here to the United States to

19  Fort Lauderdale where he's lived for 14 years.  His businesses

20  are here --

21       THE COURT:  You want to respond --

22       MS. WEINTRAUB:  -- he has employees.

23       THE COURT:  You want to respond to that?

24       MS. MONK:  Yes, I would like to offer argument

25  generally.  Earlier when I was answering your Honor's

PROCEEDINGS

1    questions, but I didn't have an opportunity to provide my

2    argument, so can I go ahead and do that?

3            THE COURT:  Yes.

4            MS. MONK:  So, yes, we are recommending that the

5    defendant be detained based upon the risk of flight and

6    danger.  One of the factors that your Honor can consider when

7    making a bond determination is the strength of the evidence,

8    and with all due respect to the defense I really think their

9    argument just ignores all of the evidence that we've

10   presented.

11           We have the defendant renting a car in Serbia,

12   tinting the windows of a rental car, which is extremely

13   abnormal, removing identifying stickers, a report that it

14   appeared as if the license plate has been changed.

15           To your Honor's point, if he had legitimate business

16   in Spain, why not just fly directly to Spain.  It's a

17   five-hour flight, as the defense attorney noted.  Instead, he

18   goes out of his way, flies into Turkey, gets to Serbia, but he

19   does so immediately.  So as to this point of, you know,

20   there's no evidence that that was his intent, again I think

21   that ignores the evidence.  He flies out on the 27th and

22   within days he's already -- he's renting the car two days

23   later and then is traveling across the Serbian-Croatian border

24   on the 30th.  So, you know, I think that ignores the evidence.

25           Then he's in the hardware store buying the exact

PROCEEDINGS

1    kind of items that are used by this phantom man who has the

2    same build that the defendant has, has facial characteristics

3    that are similar to him.  There's a stolen plate that is

4    affixed to the exact type of rental car that he rented in

5    Serbia that's placed in Spain.  We have GPS information

6    placing him in Spain.  We have that stolen plate outside of a

7    motorcycle store where there's a report that the individual

8    who bought that helmet and the vest.  When you do the

9    comparison of the receipt and what items are purchased, it's

10   the exact type of helmet that's used by this phantom man who

11   resembles the defendant spray painting the camera.

12           So the evidence in this case is extremely strong and

13   that doesn't even take into consideration this bombshell text

14   message exchanged where he's communicating with his

15   girlfriend, asks her to translate messages, and then lo and

16   behold those are the exact messages that are sent from the

17   victim's phone.  So the evidence in this case is extremely

18   strong.

19           In terms of danger, I think the danger in this case

20   should be obvious at this point.  I mean, we have a woman who

21   has been missing for three months and we don't know where she

22   is.  And there's evidence that she was last with the

23   defendant.  So obviously the government has a very strong

24   concern that she's been killed, that she's deceased at this

25   point.

41

PROCEEDINGS

1      THE COURT:  Let me ask this question, have you done

2 forensic analysis of the rental car?

3      MS. MONK:  That investigation is ongoing, but I will

4 say he kept it for a significant amount of time before turning

5 it in and the car has since been rented.  But he -- we, you

6 know, obviously, believe her disappearance and potential

7 homicide happened on the second or the third.  He then did not

8 turn the car in until March 15th, which I think is also

9 indicative of guilt.  And so I'm certain that he would have

10 cleaned that car in the month's time that he had.

11      In terms --

12      THE COURT:  Well, you would still though have to

13 concede even with everything you're saying in its entirety,

14 it's still a circumstantial case because we don't even know

15 what actually happened to her.

16      MS. MONK:  It's a circumstantial case, but as your

17 Honor knows, I mean, the evidence is the same whether it's

18 eyewitness testimony, it's given the same weight.  Direct

19 evidence and circumstantial evidence are given the same

20 weight.  And here we have --

21      THE COURT:  But if it's an entirely circumstantial

22 case, why isn't that a case that a defendant may want to

23 defend, why would he flee?

24      MS. MONK:  Because he's facing a stat max of life

25 and 10 to 12 years in prison.

PROCEEDINGS

1          THE COURT:  Only if he gets convicted.  If it's

2    entirely circumstantial, why wouldn't he fight the charge?

3          MS. MONK:  Because the circumstantial evidence is

4    extremely strong.  What are the odds that he's in Spain buying

5    paint that is used to then spray paint the surveillance -- I

6    mean, that's innocent conduct.  There is no reason someone

7    goes on a multi-country journey with stolen license plates and

8    tinted windows to spray paint someone -- I mean, that's just

9    defies common sense.

10          He's a person who has significant foreign ties.  He

11   has a lot on the line here.  It's a stat max of life.  It

12   is -- if we do find a body that becomes a stat max of death.

13   Really his ties here are not as strong as the defense is

14   making it.  I mean, he's essentially a single man at this

15   point, he has no wife.  He has no children, and as the

16   Pretrial Services report notes, I mean he didn't even know the

17   contact information for his brother.  So he can up and go

18   whenever he feels like it.

19          THE COURT:  How do you respond to Ms. Weintraub's

20   point about --

21          MS. WEINTRAUB:  First of all, his brother --

22          THE COURT:  -- if you take away his means of travel,

23   how would he do that?

24          MS. MONK:  He --

25          MS. WEINTRAUB:  The definition in the pattern jury

PROCEEDINGS

1   instruction is to kidnap a person means to forcibly and

2   unlawfully hold, keep, detain and confine that person against

3   that person's will.

4          There's never going to be any evidence of that.  The

5   involuntariness --

6          THE COURT:  Go ahead -- hold on.  Go ahead and

7   answer my question.

8          MS. MONK:  I'm sorry, what is your question, Judge?

9          THE COURT:  Her question was that if we take away

10  his means of travel, the risk of flight is sufficiently

11  ameliorated.

12         MS. MONK:  I would say this is a defendant who has

13  significant means, much more than the average defendant and

14  given those means it is much more feasible for him to flee

15  than the average.  I think cutting off the GPS monitor does us

16  no good, that does nothing to reduce the risk of flight it

17  just let's us know when he's fled and at that point it's too

18  late.

19         MS. WEINTRAUB:  I don't know how often that happens

20  but in over 25 years, I've never had a client who did that

21  honestly.  I never --

22         THE COURT:  I've had a defendant who did that.

23         MS. WEINTRAUB:  I'm sorry.  But I will also --

24         THE COURT:  When you're here 20 years you'll have at

25  least a couple.

PROCEEDINGS

1      MS. WEINTRAUB:  Judge, furthermore at the end of the

2  statute and at the end of the instructions, it says,

3  involuntariness or coercion related to taking and keeping is

4  an essential part of the crime.  Again, they don't even know

5  where she is.  They don't even know when she got -- for all we

6  know, she's just doing this because she's psychotic.  When she

7  has suffered mental health issues for years and, you know,

8  she's going to walk in the door.  I mean, we don't know.

9  There are so many questions.

10     He's got a legitimate business.  The fact that, you

11  know, they were splitting up is certainly not to be used

12  against him that she's single.  He's only 36 years old.  I

13  don't want to say it, but I have children older.  I mean, he's

14  36 years old, he's got everything -- all of his assets are

15  here in the United States.  His life has been in Fort

16  Lauderdale.

17     There is, it's -- it's -- it's -- it's almost not

18  fair to say, because it's a circumstantial case it still could

19  be and possibly and therefore and deprive him of his freedom

20  while we're waiting on Spanish police reports from more than

21  three months old already.  I mean, what is the end game here?

22     Most respectfully, I think that a bond could be

23  fashioned with reasonable conditions of confinement that it

24  could be two of his properties, his brother can sign the bond.

25     I'm looking at the Pretrial Services record.  Of

PROCEEDINGS

1    course he not have any firearms, I don't think there were any,

2    GPS monitoring.  I don't know if they could even -- I don't

3    know what is involved, I'm not going to even offer it.

4         And actually I disagree with Ms. Monk that by the

5    time they find out that the monitor is off, you know, he's

6    gone.  That's just not true.  Especially not on an

7    international flight.  I mean, they get noticed immediately if

8    something is, you know, awry.

9         I had a case in Fort Lauderdale a month ago where my

10   client took the garbage out and wound up in the middle of the

11   street and it went off because he went in the middle of the

12   street, and they were police there within five minutes.

13        I mean, I don't know where she thinks he's going

14   without a passport or travel documents.  And everything he has

15   is here, where is he going?  If his brother signs it and his

16   property and it's extensive and do a million dollar bond,

17   Judge.

18        THE COURT:  Last word, Ms. Monk.

19        MS. MONK:  Just, Judge, you know, the cat is out of

20   the bag at this point.  I think he's going to be all the wiser

21   now he knows the information that the government has that's

22   only going to make him more deliberate in his flight.

23        He obviously took steps to conceal his crime when he

24   committed it.  It's the government belief he will do the same

25   when taking the opportunity to be given a bond to flee.

PROCEEDINGS

1        The evidence in this case is strong.  There's no

2   amount of property that would assure his attendance in court

3   given the penalties that are on the line.  And we believe he's

4   both a serious risk of flight and a danger.

5        THE COURT:  Okay.  Well, I can't detain based on

6   danger because I think the evidence -- I can't make a finding

7   sufficient to detain him on danger.  There is probable cause

8   to believe of course that he committed this offense, but

9   that's not sufficient for me to find that he's a danger,

10   because I have to do that on a clear and convincing basis and

11   I don't think, even in the light most favorable to the

12   government, I could do that.

13        The issue though is on the risk of flight that the

14   government has charged him, assuming the grand jury agrees and

15   indicts, the factors that the government relies upon are

16   significant.  He's traveled to 30 countries throughout the

17   world, he has significant ties to Serbia, he has significant

18   means and the only way one can flee is through means.  So this

19   actually is a case where you have sufficient serious risk of

20   flight in the record given the property that he has available

21   and his frequent travel and the nature of the case, because

22   even though I think it's a defensible case because the

23   evidence is circumstantial, that doesn't mean it's not

24   significant.  So --

25        MS. WEINTRAUB:  Well, actually I think it kind of

PROCEEDINGS

1    is.  And I think it does mean that.  If it's a strictly

2    circumstantial case, and even the Court questions, you know,

3    and I'm sure the Court doesn't often say that it's a

4    defensible case, I'm sure of that in this building because I'm

5    here too and I know that most cases are not defensible.  This

6    case is defensible.  And it sure would help to have my client

7    in my office working with me, with investigators to defend

8    this case.

9         And there has to be a monitor system where without

10   travel documents -- I mean, he and Ana traveled extensively

11   together, I mean, that's what that was.  So that's not to be

12   used against him.  The fact that he was a successful shouldn't

13   be a factor against hum.  Whoever signs the bond they won't be

14   able to put up the money for anything else, there will be a

15   *Nebbia* requirement.  So there was no ill gotten gain, he has

16   been successful so he shouldn't we punished for that.

17        And I think that there are conditions together that

18   do make a valid presentation for bond especially.  I mean,

19   it's not -- it's not as if he went from A to B in furtherance

20   of.  There are significant legal issues to be attacked in

21   this.  They haven't gone to the grand jury yet --

22        THE COURT:  Well, you may want -- you may actually

23   want to ask for a speedy trial.

24        MS. WEINTRAUB:  And I also know that when they go to

25   the grand jury they're not going to be able to ask the

48

PROCEEDINGS

1    questions that the agent couldn't answer.  Because the bottom

2    line is, they are going to be asking a jury to speculate on

3    the coercion and the detention.

4            I just think, Judge, I know it's a close call --

5            THE COURT:  It's a close call.

6            MS. WEINTRAUB:  -- and I would ask the Court to err

7    on the side of fairness and not deprive him of his liberty.

8    He has no prior record, nothing, zero.

9            THE COURT:  Ordinarily that counts but of course in

10   a potential kidnapping and murder case that's a different --

11           MS. WEINTRAUB:  Not murder, not murder --

12           THE COURT:  -- case.

13           MS. WEINTRAUB:  -- seriously.  And they are not

14   seeking an indictment on her.

15           THE COURT:  They don't have enough information, they

16   only have at this point a potential kidnapping.

17           MS. WEINTRAUB:  Well, Judge, and I submit they don't

18   even have that --

19           THE COURT:  Right.

20           MS. WEINTRAUB:  -- but it's not going to be a murder

21   case and I don't think that the kidnapping case is going to

22   last.  And I think there are real significant -- and I think

23   the Court recognizes the jurisdictional issues that are

24   attached to this and that they are real.  They're not -- these

25   are not speculative.  These are real, substantial legal issues

PROCEEDINGS

1   that have to be ironed out.

2          I looked, you know, in a cursory way in preparing

3   for this hearing and I couldn't find any case since 2006 when

4   the Adam Walsh statute was re-- was formed -- formulated to --

5          THE COURT:  By the way, on that question why

6   wouldn't -- could the use of instrumentality of commerce in

7   furtherance of a kidnapping also be sufficient not just

8   travel?

9          MS. WEINTRAUB:  Like what?

10          THE COURT:  The WhatsApp messages from Madrid?

11          MS. WEINTRAUB:  The WhatsApp messages from when he's

12   in Serbia?

13          THE COURT:  And Madrid, right?  According to the

14   government, right, according to the government their evidence

15   is that, if you believe their theory, that he commits the

16   kidnapping, he then gets her phone and sends those

17   communications while he's there, and he sends those

18   communications to people here.

19          Why would that not be a basis for jurisdiction, or

20   is that not.  Ms. Monk, do you know?

21          MS. MONK:  Judge, I will -- I mean, I haven't

22   explored that specifically, but the statute does include the

23   use of mail or any means of facility or instrumentality of

24   interstate commerce --

25          THE COURT:  Right.

50

PROCEEDINGS

1          MS. MONK:  -- which I understand to be telephone,

2    the internet, things of that nature which I think we also

3    would have here, but also just say there has been a probable

4    cause finding.  I think this is way outside the bounds of a

5    detention hearing.

6          MS. WEINTRAUB:  Judge, the WhatsApp -- the WhatsApp

7    was not even alleged to have been in Madrid.

8          THE COURT:  Well, what was the date of the WhatsApp

9    messages?

10          MS. MONK:  It was February 3rd, the day after she's

11    last seen, so that would be during the commission of the

12    offense.

13          THE COURT:  He's clearly --

14          MS. WEINTRAUB:  Might have been, might not have

15    been.  Might have left the country by then, maybe.

16          THE COURT:  But even if he had been -- even if he

17    was on the road to Serbia it would still be a potential

18    violation if you're using a means of commerce, foreign

19    commerce for fraud purposes to further the crime, right?  I

20    could be right, right?  Okay.

21          Well, I'm going to let you defend the case as ably

22    you will be I know, and again, I can't make a finding of

23    danger because it's just not -- that's too circumstantial a

24    case; however, on the risk of flight analysis, even for

25    somebody who doesn't have a record, given the means that he

PROCEEDINGS

1   has to flee and given the seriousness of the charge, I think

2   that that is a basis for detention.

3          Now I weigh, it's a close call, and I don't know who

4   the duty judge is this week.  Ms. Monk, let me find out from

5   you if you want to appeal it, right, you have to the right to

6   appeal.

7          MS. WEINTRAUB:  And, Judge, half the property is

8   already in conservatorship and the victim's family has

9   already, you know, initiated litigation to get money and

10  property, whatever --

11         THE COURT:  Right.

12         MS. WEINTRAUB:  -- and I don't do any of that, so I

13  don't really know because I'm a criminal defense lawyer so

14  what do I know --

15         THE COURT:  Sure.

16         MS. WEINTRAUB:  -- but if there was a way to set

17  that up, I mean if the Court's concerned that he has access to

18  money, we could address that.

19         THE COURT:  Let's find out who is the duty judge,

20  is.

21         (Discussion off the record.)

22         MS. WEINTRAUB:  And, Judge, I don't believe that --

23  you know, when the government says he has all these means, he

24  doesn't have access to liquid funds right now, by the way.  I

25  don't know what the government is alluding to.

52

PROCEEDINGS

1          MS. MONK:  Judge, I don't think that's accurate

2    based on the information that I have.  It's my understanding

3    that in the last couple of months he's sold several

4    properties.  I think a decent amount of them are listed on the

5    Pretrial Services report.  I don't think that's all of them,

6    but there are at least three homes that are listed that

7    were -- that -- maybe those are the remaining residences, but

8    I know he sold recently several --

9          MS. WEINTRAUB:  Actually they --

10         MS. MONK:  -- pieces of real estate.

11         MS. WEINTRAUB:  I'm sorry, I interrupted, sorry.

12   They did not close and they are in conservatorship.  That's

13   right, he did have deals going and they were stopped by the

14   victim's family and they have been stopped.

15         MS. MONK:  This is outside the proffer and I don't

16   know that that's accurate, so I don't think your Honor should

17   rely on that representation.

18         THE COURT:  All right.  Do you know who --

19         THE COURTROOM DEPUTY:  Judge, I'm looking --

20         (Cross talk inaudible.)

21         MS. WEINTRAUB:  Would you take a representation from

22   the real estate lawyer in person?

23         THE COURTROOM DEPUTY:  -- I can't find it here.

24         THE COURT:  Shouldn't it be on the...

25         (Pause in proceedings.)

53

PROCEEDINGS

1          UNIDENTIFIED SPEAKER:  Judge Gayles.

2          THE COURT:  Judge Gayles.

3          THE COURTROOM DEPUTY:  Gayles, okay.

4          THE COURT:  Judge Gayles is the duty judge this

5    morning.

6          MS. WEINTRAUB:  I'm sorry?

7          THE COURT:  Judge Gayles, he's the duty judge this

8    morning.

9          So, all right, I'm going to go ahead and grant the

10   government's motion on risk of flight because I need only a

11   preponderance of the evidence and the preponderance of the

12   evidence here establishes a serious risk of flight.  I'm not

13   granting it on the basis of danger.

14         While you're in our custody you'll continue to have

15   opportunities to prepare for your defense and meet with your

16   family and you have a right to appeal my order to Judge

17   Gayles.  Okay?

18         MS. WEINTRAUB:  Thank you, your Honor.

19         THE COURT:  Good presentation as always.  Thank you.

20         MS. MONK:  Thank you.

21         (Matter concluded.)

22              *      *      *      *      *

23

24

25

```
1              I certify that the foregoing is an accurate

2   transcript from the official electronic sound recording of the

3   proceedings in the above-entitled matter.

4   s/ Georgette K. Betts            May 17, 2024

5   GEORGETTE K. BETTS                     DATE

6                         I N D E X

7   WITNESS                                    PAGE

8   ALEXANDRA MONTILLA

9   CROSS-EXAMINATION    BY MS. WEINTRAUB        9

10  REDIRECT EXAMINATION BY MS. MONK            31
```

WITNESS                                    PAGE

ALEXANDRA MONTILLA

CROSS-EXAMINATION    BY MS. WEINTRAUB        9

REDIRECT EXAMINATION BY MS. MONK            31