## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: <u>24-20201-CR-WILLIAMS(s)</u>

**UNITED STATES OF AMERICA**

**vs.**

**DAVID KNEZEVICH,**
        **a/k/a "DAVID KNEZEVIC,"**
        **a/k/a "DUSAN KNEZEVIC,"**

                **Defendant.**
_____/

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S <u>RENEWED MOTION FOR BOND</u>

The United States of America, by and through the undersigned Assistant United States Attorneys, hereby files its response to the Defendant's Renewed Motion for Bond. *See* (DE 147). The Defendant's Motion follows his previously filed Motion to Revoke Detention Order (DE 73), which the Court has not yet decided. Therefore, the United States files the instant Response in Opposition to the Defendant's Renewed Motion for Bond and incorporates its Response in Opposition to the Defendant's Motion to Revoke Detention Order (DE 79), by reference herein. For reasons stated below, and in its response to the Defendant's motion to revoke the detention order in this case, the United States respectfully requests that the Court deny the Defendant's motion for release.

I.      <u>Factual Background</u>

    a.  **Procedural History**

On May 4, 2024, the Defendant was arrested for kidnapping, in violation of 18 U.S.C. § 1201(a), pursuant to a criminal complaint.  *See* Criminal Complaint, Case No. 24-MJ-02896-REID (DE 3).  On May 10, 2024, the Magistrate Court detained the Defendant based on risk

of flight after receiving testimony from FBI Special Agent Alex Montilla. (DE 9). A grand jury sitting in the Southern District of Florida subsequently returned an indictment against the Defendant on the same charge on May 15, 2024. (DE 11).

On May 23, 2024, the Defendant filed an objection to the Magistrate Court's Detention Order. (DE 15). On June 10, 2024, the Defendant requested a hearing to re-cross Special Agent Montilla, which was granted. (DE 22, 24). On June 18, 2024, the Court received Special Agent Montilla's testimony (DE 31). On June 18, and 19, 2024, the Defendant filed a motion for bond (DE 32) and expedited briefing (DE 34), which were both denied with leave to renew at a future date in front of the Magistrate Court. (DE 35).

On July 1, 2024, the Defendant filed an unopposed motion to continue trial until October 2024. (DE 39). Trial was rescheduled for October 21, 2024. (DE 41).

On July 30, 2024, the Defendant filed a renewed motion to reopen the detention hearing (DE 43), which was referred to the Magistrate Court (DE 45). On August 8, 2024, the Magistrate Court heard the motion to reopen the detention hearing, and Special Agent Montilla testified for the third time. (DE 56).

On September 19, 2024, the Defendant filed a motion to revoke the detention order. (DE 73). On September 25, 2024, the United States filed a joint motion to continue trial to February 3, 2025. (DE 77). Trial was rescheduled for February 10, 2025. (DE 78).

Thereafter, on November 13, 2024, the grand jury returned a superseding indictment charging the Defendant with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) (Count 1); foreign murder of a United States national, in violation of 18 U.S.C. § 1119 (Count 2); and foreign domestic violence resulting in death, in violation of 18 U.S.C. § 2261(a)(1) (Count 3).  (DE 106). The Defendant was arraigned on the superseding indictment on December 19, 2024. (DE 123).

On December 18, 2024, the United States filed an opposed motion to continue trial to June 9, 2025. (DE 121). On January 15, 2025, the Court granted the United States' motion to continue trial and rescheduled the trial to begin on June 16, 2025. (DE 140).

On January 17, 2025, the Defendant filed a renewed motion for bond. (DE 147).  The Court set a status conference on February 3, 2025, to discuss the Defendant's bond motion. (DE 153).

### b.  Detention Hearings

At the first detention hearing in this case, on May 10, 2024, the Magistrate Court found that no condition or combination of conditions would reasonably assure the appearance of the Defendant as required and ordered him detained pending trial. (DE 37, 17 (First Detention Order)). The Magistrate Court declined to make a finding of danger because the case was "too circumstantial." (DE 37, page 50). The facts proffered by the Government can be found at Docket Entry 37, pages 3-8. The testimony of Special Agent Montilla can be found at Docket 37, pages 9-32. The Magistrate Court held a second detention hearing on August 8, 2024, and Special Agent Montilla testified again. (DE 56; DE 57, pp 8-77). The Magistrate maintained its prior ruling, finding "that there is ample evidence in the record to sustain the Government's burden of showing a sufficient factual basis to charge the Defendant and allow for his detention before trial. Indeed, the evidence produced at the second hearing supports the Court's original finding that the Defendant presents a serious risk of flight given the cunning level of deception that he has demonstrated as part of the crime he is alleged to have engaged in." (DE 69 at 1-2 (Second Detention Order)).

### c. Factual Proffer

The following facts are not intended to be a complete recitation of all known facts that establish the Defendant's guilt:

#### 1. The Victim Moved to Madrid, Spain to Separate from the Defendant

On December 26, 2023, the Victim, a 40-year-old female, traveled from Miami to Madrid, Spain.  At the time of her departure to Spain, the Victim was married to the Defendant, a dual citizen of Serbia and the United States.  The couple married in 2011 and seemed happy for many years until the relationship deteriorated in late 2023 after the Defendant had an affair. According to friends and family members, the couple tried to repair their relationship but, in December 2023, they decided to divorce. The separation was reportedly contentious because the Defendant didn't want to split the marital assets evenly with the Victim.

#### 2. The Victim's Divorce Deadline Became Deadly

During their marriage, the Victim and the Defendant acquired multiple residential properties in South Florida, which they rented out as vacation properties through their business, EOX Capital.  Additionally, they also operated EOX Technology Solutions, an IT business.  As such, they had significant marital assets that would have been at issue in a divorce proceeding.  The amount is certainly in the millions. The Victim documented the divorce negotiations with the Defendant in a series of WhatsApp voice notes to friends that have been recovered from her Google cloud account. For example, in a WhatsApp voice note dated January 9, 2024,[1] in part detailed below, the Victim recounted a conversation that she had with the Defendant wherein he stated that he only wanted to give the Victim 25% of the

---

[1] This message was translated from Spanish to English.

marital assets:

> Today I saw, today my ex made me lose my mind, we were talking about the divorce and imagine what he told me, first he told me that once I have papers to give him the papers. **And secondly, uh, he definitely did not want to give me anything since he manages all the money, he would give me something every month, and then he said if I wanted a percentage, instead of giving me the legal percentage of 50 percent, he would give me 25 percent and 75 percent to him. Eh, imagine that, because he is the one, um, you know, he deserves the most of everything, I don't even deserve shit because to him I am nothing.**

Then, in a WhatsApp voice note dated January 14, 2024, the Victim reported that the Defendant agreed to give her 50% of the marital assets, and she told him that he needed to file the divorce in court by the end of the month:

> Hey, I wanted to tell you that I was talking to, um, I talked to my therapist today, um, and of course she told me, yes, Ana, you did well like, he can promise you the the, the sky, and you know the moon and the sun but until he does what he says, you know, you just don't believe anything and. But also, you cannot just tell him, no, there is nothing after, you know, I'm not coming back with you or how you're feeling or whatever. **You just need to be very straight about like the divorce**, that is what I need right now. And, and so, I did that, so I, called, and then we will see, so that was like the message that I had to like tell him, you know. **So, I called him, I told him that, I told him that if he was serious about what he is saying, I needed us to be completely separate and I needed this to be filed in court before the end of the month. And that is what I want and that is where I am, and, and that was it and I didn't want to work with him in the future neither and that we were not going to share finances neither or anything like that. And those, those were the things that were, uh, talked about, you know, and um, so we will see. And he accepted that and he said that he was going to do it. And that everything like fifty percent, everything from the house, if I wanted to go thing by thing, or if he will do it, and if I, if he missed anything, uh, I just tell him, and you know he would include it. Uh, but everything will be, everything, the house, the things that we have, the business, the everything, so I'm happy about that and I hope it's true, and at least it's like the 13th now of the month, so I have, um, 15 more days you know of this to see if uh, (sigh of relief) if actually like this is going to be it, you know, if this is really happening, and, and it's going to be like this, that's all I want.** And, and that's it, I just wanted to let you know that everything is cool and fine, and that's all. I hope you have a beautiful day over there. And I am so excited to come on over, you have no idea. So, I'm happy that I will see you and now I'm going out with a couple of girls. And, I guess, I'll see you soon. Bye.

The Victim also documented how once the Defendant realized that she was serious about the equitable division of assets, he claimed that he wanted to reconcile. For example, in a WhatsApp voice note dated January 17, 2024,[2] the Victim stated:

> Things probably didn't change suddenly. None of this stuff is ever suddenly. My love started to die years ago but we just didn't realize. After he asked me for a divorce, after he was the one who burned all of the shit. After I was trying and trying and trying. A month after I left, all of the shit he did to me, one year that was terrible, terrible, umm, the damage he did to me, you could not even imagine. **Now he just realized what he did. Just now he realized and now he wants us to get back together.** So, imagine that. But in reality, the distance is the only thing that helps.

In a WhatsApp voice note dated January 19, 2024, in part detailed below, the Victim stated:

> **It's been super crazy because like David this last week realized all of the shit that he did just now. After he saw that I wasn't, I wasn't backing down from the money. And that I was serious. And then he realized all this shit. And now it has been like a week, and that he wants to come back and he's just coming at me with everything.** And I don't know, I don't know what to do, I don't know what to say, I don't know what to feel, it's just very confusing now for me. Umm, but I am having a great time in Madrid despite this shit with David, like really amazing (laughs).

The Victim's Google cloud account also contained screenshots of text messages from the Defendant threatening to make the divorce difficult for her if she consulted with a lawyer without him. For example, the following messages were screenshotted on December 19, 2023, and the circled language is how it appeared in the Victim's account.

---

[2] This message was translated from Spanish to English.



In a WhatsApp voice note dated January 24, 2024,[3] the Victim discloses the

Defendant's mistreatment of her:

> He got himself a lover in Bogota from Tinder, eh, like two, two months before
> the divorce, eh, he went to Bogota, he slept with her and everything they
> continued the relationship while he made me, he made me return to Fort
> Lauderdale, eh, I was looking for a therapist, couples' therapy, doing all this
> while he was playing behind my back. He behaved very bad with me. Even in
> sex he acted extremely aggressive, I mean bad, bad, bad, he treated me like shit,
> like shit, like the worst way possible. He told me that he called me a bitch, he
> called me all types of names that you can imagine, he mopped the floor with
> me, and that he no longer wanted to be with me. Apart from that he wanted to
> take everything from me, um, and I had to manage all of that. He never
> accepted any of the wrong doings that he did to me. And that I will never
> forgive him for. I was the one who found out about all the things he was doing
> afterwards.  While I was putting all of my part and doing everything for the

---

[3] This message was translated from Spanish to English.

relationship. In fact, when he went to Bogota, while he was sleeping with that old lady, I was sending him messages asking how is he doing, what did he need. You don't know how humiliating, the humiliation I feel for what he did to me.

The Defendant never filed for divorce, and the Victim disappeared two days after her ultimatum to the Defendant expired.

### 3.  The Victim Disappeared

On February 2, 2024, shortly before 2:00 p.m., the surveillance camera in the lobby of the Victim's apartment building captured her entering the building with a bouquet of flowers. The Victim's purchase of the flowers is the last non-automatic activity in her bank records. Surveillance footage never captured the Victim leaving the building after this point.

The following day, two of the Victim's friends received messages from the Victim's WhatsApp account that they did not believe to be from the Victim, that stated, in summary, that the Victim met someone on the street, she was going to his house about two hours from Madrid  to spend a few days, she wouldn't have good cell service, and she would call when she returned. Both friends responded to the messages but did not receive responses.

Then, on February 4, 2024, Spanish authorities were alerted to the Victim's disappearance by another one of her friends who had been trying to get a hold of her.  Spanish firefighters entered the Victim's apartment for a welfare check and discovered that she was not in the apartment. On February 5, 2024, that same friend went to the Madrid train station and waited for the Victim to show up for their previously scheduled train to Barcelona, however the Victim never showed. Spanish National Police ("SNP") searched the Victim's apartment on February 12, 2024, and discovered that her phone, laptop, and their respective chargers were missing.  The apartment was full of the Victim's belongings.

**4.  The Defendant Clandestinely Traveled to Madrid, Spain, from Belgrade, Serbia to Murder the Victim**

On January 27, 2024, the Defendant departed from Miami International Airport to Belgrade, Serbia. The Defendant landed in Serbia on January 28, 2024, and traveled to his apartment. The next day, on January 29, 2024, the Defendant purchased a SIM card that he used in a Xiaomi Redmi cell phone (the "Burner Phone"), rented a car, and stole two license plates from a vehicle that he then installed on his rental car using license plate holders that he purchased from a Belgrade hardware store "CRAFTER." The next day, on January 30, 2024, the Defendant paid to have his rental car's windows tinted and then drove across the Serbian-Croatian border in the rental car, using his Serbian passport. At the time that he crossed the border, the rental car bore its assigned license plate.

The Defendant rented an Airbnb in Croatia from January 30, to February 6, 2024. The last outgoing communication from the Defendant's known Serbian cellphone occurred on January 30, 2024, at approximately 8:34 p.m. After that, over the next few days when the Defendant was traveling to Madrid and back, his known Serbian and American iPhones only logged incoming communications and never appeared outside of Croatia during his travel to Spain, which is consistent with him leaving the phones behind in Croatia.

The Defendant traveled out of Serbia into Croatia by vehicle, and then traveled through Slovenia, Italy, and France, and crossed into Spain during the morning of February 1, 2024.  The Defendant arrived in Madrid during the evening of February 1, 2024, stole a license plate from a vehicle, and then was in the area of the Victim's apartment beginning around 11:16 p.m. The next day, on February 2, 2024, around noon, the Defendant paid cash for spray paint and two rolls of duct tape from a Madrid hardware store. He went to a

motorcycle store in the early evening and bought the same type of motorcycle helmet and reflective vest that he is seen wearing in the surveillance video at the Victim's apartment.

On February 2, 2024, the Defendant gained entry to the Victim's apartment building by posing as a food delivery driver and ascended the stairs. Sometime later, the Defendant descended the stairs, spray painted the only surveillance camera in her building, and then, upon his exit, placed tape on the building's entrance door to prevent it from locking. The Defendant re-entered the apartment building and entered the elevator with an object that law enforcement believes is a rolling suitcase based on the movement of the object, its proximity to the Defendant, and its shape. The Defendant then exited the elevator with the object and left the building.[4]

The Defendant returned to Serbia through the Serbian-Croatian border on February 5, 2024, and returned the rental car on March 15, 2024. The owner of the rental vehicle noted that the interior of the vehicle was extremely clean when it was returned by the Defendant. He also noticed that a sticker on the windshield was missing, both license plate frames had been replaced, the "rent-a-car" sticker was removed from the trunk, and the rear windows had been tinted. The vehicle had traveled approximately 7,677 kilometers. A round trip from Belgrade, Serbia, to Madrid, Spain, is approximately 5,200 kilometers.

The Defendant's movements from January 27, 2024, to February 4, 2024, are documented in the attached historical mobile device location analysis. (Exhibit 1, Location Analysis).

### 5. The Defendant Sent the Last Messages from the Victim's Missing Cell Phone Number

The Victim's disappearance made international news, and the coverage included

---

[4] The Victim was reportedly approximately 4'11 tall and weighed approximately 100 pounds.

screenshots of the suspicious messages that the Victim's friends received from her WhatsApp account on February 3, 2024. On February 21, 2024, a Colombian woman who had previously met the Defendant in Bogota, Colombia, on Tinder in October 2023, advised law enforcement that the Defendant asked her to translate what turned out to be the Victim's last messages.  The woman reached out to law enforcement after seeing the messages in the news. The woman provided her WhatsApp messages with the Defendant to Colombian law enforcement, which show that on February 3, 2024, the Defendant asked for help in translating a message into "perfect Colombian" for a friend in Serbia who is writing a script about a Colombian character. The Defendant explained that he wanted the writing to sound authentic, which is significant because the Victim was born and raised in Colombia. The woman then translated two messages for the Defendant. The first message stated, "I met someone wonderful, he has a summer house about two hours from Madrid. We are going there now and I will spend a few days there. There is barely a signal though, I'll call you when I come back. Kisses." The second message stated, "Yesterday after therapy I needed a walk and he approached me on the street. Amazing connection, like I never had before." Those messages were the last messages the Victim's friends received from her.

Further, French cell site data shows that the Defendant's Burner Phone was located in France on February 3, 2024, with an old cell phone that he stopped using in November 2023. The records show that the Defendant's old cell phone was using the phone number that was associated with the Victim's missing cell phone. The phones were located in the same vicinity in France around the time that the Victim's last messages were sent.

**6. The Defendant Lied about being in Fort Lauderdale at the Time of the Victim's Disappearance**

After the Victim disappeared, the Defendant told multiple people, including the Victim's brother, one of the Victim's close friends, and an employee, that he was in Fort Lauderdale when, in fact, he was actually in Serbia. On February 6, 2024, the Victim's brother messaged the Defendant via WhatsApp regarding the brother's unsuccessful attempts to contact his sister.  In response, the Defendant casually responded, "Yeah. She is missing.  We don't know." In a subsequent phone call, the Victim's brother asked the Defendant why the Defendant did not tell him that the Victim was missing.  The Victim's brother asked the Defendant where he was, and the Defendant falsely responded that he was at home, but later stated he was at a friend's house in Fort Lauderdale, Florida, and was leaving for a flight to Serbia in three hours, when he didn't return from Serbia until May 4, 2024.  The Defendant also falsely advised the Victim's brother that he filed a police report with the Fort Lauderdale Police Department regarding the Victim's disappearance.   In a subsequent telephone conversation, the Victim's brother asked the Defendant what the Defendant thought happened to the Victim.  In response, the Defendant stated that he thought that someone had the Victim in a dungeon or killed her.

On February 15, 2024, the Defendant messaged the Victim's brother in anger about information that he believed the Victim's brother was sharing with the media. The Defendant portrayed that he was being harassed at his Fort Lauderdale home, stating "Instead of working together you put me in a situation where I have to think about my safety … I have newspapers camping in front of the home. They are recording everything inside through the windows. Going through the gate trying to find entry … so instead of spending time money and energy on trying to find her, I have to spend it now protecting myself."

### 7. Proof of Death Evidence

An analysis of the Victim's accounts, coupled with the fact that she has not been seen or heard from for a year, demonstrates that she is deceased.

#### i.    Future Plans

The Victim had multiple events planned in the near future, including a trip to Barcelona, Spain, on February 5, 2024, a dinner reservation on February 9, 2024, and a concert in July 2024. The Victim was living in an apartment on a month-to-month basis and was actively looking for a long-term rental in Madrid. Specifically, on February 1, 2024, the day before the Victim's disappearance, one of the Victim's female friends accompanied her to look at apartments.  On the night of February 2, 2024, the Victim attended an online therapy session with a therapist located in Colombia that she had been seeing since August 2023. The Victim's next session was scheduled for February 5, 2024, however she never showed, and the therapist hasn't heard from the Victim since.

#### ii.    Friends and Family

Law enforcement has interviewed friends, family members, and employees of the Victim and, despite regular contact leading up to her disappearance, none of them have heard from the Victim since February 2, 2024.

#### iii.    Instagram and Facebook

Prior to her disappearance, the Victim regularly used both Instagram and Facebook. Instagram records for the Victim's account show that she frequently used Instagram's direct messaging feature to communicate with others in the months leading up to her death.  On the night of her disappearance, the Victim exchanged messages with an insurance agent about renters' insurance she needed to rent an apartment.  The Victim sent her last message to the

insurance agent at approximately 9:00 p.m. (Madrid time). The insurance agent then immediately sent the Victim five messages, but the Victim did not respond. The insurance agent sent the Victim three additional messages on February 5, 2024, but did not receive a response.

The Victim used Facebook with less frequency. The Victim last sent a message from her Facebook account on January 26, 2024, at approximately 9:21 p.m. Nevertheless, the Victim's appears to have accessed her account up until February 2, 2024, at approximately 2:39 p.m. The Victim received multiple messages after February 2, 2024, including from one of her friends, but never responded.

### iv.   Spotify

The Victim regularly used Spotify, a music streaming application, prior to her disappearance. For example, between January 1, 2024, and February 2, 2024, the Victim used Spotify all but four days. The account, which was created in 2012, has not been used since February 2, 2024.

### v.   Bumble

The Victim regularly used Bumble prior to her disappearance, and her last login occurred on February 2, 2024, at approximately 6:23 p.m.

### vi.   Gmail Account

The Victim's Google accounts also reveal a lack of activity after February 2, 2024. The Victim regularly conducted web searches through her Google account up until her death. The Victim's last Google web search occurred on February 2, 2024, at approximately 5:06 p.m. Her last Google map query occurred on February 2, 2024, at approximately 2:40 p.m. The last photo taken by her cell phone that appears in her Google Photos is from February 1, 2024,

at approximately 8:27 p.m.   Notably, between December 18, 2023, and February 1, 2024, the Victim conducted multiple web searches for divorce attorneys in South Florida, as well as research into the division of marital assets. In November 2023, the Victim's Google account saved approximately 4515 communication and media records; in December 2023, the Victim's Google account saved approximately 6780 communication and media records; in January 2024, the Victim's Google account saved approximately 5359 communication and media records; however, in February 2024, the Victim's Google account only saved approximately 325 communication and media records, and then abruptly stopped after February 2, 2024.

### vii.   Gym Membership

The Victim also had a gym membership for a gym in Madrid, Spain.  The Victim went to the gym multiple times in the month of January 2024.  She last went to the gym on January 27, 2024. Additionally, the Victim was a regular user of the Jefit fitness application. She created her account in December of 2015 and last used it on January 24, 2024. The Victim logged 132 workouts in 2023.

### viii.   Bank Accounts

Law enforcement has done an analysis of the Victim's various bank accounts. On February 2, 2024, the Victim purchased flowers in Madrid in the afternoon.  This is the last non-automatic purchase on the Victim's accounts, aside from activity that the Defendant's brother Ugljesa Knezevic is responsible for.

### 8. The Defendant Employed Others to Obstruct the Investigation and Impersonate the Victim

After the Victim disappeared, and before the Defendant was arrested, the Defendant directed one of his employees ("Employee 1") to contact an insurance carrier and bank to

impersonate the Victim for the purpose of changing account information. On or about March 4, 2024, Employee 1 contacted an insurance carrier pretending be the Victim and requested that three insurance policies held by the Victim for her and the Defendant's business be cancelled. The insurance policies related to vehicles that were used by the business. Then, on or about April 24, 2024, Employee 1 advised law enforcement that the Defendant again instructed Employee 1 to impersonate the Victim—this time, to change the bank account receiving deposits for one of the Defendant and the Victim's businesses. To do so, the Defendant provided Employee 1 with the Victim's social security number to use as proof that she was the Victim. Thereafter, on or about April 26, 2024, during a recorded controlled call with the Defendant, Employee 1 advised the Defendant that she was uncomfortable impersonating the Victim because the Victim was missing. In response, the Defendant told Employee 1 that this was not serious and that it needed to be done for the employees to be paid. The Defendant further stated, "I cannot call with my voice because I sound like a guy."

In June 2024, the month following the Defendant's arrest in this case, law enforcement searched the Defendant parents' home for evidence related to the Victim's disappearance. The search occurred after law enforcement learned that the Defendant's landlord for his Serbian apartment had turned over property, which law enforcement later learned included a laptop, that David had left behind in the apartment to his parents. During the search, law enforcement viewed Facebook messages in the Defendant's mother's iPad from Ugljesa. On or about May 30, 2024, Ugljesa sent his mother a message asking, "can you turn on his comp?" On or about June 1, 2024, Ugljesa sent a message stating, "[G]ood morning, can you turn on the computer?" His mother responded, "right away[.]" In response, Ugljesa stated,

"[I]'m done, the computer is empty just put it to charge[.]"[5] Law enforcement is aware that software and programs are available that allow an individual to remote wipe or delete all stored data across numerous device platforms, such as laptops, tablets, or cellular devices.

Additionally, in June 2024, Ugljesa was added as an authorized user to one of the Victim's corporate American Express accounts and received a card for use. The same month, in a series of recorded phone calls, a male who identified himself as "Ugljesa Knezevic" called American Express to activate the card and later to make payments on the card. During these calls, the caller provided personally identifiable information for Ugljesa, the Defendant, and the Victim for identity verification purposes, including the complete social security numbers of Ugljesa and the Defendant, and the last four digits of the Victim's social security number. In one particular call, the caller agreed and then appeared to alter his own voice in an effort to sound as if he was the Victim during various points of the call. After pretending to be the Victim on the phone, the American Express representative asked for information from the Victim's credit card and the caller stated that, "She doesn't even have that card—she was actually trying to get you to send out another one."

On October 21, 2024, while in custody the Defendant called Ugljesa via the BOP prison phone system. The call was recorded. When the Defendant is connected to the call with Ugljesa, Ugljesa can be heard having a separate phone conversation pertaining to his attempt to access a "business account" online. The other party on the call asked Ugljesa for his name, and he advised that it was David Knezevich. Ugljesa advised that he was calling to confirm his identity because he was locked out of the account and cannot get access to his account online. The representative on the line asks if it is okay to ask him questions to confirm

---

[5] The messages in this paragraph were translated into English from Croatian.

his identity.   The Defendant is heard saying, "excellent" immediately after.   The representative told Ugljesa that he would receive a one-time passcode and asked him for his mobile number.   Ugljesa provided (954) 634-2104, which has been the Defendant's phone number from as early as October 2023, until his arrest. Seconds later, Ugljesa repeats the confirmation code (347530) to the representative.   Ugljesa providing the confirmation code to the representative demonstrated that he has access to an electronic device that receives notifications that are sent to the Defendant's cell phone number.

### 9. The Defendant's Murder Mindset

On May 8, 2024, a federal search warrant was executed on the Defendant's Fort Lauderdale residence. In a drawer of the computer desk in the Defendant's locked home office, law enforcement found a notebook that contained the following quotes, as well as other writings in both English and Serbian:



### 10. The Defendant Planned the Murder Before He Left the United States

The Defendant's Google cloud account revealed a number of suspicious searches during the month leading up to the Victim's murder. On January 2, 2024, the Defendant

searched "no plan survives first contact with the enemy." On January 8, 2024, the Defendant searched "mixing bleach and ammonia chemical reaction." On January 14, 2024, the Defendant searched directions to Tara National Park, Serbia, from Madrid, Spain, and directions to Los Pirineos, Spain, from Madrid, Spain. On January 25, 2024, while in the Fort Lauderdale area, the Defendant purchased heavy duty stretch wrap and duct tape from Home Depot; a laptop from Best Buy; and withdrew $10,000 cash from the bank. The next day, on January 26, 2024, the Defendant purchased a piece of wall art on Etsy to be sent to the Victim at her Madrid apartment with a message that stated, "The flame that burns in your hearth is beautiful. Do not let anyone extinguish it." In a note to the seller, the Defendant asked, "What is the fastest shipping you can get to Spain?"[6]

## II.   Applicable Law

In moving for pretrial detention, the government must establish that the defendant is a danger to the community by clear and convincing evidence *or* a flight risk by a preponderance of the evidence. *United States v. King*, 849 F.2d 485, 489-91 (11th Cir. 1988). The government need only demonstrate one or the other to justify detaining the Defendant pending trial. *Id.* at 488. In determining whether there are conditions of release that will reasonably assure the Defendant's appearance as required and safety of the community, the court must consider several factors, including the nature and circumstances of the offense charged; the weight of the evidence against the defendant; the defendant's history and characteristics; and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

---

[6] On February 16, 2024, the seller cancelled the transaction for an unknown reason.

Upon being ordered detained pending trial, a defendant may move to revoke his order of detention. *See* 18 U.S.C. § 3145(b). The district court must conduct a *de novo* review of the detention determination. *See United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985); *United States v. Niles*, 874 F. Supp. 1372, 1374 (N.D. Ga. 1994) (citing *King*, 849 F.2d at 490). Review by the district court contemplates an "independent consideration of all facts properly before it." *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) (citing *Hurtado*, 779 F.2d at 1480-81). After such review, the district court is free to adopt the magistrate's recommendation that pretrial detention is necessary based on the same or different underlying legal conclusions or factual findings of the magistrate court. *Id.* at 491. If the district court concludes that the magistrate's "factual findings are supported and that the magistrate's legal conclusions are correct," "[t]he court may then explicitly adopt the magistrate's pre-trial detention order." *King*, 849 F.2d at 490. However, if the district court finds that pretrial detention is necessary but (1) considers evidence which was not considered by the magistrate; or (2) adopts the magistrate's recommendation that pretrial detention is necessary but disagrees with any of the magistrate's legal conclusions or factual findings, the court must state its reasons in writing. *Id.* at 491.

"The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information" at a detention hearing. 18 U.S.C. § 3142(f). Both the government and defense may proceed by proffering evidence subject to the discretion of the presiding judge. *Gaviria*, 828 F.2d at 669; *see also U.S. v. Hernandez*, 778 F.Supp.2d 1211, 1220 (D.N.M. 2011) (holding that the Confrontation Clause doesn't apply to pre-trial detention hearings) ("Before *Crawford v. Washington*, courts held that the Confrontation Clause did not attach to detention hearings. Nothing in the Supreme Court's opinion in

*Crawford v. Washington* undermines those holdings. Moreover, what authority exists after *Crawford v. Washington* rejects the proposition that *Crawford v. Washington* applies outside of trial."); *United States v. Bibbs*, 488 F.Supp.2d 925 (N.D.CA. 2007) (holding that the defendant didn't have Sixth Amendment right to confront witnesses at detention hearing); *see also Peterson v. California*, 604 F.3d 1166 (9th Cir. 2010) (concluding that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause because the right to confrontation is a trial right); *United States v. Mitchell-Hunter*, 664 F.3d 45, 52 (1st Cir. 2011) (holding that the defendant did not have a confrontation right in a pretrial jurisdictional hearing). Further, a pretrial detention hearing is "not designed to afford defendants a discovery device." *Gaviria*, 828 F. 2d at 669 (citation omitted).

### III.   Argument

#### A. This Court should continue to detain the Defendant because he is both a flight risk and danger to the community.

##### 1.   Nature and Circumstances of the Offenses Charged

First, the nature and circumstances of the charged offenses demonstrate that the Defendant is a callous killer, who will do anything to get what he wants even if that means taking the life of another. The Defendant's cold, cunning, and calculated conduct in this case, coupled with his understanding that he will spend the rest of his life in prison if convicted weighs heavily in favor of detention in this case. The Defendant poses the ultimate risk of flight and danger to the community. Since the second detention hearing, the Defendant has been indicted by a federal grand jury with the most serious crime known in our system of justice and a "prototypically violent crime." *Hylor v. United States*, 896 f.3d 1219, 1223) (*citing* James *v. United States*, 550 U.S. 192, 208, 127 S. Ct. 1586 (2007), *overruled in part on other grounds, Johnson II*, 135 S. Ct. 2551, 2562 (2015)). Although the United States has waived the

death penalty, if convicted of Counts 1 or 2, the Defendant faces mandatory life imprisonment. 18 U.S.C. § 1119, 1111, 1201(a). Further, not only is the Defendant charged with murder, but among the varying degrees of murder, the Defendant is charged with the most dangerous form—premeditated murder. The Defendant didn't kill his wife in the heat of passion. Rather, he carefully planned and executed her demise over the course of weeks, because of greed. The Defendant didn't want to share the money they made together over their almost 13-year marriage, so he murdered her because, in his mind, "Death solves all problems. No man. No problem." And now, the Victim's family is left devastated, mourning their loved one, and fearful that they may be next. (Exhibit 2, Victim's Brother's Letter to Court).

The Defendant urges the Court to release him under the same conditions that the district court imposed in *U.S v. Jones*, 143 F.Supp.3d 78 (W.D.N.Y. 2015), a wire fraud and money laundering case. (DE 147, page 15). This is not a financial crime case. The Defendant is charged with killing his wife under the most deceptive and diabolical circumstances, and for that he is facing mandatory life imprisonment. From what undersigned counsel can tell, there have only been five other substantive foreign murder prosecutions, not including conspiracies, brought in the United States under 18 U.S.C. § 1119. *United States v. Brimager*, 13-CR-2381 (S.D. Cal.) (defendant charged with killing his romantic partner); *United States v. Rudolph*, 22-CR-12 (D. Colo.) (defendant charged with killing his wife); *United States v. Wharton*, 00-CR-50066 (W.D. La.) (defendant charged with killing his wife), *aff'd*. in 320 F.3d 526 (5th Cir. 2003); *United States v. White*, 97-CR-172 (E.D. Cal. 1997) (defendant charged with killing adopted son); *United States v. Rozario*, 24-CR-00185 (S.D.N.Y.) (relationship between defendant and victim unknown). Four of the five cases involved the murder of either

an intimate partner or family member, and the defendants in all five of the cases were detained. The Defendant should likewise be detained.

2. <u>Nature and Seriousness of the Danger to any Person or the Community if the Defendant is Released</u>

The Defendant has shown that he is capable of methodically implementing a criminal plan, complete with countermeasures to avoid detection. For example, the Defendant knew that he would have to use his Serbian passport to enter the European Union in Croatia, and that there would be a record of that, so he created an alibi by renting an Airbnb in Croatia and leaving his Serbian and American iPhones powered on to receive communications so that it appeared that he was in Croatia, when in reality he had traveled to Spain to kill his wife. The Defendant's covert travel from the United States to Spain, by flying to Serbia, and then driving a rental car with stolen license plates, newly tinted windows, and markings removed, through multiple countries to the Victim's Madrid apartment, was almost foolproof. If it weren't for the SNP's collection of cell phone data from the Defendant's known locations in Madrid to identify commonalities, perhaps we wouldn't be here. The Defendant even used the Victim's cell phone number with one of his old cell phones to make it look like the Victim sent the last messages from her phone. Having the Defendant's new girlfriend translate messages into Colombian Spanish so that he could impersonate the Victim to trick her friends and family into believing that she was still alive so that they didn't go looking for her, was both calculated and diabolical. The Defendant's criminal conduct exhibited a high level of sophistication and creativity, which is a dangerous combination when dealing with a man charged with murder, released into the community, and highly motivated to do whatever necessary to avoid spending the rest of his life in prison.

Moreover, the Defendant has shown that he will use and manipulate others to do his dirty work. The Defendant has used one of his employees and his family members to manipulate accounts associated with the Victim and perhaps destroy evidence. The Defendant has no regard for the law, and this Court should have no confidence that he would respect and abide by the Court's orders if released. The Defendant being placed on home confinement would not prevent him from again employing others to make necessary preparations for him to flee or tamper with witnesses or evidence. Home confinement with electronic monitoring is also not going to prevent the Defendant from removing the monitor and fleeing, or worse, hurting someone standing in the way of his freedom. If the Defendant removed his monitor, by the time law enforcement would be able to act, it would be too late.

The Defendant offers to sign a waiver of extradition if he is released, however such a waiver would not reasonably assure his appearance if he flees. Undersigned counsel has conferred with the Department of Justice's Office of International Affairs, who advised that a proactive waiver of extradition is generally useless because a defendant has to waive extradition *during* the pendency of the extradition proceedings in which he is arrested pursuant to the extradition request. Additionally, while the United States has an extradition treaty with Serbia, and while the treaty allows for extradition of their citizens to the United States, Serbia has not been a cooperative extradition partner in practice. Therefore, if the Defendant flees to Serbia, it is extremely unlikely that Serbia will extradite him to the United States. Finally, if he flees to a country without an extradition treaty with the United States then a waiver of extradition will not secure his return.

The Defendant argues that since he voluntarily returned to the United States from Serbia "to attend to business matters" knowing that he was under investigation, that he's not a flight risk. (DE 147, p. 15). The fact that the Defendant returned to the United States does

24

not mitigate his risk of flight. There is no reason to believe that he knew that he could be prosecuted in the United States for a murder that occurred in Spain. In fact, the evidence suggests that his understanding was that the FBI was assisting the Spanish in locating the Victim. On February 15, 2024, when the Defendant messaged the Victim's brother complaining about him talking with the media, the Defendant stated, "You wanna guess what kind of conclusions they made after you people said how I don't want to go to Madrid to look for her?," "4 law firms I called trying to find one that would tell me it is ok to go there. None said so. I have no rights there (not Spanish citizens), don't speak the language, don't understand how the system works, no representation, no nothing," "Even Diane, said under no circumstances for me to go to a foreign country like that," "You have some expectation like I'm sort of bounty hunter. You have FBI, Interpol, Judicial police, all working on this. But no, wait, they need me to find her." And, even if the Defendant did know that he could be prosecuted in the United States, he knew the elaborate steps that he took to conceal his crimes and he knew that the Victim's body hadn't been found. Further, returning to the United States while under suspicion is very different than remaining in the United States knowing that he's been charged with a crime that carries mandatory life imprisonment if he's convicted.

### 3. Weight of Evidence

Although the Victim's body has still not been recovered, the evidence against the Defendant has strengthened substantially. The evidence clearly establishes that the Defendant murdered the Victim, engaged in conduct to conceal and disguise the Victim's death by destroying and disposing of her body and physical evidence connected to her death, and then manufactured a cover story to explain her disappearance.

During the detention hearings, the Magistrate Court stated that he couldn't find that

the Defendant was a danger to the community because the case was "too circumstantial." Although the case is largely circumstantial, the evidence of the Victim's murder is clear. There is no legal difference between direct and circumstantial evidence. In other words, circumstantial and direct evidence are weighed the same. *See* Eleventh Circuit Pattern Jury Instructions, Basic Instruction 4 ("You shouldn't be concerned about whether the evidence is direct or circumstantial. Direct evidence is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence") (internal quotations omitted); s*ee also United States v. Clark*, 506 F.2d 416 (5th Cir. 1975), *cert. denied*, 421 U.S. 967, 95 S. Ct. 1957, 44 L. Ed. 2d 454 (1975) approves the substance of this instruction concerning the lack of distinction between direct and circumstantial evidence; *see also United States v. Barnette*, 800 F.2d 1558, 1566 (11th Cir. 1986), *reh'g denied*, 807 F.2d 999 (11th Cir. 1986), *cert. denied*, 480 U.S. 935, 107 S. Ct. 1578, 94 L. Ed. 2d 769 (1987) (noting that the "test for evaluating circumstantial evidence is the same as in evaluating direct evidence") (citing *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982)).

Indeed, the circumstantial nature of this case was by the *Defendant's design*, and he shouldn't benefit from his disposal of the Victim's body to escape accountability for his crimes. Indeed, courts have repeatedly held that "[t]he recovery of the victim's body is not necessary to prove murder beyond a reasonable doubt." *See United States v. Russell,* 971 F.2d 1098, 1110 (4th Cir. 1992), *as amended* (Aug. 12, 1992) (affirming murder conviction where all evidence was circumstantial and wife's body was never found); *see also Virgin Islands v. Harris,* 938 F.2d 401, 411 (3d Cir.1991) ("Historically, the production of the body of a missing

person was generally not required under the common law in order to establish the corpus delicti for homicide."); *Epperly v. Booker*, 997 F.2d 1 (4th Cir. 1993) (affirming first-degree murder conviction where victim's body and murder weapon were never found, and the defendant never confessed); *United States v. Gibert, et al.,* 25 F.Cas. 1287, 1290 (C.C.D.Mass.1834) (No. 15,204) ("That there ought to be no conviction for murder, unless the murdered body is actually found ... [is a] proposition [that] certainly cannot be admitted as correct in point of common reason, or of law, unless courts of justice are to establish a positive rule to screen persons from punishment, who may be guilty of the most flagitious crimes.... [A] more complete encouragement and protection for the worst offences of this sort could not be invented, than a rule of this strictness."). Furthermore, "the prosecution need not prove exactly *how* a murder was committed or what instrumentalities were used to dispatch the victim." *Klindt v. Thalacker*, 1998 WL 34114573, at *8–10 (N.D. Iowa Apr. 29, 1998).

4.   The History and Characteristics of the Defendant

The Defendant's significant foreign ties, lack of ties to this District, and assets also make him a serious risk of flight. Despite the Defendant advising Pre-Trial Services that he "relinquished his Serbian citizenship" (PTS Report at 1), and suggesting that he was not a dual citizen and representing that his Serbian passport was expired at his first detention hearing (DE 43-1 at 24:15-25:20), the Republic of Serbia has unequivocally advised that the Defendant "is a citizen of the Republic of Serbia and has an active passport, with an expiration date of 09/17/2032. *See* (Sealed Exhibit 4 to DE 52). Further, the Defendant's parents live in Serbia and he had an apartment in Serbia just prior to his arrest.

The Defendant's financial means also give him the ability to flee to avoid criminal prosecution. As of December 2024, the Defendant has available cash in bank account balances of approximately $32,248; approximately $14,160 in available credit; balloon mortgage payments due to him by March 1, 2025, in the amount of $718,314; escrow account balances held on his behalf with Real Title Insurance Agency, LLC ("Real Title") totaling approximately $123,532; the Defendant owns four motorcycles with an estimated net value of at least $17,140; and owns three properties with an estimated net value of approximately $1,226,838. *See* (Exhibit 3, Declaration of Forensic Accountant). Based on his evasive conduct in this case, and his ties to Serbia, it is also reasonable to believe that the Defendant may have foreign assets that we are not aware of.

**B. Continuing the Trial to June 2025 Doesn't Warrant the Defendant's Release**

The Defendant argues that he should be released because the trial was continued until June 2025, and the Government's delays violate his due process and speedy trial rights. (DE 147, p. 8). The Defendant cites intentional delays by the Government to investigate its case and failures by the Government to "obtain and provide discovery." (*Id.* at p. 8-9). The delay at issue is an additional four months from the February 2025 trial date that the Defendant agreed to. (DE 77). All other time that the Defendant has been in custody is properly excluded from the speedy trial calculation based on the reasons stated in the Government's speedy trial report. (DE 120). The Defendant, through Defense Counsel, now claims that the Government is "highly disingenuous" in filing a speedy trial report that excluded from the calculation the time periods resulting from joint continuances. (DE 147, p. 9). The Government has grown weary of the constant barrage of baseless misconduct allegations from Defense Counsel. What is highly disingenuous is Defense Counsel now arguing that the Government improperly

excluded time from the speedy trial calculation when Defense Counsel *expressly agreed* to the Government's calculation. (Exhibit 4, Email).

Defense Counsel's claims that the Government has not complied with its *Brady* obligations are similarly untrue, and frankly frustrating. Since the inception of this case, the Government has engaged in a discovery practice that extends far beyond what the law requires. As soon as reports and other documents are received, including *Jencks* statements by witnesses, which Defense Counsel knows that they are not legally entitled to at this stage, the information has been processed and provided to Defense Counsel. The Government has provided contact information for all of its witnesses, at the Court's direction. The Government even included the Defendant's request to view the Victim's apartment in an MLAT request to Spain despite Defense Counsel having the ability to separately petition the Spanish Judge. In many instances, Defense Counsel has improperly used the Government as its pseudo-investigator to obtain items of information not in the Government's possession. Rule 16 does not obligate the United States to "take action to discover information which it does not possess." *United States v. Badonie*, 2005 WL 2312480, at *2 (*quoting United States v. Tierney*, 947 F.2d 854, 864 (8th Cir. 1991)) (internal quotation marks omitted). Nor is the United States required to secure information from third parties. *See United States v. Gatto*, 763 F.2d 1040, 1048 (9th Cir. 1985) (holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control). The government is only required to disclose exculpatory materials to the defense "[i]f [the] federal prosecutor has knowledge of and access to exculpatory information as defined in *Brady*." *United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989); *see also United*

*States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) ("The prosecution must only reveal information that it had in its possession or knowledge—whether actual or constructive.").

While knowledge or possession by the prosecutor "includes materials in the hands of a governmental investigatory agency closely connected to the prosecutor," *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003), a "prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially [exculpatory information] every time a criminal defendant makes a *Brady* request[.]" *Brady* does not require the government to conduct discovery on the defense's behalf. *See United States v. Baker*, 1 F.3d 596, 598 (7th Cir. 1993) ("Certainly, *Brady* does not require the government to conduct discovery on behalf of the defendant."). However, the Government acknowledges the difficulties in obtaining foreign discovery, and so it has assisted Defense Counsel despite not being legally required to. In fact, the Government's assistance has even extended to obtaining domestic records for the Defendant. For example, Defense Counsel expressed interest in obtaining the contents of the Victim's Bumble account and the Government went so far as to obtain a federal search warrant for the account to provide to the Defendant despite not deeming the account relevant to its own investigation.

The Government understands the Defendant's frustration in having to wait for the MLAT responses, however Congress clearly understood the challenges in obtaining foreign evidence when it provided courts with a basis to exclude periods of delay under the Speedy Trial Act when a party is seeking evidence from a foreign country:

> Any period of delay, not to exceed one year, ordered by a district court upon an application of a party and a finding by a preponderance of the evidence that an official request, as defined in section 3292 of this title, has been made for evidence of any such offense and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such a foreign country.

18 U.S.C. § 3161(h)(8). The Government filed its application with the Court on December 18, 2024 (DE 121). The Court ultimately granted the Government's motion to continue, finding that the ends of justice served by granting the continuance outweigh the interests of the defendant and the public in a speedy trial. (DE 140). 18 U.S.C. § 3161(h)(7). Finally, by the time the Defendant's trial begins, he will have been detained for 13 months, which appears to be in line with the duration of other cases in our district with capital charges. *United States v. Daniels, et al.,* Case No. 23-CR-20431-ALTMAN (defendants detained for kidnapping resulting in death; trial took place 13 months after defendants were charged); *United States v. Singh, et al.,* Case No. 23-CR-20483-ALTMAN (defendants detained for kidnapping resulting in death; trial currently scheduled 18 months after defendants were charged); *United States v. Mentor, et al.,* Case No. 11-CR-20351-GRAHAM (defendants detained for murdering a federal employee and carjacking resulting in death; trial took place 16 months after defendants were charged). The Capital Case process in murder prosecutions alone can cause significant delays. In this case, through the exercise of diligence, the Government obtained a death penalty waiver in approximately one month's time. This case has been complicated significantly due to the amount of foreign evidence involved, which of course was a situation created by the Defendant for the purpose of evading detection. The Government will continue to diligently push forward to ensure trial readiness by the June 2025 trial date.

## IV.    Conclusion

Accordingly, the Defendant's meager ties to this district are substantially outweighed by the mandatory life sentence the Defendant is facing, for the cold, calculated, and premeditated killing of the Victim, his foreign ties, substantial assets, and inclination to use whatever means necessary to escape accountability. The record clearly supports both of the

Magistrate Court's findings that the Defendant is a serious risk of flight, as well as establishes that the Defendant's danger to the community. Wherefore, the United States respectfully requests that the Defendant's Motion to Revoke Detention Order (DE 73), and Renewed Motion for Bond (DE 147) be denied.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

**Jessica Kahn Obenauf**
Jessica Kahn Obenauf
Assistant United States Attorney
Florida Bar No. 0052716
U.S. Attorney's Office
101 S. U.S. Hwy 1, Fort Pierce, FL 34950
(772) 293-0981 | Jessica.Obenauf@usdoj.gov

**Lacee Elizabeth Monk**
Lacee Elizabeth Monk
Assistant United States Attorney
Florida Bar No. 100322
U.S. Attorney's Office
99 N.E. 4th Street, Miami, FL 33132
(305) 961-9427 | Lacee.Monk@usdoj.gov