UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cr-20201-KMW

UNITED STATES OF AMERICA,

v.

DAVID KNEZEVICH,

    Defendant.
_____/

## RESPONSE TO SEARCH WARRANT AFFIDAVIT ALLEGATIONS AND REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITON TO RENEWED MOTION FOR BOND

David Knezevich ("Knezevich"), through undersigned counsel, submits this Response to Search Warrant Affidavit Allegations as well as Reply to Government's Response in Opposition to Renewed Motion for Bond.

Knezevich's Renewed Motion for Bond is pending before the Court (D.E. 147). The Government has filed its Response in Opposition to Knezevich's Renewed Motion for Bond (D.E. 157). The Court has informed the parties that the January 10, 2025 Affidavit in Support of an Application for Search Warrant ("Search Warrant Affidavit") (D.E. 146; 146-1) relating to the search of Knezevich's brother's ("U.K.") electronic devices is pertinent to the Court's consideration of Knezevich's bond application. Knezevich received a copy of the Search Warrant Affidavit on February 3, 2025 when the affidavit was ordered unsealed by the Court (D.E. 159). This pleading addresses the allegations contained in Search Warrant Affidavit as well as submits Knezevich's Reply to the Government's Response in Opposition to Knezevich's Renewed Motion for Bond.

## I. SEARCH WARRANT AFFIDAVIT ALLEGATIONS

The Court identified twelve paragraphs from the Search Warrant Affidavit (¶¶ 26-38) that presented allegations significant to the Court's consideration of Knezevich's Renewed Motion for Bond. Since merely being the brother of a defendant charged with a criminal offense is insufficient to establish probable cause to search the defendant's brother's electronic devices, the Search Warrant Affidavit sought to cast U.K. as participating in alleged improprieties relating to Knezevich.

The twelve paragraphs sought to paint a picture of U.K.'s complicity in efforts to tamper with evidence, obstruct justice, and commit fraud. Not only are those allegations meritless, they are based on starkly unsupported assumptions and speculation. Even more concerning, the Search Warrant Affidavit is saturated with inaccurate and incomplete information that could easily have been rectified with the most basic of investigation. As a result, the Search Warrant Affidavit presents an inaccurate montage, when in fact there has been no tampering of evidence, no obstruction of justice, and no fraud committed. *See* Declaration of U.K. (**Exhibit A**).

Markedly missing from the Search Warrant Affidavit's attempt to define U.K.'s activity as nefarious is the fact that days after Knezevich's May 4, 2024 arrest, Knezevich signed authorization for his brother to be his Power of Attorney (Ex. A at ¶ 11). That Knezevich would select his brother to be entrusted with authority to act on Knezevich's real and legitimate affairs while Knezevich was incarcerated is hardly villainous. Unfortunately, the Search Warrant Affidavit fails to include this readily available fact that is patently inconsistent with the image of rogue brothers seeking to tamper with evidence, obstruct justice, and commit fraud.

The Search Warrant Affidavit also omits the challenges which Knezevich's brother faced with his Power of Attorney responsibilities. While incarcerated, as the Government well knows,

Knezevich's identity was stolen, his credit ruined, his business cratered, his home broken into, and his mail stolen (Ex. A at ¶¶ 12-14). It has been Knezevich's brother's obligation to deal with each of these unforeseen issues, while tending to Knezevich's financial and personal issues during his nine-month detention. And all of this while Knezevich faces murder charges, with his assets frozen, and Ana Knezevich's family seeking to prevent Knezevich from being represented by a fully funded defense team.

As will be discussed *infra*, all the activity cited in the Search Warrant Affidavit, other than the family trip to Portugal and Spain, was performed by Knezevich's brother either as Power of Attorney, or in his role as assisting Knezevich's trial team in trial preparation. And when those activities are viewed in their full and complete context, there is no credible real evidence of evidence tampering, obstruction, or fraud.

### FAILED ATTEMPT TO QUESTION U.K.'s VERACITY (¶ 26)

Needing to establish the appearance of U.K. being complicit in alleged wrongdoing, paragraph 26 of the Search Warrant Affidavit seeks to paint a scenario of U.K. falsely representing to law enforcement his relationship with Knezevich. Not only does paragraph 26 fail to offer any facts to support its contrived innuendo, it inadvertently provides support to Knezevich's assertion that he is not a risk of flight.

The Search Warrant Affidavit claims that when the FBI contacted U.K. on March 8, 2024, U.K. represented that he and Knezevich had been estranged until U.K. had recently contacted Knezevich concerning reports of Ana Knezevich being missing. The Search Warrant Affidavit erroneously attempts to suggest that U.K.'s estrangement claim was false since U.K. was the first person Knezevich contacted after his arrest a few months later, and at that time Knezevich asked U.K. to relay messages to their family. Obviously, the Government's claim of U.K.'s complicity

3

is strengthened if U.K. lied about the brothers' estrangement. However, the mere opinion of an FBI agent without even a scintilla of supporting evidence is nothing more than rank speculation. Most troubling is the fact that the Government appears to have not conducted any investigation whatsoever to locate evidence to support its speculation. Had the Government actually investigated, instead of spouting speculation to support its imagined narrative, the Government would have learned that the Knezevich brothers had in fact been estranged for years before the February 2024 contact. (Ex. A at ¶¶ 6-8). Moreover, the messages U.K. was to relay to family related to David's arrest, his detention, and what that would mean as far as communicating with David going forward. (Ex. A at ¶¶ 9-10).

The Search Warrant Affidavit supports that Knezevich is *not* a risk of flight by referring to certain alleged pre-arrest conversations between Knezevich and U.K. related to Knezevich's potential arrest (D.E. 146-1 at ¶ 26), clearly manifesting Knezevich's understanding that an arrest *was* possible when returning to the United States. This is the antithesis of being a risk of flight. Moreover, making arrangements to have one family member contact another family member should an arrest occur is hardly evidence of complicity in wrongdoing.

### U.K. PAYMENTS TO INMATES WERE NOT NEFARIOUS (¶¶ 27-32)

Without any evidence of inappropriate conduct resulting from U.K.'s communications with Knezevich, there could be no finding of Probable Cause to support issuance of a search warrant of U.K.'s electronic devices. Since the Government lacked any evidence of misconduct resulting from communications that led to the depositing of funds in the commissary accounts of jail inmates, the Government in the Search Warrant Affidavit sought to substitute conjecture and speculation for evidence. The Search Warrant Affidavit insinuates that U.K.'s payments to certain inmates on Knezevich's behalf were for contraband, to allow Knezevich to use inmates' phone

4

accounts for an improper purpose, or to employ inmates to tamper with evidence or witnesses. (D.E. 146-1 at ¶ 32). As discussed below and in U.K.'s Declaration, this is patently false.

U.K. does not deny that he placed or attempted to place funds into the jail commissary accounts of individuals listed in the Search Warrant Affidavit. (Ex. A at ¶ 15). Without any factual or evidentiary support, the Search Warrant Affidavit speculates that these payments in June 2024 were for improper purposes. Once again, the Government seeks to employ guesswork and speculation to support its theme of nefarious conduct, rather than investigation. Like the failure to investigate U.K.'s claim of estrangement with Knezevich, the Government failed to employ any of the multiple investigative means available to it to make a factual determination. There can be no doubt had the Government uncovered actual evidence of one act, one syllable, or one breath of illicit conduct arising from the commissary payments that would have been included in the Search Warrant Affidavit. The only logical conclusions are that the Government sought and did not obtain any evidence to support its baseless speculation, or just as disturbing the Government never bothered to investigate.

### NO ATTEMPT WAS MADE TO TAMPER WITH EVIDENCE INVOLVING KNEZEVICH'S COMPUTER (¶¶ 33-34)

The Search Warrant Affidavit claims that U.K.'s messages with his mother concerning Knezevich's laptop computer, and the alleged disappearance of the laptop, established that U.K. had tampered with evidence. (D.E. 146-1 at ¶ 34). As discussed below and in U.K.'s Declaration, U.K. did not tamper with or dispose of any evidence. In fact, no evidence has been tampered with directly or indirectly by U.K. or Knezevich.

U.K. agrees that he remote-accessed a computer at their mother's home in Serbia in June 2024. The purpose of U.K.'s remote log-in was *not* to delete any information of evidence, but

5

rather to obtain log-in information for Knezevich's bank accounts and businesses, among other financial information. (Ex. A at ¶ 16).

Likewise, U.K. agrees that he sent his mother the messages described in the Search Warrant Affidavit. (*Id.*) The messages sent to his mother were not instructions to delete anything from the computer or an affirmation that anything had been deleted from Knezevich's computer. U.K. did not "wipe" the computer or delete anything from the computer. (*Id.*)

The translation of U.K.'s message, as the Government acknowledges, is: "I'm done, the computer is empty just put it to charge." (*Id.*) (emphasis added) The Government jumps to the (wrong) conclusion about this message. U.K.'s statement that "the computer is empty" related to the computer battery being dead, and the need for the computer to be charged. Had U.K.'s message related to the deletion of information from the computer there would be no need for the "just put it to charge" instruction. As U.K. states in his Declaration:

> In Serbian, this is how you say an electronic or a car or any other device is out of battery. That is why I also tell my mother to put it on the charger. This is just a translation issue. This does not mean the laptop was erased or anything was deleted. In Serbian, the sentence would be, "Obrisao sam sve," which is "I deleted [or erased] everything." In Serbian, delete or erase is a different word than empty.

(*Id.*) The inaccurate computer evidence tampering allegation reflects another instance of the lack of Government investigation. Not only did the Government not bother to seek facts, but it ignored facts it had within its possession. The Government spins U.K.'s involvement as nefarious conduct, but in truth U.K. was trying to assist his brother with financial matters. (*Id.*) The reason U.K. had Knezevich's Power of Attorney was he needed to be able to access Knezevich's personal and business bank information to manage his financial affairs. Knezevich's identity had been stolen, fraudulent charges were being attempted almost daily, and U.K. was the only one in a position to

6

assist. Knezevich's mother is disabled and extremely ill, while U.K. is in the United States, can visit Knezevich, and can assist with financial matters. That the computer was not located during the execution of the Serbian search warrant is not proof that it was disposed of or that someone tampered with its contents.

Early in the representation, it came to the attention of undersigned counsel (Jayne Weintraub) that Knezevich's laptop computer was in Serbia unprotected. Defense counsel believed that the laptop may contain information and potentially relevant evidence. Rather than allow the laptop to remain in Serbia, defense counsel promptly took essential steps to preserve evidence. Counsel sought to protect the integrity of Knezevich's laptop so that she could carry out her fundamental responsibilities in representing Knezevich. Consistent with her responsibilities in representing Knezevich as well as her professional obligations, defense counsel arranged to obtain and did obtain Knezevich's laptop.

The Search Warrant Affidavit makes allegations against U.K. concerning the laptop which are totally contrary to what defense counsel, from firsthand experience and observation, understood. Given these allegations, defense counsel immediately sought an independent expert examination of the laptop to determine whether the Search Warrant Affidavit accusations were supported by any fact whatsoever. The result of the independent forensic analysis confirms that no files were deleted by U.K. or anyone else on June 1, 2024 or surrounding dates. *See* **Exhibit B**, declaration from forensic analyst.[1]

Stripped of the Government's inaccurate speculation, combined with the independent forensic examination of the computer establishing the lack of June 2024 computer deletions, the

---

[1] Undersigned counsel will contact the Government to arrange and coordinate with the taint team, so that the Government can obtain the laptop and examine it to confirm the findings of the defense's forensic expert.

Search Warrant Affidavit allegation of evidence tampering is totally unsubstantiated. Not only did U.K. not tamper with evidence, but there was also no attempt to destroy evidence by *Knezevich*.

### U.K. IS NOT THE RECORDED CALLER ON THE PHONE WITH AMEX (¶ 35)

The Search Warrant Affidavit asserts that U.K. is captured on a recorded call with American Express impersonating Ana Knezevich, and states that he was not legitimately added to Knezevich's American Express account. (D.E. 146-1 at ¶ 35). The Search Warrant Affidavit is false.

U.K. *unequivocally denies* that he is the individual on the June 2024 recorded call with American Express. (Ex. A at ¶ 17). As stated during Knezevich's detention hearing, Knezevich's identity was stolen, his home was broken into, his mail was stolen, and there were many attempted fraudulent charges on his American Express account. U.K. filed police reports documenting these crimes. Knezevich's defense counsel informed the Government of these crimes against Knezevich in June 2024.[2] The supposed smoking gun recording of U.K.'s fraud is actually evidence of the fraud *against* Knezevich. That the Government failed to recognize the true nature of the recorded call is particularly disappointing. The fact that the Government has chosen to use this recorded call as a basis to establish probable cause in a search warrant, and now as a basis for Knezevich's continued detention, is even more disturbing.

First, the person on the recorded American Express call is not U.K. (*Id.*) The voice on the American Express call sounds *nothing* like U.K.'s voice. U.K. has a distinct voice and a strong Serbian accent. The difference between U.K.'s voice and the voice on the recorded American Express call is unambiguous. The voice on the recorded American Express call does not even have

---

[2] Defense counsel Weintraub contacted the Government (AUSA Monk) in June 2024 and advised her of the identity theft, burglary, and mail theft. AUSA Monk suggested that police reports and reports to the post office be made, both of which were done by U.K.

8

a Serbian accent, <u>and *not* pronounce U.K.'s name</u>, notably pausing for a long time before even attempting to say it. (*Id.*) The Government, with only the most superficial investigation, could have concluded that U.K. is not the individual on the recorded American Express call. The Government is in possession of recordings that include U.K.'s actual voice, such as the October 2024 call identified in the Search Warrant Affidavit. Given the affiant Agent's "training and experience," she should have known that the FBI has methods to compare voice samples, but it appears none of those methods were utilized. Instead, the FBI came to the absurd and false conclusion that the recorded caller is U.K. without any investigation at all, which is unsettling given what is at stake for Knezevich, and the seriousness of the allegations against U.K.

Second, by June 2024, U.K. had collected much of Knezevich's financial information, as his Power of Attorney. The recorded caller with American Express did not know *any* of the security questions and did not have access to any of the American Express cards. This is information U.K. would have been able to provide easily, had he been the recorded caller.[3] (*Id.*)

Third, U.K. routinely called financial institutions on his brother's behalf, sometimes with Knezevich on the line (as with the October 2024 recorded call discussed in the Search Warrant Affidavit). U.K. *never* disguised his voice on those calls. (*Id.*)

Fourth, any reasonable person, let alone a "trained and experienced" FBI Agent, listening to the content of the recorded American Express call, can easily discern that the call is an attempt to defraud Knezevich and American Express. The recorded caller seeks to make minimum payments on the American Express account so that American Express will unblock the account. The recorded caller is only interested in minimum payment amounts and total balances so that he can then go charge to this card far in excess of the minimum payments. When the recorded caller

---

[3] There are others in this case, who the FBI is aware of, with far more motive than U.K. to try and access Ana's finances.

9

could not locate a single card, access the mobile app, or get a single security question correct (despite being allowed an alarming number of attempts, coming after a ridiculous impersonation of a woman), the recorded caller hung up frustrated. This was pure fraud against Knezevich, which should have come as no surprise to the Government given defense counsel put them on notice of the events happening around the time of this call. Like the failure to investigate the prior allegations, the Government unfortunately failed to investigate this claim, and instead presented a fictional and speculative scenario concerning the call.

## U.K. REPORTED KNEZEVICH'S IPHONE AS "LOST OR STOLEN" FOR A LEGITIMATE PURPOSE (¶ 36)

U.K. reported Knezevich's iPhone as lost or stolen in June 2024. This was done for two reasons. First, as stated throughout this pleading, Knezevich's identity had been stolen and he was a target for fraud. U.K., having Power of Attorney, was charged with addressing these issues, including fraudulent Apple charges. (Ex. A at ¶ 18). Second, U.K. needed banking and other financial login codes to go to devices other than Knezevich's phone. (*Id.*) U.K.'s only motive in reporting Knezevich's device as stolen to Apple was to prevent any further fraud attempts against Knezevich and to get David's information on other devices. U.K., as a lay person, did not have any knowledge that reporting the device as stolen would have any impact on the Government's investigation (*id.*), which presumedly had been completed by the time Knezevich had been arrested. The Government's conclusion that U.K. *should have known* that Apple's policies, which kick in when a phone is reported lost or stolen, could prevent the FBI from accessing the phone lacks any factual support. Rather than evidencing any U.K. or Knezevich wrongdoing, this allegation represents the Government's desperation to paint U.K. as a wrongdoer.

It is worth noting that David's phone has been in possession of the Government **and locked since David's arrest on May 4, 2024**. The defense knows this because the Government said so

months ago during the evidence viewing at the FBI office. The Government remarked that David's phone had been locked and it had never been able to access it. The Government jokingly asked if the defense was willing to provide Knezevich's phone passcode. Thus, it appears that even if U.K.'s innocent actions might have locked the phone, that was the state it was *already in*, which the Government knows full well. Despite that knowledge, the Government includes this allegation in the Search Warrant Affidavit in desperation, to malign U.K. and to deflect the taint from its improper and illegal search and seizure of U.K.'s electronics at the border.

### U.K. CALLED CHASE BANK WITH KNEZEVICH FOR A LEGITIMATE PURPOSE (¶ 37)

Knezevich and U.K. both participated on this recorded call in October 2024. (Ex. A at ¶ 19). U.K. initiated a call with Chase Bank to gain access to the Orbitify LLC online business account. (*Id.*) Orbitify LLC is a company solely owned by Knezevich. (*Id.*) Once U.K. had Chase Bank on the call, he answered Knezevich's call from another line. (*Id.*) This call was done as part of U.K.'s Power of Attorney responsibility to assist the survival of Knezevich's businesses, including Orbitify, as well as fund Knezevich's expenses. (*Id.*) U.K. arranged this call with Knezevich's approval and Knezevich's participation. (*Id.*) Nothing associated with this call was nefarious or part of an attempt to obstruct justice or commit fraud. U.K. was never able to gain access to this business account. (*Id.*) U.K. was lawfully exercising his Power of Attorney, and to speculate, guess or theorize otherwise without any supporting evidence is at best, inappropriate.

### U.K. DID NOT VISIT MADRID OR TAMPER WITH ANY EVIDENCE DURING HIS FAMILY TRIP TO SPAIN AND PORTUGAL (¶ 38)

Review of the Search Warrant Affidavit reveals that most of the information relating to U.K. was "stale" as it related to the necessary probable cause to satisfy search warrant requirements. To overcome that infirmity, and to supplement its fictitious "searching for a ham"

pretext, the Government presented in the Search Warrant Affidavit a concocted and barren tale of U.K.'s alleged clandestine and surreptitious conduct while on family vacation.

The Government's suggestion that U.K. took two days of his family vacation with his wife and two minor children to tamper with evidence in Madrid represents the depths of the Government's imagination and creativity. The Government's fiction lacks evidentiary support, and the actual evidence refutes the Government's allegation.

Both U.K. and his wife were questioned by border patrol agents about what they had done and where they had been in Spain. As to the "two missing days" on January 4 and 5, 2025, where the Government cannot account for U.K.'s whereabouts in Spain, U.K. and his family were in Sevilla.[4] (Ex. A at ¶ 20). U.K. provides in his Declaration the full timeline of his trip, with hotel, Airbnb, and rental car receipts. (*Id.*) The only time U.K. and his family were not in Sevilla was when they rented a car and drove southwest (the opposite direction of Madrid) through Ronda to Malaga. (*Id.*) The fact that the Government states it could not account for two days is revealing. The Government could have obtained this information if it bothered to do *any* investigation or fact-finding prior to seeking this search warrant. Instead, as has become its pattern, the Government chose to rely on <u>pure speculation</u> to fuel a search warrant process that never should have been brought to a U.S. Magistrate to sign. It was nothing more than a thinly veiled attempt to conceal a pure pre-text plan to obtain evidence against Knezevich during a border stop.

## II.   **THE GOVERNMENT'S RESPONSE BRIEF**

The Government's Response in opposition to the Renewed Motion for Bond (D.E. 157) largely regurgitates the same arguments and allegations made previously as to why detention is

---

[4] If U.K. was being surveilled by foreign law enforcement during his family trip to Sevilla, presumably by the Spanish National Police, apparently even that was not done correctly or thoroughly.

required.[5] Many of the Government's allegations are disputable and there is strong contrary evidence.[6] Chief Magistrate Judge Torres has already found Knezevich is not a danger to the community.[7] The issue is risk of flight and the new allegations included in the Response, frankly, should not have any bearing on the decision of bond. The new allegations include: (1) allegations concerning U.K., addressed above (*id.* at 15-18); (2) allegations concerning Knezevich's alleged "murder mindset" (*id.* at 18); and (3) allegations concerning Knezevich's planning of the murders before he left the United States (*id.* at 18-19). As to the allegations regarding U.K., those are explained in his Declaration, and Knezevich has already shown why the Government's speculation and unfounded accusations should not prevent the Court from granting a reasonable bond.

---

[5] It is also worth noting the Government's inaccurate continued claims that it has gone above and beyond its discovery obligations in this case without any obligations to do so. While the Government has produced thousands of documents, that is in part because it has been *ordered* to do so by Chief Magistrate Torres and this Court. <u>Moreover, the defense still has not gotten important discovery that the Government told the Court was available</u>. An example is Ana Knezevich's Bumble messages. While the Government represented to the Court during the January 15, 2025 hearing that it had served a search warrant on Bumble and "[T]he defense can review that. So if there's some individual that the victim made contact with via Bumble -- or something that they find to be of evidentiary value -- they have that information available to them and they can go track that information down." (1/15/25 Hrg. Tr. at 14). **This is simply not true**. Bumble did not produce messages or identify any individuals in response to that search warrant (or previously when subpoenaed). Those communications have never been produced and will be the subject of an imminent filing by the defense.

[6] The response contains snippets of text chains and voice memos between the alleged victim and her friends. The defense has not yet received a copy of the alleged victim's Google account, but there are doubtless dozens of other communications, including a few the defense is already aware of, that are inconsistent with the messages included in the response. For example, at the last bond hearing on August 8, 2024, the defense played a recording of the alleged victim telling her friend that *<u>Knezevich had agreed to give her whatever she wanted in the divorce</u>*, contrary to the sworn testimony of an FBI Agent during a detention hearing and everything the Government cites on pages 4 and 5 of its response. It is the defense position that the Government should not be able to cherry pick messages, and the Court should order that the entire chains be provided to the defense before they are considered by the Court, and as part of the Government's discovery obligations. These messages contain statements of witnesses not produced by the Government, despite the Court's order to produce them.

[7] The Government appears to be trying to re-argue that Knezevich is a danger to the community contrary to Chief Magistrate Judge Torres' prior findings, and this Court adopting those findings. The Government had ample time to appeal Chief Magistrate Judge Torres' findings on danger to the community and never did. The Government should be precluded from re-litigating that now, especially in a response.

As to Knezevich's alleged "murder mindset," the evidence cited by the Government in support of that claim are three quotations from a notebook found in Knezevich's home in Fort Lauderdale: A quote from Emerson, a quote from Stalin, and quote from Churchill. There is no indication from the Government *when* these quotations were written. There is no proof they were written *by* Knezevich. Certainly, the FBI could have attempted to make some determination when these quotations were written and who wrote them before including this allegation in the Search Warrant Affidavit but chose not to. The Government would rather put the most nefarious spin possible on them, investigation and facts be damned. On information and belief, the defense can represent that Knezevich started writing in the two notebooks located in Fort Lauderdale when he was approximately 13 years old, *over 20 years ago*. The quotations are not disturbing in any way.[8] It is a truly incredible stretch to say these quotations reflect a "murder mindset."

Similarly, the allegations that Knezevich "planned the murder before he left the United States" includes a Google search for a popular military quotation, directions to national parks, the purchase of packing items that are not even alleged to have been used in commission of the crime, the purchase of a new laptop, and the withdrawal of cash[9] from the bank (ahead of a long trip out of the country).[10] None of this is suspicious let alone proof of planning a murder. More importantly, none of the foregoing indicates that Knezevich is a risk of flight. Just as the Government misled the grand jury for jurisdictional purposes into believing Knezevich flew from

---

[8] Simple Google searches show the Emerson quotation has been included in books, official military media posts on social media, and more. The Stalin and Churchill quotations relate to their differing leadership styles in war-time periods of history.

[9] The landlord in Serbia told the government that he was paid in cash equal to $2,200 monthly.

[10] The Government's interview of Knezevich's landlord revealed that Knezevich paid cash for rental of his Serbian apartment every month. For this reason alone, the Government's allegation that Knezevich withdrawing cash before returning to Serbia is proof of planning a murder should be dismissed outright as pure speculation.

14

the United States to Madrid, the Government continues to stretch reality to link the alleged crime to the United States.

Finally, the Government continues to insist that Knezevich should be given no credit for *voluntarily returning to the United States* because "[t]here is no reason to believe that he knew that he could be prosecuted in the United States[.]" (D.E. 157 at 24-25). This is simply not true, and for the Government to make this argument is troubling. The evidence, as *admitted* by the Government, is that Knezevich returned to the United States after speaking with criminal lawyer and learning he was a suspect in the case. (**Exhibit C**, transcript excerpt from hearing on August 8, 2024, at 74). Given the Agent's sworn testimony, for the Government to even try to downplay Knezevich's return is an insult to the integrity of the bond process.

In its response, the Government continues to cite cases in support of detention where the defendants all had lengthy prior records and were deemed to be a danger to the community. In one of the cases, the defendant was a fugitive. These cases are inapplicable as Knezevich has lived and worked in Broward County for almost twenty years with no prior record at all. Whether bond is appropriate depends on the facts of each case, and the facts here are totally different from the cases cited by the Government.

## **CONCLUSION**

This Court stated the obvious when it said that no one could credibly claim that the border search of U.K. and his family was to locate a ham being smuggled from Spain into the United States, and that U.K. was stopped only because he is Knezevich's brother. Now, with the unsealing of the Search Warrant Affidavit, it is clear that the fictions and inaccuracies surrounding U.K.'s search was not limited to the pretext "ham" story. Tragically, the Government's Search Warrant Affidavit unveils a litany of factual inaccuracies and deliberately uninvestigated false claims that

now reveal a totally fabricated scenario of witness tampering, obstruction of justice, and fraud. The Government persuaded a United States Magistrate Judge to sign this Search Warrant based on a web of speculation and untruths, rather than investigated, factual allegations. This is just one more example of the Government operating in this case outside usual norms in a criminal case, <u>beginning with its "reactive arrest" of a defendant who voluntarily returned to the jurisdiction</u>.

While the propriety of the search warrant is not at issue in this pleading, the unfounded and inaccurate allegations in the Search Warrant Affidavit have become the focus of the determination of Knezevich's bond motion. Knezevich's systematic dismantling of the false Search Warrant Affidavit will hopefully not only be an effective antidote but will also impress the Court of the Government's desperation to keep Knezevich detained at all costs. We are now over nine months since Knezevich was arrested and detained, trial is at a minimum four months away, and the Government still has not offered any true evidence that he is a flight risk. No matter how many times the Government "proffers" the circumstantial evidence it has in this case, the law remains that the weight of the evidence is the least important factor when it comes to risk of flight.[11] Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in favor of Knezevich.[12] There are conditions which exist that would guarantee Knezevich's continued appearance before this Court.[13]

---

[11] *See United States v. Kaplowitz*, No. 14-20323-CR, 2014 WL 2155231, at *5 (S.D. Fla. 2014) (Chief Justice Altonaga finding, "[T]he weight of the evidence is the least important of the various factors").

[12] *Kaplowitz*, at *4.

[13] *See U.S. v Jones*, 143 F.Supp.3d 78 (2015) (finding conditions of release sufficient to guarantee defendant's appearance, where defendant was found to be a risk of flight).

The Government's meager attempts to muddy the waters with these allegations should not prevent Knezevich's application for bond.[14] Knezevich respectfully requests that he be granted reasonable bond, consistent with the relief sought in his renewed motion (D.E. 147). Nothing in the Search Warrant Affidavit or the Government's response should prevent that relief.

Respectfully Submitted,                                            Dated: February 10, 2025.

**By: s/ Jayne C. Weintraub, Esq.**
Florida Bar No. 320382
**SALE & WEINTRAUB, P.A.**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 374-1818
Email: JWeintraub@SaleWeintraub.com

**By: s/ Christopher Cavallo, Esq.**
Florida Bar No. 0092305
**NELSON MULLINS**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 373-9465
Email: Chris.Cavallo@NelsonMullins.com

**By: s/ Bruce A. Zimet, Esq.**
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd., Suite 1400
West Palm Beach, FL 33401
Tel:   (561) 508-7741
Tel:   (954) 764-7081
Email: BAZ@BruceAZimetLaw.com

---

[14] Even if the frivolous obstruction and tampering allegations against Knezevich and U.K. were true (which they clearly are not) that would not per se require detention. *See U.S. v. Demmler*, 523 F.Supp.2d 677, 681 (E.D. Oh. 2007) (refusing to adopt per se rule that obstruction and tampering require pre-trial detention, finding the threshold for detaining a defendant pre-trial is not easily satisfied).